**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**DOCKETED**

AUG 2 6 2002

| | | |
|---|---|---|
| PAMELA BRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01 C 7770 |
| | ) | |
| CITY OF CHICAGO, a municipal | ) | Judge Holderman |
| corporation | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF FILING**

To:    **Lara A. Walicek
Ernest T. Rossiello & Associates, P.C.
300 West Washington Street, Suite 1004
Chicago, Illinois 60606**

**PLEASE TAKE NOTICE** that I have this day filed with the Clerk of the United States District Court for the Norther District of Illinois, Eastern Division, **Defendant City of Chicago's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment**, a copy of which is attached.

DATED at Chicago, Illinois, this 23rd day of August, 2002.

Respectfully submitted,

MARA S. GEORGES
Corporation Counsel of the
City of Chicago

BY: _____

VALERIE DESPIES HARPER
STAN B. STEC
Assistant Corporation Counsel

30 N. LaSalle Street
Suite 1020
Chicago, Illinois 60602
(312) 744-4746/5002

**DOCKETED**

AUG 2 6 2002

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PAMELA BRAY, )
)
        Plaintiff, )
)
    v. )    **No. 01 C 7770**
)
CITY OF CHICAGO, a municipal )    **Judge Holderman**
corporation, )
)
        Defendant. )

FILED AUG 2 3 2002
MICHAEL W. DOBBINS
U.S. DISTRICT C...

**DEFENDANT CITY OF CHICAGO'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF IT MOTION FOR SUMMARY JUDGMENT**

    Defendant City of Chicago ("City"), by its attorney, Mara S. Georges, Corporation

Counsel of the City, submits this statement of material facts as to which there is no genuine

dispute and which entitles the City to judgment as a matter of law.

**I.    THE PARTIES, JURISDICTION AND VENUE**

    1.    The defendant is the City of Chicago (the "City"). Compl., p. 1 (attached hereto

as Exhibit A).[1]

    2.    The plaintiff is Pamela D. Bray (the "plaintiff"). Ex. A, p. 1.

    3.    Plaintiff alleges in her complaint that while employed as a probationary police

officer ("PPO") for the Chicago Police Department ("CPD"), she was sexually harassed by her

direct supervisor and then retaliated against when she was terminated in violation of Title VII of

the Civil Rights Act, 42 U.S.C. 2000e-2(a)(1) and 2000e-3(a), respectively. Ex. A, ¶¶ 1, 6-7.

---

    [1] The City presents the following facts as undisputed for the purposes of its motion for
summary judgment only. Exhibits attached to the City's fact statement are in alphabetical order
from Ex. A through Z and Ex. AA through Ex. CC. Exhibits that are a part of an exhibit labeled
alphabetically are in numeric order.

12

3. This Court has jurisdiction to hear this matter. Ex. A, ¶¶ 1, 6-7; Answer, ¶ 1 (attached hereto as Exhibit B).

4. Venue is proper under 28 U.S.C. § 1391(b)(2). Ex. A, ¶ 2; Ex. B, ¶ 2.

## II. PLAINTIFF'S POLICE ACADEMY TRAINING

5. On October 25, 1999, plaintiff was appointed to the position of PPO. Pl. Dep., pp. 175-76 (Plaintiff's Deposition is attached hereto as Exhibit C). A PPO can be terminated at any time for any reason, with or without notice. Schenkel Aff., ¶ 2 (attached hereto as Exhibit D); Skahill Aff., ¶¶ 3, 5 (attached hereto as Exhibit E); see Ex. C, p. 175. The probationary period lasts for one year from the date of a PPO's appointment. Ex. D, ¶ 2; Ex. E, ¶ 3; Ex. C, p. 183-84.

6. Plaintiff started at the Chicago Police Academy (the "Academy") where her job included learning the duties of a PPO and passing tests. Ex. C, p. 178. The Academy's training program consists of approximately six months of concentrated study which is continuous and full time. Ex. D, ¶ 5. Regular attendance at the Academy is required of all trainees. Ex. D, ¶ 5.

7. A PPO is required to be honest at all times. Ex. E, ¶ 19; Ex. C, p. 186. Cheating is strictly forbidden at the Academy. Ex. E, ¶ 19. The rules applicable to PPOs state that "[a]ny trainee who is unable to live up to the esprit of this requirement is unfit to serve as a member of the Academy class, [or] as a police officer." Ex. E, ¶ 19, Ex. 1, pp. 18-19.

8. The Academy, and all of CPD, is subject to the chain of command. Ex. D, ¶ 3. The chain of command sets forth in rank order to whom each sworn officer is accountable. Ex. D, ¶ 3. It clarifies any possible mistakes about who is and who is not someone's superior. Ex. D, ¶ 3. At the first step of the chain are recruits, PPOs, police officers ("POs") and Field Training Officers ("FTOs"). Ex. D, ¶ 3. FTOs have acquired the ability to train PPOs in the field. Ex. D,

¶ 3. Sergeants are the immediate superiors of PPOs and POs, including FTOs. Ex. D, ¶ 3. Above sergeants are lieutenants, and above lieutenants are captains. Ex. D, ¶ 3. Commanders outrank captains. Ex. D, ¶ 3. Deputy chiefs, chiefs, assistant deputy superintendents, and deputy superintendents follow. Ex. D, ¶ 3. The superintendent is at the top of the chain of command. Ex. D, ¶ 3.

9.     At the Academy, plaintiff learned that when her partner is arresting or questioning someone on the street, she is required to exit the vehicle and stand right next to her partner. Ex. C, pp.225-26. She is to guard and assist her partner due to safety concerns. Ex. C, pp. 225-26.

10.     The general and special orders issued by the CPD applied to plaintiff and she was required to learn them. Ex. E, ¶¶ 8-15; Ex. C, pp. 188-89, 201-02.

11.     Plaintiff failed her tests twice, before passing the third time with help from an assigned tutor. Ex. D, ¶¶ 12; Ex. C, p. 197. She was warned that if she did not improve on her tests she could no longer attend the Academy. Ex. D, ¶ 12; Ex. C. pp. 197-98. Plaintiff did not know how to write a ticket when she left the Academy. Ex. C, p. 196. While there, she was counseled for tardiness. D1063-64 (attached hereto as Exhibit F).

12.     Plaintiff claims she accepted answers to tests and quizzes given by instructors, including a sexual harassment quiz. Ex. C, pp.191-95, 208. She also claims she would provide money and cigarettes to an Academy instructor in exchange for answers on quizzes and tests. Ex. C, pp. 194-97. Plaintiff considered this cheating. Ex. C, pp. 195-96. Plaintiff did not complain to anyone about this. Ex. C, pp. 195-97. Plaintiff testified she did not have time to learn the material. Ex. C, p. 195. She had sexual harassment training at the academy and a quiz on the material. Ex. E, ¶¶ 6-17; Ex. C, pp. 191-93.

### III. THE CHICAGO POLICE DEPARTMENT'S POLICY AGAINST SEXUAL HARASSMENT AND RETALIATION

13. It is the CPD's policy to maintain a workplace free from sexual harassment and sexual harassment is strictly prohibited. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 199. Plaintiff's alleged harassers both were aware of the CPD's anti-sexual harassment policies. Askew Dep., pp. 176, 178-82 (Bruce Askew's Deposition is attached hereto as Exhibit G); Adams Dep., pp. 133-36 (Donna Adams' Deposition is attached hereto as Exhibit H). The CPD will promptly investigate any alleged sexual harassment, and retaliation against someone alleging sexual harassment is strictly prohibited. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 199-200, 204-08. This was taught at the academy during 1999 and 2000. Ex. E, ¶¶ 6-16, Ex. 4-10; Skahill Dep., pp. 19-20 (Tina Skahill's Deposition is attached hereto as Exhibit I).

14. The general orders set forth that alleged sexual harassment is to be reported to an immediate supervisor. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 202, 208. If the immediate supervisor is the alleged harasser, a supervisor one rank above the accused member is notified. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 202-03. In making a report, as much detail of the alleged conduct as possible should be submitted. Ex. C, p. 203. The report is transmitted to the Office of Professional Standards ("OPS") for assignment of a Complaint Register ("CR") number and submitted to the Internal Affairs Division ("IAD") for investigation. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 203, 208.

15. The Academy teaches all PPOs the CPD's sexual harassment policies and procedures for filing complaints of sexual harassment. Plaintiff and her classmates received this lesson during their Academy training in 1999 and 2000. The sexual harassment lesson given to

4

PPOs in 1999 and 2000 is outlined in the CPD Education and Training Division Sexual

Harassment Lesson Plan, and covers the following: 1) defining sexual harassment, 2) identifying

the types of sexual harassment, 3) identifying the legal standards delineated in <u>Vinson</u> and <u>Harris</u>

by the U.S. Supreme Court, 4) defining who may be a victim and offender according to Chicago

Police Department General Order ("G.O.") 92-1, 5) identifying the steps taken by the Chicago

Police Department when an allegation of sexual harassment is made, as explained in G.O. 92-1,

6) identifying the circumstances under which an employer may be held liable for the conduct of

another committing sexual harassment, and 7) identifying the remedies available to victims of

sexual harassment. Ex. E, ¶¶ 6-16, Ex. 3.

      16.     The Rules and Regulations of the CPD, which were in effect during 1999 and

2000, require sworn members to, among other things, "[k]now and conform to the Department's

Policy, Rules, Regulations, Orders, Procedures, and Directives." In addition, the Rules and

Regulations expressly prohibit "[f]ailure to report to the Department any violation of Rules and

Regulations or any other improper conduct which is contrary to the policy, orders or directives of

the Department." General and Special Orders are distributed to all CPD personnel, including

PPOs. During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff,

to read and become familiar with this document during the course of their training. The CPD

also required all sworn officers to maintain familiarity with this document during their career.

Ex. E, ¶ 8, Ex. 4.

      17.     General Order 92-1 of the CPD, which was in effect during 1999 and 2000, reads

in part as follows:

      III.    POLICY

The Chicago Police Department is committed to observing, upholding and enforcing all laws related to individual rights. Department members will respect and protect each person's human rights and comply with all laws relating to human rights.

In addition to respect for those human rights prescribed by law, Department members will treat all persons with the courtesy and dignity which is inherently due every person as a human being. Department members will act, speak and conduct themselves in a professional manner, recognizing their obligation to safeguard life and property, and maintain a courteous, professional attitude in all contact with the public.

Members will not exhibit any bias or prejudice against an individual or group because of race, color, gender, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status, or source of income. Members will not exhibit a condescending attitude or direct and derogatory terms toward any person in any manner.

The Chicago Police Department is committed to working with the communities of the City to serve and protect; to safeguard lives and property, to guarantee all persons fair and equal treatment under the law; and to ensure that all persons may enjoy their fundamental rights as human beings.

During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with General Order 92-1 during the course of their training. The CPD also required all sworn officers to maintain familiarity with General Orders during their career. Ex. E, ¶ 10, Ex. 5.

18.     Addendum 3 (Department Personnel Practices) to General Order 92-1, which was in effect during 1999 and 2000, reads in part as follows:

V.      EQUAL EMPLOYMENT OPPORTUNITY

Equal employment opportunity protects the right of every person to apply and to be considered for job opportunities regardless of race, color, sex age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, or military discharge status.

6

A.    Equal Employment Opportunity Violation Complaints by a
      Department Member

      1.    Complaints by a Department member of violations of equal
            employment opportunity may be filed by the affected
            member with the Department's Equal Employment
            Opportunity (EEO) Officer, who is assigned to the Office
            of Legal Affairs.

      2.    The EEO Officer acts as a liaison with regulatory agencies,
            monitors the process of these complaints / investigations
            with any subsequent legal action and reports the outcome of
            these investigations to the Superintendent of Police.

. . .

VI.    SEXUAL HARASSMENT

A.    Department Policy

Sexual harassment is a form of discriminatory conduct that
undermines the integrity of the Department. Sexual harassment in
any form will not be tolerated. The Department is committed to
maintaining a workplace free from all forms of sexual harassment,
and allegations of such conduct will be promptly and thoroughly
investigated and resolved.

B.    Municipal Code of Chicago

Section "2-160-020-(2): 'Sexual Harassment' means any
unwelcomed sexual advances or requests for sexual favors or
conduct of a sexual nature when (1) submission to such conduct is
made with [sic] explicitly or implicitly a term or condition of an
individual's employment; or (2) submission to or rejection of such
conduct by an individual is used as the basis for any employment
decisions affecting the individual; or (3) such conduct has the
purpose or effect of substantially interfering with an individual's
work performance or creating an intimidating, hostile or offensive
working environment."

Section "2-160-040: Sexual Harassment
No employer, employee, agent of an employer, employment agency
or labor organization shall engage in sexual harassment. An

employer shall be liable for sexual harassment by nonemployees or nonmanagerial and nonsupervisory employees only if the employer becomes aware of the conduct and fails to take reasonably corrective measures."

C.    General Information

    1.    Sexual harassment can occur in a variety of circumstances, including but not limited to the following:

        a.    The victim, as well as the offender, may be of either or the same sex.

        b.    The offender may be the victim's supervisor, an agent of the employer, a supervisor in another area, a co-worker, or a non-employee.

        c.    The victim does not have to be the person harassed but could be anyone affected by the offensive conduct.

    2.    Sexual harassment covers a broad range of conduct, that typically falls into one of two general categories of harassment:

        a.    A demand for sexual favors as a condition to receiving or keeping an employment benefit ("Quid pro quo harassment").

        b.    The everyday working environment is so rampant with sexual, verbal, or physical abuses that it creates an intimidating or hostile working environment ("Hostile environment harassment").

D.    Reporting and Investigating Sexual Harassment

    1.    A Department member who alleges that a sexual harassment incident has taken place, will:

        a.    Report the incident to their immediate supervisor, by notifying the supervisor orally of the incident, no later than 180 days following the alleged incident.

8

> If the immediate supervisor is the alleged offender, the member will notify a supervisor one rank above that of the accused member.
>
> b.     Provide as many details of the alleged conduct as possible (dates, names of offenders and witnesses, etc.).

2.     The supervisor receiving the complaint of sexual harassment will:

> a.     contact the Office of Professional Standards and obtain a Complaint Register number.
>
> b.     submit a written report directly to the Internal Affairs Division containing as much information as possible concerning the allegation.
>
> c.     follow the provisions of the General Order entitled "Complaint and Disciplinary Procedures."

3.     The Office of Professional Standards will promptly submit a photocopy of the Complaint Against Department member form (CPD 44.202) to the Office of Legal Affairs.

4.     The Internal Affairs Division will investigate all allegations of sexual harassment against Department members.

5.     No provision of this directive shall be so construed as to prevent any Department member from seeking legal remedy outside of the Department regarding a complaint of sexual harassment.

During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with Addendum 3 (Department Personnel Practices) to General Order 92-1 during the course of their training. The CPD also required all sworn officers to maintain familiarity with General Orders during their career. Ex. E, ¶ 12, Ex. 6.

19.     General Order 93-3 of the Chicago Police Department (Complaint and

Disciplinary Procedures), addendum 2A (Specific Responsibilities), which was in effect during

1999 and 2000, states in part that "When misconduct is observed or a complaint relative to

misconduct is received by a non-supervisory member, such member will immediately notify a

supervisory member and prepare a written report to his commanding officer containing the

information received, observations, and any action taken." During 1999, the Recruit Training

Section required recruits, including plaintiff, to read and become familiar with General Order 93-

3 of the Chicago Police Department (Complaint and Disciplinary Procedures), addendum 2A

(Specific Responsibilities) during the course of their training. The Chicago Police Department

also required all sworn officers to maintain familiarity with General Orders during their career.

Ex. E, ¶ 13, Ex. 7.

20.    The Education and Training Division Rules and Regulations, which were in effect

during 1999 and 2000, read in part as follows:

### DISCRIMINATION AND SEXUAL HARASSMENT

The Education and Training Division of the Chicago Police Department is
committed to maintaining a workplace free from all forms of discrimination. All
recruits will be courteous and respectful toward all staff personnel, fellow recruits,
other Department members, and all other persons.

No type of discrimination will be tolerated at the Chicago Police Department
Education and Training Division. This includes, but is not limited to,
discrimination based on color, race, gender, religion, national origin, age,
ancestry, sexual orientation, lifestyle choice, or mental or physical disability.

Any recruit who feels he or she is the victim of discrimination or sexual
harassment by any member of the Chicago Police Department will bring the
matter to the attention of his or her immediate supervisor. Appropriate action will
be taken in all instances and no retaliatory action will be taken against any recruit
who has filed such a complaint in good faith.

During 1999, the Recruit Training Section required recruits, including plaintiff, to read and

become familiar with the Education and Training Division Rules and Regulations during the course of their training. Ex. E, ¶ 15, Ex. 9.

21.    The Chicago Police Department Education and Training Division Basic Recruit Procedural Manual, which was in effect during 1999 and 2000. begins with the following "POLICY STATEMENT":

> It is the policy of the Chicago Police Department and the responsibility of the Assistant Deputy Superintendent of Education and Training and all Education and Training Division Staff to provide quality training in a fair and equitable manner to all Trainees, without regard to an individual's race, color, sex, age, religion, disability, national origin, ancestry, sexual-affectional orientation, marital status, parental status military discharge status or source of income.

During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with the CPD Education and Training Division Basic Recruit Procedural Manual during the course of their training.  Ex. E, ¶ 3, Ex. 1, Policy Statement.

22.    Rule 4 of the CPD Education and Training Division Basic Recruit Procedural Manual, which was in effect during 1999 and 2000, reads in part as follows:

> 4-2    BIGOTRY - Police professionals are expected to be sensitive to, and exhibit a tolerance for concerns, opinions, and backgrounds of others, and to treat all individuals with respect, dignity, and courtesy regardless of their circumstances or condition.  The use of degrading language or actions with regard to race, ethnicity, religion, sex, sexual-affectional orientation, and/or physical challenge, to address, refer to or otherwise affect any person, or group of people, directly or indirectly, is prohibited, except in training simulations, or when necessary in police reports or testimony.
> . . .
>
> 4-5    COMPLAINT PROCEDURE - Trainees will adhere to the chain of command established by the Assistant Deputy Superintendent of Education and Training at all times.  In matters directly involving a member of the chain of command, a trainee may request from the next level in the chain of command, and must be granted, permission to take the matter directly to the next level of the chain of command.  Trainees are encouraged to discuss their Academy

11

experiences and progress with their Homeroom Instructors, and with their employing agency's Training Officer.

. . .

4-7     RACIAL OR SEXUAL HARASSMENT - Racial or sexual harassment is a form of discriminatory conduct that undermines the integrity of all involved. Harassment in any form will not be tolerated. The Academy is committed to maintaining a facility free from all forms of racial and sexual harassment, and allegations of such conduct will be promptly and throughly investigated and resolved.

Trainees will not use epithets or terms that tend to denigrate a particular race or group, except when necessary in police reports or testimony.

No trainee will make unwelcome sexual advances, request for sexual favors, and/or engage in any other verbal or physical conduct of a sexual nature, which has the purpose or effect of interfering with an individual's work performance, or creating a hostile work environment.

Racial or sexual harassment will not be tolerated by the Chicago Police Department Education and Training Division. All trainees are guaranteed protection against racial or sexual harassment.

Whenever a trainee feels that he has been the victim of racial or sexual harassment caused by a fellow trainee, an Instructor, a staff member, or any other member of the Chicago Police Department, he/she will bring the matter to the attention of his Homeroom Instructor. The Homeroom Instructor will assist the trainee in initiating a formal investigation, and will immediately bring the matter to the attention of the Homeroom Supervisor, and the Assistant Deputy Superintendent of Education and Training. All current Chicago Police Department procedures related to allegation of this nature will be followed. If the accused is a member of another department or agency, a thorough investigation will be conducted, but in lieu of a complaint register number the employing department or agency will be notified.

No retaliatory action may be taken against any trainee who has filed such a complaint in good faith.

Ex. E, ¶ 3, Ex. 1, pp. 19-21.

## IV.     FIELD TRAINING IN THE SEVENTH DISTRICT, ENGLEWOOD

23.     Following training at the Academy, PPOs are detailed to a police district for field

training. Ex. D, ¶ 6. Field training typically consists of three (3) cycles, each cycle lasts twenty-eight (28) days. Ex. D, ¶ 6; Ex. G, pp. 10-11.; Ex. C, pp. 229-30. During each cycle, a PPO is assigned an FTO who trains the PPO and observes the PPO's performance. Ex. D, ¶ 6; Ex. C, pp. 230-31. After observing the PPO's performance, the FTO assesses it in a Daily Observation Report ("DOR"). Ex. D, ¶ 6; Ex. C, pp. 231-35. The FTO then discusses his or her assessment of the PPO's performance and the PPO and FTO then sign the DOR to verify the PPO read the assessment. Ex. D, ¶ 6; Ex. C, pp. 231, 234-35. At the end of each training cycle, the FTO completes a Training Cycle Summary Report ("TCSR"). Ex. D, ¶ 6; Ex. C, pp. 239-40. The DORs contain numerous categories for rating a PPO's performance numerically, on a scale of one (1) to seven (7), with one being the worst, four passing, and seven being the best. Ex. D, ¶ 6; Ex. C, pp. 232-33. Along with the section in which a PPO is rated numerically, a section for comments on the PPO's performance is provided. Ex. D, ¶ 6; Ex. C, pp. 231-34. To become field qualified ("FQ"), a PPO has to receive at a minimum a four (4) in each category. Ex. D, ¶ 6; Ex. C, p. 234. FQ means a PPO completed his or her training with an FTO. Ex. D, ¶ 6. Regardless of whether a PPO is FQ, she must still successfully complete her probationary period before becoming a PO. Ex. D, ¶ 6.

24. At times, acting FTOs are utilized. Ex. D, ¶ 7. However, acting FTOs are not trained as FTOs. Ex. D, ¶ 7; Ex. C, pp. 229-31, see 246. Because of their training, observations and evaluations of FTOs are more reliable in the evaluation of a PPO's performance. Ex. D, ¶ 7; Ex. C, pp. 378-79. To qualify as an FTO, a PO must pass an exam and then undergo about three weeks of training, including on sexual harassment. Ex. D, ¶ 7; Ex. G, pp. 12-13, 175-76; see Ex. H, pp. 134-36.

13

25.     FTOs are not supervisors of PPOs. Ex. D, ¶ 8. They are trained field training officers that train PPOs. Ex. D, ¶ 8; see Ex. C, pp. 75-76, 544, Ex. 1, D0017. FTOs cannot hire PPOs. Ex. D, ¶ 8. FTOs cannot promote PPOs. Ex. D, ¶ 8. FTOs cannot transfer PPOs. Ex. D, ¶ 8. FTOs cannot demote PPOs. Ex. D, ¶ 8. FTOs cannot discharge PPOs. Ex. D, ¶ 8. FTOs cannot discipline PPOs. Ex. D, ¶ 8. FTOs make observations and recommendations regarding a PPO's being FQ and can make recommendations that a PPO is in need of remedial training. Ex. D, ¶ 8. FTOs may also recommend a PPO's performance be reviewed by a Field Training and Evaluation Review Board. Ex. D, ¶ 8.

26.     Plaintiff was assigned to the 7th District in Englewood ("7th District"). Ex. C, pp. 225-28.

27.     The 7th District, a high crime area, is reputed to be the most violent police district in the City. Ex. C, pp. 227-28. Because just about everything happens in the 7th District, a PPO should learn fast. Ex. C, p. 227.

28.     Field training in the 7th District is a para-military environment where a PPO takes orders from her superior. Ex. C, p. 308.

## A.     PLAINTIFF'S FIRST CYCLE OF FIELD TRAINING

29.     Plaintiff's first FTO was Renee Daniels in April 2000. Ex. C, pp. 241-42. Plaintiff worked the 3rd watch which is generally from 3:00 p.m. to 11:00 p.m. Ex. C, pp. 266-67. It is a fast watch, meaning it receives a large number of calls to which officers must respond. Ex. C, p. 267. After her first day with plaintiff, Daniels rated plaintiff below the minimum acceptable level and observed that plaintiff was not responding to training (Daniels' DORs and TCSR attached hereto as Exhibit J, D365-70, D383-85). Daniels commented in a DOR that plaintiff

14

must learn to write her reports without assistance, include important details, listen to the victim and proofread her reports. Ex. J, D368. Plaintiff states she would write her reports the way she knew how, but Daniels, "liked perfect writing; she wanted everything right, you know. And I'm like: Well, that's you . . . The way you do yours is the way you do yours, and the way I do mine is the way I do mine." Ex. C, pp. 244-45, see 262-63.

30.     Daniels wrote in the same DOR that plaintiff did not complete her assignment sheets before the end of that day's tour and that she did not use the radio properly. Ex. J, D368. Daniels also wrote that plaintiff had "no" knowledge of her location, including the sector or beat, despite having the beat maps and a map that breaks down each beat with street names and numbers. Ex. J, D368. Plaintiff states she did not know her location because "each beat consists of so many, you know, blocks, and it's like this large area. I didn't know it because the beat that we were assigned to, I don't think I was really familiar with it. And she expected me to right off the bat [to] know these places . . . I'm like, if I'm not familiar with this area, how am I going to know?" Ex. C, pp. 247-48.

31.     Daniels repeatedly wrote in her DORs and TCSR that "P.P.O. DOESN'T 'LISTEN / COMPREHEND'." Ex. J, D368, D370, D384. In a DOR, Daniels wrote she directed plaintiff to guard a crime scene, while she spoke to witnesses. Ex. J, D370. Daniels wrote that when she returned, plaintiff was sitting in the vehicle. Ex. J, D370.

32.     Daniels also wrote in this DOR that plaintiff made numerous errors while conducting a crash investigation and writing the crash report, even though plaintiff claimed she had prepared several already. Ex. J, D370.

33.     Near the end of her first training cycle with Daniels, plaintiff was in an accident

15

while responding to an emergency call. Ex. C, pp. 255-60. After a suspect hit someone, he

attempted to escape in a stolen car and plaintiff was driving when the call came over the radio.

Ex. C, p. 256. Daniels told plaintiff to turn on the sirens, "and hurry up and go help your fellow

officers. So at this time, [plaintiff told her], you know, Renee, . . . The weather is kind of bad, I

don't think I'm really ready to be in an emergency call where it requires really fast driving. . . .

And she [Daniels] was like, . . . Follow my directions . . . I'm like, I'm not going to go that fast,

you know. I was like, Not–with this my first time, I'm going to go with what I'm comfortable

with." Ex. C, pp. 256-57. During this emergency chase, plaintiff stopped at each intersection,

looked both ways, and sounded her horn. Ex. C, p. 257. Daniels told plaintiff to "[j]ust pay

attention to me and listen to me. Keep on going, go, go, go." Ex. C, p. 257. Plaintiff was

"arguing back." Ex. C, p. 257. Then, at an intersection, plaintiff "looked, and everybody kind of

stopped . . . By the time [she] eased out, . . . this older guy hit [her]." Ex. C, pp. 257-58. Plaintiff

states she was found responsible for the accident and was suspended a day. Ex. C, pp. 258-61;

see Ex. H, pp. 18-19. After the accident, plaintiff went on injured on duty ("IOD") leave. Ex. C,

pp.260-61.

> 34.    In her TCSR on plaintiff's first cycle, Daniels failed plaintiff and wrote:
>
>  P.P.O. needs improvement in all areas of grading. . . . F.T.O. feels P.P.O. "lacks"
> self-confidence, takes "no" initiative, has "no" knowledge of what is occurring,
> doesn't "listen", doesn't comprehend, has "no" knowledge of location, even when
> observed driving has to be directed on directions, and operating vehicle . . .
> Refuses to utilize beat map. F.T.O. constantly telling P.P.O. to clear from job and
> utilizing P.D.T. . . . Recommendation–Additional cycle / training ("remedial")
> needed—All remaining with F.T.O.'s.

Ex. J, D384-85; see Ex. H, pp. 16-19; Ex. G, pp. 29-30, 90. Plaintiff was miserable training with

Daniels because she "had an attitude where everything she said was right." Ex. C, pp. 264-66.

When plaintiff returned from IOD leave she began a new training cycle. Ex. C, pp. 261-62.

### B. PLAINTIFF'S SECOND CYCLE OF FIELD TRAINING

35. During plaintiff's second cycle of training, working the midnight shift, her FTO was Bruce Askew. Ex. C, p. 266-67; Ex. G, pp. 12, 17, 25-26. This cycle began in late April and ended mid-May 2000. Ex. C, p. 266. Plaintiff received below acceptable and acceptable ratings during her second cycle (Askew's DORs and TCSR attached as Exhibit K, D333-44, D353-362). Askew stated she actually deserved lower ratings. Ex. G, pp. 90-91.

36. Askew wrote in one DOR that "suspects can be handcuffed anytime officer safety is a question." Ex. K, D336. In another DOR, Askew wrote that "P.P.O. is aware whenever a driver is in her control and she has been informed that this driver is a T[raffic] V[iolator] [on] B[ond] the driver is to be cuffed and placed into squad after frisk without delay!!!" Ex. K, D338; Ex. G, pp. 26-28. Askew stated two days after this incident, plaintiff did not frisk and handcuff a driver who did not have a license or ticket on which he was allegedly driving. Ex. G, p. 36. On the next DOR, Askew wrote that plaintiff

> must become more aggressive during arrest situations. Once suspect or arrestee is to be taken into custody P.P.O. cannot allow her feelings to allow her to drop her guard. During arrest for agg[ravated] batt[ery] a passive female arrestee was permitted to stand outside of veh[icle] for about 10 min[utes] when complaints were signed and transport was to be made P.P.O. asked "Should I cuff her?" To which FTO replied 10 min[utes] ago. . . .

Ex. K, D340; Ex. G, pp. 37-39. In her TCSR, Askew commented that plaintiff "needs to work on prisoner control." Ex. K, D348, D354.

37. Also during her second cycle, plaintiff received a Summary Punishment Action Request ("SPAR") for failure to "[p]urchase a city vehicle registration [sticker]" (SPARs

attached hereto as Exhibit L, D205). Plaintiff explained that she did not purchase a City sticker because she just purchased a new car for "$17,000, or something like that," and did not have enough money to pay for one until she got paid. Ex. C, pp. 288-91; Judon Dep., pp. 8-9 (Judon's Deposition is attached as Exhibit M). She received a one-day suspension. Ex.C, pp.290-1; Ex. L.

38.     While Askew trained plaintiff, he commented in her DORs on her lack of self confidence, and wrote in her TCSR that "her career may be dependent upon her gaining self confidence." Ex. K, D334, D336, D348, D354. Plaintiff never voiced her disagreement with Askew about his comments that she needs to work on her self confidence. Ex. C, p. 276; Ex. G, p. 26. He passed plaintiff with a "D-minus with a red circle around it." Ex. G, p. 48. Askew considered her performance subpar because she had problems following direction, being aggressive, and being confident. Ex. G, pp. 20, 47-48.

### C.     PLAINTIFF'S THIRD CYCLE OF FIELD TRAINING

39.     Plaintiff's third cycle began in late May and ended in mid-June of 2000. Ex. C, p. 291. Plaintiff worked the day shift from 7:00 a.m. to 3:00 p.m. Ex. C, pp. 291-92.

40.     Plaintiff began her third training cycle with FTO Kevin Scott. Ex. C, p. 292. She worked briefly with him. Ex. C, p. 292. Scott stated to plaintiff that she needed to work on her confidence. Ex. C, pp. 434, 565. His DORs also commented on plaintiff's need to work on her confidence. Ex. C, p. 434; (Scott's DORs are attached hereto as Exhibit N , D322, D292, D290).

41.     Scott wrote in plaintiff's DORs that she had difficulty in providing the proper content and sequence of events in her written communication and took too much time to do so. Ex. N, D320, D322, D294, D292, D290. Scott also wrote in a DOR that plaintiff "needs to develop [an] 'ear' for beat assignment when called [over radio]." Ex. N, D320. Scott also wrote

18

in his DORs that plaintiff needs to be aware of her location when driving on patrol and responding to calls. Ex. N, D294, D292.

42. Because Scott was going to be promoted and Donna Adams did not have a PPO, she became plaintiff's FTO. Ex. C, pp. 291-92, 294; Ex. H, pp. 15-16; Ex. G, pp. 51-52. Adams wrote in a DOR and the TCSR that plaintiff is not aware of her location (Adams' DORs and TCSRs are attached hereto as Exhibit O, D312, see D332). Adams commented that as a result plaintiff "still is unsure of when she should pick up speed when an emergency call is dispatched." Ex. O, D312. Plaintiff stated that "I wasn't really aware of my location because we did not stay on our beat. And when you're not staying on your beat, how are you going to know your locations." Ex. C, p. 300. Plaintiff does not remember if she asked for a beat map. Ex. C, p. 300.

43. Adams also commented in a DOR that "PPO has yet to develop an 'ear' when driving. She maintains too much of a focus on driving and does not listen to the radio. She may hear the call numbers, but miss calls / assignments to other cars that we could handle or that we are near enough to take or assist." Ex. O, D312. Adams wrote that plaintiff "[d]oes not understand the proper use or appropriate time to use a certain code [for identifying a crime]." Ex. O, D312.

44. In the same DOR, Adams wrote that plaintiff "has some difficulty controlling situations through verbal commands. She has a 'small' voice." Ex. O, D312. Adams also wrote that plaintiff "is getting better at initiating activity but should be more aggressive in this area. She still lacks the self-confidence needed. Hesitates to make decisions for fear of being wrong." Ex. O, D312. Adams also wrote that "PPO has tunnel vision and does not see anything outside of what she has focused on." Ex. O, D313.

19

45.     In her TCSR for plaintiff's third cycle, Adams checked in most rating areas that plaintiff was not responding to training. Ex. O, D331. Also in the TCSR, Adams wrote that plaintiff "needs more work" in vehicle operation. Plaintiff "is over cautious when responding to an emergency call." Ex. O, D331-32. Adams wrote that plaintiff "exhibited the most difficulty" in verbal communication. Ex. O, D331-32. "PPO will not take charge of a situation verbally for fear of offending or getting a CR#. She's polite. She is not assertive enough. She has stated several times that she 'doesn't want to get in trouble.'" Ex. O, D332; see Ex.C, p. 302. Adams also wrote that "PPO has had difficulty [in] identifying ways to establish field contact and is hesitant to approach for the purpose of making field contact. She is not authoritative enough." Ex. O, D310. "PPO is . . . hesitant to make traffic stops." Ex. O, D310.

46.     Adams wrote in her TCSR that in a foot chase plaintiff "was slow to start and did not pursue offender with any speed." Ex. O, D310. Plaintiff stated that the offender "had a warrant out for his arrest for–I think it was for aggravated battery. . . He had broke her ribs, broke her nose, and did a lot of damage to her. He was standing out there with a can of beer . . . So I was like, Excuse me, sir, and I was calling him. And then when he saw us, he took out running. I took out running behind him. It was me and another officer jumped in. I don't know his name, but he was running too. . . . I was over the radio, and I was giving my location. I was letting them know that he had just entered a house. . . . and I told them that I'm not familiar with the area, so I'm going to–I'm going back to the car, you know. . . . And then [Adams] goes over the radio and starts telling me, Well, tell them this and tell them that. I'm like, First let me, you know, get myself together; this is my first foot chase. And she was just putting a lot of pressure on me, Hurry up and go do this thing, and go do that." Ex. C, pp. 305-07.

20

47.     Adams failed plaintiff in her third cycle and wrote in the TCSR that "PPO needs more work . . . to understand the elements of various offenses." Ex. O, D310, see D332; Ex. G, pp. 56-57. Adams wrote that plaintiff "is not confident when performing. She is unable to make decisions effectively." Ex. O, D310. Plaintiff needed to become competent in listening to the radio, case report writing, assertiveness, and taking direction and knowing her location when driving. Ex. H, pp. 33-35.

48.     Plaintiff requested a fourth training cycle. Ex. C, pp. 310-11; (Plaintiff's and Adams' request for a fourth remedial training cycle and Lt. Charles Flynn's counseling session report attached hereto as Exhibit P, D166). Plaintiff wrote in a memorandum to the Commander of the 7th District that

> P.P.O. is submitting this report requesting that a fourth cycle be given. P.P.O.
> strongly feels that having a fourth cycle would benefit me to help me to strengthen
> areas of weakness. Since training with F.T.O. D. Adams, has help [sic] P.P.O.
> identify weak areas and is making progress and gaining the needed confidence to
> handle situations as they arise. P.P.O. is definite that a 4th cycle with F.T.O.
> Adams will continue to help build the foundation and confidence P.P.O. needs to
> perform the tasks needed to maintain my duties as a police officer.

Ex. P, D166.

49.     Adams submitted a memorandum to the Commander of the 7th District requesting that "PPO Pamela Bray #14176 be given a fourth cycle." Ex. P, D165. Adams wrote that plaintiff could greatly benefit from a fourth cycle, explaining that

> PPO has continued to have difficulty in the majority of the rating areas. This has
> been documented. PPO has a basic understanding of what is required of her but is
> hesitant to make decisions and is timid in her approach; PPO lacks the self
> confidence needed to perform the tasks she is capable of doing.

Ex. P, D165.

21

50.     After receiving Adams' request for a fourth remedial cycle, Lieutenant Charles

Flynn counseled plaintiff about her performance. Ex. P, D167.  In his counseling session report,

Lt. Flynn wrote in relevant part that

> P.O. Adams indicated that, although competent in may areas, P.P.O. Bray needed
> to be more assertive and confident before being rated as field qualified. The Final
> Summary Report prepared by P.O. Adams indicated that this lack of assertiveness
> was present in many aspects of Bray's job performance: driving, verbal
> communication, street stops, and apprehension of criminal offenders. . . .
>
> P.P.O. Bray acknowledged her weaknesses and requested that she have a fourth
> training cycle.  Bray stated that she expected to make significant progress while
> being trained by P.O. Adams.  Bray stated that her first training cycle was not
> particularly helpful, in that she worked with many different officers, making it
> difficult to develop rapport with any one trainer and difficult to understand what
> was expected of her.  However, P.P.O. Bray took responsibility for her continuing
> development, and is aware that unsatisfactory performance could lead to her
> termination from the department.

Ex. P, D167.

## D.  PLAINTIFF'S FOURTH REMEDIAL FIELD TRAINING CYCLE

51.     Plaintiff requested to work with FTO Adams for her remedial cycle. Ex. C, pp.

320-21; Ex. P, D166-67. Plaintiff stated that according to procedure, she was supposed "to go out

of the district for a fourth cycle."  Ex. C, p. 320-21; Ex. H, pp. 34-35.  But plaintiff did not want

to go outside of the 7th District and requested not to because it "would have been more stressful .

. . to learn that area and that environment." Ex. C, p. 321.  Plaintiff's remedial cycle began in

June and ended in late July of 2000.  Ex. C, p. 320.  Plaintiff worked days again, from 7:00 a.m.

to 3:00 p.m. Ex. C, p. 320.

52.     During plaintiff's fourth cycle, Adams wrote in a DOR that "PPO is still not sure

of where she is.  Does not pay attention to the streets." Ex. O, D304. It is important for an officer

to know her location "[b]ecause we're supposed to know where we are at all times. If you're

trying to get to an emergency situation, you need to know." Ex. C, p. 333. In the same DOR,

Adams wrote that "PPO is hesitant to enter aband[on]ed buildings for the purpose of a premise

check." Ex. O, D304. An officer on the day shift works alone and is required to do a check on

abandoned buildings on her beat as one of her duties. Ex. H, pp. 52-53.

53.     Adams wrote in another DOR that "PPO cannot remember to notify O[ffice of]

E[mergency] C[ommunications dispatcher] when making a stop." Ex. O, D276. Adams wrote in

another DOR that "PPO Bray is overcautious when engaging in emergency driving which means

we are amongst the last to arrive to in progress assignments." Ex. O, D278. Further, Adams

commented that the "daily watch assignment log is filled out twice with numerous mistakes" and

a "To-From report [was] not completed properly." Ex. O, D278. Plaintiff stated that "everybody

would do their logs differently, the assignment logs differently, so me and [Adams] kind of had

conflict." Ex. C, p. 331.

54.     Plaintiff drafted a memorandum to Commander Maurice Ford of the 7th

District explaining why she did not notify the dispatcher that she and Adams were "clear", i.e.

had completed a job assignment. Ex. C, pp. 334-36; (Memorandum to Commander Maurice

Ford attached as Exhibit Q, D198-99). It is important for an officer to notify the dispatcher that

she is clear "[b]ecause if anything comes up on the beat, then we have–you know, we'll be

available [for the next call]". Ex. C, p. 336.

55.     At the end of plaintiff's fourth remedial cycle, Adams wrote in her TCSR that

"PPO still spends an unnecessary amount of time on case reports." Ex. O, D296. Adams wrote

that "patrol procedures in general, PPO does OK, in particular crimes in progress are not her

23

forté." Ex. O, D296.

56.     Adams also wrote in her remedial TCSR that "Bray uses the radio properly, but still has problems interviewing the citizens. She needs to work on her communication skills both verbal as well as body language." Ex. O, D296. For example, at a domestic dispute between two large, angry, mentally disturbed brothers arguing over a woman they were sharing, plaintiff stood between the men with her hands behind her back asking them to "please be quiet" without projecting her voice. Ex. H, pp. 26-28. Regarding community interaction, Adams commented that in "this area PPO Bray's lack of communication skills is clearly evident." Ex. O, D296. For example, Adams asked plaintiff to disperse a crowd off a street corner. Ex. H, pp. 29-30. Plaintiff approached the crowd and with her hands behind her back told them, "I am going to ask you to get off the corner;" when the crowd did not move, plaintiff did not know how to handle the situation. Ex. H, pp. 30-31.

57.     On July 24, 2000, Adams rated plaintiff at the minimum possible level to become FQ. Ex. C, pp. 337-38, 340; Ex. H, p. 55, 75. Adams had no further personal interaction with plaintiff after this date, other than to say "hello" in the hall if they saw each other. Ex. H, p. 57. Adams considered plaintiff to be a stupid recruit, meaning plaintiff was "[u]nable to comprehend, unable to attempt to learn, refuse to learn, refuse to try." Ex. H, pp. 10-11.

## V.     PLAINTIFF'S PROBATIONARY PERIOD IN THE SEVENTH DISTRICT, AFTER HER FOURTH REMEDIAL TRAINING CYCLE

58.     Following her fourth remedial training cycle, plaintiff began working "with different officers every day." Ex. C, p. 341. Askew stated nobody wanted to work with her as a regular partner. Ex. G, pp. 65-68. Plaintiff worked day and midnight shifts. Ex. C, pp. 340-42,

24

366-67.

59.     While stationed at police headquarters on 35th street, plaintiff received a SPAR for tardiness in reporting for duty and failure to notify.  Ex. C, pp. 343-46; Ex. L, D206.  Plaintiff stated that "all my electricity went out.  So when I woke up, I was running late.  I wasn't able to call the job.  I was on the expressway coming off of 35[th]."  Ex. C, p. 343.

60.     On a midnight shift, plaintiff and her partner came to assist on a call.  Ex. C, pp. 346-47.  When they arrived, Lieutenant Edward Zapolsky "was out there with a prisoner who was already cuffed. . . . I was like, We might as well take the prisoner [who was a big stocky guy] because Lieutenant Zapolsky doesn't have a cage and that's not safe.  Because if you put prisoners in the back and they come out of their cuffs and you don't have a cage, then they can kind of like, you know, grab you from the back and do anything while you're driving. . . . So by this time, [my partner] jumped out. . . . So he jumped out the car . . . He goes over to the guy, and then he starts to do a search.  So at the same time, I'm bumping on my door because it was jammed, and I'm hitting it.  By this time, Lieutenant Zapolsky pulls up on the side of me, and he was like, You get out the car and assist your partner.  I said, That's what I'm trying to do.  And then he just pulled off."  Ex. C, pp. 346-48, 350.

61.     Plaintiff was driving at the time that her partner exited their vehicle and "ran over there, and he grabbed the guy and brought him back to the car" to search him.  Ex. C, p 351.  That is when Lt. Zapolsky "pulled up really fast . . . and he was like, You get out the car and you assist your partner now.  And that's when I was like, That's what I'm trying to do, you know.  Because he was just—first he was asking me, you know, Why are you not getting out the car instead of just coming to me. . . . Everything happened quick.  Like when you get an arrestee, you

25

hurry up and get them in the car before they start to resist." Ex. C, pp. 351-52. Plaintiff is supposed to assist her partner for safety reasons. Ex. C, p. 353.

62.     Plaintiff's explanation for failing to immediately assist her partner is that her door jammed. Ex. C, p. 353. The door was not jammed when she got into the car. Ex. C, p. 353. "And, see, we have on the side of the car, it's like a lot of buttons. And if they're not lit up, you can't see, you know. So I don't know if my door was locked from my side; I don't know. But I was hitting buttons and trying to hurry up and trying to push out (indicating), trying to hurry up and get out to assist my partner." Ex. C, p. 353. Plaintiff did not try to get out and exit through the other door. Ex. C, p. 354. When plaintiff returned, she did not fill out a report or any paperwork that her door was jammed in the squad car. Ex. C, p. 356. To plaintiff's knowledge, the car did not need to be repaired. Ex. C, p. 356.

63.     After Lt. Zapolsky told plaintiff to get out of the car and assist her partner, he "pulled off. He kind of hot-headed pulled off. So when we go back to the district, you know, he didn't say anything to me. Because I was kind of upset at the way he approached me, you know; he first should have found out." Ex. C, p.354.

64.     On October 20, 2000, Lt. Zapolsky wrote of this incident that "the reporting lieutenant went to an assignment and found PPO Bray's partner searching a prisoner on the street while PPO Bray sat in the squad car. The reporting lieutenant addressed the circumstances immediately, and informed PPO Bray of her obligation to exit the vehicle and to be available to assist her partner if needed." Ex. D, ¶ 12; (Lt. Virginia Drozd Affidavit attached hereto as Ex. R ¶ 7, D202). Plaintiff does not know of any other PPO who stayed in their car while their partner was making an arrest. Ex. C, p. 427.

65.     After plaintiff's fourth cycle, Sgt. Cassandra Judon had several officers approach her and request not to work with plaintiff. Ex. M, p. 10. Adams also had several officers complain to her that plaintiff was lazy, did not know how to write reports, and that they were afraid to work with plaintiff. Ex. H, pp. 64-66. Adams also heard that plaintiff failed to get out of the vehicle to respond to assignments and on one occasion to assist her partner. Ex. H, pp. 64-65, 70. Adams confirmed this with Lt. Zapolsky. Ex. H, p. 136. One officer stated to Sgt. Judon that she searched someone improperly, placing herself and her partner in danger. Ex. M, p. 10. Sgt. Judon spoke to Lt. Zapolsky because this was the third or fourth person that told her they did not want to work with plaintiff and that plaintiff's performance had dropped off. Ex. M, pp. 11-12, 21-24. Plaintiff's performance productivity after her fourth cycle was low. Ex. R, ¶ 8, Ex. 1, D1040-45. Adams also learned from several officers who worked with plaintiff that they would not work with her again. Ex. H, pp. 73-74.

66.     Adams and Askew wrote memoranda to the Commander of the 7th District recommending that plaintiff be separated from the CPD. Ex. G, pp. 91-94; Ex. H, pp. 80-83 (Adams' and Askew's memoranda are attached hereto as Exhibit AA, D203-04). Askew wrote in his memorandum that he made his recommendation because plaintiff had to be ordered out of her vehicle to assist her partner. Ex. AA, D204. Adams wrote in her memorandum that she made her recommendation because plaintiff had to be ordered out of a vehicle to assist plaintiff's partner and because several POs approached Adams and told her they would not work with her. Ex. AA, D203.

27

## VI.    THE FIELD TRAINING AND EVALUATION REVIEW BOARD REVIEWS PLAINTIFF'S PERFORMANCE AND PLAINTIFF'S TERMINATION

67.    Maurice Ford, Commander of the 7th District, requested a Field Training and Evaluation Review Board convene to review plaintiff's performance (attached hereto as Exhibit S, D200); Ex. D, ¶ 9; Ex. R, ¶ 3.

68.    On October 20, 2000, plaintiff received a Field Training and Evaluation Review Board Notice that her performance was going to be reviewed, and if it determined her performance was not sufficient, she would be terminated. Ex. C, pp. 390-96; (Review Board Notice attached hereto as Exhibit T, D201).

69.    The review board notice states that

An assessment of your performance while on probation has resulted in a request that a Field Training and Evaluation Review Board review your performance and make recommendations regarding the continuation of your employment with the Chicago Police Department.

The Board will review observations made by the Field Training and Evaluation Officers, Supervisors and others that monitored your performance while on probation. You will be afforded the opportunity to submit a written statement to the Board.

During the review process you will be restricted to desk duty. You are not authorized to represent yourself as a police officer, take police action or carry a weapon. If the Board review results in a recommendation to terminate your employment your detail to Patrol Division will be cancelled. If the Board review results in a recommendation for retention you will be restored to full duty.

Ex. T. The notice was presented to plaintiff by Lt. Zapolsky, Lt. Robert Deusworth, and Sgt. Judon. Ex. C, pp. 391-96; Ex. M, pp. 14-15.

70.    Plaintiff was then to report for desk duty. Ex. C, p. 397. While on desk duty, plaintiff began drafting a statement for the review board. Ex. C, p. 398. Plaintiff wrote in the

28

statement she submitted to the review board that

> Thhe [sic] following report will describe details of my training . . . and provide
> insight as to what, if any trtraining [sic] deficiensies [sic] on my behalf may have
> resulted.

(Plaintiff's Statement to the Review Board is attached hereto as Exhibit V, D508). Plaintiff

attributed her problems with FTO Daniels to a "personality conflict." Ex. V, D508.

71.     Plaintiff wrote that Askew stopped providing her positive feedback after he spoke

with Daniels. Ex. V, D509. Plaintiff wrote, reporting officer ("RO") "feels that the personality

conflict between R/O and FTO Daniels inappropriately colorered [sic] FTO Askews [sic]

judgment as to abilities after F.T.O. Askewss [sic] conversation with F.T.O. Daniels, F.T.O.

Askew's attitude towaards [sic] R/O changed." Ex. V, D509; Ex. H, p. 37.

72.     Plaintiff concluded that, "R/O is willing toto [sic] do another cycle in [sic] effort

to improve any deeficiencies [sic] that I may have. I feel that I have been prejudged by a lot of

officers who never gave me a chance. There has been so many negative rumors oon [sic] my

part. R/O has every intention of improving on any areas needed. R/O is aware of officer's

safety. R/O is requesting additional training and rerespectfully [sic] request [sic] the opportunity

to further prove it to thhe [sic] police dept." Ex. V, D510.

73.     This statement does not mention any alleged sexual harassment. Ex. C, p. 409;

Ex. V, D508-10. Plaintiff also submitted statements to the review board about her performance

from POs on her behalf. Ex. C, pp. 409-10. None of these statements were from FTOs or

mentioned any alleged sexual harassment. Ex. C, p. 410.

74.     On October 20, 2000, Lt. Virginia Drozd was the Chairperson of the Field

Evaluation and Review Board ("review board") convened at the request of the 7th District

Commander, Maurice D. Ford, to review the performance of recruit Pamela Bray, and make a recommendation regarding her future in the CPD. Ex. R, ¶ 3.

75.     A review board may be convened to review and evaluate the performance of recruits throughout their probationary period. An evaluation of the recruit's performance includes, but is not limited to, a review of disciplinary records, medical records, field performance, and academic training. Ex. R, ¶ 5.

76.     A recruit's performance can be reviewed until the end of his or her probationary period in order to obtain as much information about the recruit's performance to make the most informed decision. There have been review board's in the past that have been convened shortly before a recruit's probationary period ends. Ex. R, ¶ 4.

77.     The review board that evaluated Pamela Bray's performance consisted of Lieutenant Michael Mealer, Sergeant Gertrude West, Sergeant Teresa Williams, Field Training Officer ("FTO") Kathy Purvis, and FTO Robert Tapia. As is general practice, this review board met at the Chicago Police Academy. Ex. R, ¶ 6.

78.     The review board examined DORs and TCSRs on Bray's performance during her probationary period; a Final Summary Report; requests from Bray and an FTO for Bray to undergo a fourth remedial training cycle; a counseling session report regarding Bray's fourth remedial training cycle that reminds Bray that unsatisfactory performance could lead to her termination; a Remedial Summary Report; memoranda from two FTOs; Lt. Edward Zapolsky's memorandum on Bray's failure to exit her vehicle and assist her partner; and two SPARs. In the course of its proceedings, the review board reviewed documentation containing evaluations of Bray. Ex. R, ¶ 7.

79.     The review board also considered Bray's activity reports after she completed her fourth remedial cycle of training. The reports indicated low productivity consistent with a lack of initiative and a lack of confidence in the performance of her police duties. In fact, for Bray's period of activity from September 14, 2000 through October 18, 2000, Bray worked twenty (20) days and recorded 1 arrest, 1 recovered vehicle, 8 parking tickets, and 3 Chicago Transit checks. This is the amount of work an average police officer might complete in one day. Ex. R, ¶ 8.

80.     After a review board reviews a particular recruit's performance, the review board makes a recommendation to the Assistant Deputy Superintendent ("ADS") of the Education and Training Division regarding the recruit. Ex. R, ¶ 9. The recommendations range from a request for further academic and/or field training, counseling, termination, or no further action. Ex. R, ¶ 9.

81.     At the conclusion of its proceedings, the review board examining Pamela Bray's performance unanimously recommended that she be separated from the CPD based on her conduct which revealed the following: 1) she was unable to adequately perform police duties; 2) she was unwilling to assist and back up her partner when elements of danger and stress exist; 3) and she failed to follow safety procedures. Some of plaintiff's unsafe conduct included failing to handcuff prisoners until ordered to do so and sitting in the squad car while her partner was effecting an arrest. Ex. R, ¶ 10.

82.     As is the review board's general practice, the recruit being reviewed and evaluated, Pamela Bray, was not present when the review board convened. She did not speak to any of its members while it met to discuss her performance. Ex. R, ¶ 13; Ex. C, p. 410. In fact, plaintiff did not speak to any of the review board members before, during, or after

31

they met to discuss her performance. Ex. C, pp. 411-12.

83.     Also, as is the review board's general practice, no one besides members of the review board were present while the review board reviewed and evaluated Bray's performance, while the review board reached and summarized its findings, while the review board reached its conclusion, or while the review board reached its recommendation that Bray be separated from the CPD. Ex. R, ¶ 14. **Askew and Adams were not present when the review board convened. Ex. G, pp. 183-84; Ex. H, pp. 79-80.**

84.     The review board was convened and reviewed Bray's progress and performance in the same manner it does for all recruits whose performance is brought before it. Ex. R, ¶ 15. **The review board summarized its deliberations during that session, reached a conclusion, and made a recommendation on Pamela Bray's future with the CPD in the same manner it does for all recruits whose performance is brought before it.** Ex. R, ¶ 16.

85.     Based on its findings, the review board unanimously recommended to ADS Schenkel that plaintiff be separated from the CPD and that she be removed from her present detailed unit of assignment until a final determination of her status could be made. Lt. Drozd reported the review board's recommendation in a memorandum dated October 23, 2000 to ADS Schenkel. Along with the review board's recommendation, Lt. Drozd included all the materials the review board considered during its conference. Ex. R, ¶ 11.

86.     **ADS Schenkel received written notice that the review board determined plaintiff's performance was substandard and a package containing the materials the review board examined during its session** (Gary W. Schenkel's Deposition is attached hereto as Exhibit W, pp. 6-7); Ex. R, ¶ 11. **ADS Schenkel does not always accept the review board's recommendation.** Ex. D, ¶ 15.

32

ADS Schenkel reviewed all the materials the review board did, plus plaintiff's statement and PO statements attached thereto, and her academy file, and independently determined to support the review board's recommendation. Ex. D, ¶¶ 9-15; Ex. W, pp. 9-10, 12.

87.     ADS Schenkel decided plaintiff should be terminated primarily because of her unsafe actions, including her unwillingness or inability to back up her partner and perform duties to which she was assigned. Ex. W, p. 12; Ex. D, ¶¶ 9-15.

88.     The review board's recommendation was unanimously approved by Commander of the Education and Training Division, Samuel T. Christian, and ADS Schenkel. Ex. R, ¶ 12, Ex. 2, D65.

89.     On October 24, 2000, in accordance with his termination procedures, ADS Schenkel notified plaintiff that her employment with the CPD was terminated, effective at the close of business on October 24, 2000. Ex. W, pp. 13-18, 20, Ex. 1, 000055. **Lt. Skahill and Commander Christian were also present. Ex. C, pp. 421; Ex. W, p. 16; Ex. I, pp. 11-12. Bray did not attempt to report any alleged sexual harassment, alleged inappropriate behavior, or alleged retaliation during her termination. Ex. D, ¶ 16; Ex. C, p. 428; Ex. I, pp. 19, 21. Plaintiff does not believe that ADS Schenkel or Lt. Skahill knew she was allegedly sexually harassed by Askew or Adams. Ex. C, pp. 428-29.**

90.     ADS Schenkel read plaintiff his standard termination statement and gave her a termination letter in the same manner he has to all individuals for whom he approved terminations. Ex. W, pp. 14-17; Ex. D, ¶ 17; (Plaintiff's Answers to Interrogatories are attached hereto as Exhibit U, No. 20). **Plaintiff received the termination letter. Ex. C, p. 424; (Schenkel's Termination Procedures and Plaintiff's Termination Letter attached hereto as Exhibit X, D1021).**

33

This was three or four days after she was notified that her performance would be reviewed and if the board found it insufficient, she would be terminated. Ex. C, p. 424. The letter stated plaintiff's termination was in compliance with Rule IX, Section 2 of the City's Personnel Rules and Regulations. Ex. C, pp. 9-10; Ex. X, D1021. Rule IX, Section 2 states a department head may discharge an employee during the probationary period (City of Chicago Personnel Rules attached hereto as Exhibit Y, Rule 9, § 2, p. 20).

91.     Plaintiff does not allege that any of the members of the review board sexually harassed her or created a sexually hostile environment. Ex. C, p. 412. Plaintiff has no reason to believe the review board knew that Askew or Adams were allegedly harassing her. Ex. C, p. 425. Plaintiff does not allege that she ever spoke to Commander Christian, or that he sexually harassed her, or that he created a sexually hostile work environment for her, or that he somehow retaliated against her. Ex. C, p. 413. Plaintiff does not allege that ADS Schenkel or Lt. Skahill somehow created a hostile sexual work environment for plaintiff. Ex. C, p. 428.

92.     Plaintiff claims the review board members somehow retaliated against her by supporting Askew and Adams and, by not hearing her side. Ex. C, pp. 412-13, 425. Plaintiff also believes the review board treated her differently than other PPOs because, "like I say, even with the whole firing process, it was unheard of. I mean, the whole rushing me down to the academy, you know, not receiving all my performances, this was this was all that I was told. No one explained. No one took out the time to say anything. The whole seven hours, no one–I sat down there, no one said anything, so I feel that the department is just as guilty." Ex. C, pp. 425-26. Plaintiff also believes ADS Schenkel and Lt. Skahill retaliated against her because, "the way that [my termination] was done and with these officers submitting To / Froms [sic] regarding me,

34

the way I was terminated, I don't think that it was done correctly." Ex. C, p. 428. Plaintiff does

not know if ADS Schenkel and Lt. Skahill treated her differently than they treated other PPOs.

Ex. C, p. 429. They did not. Ex. D, ¶ 17; Ex. W, pp. 14-18; Ex. I, p. 19.

## VII.    THE ALLEGED SEXUAL HARASSMENT

### A.    BRUCE ASKEW

93.    Askew never had a romantic interest in plaintiff. Ex. G, p. 159. Plaintiff alleges

the first incident of sexual harassment with Askew occurred during her second cycle, while

performing routine patrols. Ex. C, pp. 65-66. Routine patrolling requires and officer to observe

and "look for crimes, look for suspicious people. Do traffic stops, look for traffic violators.

Respond to calls, though, mostly." Ex. C, p. 66. They were in the squad car and Askew drove to

74th and Lowe under a viaduct. Ex. C, p. 65. Plaintiff does not recall any advice or training

Askew gave her while on routine patrol. Ex. C, p. 68. Askew allegedly stated that "when he was

a teenager, he used to come to this lot to have sex, and that other officers would come there while

on duty. And he then made the comment that one day I might end up back there." Ex. C, p. 65.

Plaintiff does not recall if Askew told her anything else. Ex. C, p. 67. Plaintiff's response was,

"I don't do things like that." Ex. C, p. 65, 68.

94.    Plaintiff alleges the second incident of sexual harassment with Askew occurred

during her second cycle while at 74th and Damen. Ex. C, pp. 68-69. Plaintiff stated that this is

"like a railroad track, a factory; it's a wooded area. He took me back there, and he told me that

sometimes they find dead bodies back there." Ex. C, pp. 68-69. Then Askew allegedly stated

that "two sergeants . . . got caught in the same area having–performing oral sexual [sic]." Ex. C,

p. 69. He allegedly said "it was a joke going around the district where they were asking that

sergeant how he enjoyed his lunch." Ex. C, p. 69. Plaintiff states she did not "say anything [in response.] I just shook my head." Ex. C, p. 69.

95.     The first couple of days plaintiff states that Askew was "polite, he cracked a lot of jokes, he was okay. He would teach me procedures, burglaries and things like that, showed me how to do alarms, how to ticket companies that alarms–were false alarms, things like that." Ex. C, p. 269. And "when I was telling him things like, you know, that I have five children and stuff like that, that's when he started with the, Get away from Bray stuff . . . he started cracking jokes and stuff, saying I was so fertile, I better not get too close to you because you might get pregnant." Ex. C, pp. 269-70, <u>see</u> 473. Plaintiff, who has never been married, has five children by three different fathers. Ex. C, pp. 160-63, 453-67. Plaintiff alleges Askew's comments about her fertility constitute the third incident of sexual harassment. These comments usually happened in the parking lot with other people present. Ex. C, pp. 70-71. Some people laughed. Ex. C, p. 71. Officer Spurgeon was allegedly present during one time. Ex. C, pp. 121-22. Officer Spurgeon testified that plaintiff did not appear upset by the one comment he heard (Benny Spurgeon's Deposition is attached hereto as Exhibit BB, pp. 24-26). Plaintiff said nothing to Askew about these alleged comments. Ex. C, p. 71.

96.     The fourth alleged incident of sexual harassment by Askew involved "sending messages on the PDT [personal data computer in the car] asking" plaintiff and her children to the movies. Ex. C, p. 78. Askew only asked plaintiff to come with her children to the movies. Ex. C, pp. 78-80. Plaintiff always responded, "No." Ex. C, pp. 79-80. Plaintiff does not know if Askew invited other officers. Ex. C, p. 79. Askew worked part-time at a movie theater and invited his co-workers to come because he could get them in for free. Ex. G, pp.61,130-31.

36

97.     Plaintiff did not consider Askew to be her supervisor when he was not her FTO. Ex. C, pp. 80-81. Askew was no longer her FTO after mid-May 2000. Ex. C, 266-67. The fifth incident of alleged sexual harassment happened on September 19, 2000 in felony court at 26th and California. Ex. C, p. 93. Askew went with plaintiff and another PPO to court at her request "to, you know, show me how to do the court procedures because I wasn't familiar with court." Ex. C, p. 93, see 102-03. While court was in session and while they were sitting, Askew allegedly touched plaintiff's leg near her ankle and her ankle through her sock. Ex. C, pp. 93-94, 142-146. This lasted one second. Ex. C, pp. 94, 97. Plaintiff had her legs crossed and was wearing pants. Ex. C, p. 144. Askew did not say anything to plaintiff before or after he allegedly touched the bottom of her leg and ankle. Ex. C, p. 94. Plaintiff claims she told Askew to stop. Ex. C, pp. 94-95. Askew allegedly got up shortly thereafter and left the court room. Ex. C., pp. 97-98, 145. Askew tapped her on the leg to indicate it was time to be briefed by the State's Attorney. Ex. G, pp. 137-39.

98.     Then as they were leaving the courthouse, plaintiff alleges Askew jumped into the same revolving-door partition "and grabbed my waist and started like giving me a bear hug." Ex. C, p. 99; Ex. U, No. 3(1)(h). This lasted a "couple of seconds." Ex. C, p. 101. She said nothing else to him. Ex. C, p. 101. There was a crowd going in and coming out of the courthouse. Ex. C, pp. 99-100. When they were coming out of the door, plaintiff claims she told him to stop. Ex. C, p. 101.

99.     Plaintiff asked Askew about Officer Corey Walker, who used to be Askew's partner, because she was interested in him. Ex. G, pp. 121-124. After dropping plaintiff off near her car in the 7th District, Askew allegedly commented that Walker, whom plaintiff dated off and

37

on, was not the marrying type. Ex. C, pp. 101-02, 103. Askew then allegedly said, "Anyway, you're too young to be thinking about marriage, you should go out and fuck everybody." Ex. C, p. 103. Plaintiff "just shook her head and got in [her] car." Ex. C, p. 104. She said nothing. Ex. C, p. 104.

100.    The sixth alleged incident of sexual harassment also occurred after Askew was plaintiff's FTO. Ex. C, p. 80. At this time, plaintiff did not consider Askew her supervisor. Ex. C, p. 81. Plaintiff could not pinpoint whether this allegedly happened in July, August, September or October 2000. Ex. C, pp. 81, 434; Ex. U, No. 3(1)(g). Plaintiff states that twice, while in the hall in the 7th District, FTO Askew "came up to me and said, Bray, do you have on your [bullet-proof] vest?" Plaintiff claims that before she could answer he touched her bullet-proof vest. Ex. C, pp. 81-82. Each time Askew allegedly touched her bullet-proof vest in the vicinity of where plaintiff's breasts are, she had on a cotton bra, a cotton T-shirt over her bra, a cotton shirt over her T-shirt, a uniform shirt over that, and then the bullet-proof vest. Ex. C, pp. 137-38. The bullet-proof vest was visible. Ex. C, p. 138.

101.    The vest is designed to stop bullets and is made of a dense nylon material. Ex. C, p. 139; Ex. R, ¶ 2. Plaintiff describes it "like a metal coverage," and about an inch thick. Ex. C, p. 139-40. The bullet-proof vest is made of a thick, stiff, firm material that deadens sensation beneath it. Ex. R, ¶ 2; Ex. E, ¶ 2. It is body-armor designed to absorb and distribute the force of contact made by any object that touches it. Ex. E, ¶ 2. On the two occasions Askew allegedly touched plaintiff's vest, she "could feel pressure." Ex. C, p. 140. When Askew allegedly touched plaintiff on her bullet-proof vest, it lasted one second. Ex. C, p. 97. Plaintiff states people were around, but does not recall who, except the second time, Officer Arlene Tankson

38

allegedly was one of the people present. Ex. C, p. 82. At her deposition, plaintiff claimed she told Askew to stop afterwards and he just started laughing. Ex. C, p. 83. In her interrogatories, however, plaintiff does not claim she told Askew to stop; instead, she wrote that she immediately walked away. Ex. U, No. 3(1)(g).

102.     Plaintiff's seventh alleged incident of sexual harassment is when Askew allegedly touched plaintiff's bullet-proof vest a third time. Ex. C, pp. 84-85. This allegedly occurred in the 7th District's interview room on October 4, 2000 with an arrestee present. Ex. C, pp. 85-86. Askew came into the interview room to help plaintiff and Officer Davina Loggins with an arrest. Ex. C, p. 85. While Officer Loggins left to make notification, Askew allegedly touched plaintiff's bullet-proof vest in the vicinity of where her breasts are. Ex. C, p. 85-86. This lasted one second. Ex. C, p. 97. Plaintiff had on four layers of clothes and a bullet-proof vest on top. Ex. C, pp. 137-38. The bullet-proof vest was visible. Ex. C, p. 139. Plaintiff did not say anything to Askew. Ex. C, pp. 86-87. When Officer Loggins came in, plaintiff did not tell her what happened. Ex. C, p. 87.

103.     The eighth incident allegedly happened on October 4, 2000. Ex. C, pp. 85, 87. Plaintiff was speaking to Officer Tankson about getting a partner and Tankson "was telling me to write a To/From letter to the lieutenant requesting to work with Davina or, you know, somebody I felt comfortable with. . . . And by this time, she told me–she said, I'll type it. She said, You don't have to; I'll type your letter for request to work with Loggins." Ex. C, pp. 87-88. Askew allegedly "was like, Oh, don't do that because we're already spoon feeding her now. And he was like, She–you already owe me some anyway." Ex. C, p. 88. Plaintiff "took it to be sexual." Ex. C, p. 88. Askew stated she owed him, but not sexually, because he worked extra hard with

plaintiff. Ex. G, pp. 132-33,143-44. Plaintiff claims later that day she "told him, Bruce, if you touch me again, I'm going to go to the supervisor." Ex. C, pp. 88-89. No one else was present. Ex. C, p. 89. After plaintiff said this, Askew never touched or made sexual comments to plaintiff. Ex. C, p. 89-90.

104.    Askew never threatened to give plaintiff a poor DOR or TCSR. Ex. C, p. 435. He never threatened to get plaintiff in trouble after her training cycles. Ex. C, p. 435. He never threatened her job. Ex. C, p. 435. Askew never physically threatened or intimidated plaintiff. Ex. C, pp. 621-22.

105.    Plaintiff admits that she told the EEOC that she never complained about the alleged harassment until the day when she was discharged. Ex. C, p. 433. She also stated to the EEOC that the only officer she complained to was PO Joyce. Ex. C, p. 433.

**B.      DONNA ADAMS**

106.    Plaintiff did not believe Donna Adams' behavior towards her constituted sexual harassment while she was employed by the City. Ex. C, pp. 381-83, see 219-20, 222.

107.    The first alleged incident of sexual harassment involving Adams occurred while on call at 59th and Halstead in June or July 2000 during her third cycle. Ex. C, pp. 91, 106-07. Adams allegedly handed an RC Cola card with a man's name on it to plaintiff. Ex. C, pp. 91, 106. Adams allegedly responded that plaintiff "should go out and sleep with him for money." Ex. C, pp. 91-92, see 106. Plaintiff stated she was not interested in dating anyone at the time. Ex. C, pp. 91, 106.

108.    The second alleged incident of sexual harassment involving Adams occurred in July 2000 while they were on call at 75th and Vincennes at a hardware store during plaintiff's

fourth cycle. Ex. C, pp. 107, 109. When Adams came out of the store, plaintiff was talking to an older guy. Ex. C, p. 107. Adams allegedly asked him, "Are you still giving applications? And he's like, Yeah, I'm still giving applications. And then she was like, Well, she wants an application. And I told her, I said, No, I don't, like that. And he told me, Well, I'm not looking for anybody to—I'm not looking for you to be my woman, I'm just looking for you for convenience, and he was telling me he pays well." Ex. C, pp. 107-08. Plaintiff "told him no. And when I—when I told her no, that I don't do things like that, that's when she tells me, You're so stupid, you're just like my daughter; you need a sugar daddy." Ex. C, p. 108. Adams allegedly told plaintiff that "men like that, they don't like to fuck, they like to suck. She was telling me, That's all you have to do is get drunk. And I told her, I don't do that; I said, That's disgusting." Ex. C, pp. 108-09.

109.    The third alleged incident of sexual harassment by Adams is in late July 2000. Ex. C, pp. 109-10. Adams allegedly told plaintiff in the squad car about her "dominatrix sessions," and "she revealed . . . that she was in a club up north that's called Underground or something, and it was for people who were involved in dominatrix, and . . . that [plaintiff] would make a good dominatrix. She started telling [plaintiff] . . . some of the things that she did, like how she like to put her slaves in cages." Ex. C, p. 110. No one else was present. Ex. C, p. 111. Adams allegedly told plaintiff this during a conversation in late July. Ex. C, pp. 110-11. Plaintiff does not know what her response to this was. Ex. C, p. 112. Plaintiff alleges that is "when she went into detail of telling me it's some kind of bondage thing where like men—people with power who have higher authority like being like in bondage or tied down." Ex. C, pp. 112-13. Adams allegedly suggested plaintiff take up the practice because plaintiff "could use the

41

money because [she] was a single mom of five children and that the extra income would help [her] out." Ex. C, p. 114.

110.    On this same day, Adams also allegedly invited plaintiff to three parties, one for a housewarming for Adams' new house, one for a dominatrix and one for her daughter. Ex. C, pp. 111-12. Plaintiff claims she said she would come to the housewarming party but not the dominatrix party. Ex. C, p. 112. Plaintiff did not attend any of Adams' parties. Ex. C, p. 112. Plaintiff's failure to attend Adams' housewarming party did not offend Adams. Ex. H, p. 107. The parties were after plaintiff's training cycles. Ex. C, pp. 125-26. Plaintiff alleges Adams did not talk to her after she did not attend the parties. Ex. C, pp. 125, 435.

111.    The fourth alleged incident is Adams allegedly telling plaintiff "crazy things about [how] she liked to wash her dog [while] naked." Ex. C, pp. 113-14.

112.    The fifth alleged incident of sexual harassment by Adams happened near the end of July 2000. Ex. C, p. 115. Plaintiff alleges that "we went to pick up on 74th and Ashland her cage, and present was officer Hebein [and officer Spurgeon]." Ex. C, pp. 115-16. Plaintiff states she knew it was a cage for bondage because Adams talked about this cage during the cycle. Ex. C, pp. 120, see 123-24. They went to a storage warehouse where Adams allegedly had a cage for her sessions built. Ex. C, p. 115, 117. The alleged "cage" did not have any specific characteristics nor was it distinctive in any way. Ex. C, p. 124. "It was just like–like a storage box with the openings, slats." Ex. C, p. 124. Adams allegedly had Officer Hebein and Officer Spurgeon load the cage into the "paddy wagon" and take it to her house and into her basement. Ex. C, p. 115. Plaintiff did not go into the basement, she waited in the car. Ex. C, pp. 118-19. The "cage" was "wooden and it had like four or five slats in. It wasn't assembled . . . So during

42

that course of time, as she was putting it in the car, . . . she told Spurgeon–he asked her what it was for. And when I spoke to him on the phone, he told me that in–not in so many words, she told him that she was dominatrix, that she–she kind of let him know but not in so many words that it was a cage." Ex. C, pp. 117-18. Officer Spurgeon testified that Adams never told him she was a dominatrix. Ex. BB, pp. 19-20. She "didn't see [the cage] as good [sic] as Spurgeon and Hebein because they were the once [sic] that carried it." Ex. C, p. 124. Plaintiff states Adams told her directly the "cage" was for her slaves. Ex. C, p. 150. Someone may have made a joke about these wooden pallets being a cage. Ex. H, pp. 110-111. Adams testified that anybody with common sense would know that was a joke. Ex. H, p. 110. Officer Spurgeon does not remember any mention of a cage for sex slaves or jokes about it. Ex. BB, pp. 19-20. Plaintiff did not believe Adams was joking. Ex. C, p. 150. Adams said nothing about the cage after it was delivered to her basement. Ex. C, p. 125.

113. Adams admits that she brought pallets or skids to her house in a squad roll, but states they were to store things on because a vent pipe broke in her basement, flooding her floor with water. Ex. H, pp. 94-97.

114. Plaintiff claims while training with Adams during her fourth cycle, Adams met a homeless guy she thought was cute and offered him a ride to a shelter. Ex. C, p. 586. According to plaintiff, the homeless guy offered to treat them all to breakfast with his last ten dollars, but plaintiff claims she refused because it is against regulations to accept gifts from citizens. Ex. C, pp. 586-88. At breakfast, plaintiff claims the homeless man told them he was looking for a place to stay and Adams began making sexual advances towards him by stating, "I can preach to you in my bed." Ex. C, p. 588. Plaintiff alleges she left the table because she was embarrassed. Ex. C,

43

p. 588. Plaintiff claims Adams then brought the homeless man to her house to call Texas and he moved in with her. Ex. C, pp. 590-92. Adams allegedly told plaintiff the man eventually left her house hysterical because he witnessed one of her sado-masochism sessions. Ex. C, pp. 592-93.

115.    Plaintiff also alleges that Adams told plaintiff that she walked "too feminine and that I was too small, so with me being a small person I should be loud. She was trying to force me to cuss citizens and be like real rude, and I wouldn't do it. . . . so she told me to change my walk and even walk with a dip." Ex. C, p. 126. Adams told plaintiff she needed to eat to put on some weight to be able to carry all the equipment and look substantial. Ex. H, pp. 103-04.

116.    Adams states that she probably told plaintiff that her walk does not convey a sense that she is "in charge of this situation." Ex. H, pp. 105-06.

117.    Plaintiff also generally alleges that "mainly my whole training with Donna Adams consisted of looking for furniture for her dominatrix sessions at her house." Ex. C, p. 119, see pp. 127-28. Plaintiff alleges in July 2000 during training Adams picked up a chair in an alley and took it home for her dominatrix sessions. Ex. C, p. 127-28. Plaintiff alleges Adams told her it was for her dominatrix sessions. Ex. C, p. 127. Plaintiff states she would talk to Adams about motherhood, "about being a black single mom. Sometimes we talked about college." Ex. C, p. 129.

118.    Adams never threatened to give plaintiff poor DORs or TCSRs. Ex. C, p. 435. She never threatened to get plaintiff in trouble after her training cycles. Ex. C, p. 435. Adams never physically threatened or intimidated plaintiff. Ex. C, pp. 621-22. Plaintiff never told Adams that she intimidated her. Ex. H, p. 108. Plaintiff told the EEOC that she never asked Adams to stop talking about sado-masochism. Ex. C, pp. 432-33. Plaintiff never complained to

44

Adams that she felt uncomfortable or that she was being sexually harassed in any way. Ex. H, p.
133.

## VIII. PLAINTIFF CONTACTS THE EEOC AND THE CITY RECEIVES NOTICE OF PLAINTIFF'S COMPLAINT OF ALLEGED SEXUAL HARASSMENT AND THOROUGHLY INVESTIGATES

119.    Plaintiff contends that two days after her termination she contacted the EEOC.
Ex. C, p. 430. Plaintiff contacted the EEOC because she wanted them to investigate what
occurred during her probationary period. Ex. C, p. 431. She claims she cooperated with the
EEOC as best she could and answered their questions honestly and completely. Ex. C, p. 431.

120.    Plaintiff never filed a sexual harassment complaint with the police department's
OPS. Ex. C, p. 210.

121.    In November 2000, IAD received from OPS a copy of plaintiff's EEOC charge,
assigned CR number 267043. (Police Agent Draper-Sibley Affidavit is attached hereto as Exhibit
CC, ¶ 2, Ex. 1. Police Agent Denise Draper-Sibley immediately began a thorough investigation
of plaintiff's EEOC charge. Ex. CC, ¶ 2. She first contacted plaintiff by speaking over the
telephone in an attempt to interview plaintiff. Ex. CC, ¶ 3. Plaintiff did not wish to speak over
the telephone and agreed to meet Draper-Sibley for a formal statement. Ex. CC, ¶ 3; Ex. C, p.
211. Plaintiff did not appear as scheduled or contact Draper-Sibley to reschedule. Ex. CC, ¶ 3;
Ex. C, pp. 212-14.

122.    Draper-Sibley sent a certified letter to plaintiff requesting that she contact
Draper-Sibley. Ex. CC, ¶ 4; Ex. C, pp. 210-11, 213. Plaintiff did not contact Draper-Sibley. Ex.
CC, ¶ 4.

123.    Draper-Sibley again telephoned plaintiff about her CR, and plaintiff refused to

45

discuss her EEOC charge with Draper-Sibley on the advice of her attorney. Ex. CC, ¶ 5. Plaintiff

did not identify her attorney. Ex. CC, ¶ 5; Ex. C, pp.211-13. Draper-Sibley informed plaintiff

that her lack of cooperation impeded investigation into her EEOC charge. Ex. CC, ¶ 6. Plaintiff

acknowledged that she understood and indicated she would relay their conversation to her

attorney. Ex. CC, ¶ 6. Plaintiff never contacted Draper-Sibley after this conversation nor did her

alleged attorney. Ex. CC, ¶ 6.

124.    Plaintiff did not reveal to Draper-Sibley the specifics of her EEOC charge.

Ex. CC, ¶ 7. Namely, plaintiff did not reveal who allegedly harassed her, where these events

occurred, or when they occurred. Ex. CC, ¶ 7; see Ex. C, p. 220. However, because the EEOC

charge alleges plaintiff's FTO sexually harassed her, Draper-Sibley obtained statements from her

FTOs. Ex. CC, ¶ 7. None of the statements supported plaintiff's EEOC charge. Ex. CC, ¶ 7.

125.    Without plaintiff's cooperation, the investigation slowed until Draper-Sibley

noticed an article in the *Chicago Defender* dated December 4, 2000, in which plaintiff provided

an interview to a reporter, Ferman Beckless. Ex. CC, ¶ 8. The article did not contain the names

of the alleged harasser but insinuated that Officer Jerry Crawley had information on plaintiff's

EEOC charge. Ex. CC, ¶ 8.

126.    Draper-Sibley contacted Ferman Beckless, who did not identify the alleged

harassers. Ex. CC, ¶ 9. Beckless stated he had notes on the interviews for his article and would

contact Draper-Sibley with the information but he never called her back. Ex. CC, ¶ 9. Draper-

Sibley sent a follow-up certified letter for him to contact Draper-Sibley but he did not contact

her. Ex. CC, ¶ 9.

127.    Draper-Sibley also made several attempts to obtain a witness report from Officer

Crawley, who either was on medical leave, in the hospital or on furlough. Ex. CC, ¶ 10. On May 11, 2001, Draper-Sibley sent an additional request when he returned to duty, but Officer Crawley did not respond. Ex. CC, ¶ 10. Draper-Sibley learned soon after that Officer Crawley resigned on May 14, 2001. Ex. CC, ¶ 10. He never contacted Draper-Sibley. Ex. CC, ¶ 10.

128.     The article identified an event that allegedly occurred on September 19, 2000 at Felony Court at 26th and California. Ex. CC, ¶ 11. Draper-Sibley obtained all the court log sheets she could for that date and reviewed them for officer signatures from the 7th District. Ex. CC, ¶ 11. After finding all officers from the 7th District, Draper-Sibley contacted each to obtain a witness statement about September 19, 2000 and whether any officer observed any alleged sexual harassment at the courthouse. Ex. CC, ¶ 11. None of the twenty-plus witness reports supported plaintiff's allegation of events on September 19, 2000 at Felony Court at 26th and California. Ex. CC, ¶ 11.

129.     Because of insufficient evidence and plaintiff's lack of cooperation, Draper-Sibley's investigation did not sustain plaintiff's allegations in her EEOC charge or that she was sexually harassed in Felony court or on her way out through the revolving door at 26th and California on September 19, 2000. Ex. CC, ¶ 12. Draper-Sibley memorialized her investigation in a detailed report. Ex. CC, ¶ 13.

130.     Plaintiff contacted the *Chicago Defender* in about November 2000 to "let people see what goes on in the district." Ex. C, p. 216. She hoped that through this article something could be changed or done. Ex. C, p. 222. Plaintiff told the author of the December 4, 2000 article everything she alleges happened to her. Ex. C, pp. 215-19. The article does not identify plaintiff's alleged harassers. Ex. C, p. 220; (*Chicago Defender* article dated December 4, 2000

47

attached as Exhibit Z). According to plaintiff, the article edited events out that included Adams and plaintiff "didn't really focus on Donna because, like I said, . . . I didn't look at it as a form of sexual harassment." Ex. C, p. 218-19, 221-22. The article contains nothing on Askew's alleged touching of her bullet-proof vest. Ex. Z.

131. Plaintiff filed her complaint in federal court on October 9, 2001. Ex. A, p. 1.



Respectfully submitted,

MARA S. GEORGES
Corporation Counsel of the
City of Chicago


BY: _____
VALERIE DEPIES HARPER
STAN B. STEC
Assistants Corporation Counsel

30 North LaSalle Street
Suite 1020
Chicago, IL 60602
(312) 744-4746/5002

48

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be mailed a true and correct copy of the attached

**Defendant City of Chicago's Statement of Undisputed Facts in Support of Its Motion for**

**Summary Judgment** to the attorney at the address indicated below on this 23rd day of August

2002.


To:    **Lara A. Walicek**
       **Ernest T. Rossiello & Associates, P.C.**
       **300 West Washington Street, Suite 1004**
       **Chicago, Illinois 60606**

_____
Stan B. Stec
Assistant Corporation Counsel