# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| PAMELA BRAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 01 C 7770 |
| | ) |
| CITY OF CHICAGO, a municipal | )    Judge Holderman |
| corporation, | ) |
| | ) |
| Defendant. | ) |

DOCKETED

SEP 2 3 2002

## PLAINTIFF'S RESPONSE TO

## DEFENDANTS' STATEMENT OF MATERIAL FACTS1

### I.    THE PARTIES, JURISDICTION AND VENUE

1.    The defendant is the City of Chicago (the "City"). Compl., p. 1 (attached hereto as Exhibit A).[2]

**RESPONSE:** Admit.

2.    The plaintiff is Pamela D. Bray (the "plaintiff"). Ex. A, p. 1.

**RESPONSE:** Admit.

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
FILED
SEP 2 0 2002

3.    Plaintiff alleges in her complaint that while employed as a probationary police officer ("PPO") for the Chicago Police Department ("CPD"), she was sexually harassed by her

---

1 Defendant included numerous facts within each numbered paragraph. To avoid confusion, it was necessary for the plaintiff to separate the paragraphs and address the facts in each sentence.

16

direct supervisor and then retaliated against when she was terminated in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e-2(a)(1) and 2000e-3(a), respectively. Ex. A, ¶¶ 1, 6-7.

**RESPONSE:** Admit.

3.     This Court has jurisdiction to hear this matter. Ex. A, ¶¶ 1, 6-7; Answer, ¶ 1 (attached hereto as Exhibit B). Venue is proper under 28 U.S.C. § 1391(b)(2). Ex. A, ¶ 2; Ex. B, ¶ 2.

**RESPONSE:** Admit.

4.     Venue is proper under 28 U.S.C.§ 1391(b)(2). Ex. A, ¶ 2: Ex. B, ¶ 2.

**II.     PLAINTIFF'S POLICE ACADEMY TRAINING**

5.     On October 25, 1999, plaintiff was appointed to the position of PPO. Pl. Dep., pp. 175-76 (Plaintiff's Deposition is attached hereto as Exhibit C).

**RESPONSE:** Admit.

A PPO can be terminated at any time for any reason, with or without notice. Schenkel Aff., ¶ 2 (attached hereto as Exhibit D); Skahill Aff., ¶¶ 3, 5 (attached hereto as Exhibit E); <u>see</u> Ex. C, p.175.

**RESPONSE:** Admit with clarification. A PPO can be terminated at any time for any reason, except for an illegal reason such as in the retaliation for threatening to report their supervisor for sexual harassment. The probationary period lasts for one year from the date of a

PPO's appointment. Ex. D, ¶ 2; Ex. E, ¶ 3; Ex. C, p. 183-84.

**RESPONSE:** Admit.

6.     Plaintiff started at the Chicago Police Academy (the "Academy") where her job included learning the duties of a PPO and passing tests. Ex. C, p. 178. The Academy's training program consists of approximately six months of concentrated study which is continuous and full time. Ex. D, ¶ 5. Regular attendance at the Academy is required of all trainees. Ex. D, ¶ 5.

**RESPONSE:** Admit.

7.     A PPO is required to be honest at all times. Ex. E, ¶ 19; Ex. C, p. 186. Cheating is strictly forbidden at the Academy. Ex. E, ¶ 19. The rules applicable to PPO's state that "[a]ny trainee who is unable to live up to the esprit of this requirement is unfit to serve as a member of the Academy class, [or] as a police officer." Ex. E, ¶ 19, Ex. 1, pp. 18-19.

**RESPONSE:** Admit. The court should note that the plaintiff has never been accused of cheating.

8.     The Academy, and all of CPD, is subject to the chain of command. Ex. D, ¶ 3.

**RESPONSE:** Admit only that the Affidavit states this.

The chain of command sets forth in rank order to whom each sworn officer is accountable. Ex. D, ¶ 3.

**RESPONSE:** Admit only that the Affidavit states this.

3

It clarifies any possible mistakes about who is and who is not someone's superior. Ex. D, ¶ 3.

**RESPONSE:** Deny and objection, argumentative.

At the first step of the chain are recruits, PPO's, police officers ("POs") and Field Training Officers ("FTO's"). Ex. D, ¶ 3.

**RESPONSE:** Deny. FTO's are above PPO's because they have acquired the ability to train PPO's in the field. (Pl LR56.1(b) Ex. 2 Askew dep. p. 12-13)

FTO's have acquired the ability to train PPO's in the field. Ex. D, ¶ 3.

**RESPONSE:** Admit.

Sergeants are the immediate superiors of PPO's and POs, including FTO's. Ex. D, ¶ 3.

**RESPONSE:** Deny. FTO's are the immediate supervisors of PPO's. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 74, 77; Ex. 6 Crawley dep. p. 28; Ex. EEOC Notes p. 000354)

Above sergeants are lieutenants, and above lieutenants are captains. Ex. D, ¶ 3.

**RESPONSE:** Admit.

Commanders outrank captains. Ex. D, ¶ 3.

**RESPONSE:** Admit.

4

Deputy chiefs, chiefs, assistant deputy superintendents, and deputy superintendents follow. Ex. D, ¶ 3.

**RESPONSE:** Admit.


The superintendent is at the top of the chain of command. Ex. D, ¶ 3.

**RESPONSE:** Admit.


9.  At the Academy, plaintiff learned that when her partner is arresting or questioning someone on the street, she is required to exit the vehicle and stand right next to her partner. Ex. C, pp.225-26.

**RESPONSE:** Admit.


She is to guard and assist her partner due to safety concerns. Ex. C, pp. 225-26.

**RESPONSE:** Admit.


10.  The general and special orders issued by the CPD applied to plaintiff and she was required to learn them. Ex. E, ¶¶ 8-15; Ex. C, pp. 188-89, 201-02.

**RESPONSE:** Admit.


11.  Plaintiff failed her tests twice, before passing the third time with help from an assigned tutor. Ex. D, ¶¶ 12; Ex. C, p. 197.

**RESPONSE:** Admit with clarification. Plaintiff states in her deposition that because the teachers at the Academy were simply Police Officers taken from the street who had no training as teachers, things were not taught correctly making it hard to learn the material (Pl LR56.1(b) Ex. 1 Bray dep. p. 195)

She was warned that if she did not improve on her tests she could no longer attend the Academy. Ex. D, ¶ 12; Ex. C, pp. 197-98.

**RESPONSE:** Admit with clarification. Plaintiff was not being taught the material she needed to learn to pass the tests and was given an oral warning that her test scores needed to improve. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-198) Nevertheless, plaintiff did pass her tests and graduated from the Police Academy in March 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 224, 227)

Plaintiff did not know how to write a ticket when she left the Academy. Ex. C, p. 196.

**RESPONSE:** Admit with clarification. Plaintiff states that they had teachers that didn't even know how to write tickets. (Pl LR56.1(b) Ex. 1 Bray dep. p. 196) At one point while she was at the Academy, a teacher stepped out of the classroom and asked a student to help write the ticket. (Pl LR56.1(b) Ex. 1 Bray dep. p. 196) Furthermore, Askew testified at his deposition that it was the job of the FTO to teach PPO's how to write tickets during their training cycles.

While there, she was counseled for tardiness. D1063-64 (attached hereto as Exhibit F).

**RESPONSE:** Admit with clarification. Plaintiff was counseled for tardiness once on or

6

about January 24, 2000 because she was stuck behind an accident that occurred under the viaduct while she was driving to work. (Pl LR56.1(b) Ex. 57 Report of Tardiness)

12. Plaintiff claims she accepted answers to tests and quizzes given by instructors, including a sexual harassment quiz. Ex. C, pp.191-95, 208.

**RESPONSE:** Admit in part. Plaintiff states that the teacher gave the answers to the entire class instead of teaching them the material. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197)

She also claims she would provide money and cigarettes to an Academy instructor in exchange for answers on quizzes and tests. Ex. C, pp. 194-97.

**RESPONSE:** Admit with clarification. Plaintiff states that the entire class would pitch in money and buy cigarettes for one teacher in particular who would then give them the answers instead of teaching the material. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197)

Plaintiff considered this cheating. Ex. C, pp. 195-96.

**RESPONSE:** Admit with clarification. Plaintiff admits that she personally considered this cheating, but denies that she cheated because this was simply the way her classes were conducted while she is in the Academy. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197) Significantly, plaintiff has never been accused of cheating.

Plaintiff did not complain to anyone about this. Ex. C, pp. 195-97.

**RESPONSE:** Admit with clarification. Plaintiff was accustom to this because it was

7

simply the way her classes were conducted while she was in the Academy. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197)

Plaintiff testified she did not have time to learn the material. Ex. C, p. 195.

**RESPONSE:** Admit with clarification. Plaintiff testified that the Academy did not give the entire class time to learn all the material before testing them on it. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197)

She had sexual harassment training at the academy and a quiz on the material. Ex. E, ¶¶ 6-17; Ex. C, pp. 191-93.

**RESPONSE:** Admit with clarification. Plaintiff states that the teacher gave the answers to the tests to the entire class instead of teaching the material to them. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197)

## III. THE CHICAGO POLICE DEPARTMENT'S POLICY AGAINST SEXUAL HARASSMENT AND RETALIATION

13.     It is the CPD's policy to maintain a workplace free from sexual harassment and sexual harassment is strictly prohibited. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 199.

**RESPONSE:** Deny. Defendant did not enforce this policy as evidenced by the continued sexual harassment Bray was subjected to by Askew and Adams during her employment. (Pl LR56.1(b) Ex. Ex. Bray dep. p. 91, 321-322; Ex. 13 Plaintiff's Answers to Interrogatories p. 3, 8)

Plaintiff's alleged harassers both were aware of the CPD's anti-sexual harassment policies. Askew Dep., pp. 176, 178-82 (Bruce Askew's Deposition is attached hereto as Exhibit G); Adams Dep., pp. 133-36 (Donna Adams' Deposition is attached hereto as Exhibit H).

**RESPONSE:** Admit. Although Askew and Adams claimed they were aware of the policy, they both disregarded it by continually sexually harassing plaintiff. (Pl LR56.1(b) Ex. Bray dep. p. 91, 321-322; Ex. 13 Plaintiff's Answers to Interrogatories p. 3, 8)

The CPD will promptly investigate any alleged sexual harassment, and retaliation against someone alleging sexual harassment is strictly prohibited. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 199-200, 204-08.

**RESPONSE:** Deny. On or about October 20, 2001, Bray attempted to report the sexual harassment she was subjected to by Adams and Askew to Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth. (Pl LR56.1(b) Ex. 13 Plaintiff's Answers to Interrogatories p. 24; Ex. 1 Bray dep. p. 393-394) However, Judon cut her off stating, "it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394) The CPD did not even start investigating Bray's allegations until after she was terminated. (Pl LR56.1(b) Ex. 14 Defendant's Answers to Interrogatories p. 8)

This was taught at the academy during 1999 and 2000. Ex. E, ¶¶ 6-16, Ex. 4-10; Skahill Dep., pp. 19-20 (Tina Skahill's Deposition is attached hereto as Exhibit I).

**RESPONSE:** Deny and Move to Strike. The cited document does not provide any direct knowledge as to what was communicated or taught to the plaintiff or anyone else at the Academy

9

at that time.

14.     The General Orders set forth that alleged sexual harassment is to be reported to an immediate supervisor.  Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 202, 208.

**RESPONSE:**  Deny in part.  General Orders provides that sexual harassment is to be reported to an immediate supervisor.  Furthermore, pursuant to <u>Burlington Industries v. Ellerth</u> 118 S.Ct. 2257(1998), a supervisor is vicariously liable for the sexual harassment he commits upon an employee below him regardless of whether or not the employee complained.

If the immediate supervisor is the alleged harasser, a supervisor one rank above the accused member is notified. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 202-03.

**RESPONSE:**  Admit that although the General Orders state this, pursuant to <u>Burlington Industries v. Ellerth</u> 118 S.Ct. 2257(1998), a supervisor is vicariously liable for the sexual harassment he commits upon an employee below him regardless of whether or not the employee complains.

In making a report, as much detail of the alleged conduct as possible should be submitted. Ex. C, p. 203.

**RESPONSE:**  Plaintiff only admits the General Orders state this.

The report is transmitted to the Office of Professional Standards ("OPS") for assignment of a Complaint Register ("CR") number and submitted to the Internal Affairs Division ("IAD")

for investigation. Ex. E, ¶¶ 6-16, Ex. 4-10; Ex. C, pp. 203, 208.

**RESPONSE:** Plaintiff only admits that the General Orders state this.

15. The Academy teaches all PPO's the CPD's sexual harassment policies and procedures for filing complaints of sexual harassment.

**RESPONSE:** Deny. The teachers at the Academy failed to teach the PPO's the CPD's sexual harassment policies but rather simply gave the PPO's the answers to the tests. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197)

Plaintiff and her classmates received this lesson during their Academy training in 1999 and 2000.

**RESPONSE:** Deny. The teachers at the Academy failed to teach the PPO's the CPD's sexual harassment policies but rather simply gave the PPO's the answers to the tests. (Pl LR56.1(b) Ex. 1 Bray dep. p. 194-197)

The sexual harassment lesson given to PPO's in 1999 and 2000 is outlined in the CPD Education and Training Division Sexual Harassment Lesson Plan, and covers the following: 1) defining sexual harassment, 2) identifying the types of sexual harassment, 3) identifying the legal standards delineated in Vinson and Harris by the U.S. Supreme Court, 4) defining who may be a victim and offender according to Chicago Police Department General Order ("G.O.") 92-1, 5) identifying the steps taken by the Chicago Police Department when an allegation of sexual harassment is made, as explained in G.O. 92-1, 6) identifying the circumstances under which an

employer may be held liable for the conduct of another committing sexual harassment, and 7) identifying the remedies available to victims of sexual harassment. Ex. E, ¶¶ 6-16, Ex. 3.

**RESPONSE:** Admit in part. Deny in part. Plaintiff admits the sexual harassment lesson plan states this. However, plaintiff denies that she received it. As plaintiff states in her deposition, she does not ever recall seeing the document. (Pl LR56.1(b) Ex. 1 Bray dep. p. 191-93)

16.     The Rules and Regulations of the CPD, which were in effect during 1999 and 2000, require sworn members to, among other things, "[k]now and conform to the Department's Policy, Rules, Regulations, Orders, Procedures, and Directives." In addition, the Rules and Regulations expressly prohibit "[f]ailure to report to the Department any violation of Rules and Regulations or any other improper conduct which is contrary to the policy, orders or directives of the Department." General and Special Orders are distributed to all CPD personnel, including PPO's. During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with this document during the course of their training. The CPD also required all sworn officers to maintain familiarity with this document during their career. Ex. E, ¶ 8, Ex. 4.

**RESPONSE:** Plaintiff admits that the Rules and Regulations state this. However, plaintiff testified at her deposition that they were told if they did not feel safe within the district, that the employees could go out of the district [to the EEOC and/or the Illinois Department of Human Rights] to file a complaint. (Pl LR56.1(b) Ex. 1 Bray dep. p. 189) Plaintiff stated that it was her understanding that if the sexual harasser was her supervisor she could go to the EEOC.

(Pl LR56.1(b) Ex. 1 Bray dep. p. 190)  Plaintiff filed a Charge of Discrimination with the Equal

Employment Opportunity Commission on or about October 30, 2000.  (Pl LR56.1(b) Ex. 1 Bray

dep. p. 430; Ex. Charge of Discrimination)


17.    General Order 92-1 of the CPD, which was in effect during 1999 and 2000, reads

in part as follows:

III.    POLICY

The Chicago Police Department is committed to observing, upholding and
enforcing all laws related to individual rights.  Department members will
respect and protect each person's human rights and comply with all laws
relating to human rights.

In addition to respect for those human rights prescribed by law,
Department members will treat all persons with the courtesy and dignity
which is inherently due every person as a human being.  Department
members will act, speak and conduct themselves in a professional manner,
recognizing their obligation to safeguard life and property, and maintain a
courteous, professional attitude in all contact with the public.

Members will not exhibit any bias or prejudice against an individual or
group because of race, color, gender, age, religion, disability, national
origin, ancestry, sexual orientation, marital status, parental status, military
discharge status, or source of income.  Members will not exhibit a
condescending attitude or direct and derogatory terms toward any person
in any manner.

The Chicago Police Department is committed to working with the
communities of the City to serve and protect; to safeguard lives and
property, to guarantee all persons fair and equal treatment under the law;
and to ensure that all persons may enjoy their fundamental rights as human
beings.


**RESPONSE:** Plaintiff only admits that General Order 92-1 of the CPD states this.

Plaintiff denies that the defendant followed its policies.  (Pl LR56.1(b) Ex. Bray dep. p. 91, 321-

13

322; Ex. 13 Plaintiff's Answers to Interrogatories p. 3, 8)

During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with General Order 92-1 during the course of their training.

**RESPONSE:** Deny and Move to Strike. Defendant does not cite to any evidence in the record as to how or when, if ever, this was communicated to the plaintiff.

The CPD also required all sworn officers to maintain familiarity with General Orders during their career. Ex. E, ¶ 10, Ex. 5.

**RESPONSE:** Deny and Move to Strike. Defendant does not cite to any evidence in the record as to how this was communicated to the officers and when, if ever, the requirement was fulfilled by the sworn officers.

18. Addendum 3 (Department Personnel Practices) to General Order 92-1, which was in effect during 1999 and 2000, reads in part as follows:

V. EQUAL EMPLOYMENT OPPORTUNITY

Equal employment opportunity protects the right of every person to apply and to be considered for job opportunities regardless of race, color, sex age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, or military discharge status.

A. Equal Employment Opportunity Violation Complaints by a Department Member

1. Complaints by a Department member of violations of equal employment opportunity may be filed by the affected member with the Department's Equal Employment

14

Opportunity (EEO) Officer, who is assigned to the Office of Legal Affairs.

2. The EEO Officer acts as a liaison with regulatory agencies, monitors the process of these complaints / investigations with any subsequent legal action and reports the outcome of these investigations to the Superintendent of Police.

## VI. SEXUAL HARASSMENT

### A. Department Policy

Sexual harassment is a form of discriminatory conduct that undermines the integrity of the Department. Sexual harassment in any form will not be tolerated. The Department is committed to maintaining a workplace free from all forms of sexual harassment, and allegations of such conduct will be promptly and thoroughly investigated and resolved.

### B. Municipal Code of Chicago

Section "2-160-020-(2): 'Sexual Harassment' means any unwelcomed sexual advances or requests for sexual favors or conduct of a sexual nature when (1) submission to such conduct is made with [sic] explicitly or implicitly a term or condition of an individual's employment; or (2) submission to or rejection of such conduct by an individual is used as the basis for any employment decisions affecting the individual; or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

Section "2-160-040: Sexual Harassment
No employer, employee, agent of an employer, employment agency or labor organization shall engage in sexual harassment. An employer shall be liable for sexual harassment by nonemployees or nonmanagerial and nonsupervisory employees only if the employer becomes aware of the conduct and fails to take reasonably corrective measures."

### C. General Information

1. Sexual harassment can occur in a variety of circumstances, including but not limited to the following:

   a. The victim, as well as the offender, may be of either or the same sex.

   b. The offender may be the victim's supervisor, an agent of the employer, a supervisor in another area, a co-worker, or a non-employee.

   c. The victim does not have to be the person harassed but could be anyone affected by the offensive conduct.

2. Sexual harassment covers a broad range of conduct, that typically falls into one of two general categories of harassment:

   a. A demand for sexual favors as a condition to receiving or keeping an employment benefit ("Quid pro quo harassment").

   b. The everyday working environment is so rampant with sexual, verbal, or physical abuses that it creates an intimidating or hostile working environment ("Hostile environment harassment").

D. Reporting and Investigating Sexual Harassment

1. A Department member who alleges that a sexual harassment incident has taken place, will:

   a. Report the incident to their immediate supervisor, by notifying the supervisor orally of the incident, no later than 180 days following the alleged incident. If the immediate supervisor is the alleged offender, the member will notify a supervisor one rank above that of the accused member.

   b. Provide as many details of the alleged conduct as possible (dates, names of offenders and witnesses, etc.).

2. The supervisor receiving the complaint of sexual harassment will:

    a. contact the Office of Professional Standards and obtain a Complaint Register number.

    b. submit a written report directly to the Internal Affairs Division containing as much information as possible concerning the allegation.

    c. follow the provisions of the General Order entitled "Complaint and Disciplinary Procedures."

3. The Office of Professional Standards will promptly submit a photocopy of the Complaint Against Department member form (CPD 44.202) to the Office of Legal Affairs.

4. The Internal Affairs Division will investigate all allegations of sexual harassment against Department members.

5. No provision of this directive shall be so construed as to prevent any Department member from seeking legal remedy outside of the Department regarding a complaint of sexual harassment.

**RESPONSE:** Plaintiff only admits that Addendum 3 (Department Personnel Practices) to General Order 92-1 states this. Plaintiff denies that the defendant followed its written policies. (Pl LR56.1(b) Ex. 17 Charge of Discrimination [000139]; Ex. 11 Complaint)


During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with Addendum 3 (Department Personnel Practices) to General Order 92-1 during the course of their training.

**RESPONSE:** Deny and Move to Strike. Defendant does not cite to any evidence in the record as to how or when, if ever, this was communicated to the plaintiff.

17

The CPD also required all sworn officers to maintain familiarity with General Orders during their career. Ex. E, ¶ 12, Ex. 6.

**RESPONSE:** Deny and Move to Strike. Defendant does not cite to any evidence in the record as to how this was communicated to the sworn officers and how, if ever, the requirement was fulfilled by them.

19.    General Order 93-3 of the Chicago Police Department (Complaint and Disciplinary Procedures), addendum 2A (Specific Responsibilities), which was in effect during 1999 and 2000, states in part that "When misconduct is observed or a complaint relative to misconduct is received by a non-supervisory member, such member will immediately notify a supervisory member and prepare a written report to his commanding officer containing the information received, observations, and any action taken."

**RESPONSE:** Plaintiff only admits that General Order 93-3 states this. However, this alleged policy was not followed by the CPD. From June 2001 to October 2001, Bray complained to Officer Jones about Askew and Adams sexually harassing her. (Pl LR56.1(b) Ex. 4 Jones dep. p. 23-27) Jones, a Police Officer with the Chicago Police Department since 1990 never notified a supervisory member or prepared a written report regarding Bray's complaints. (Pl LR56.1(b) Ex. 4 Jones dep. p. 23-27)

During 1999, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with General Order 93-3 of the Chicago Police Department (Complaint and

Disciplinary Procedures), addendum 2A (Specific Responsibilities) during the course of their training.

**RESPONSE:** Deny and Move to Strike. Defendant does not cite to any evidence in the record as to how, if ever, this was communicated to the plaintiff.

The Chicago Police Department also required all sworn officers to maintain familiarity with General Orders during their career. Ex. E, ¶ 13, Ex. 7.

**RESPONSE:** Deny and Move to Strike. Defendant does not cite to any evidence in the record as to how, if ever, this was communicated to the sworn officers and how, if when, the requirement was fulfilled.

20. The Education and Training Division Rules and Regulations, which were in effect during 1999 and 2000, read in part as follows:

### DISCRIMINATION AND SEXUAL HARASSMENT

The Education and Training Division of the Chicago Police Department is committed to maintaining a workplace free from all forms of discrimination. All recruits will be courteous and respectful toward all staff personnel, fellow recruits, other Department members, and all other persons.

No type of discrimination will be tolerated at the Chicago Police Department Education and Training Division. This includes, but is not limited to, discrimination based on color, race, gender, religion, national origin, age, ancestry, sexual orientation, lifestyle choice, or mental or physical disability.

Any recruit who feels he or she is the victim of discrimination or sexual harassment by any member of the Chicago Police Department will bring the matter to the attention of his or her immediate supervisor. Appropriate action will be taken in all instances and no retaliatory action will be taken against any recruit who has filed such a complaint in good faith.

**RESPONSE:** Plaintiff only admits that The Education and Training Division Rules and Regulations state this. However, this policy was not followed or enforced by CPD as evidenced by the continued sexual harassment Bray was subjected to by Askew and Adams during her employment. (Pl LR56.1(b) Ex. Ex. Bray dep. p. 91, 321-322; Ex. 13 Plaintiff's Answers to Interrogatories p. 3, 8)

During 1999, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with the Education and Training Division Rules and Regulations during the course of their training. Ex. E, ¶ 15, Ex. 9.

**RESPONSE:** Deny. Defendant does not cite to any evidence in the record as to how or when, if ever, this was communicated to the plaintiff.

21. The Chicago Police Department Education and Training Division Basic Recruit Procedural Manual, which was in effect during 1999 and 2000, begins with the following "POLICY STATEMENT":

> It is the policy of the Chicago Police Department and the responsibility of the Assistant Deputy Superintendent of Education and Training and all Education and Training Division Staff to provide quality training in a fair and equitable manner to all Trainees, without regard to an individual's race, color, sex, age, religion, disability, national origin, ancestry, sexual-affectional orientation, marital status, parental status military discharge status or source of income.

**RESPONSE:** Plaintiff only admits the document states this.

During 1999 and 2000, the Recruit Training Section required recruits, including plaintiff, to read and become familiar with the CPD Education and Training Division Basic Recruit

Procedural Manual during the course of their training. Ex. E, ¶ 3, Ex. 1, Policy Statement.

**RESPONSE:** Deny and Move to Strike. Defendant does not cite to any evidence in the record as to how or when, if ever, this was communicated to the plaintiff.

22.     Rule 4 of the CPD Education and Training Division Basic Recruit Procedural Manual, which was in effect during 1999 and 2000, reads in part as follows:

> 4-2     BIGOTRY - Police professionals are expected to be sensitive to, and exhibit a tolerance for concerns, opinions, and backgrounds of others, and to treat all individuals with respect, dignity, and courtesy regardless of their circumstances or condition. The use of degrading language or actions with regard to race, ethnicity, religion, sex, sexual-affectional orientation, and/or physical challenge, to address, refer to or otherwise affect any person, or group of people, directly or indirectly, is prohibited, except in training simulations, or when necessary in police reports or testimony.
> . . .
>
> 4-5     COMPLAINT PROCEDURE - Trainees will adhere to the chain of command established by the Assistant Deputy Superintendent of Education and Training at all times. In matters directly involving a member of the chain of command, a trainee may request from the next level in the chain of command, and must be granted, permission to take the matter directly to the next level of the chain of command. Trainees are encouraged to discuss their Academy experiences and progress with their Homeroom Instructors, and with their employing agency's Training Officer.
> . . .
>
> 4-7     RACIAL OR SEXUAL HARASSMENT - Racial or sexual harassment is a form of discriminatory conduct that undermines the integrity of all involved. Harassment in any form will not be tolerated. The Academy is committed to maintaining a facility free from all forms of racial and sexual harassment, and allegations of such conduct will be promptly and throughly investigated and resolved.
>
> Trainees will not use epithets or terms that tend to denigrate a particular race or group, except when necessary in police reports or testimony.
>
> No trainee will make unwelcome sexual advances, request for sexual favors,

21

and/or engage in any other verbal or physical conduct of a sexual nature, which has the purpose or effect of interfering with an individual's work performance, or creating a hostile work environment.

Racial or sexual harassment will not be tolerated by the Chicago Police Department Education and Training Division. All trainees are guaranteed protection against racial or sexual harassment.

Whenever a trainee feels that he has been the victim of racial or sexual harassment caused by a fellow trainee, an Instructor, a staff member, or any other member of the Chicago Police Department, he/she will bring the matter to the attention of his Homeroom Instructor. The Homeroom Instructor will assist the trainee in initiating a formal investigation, and will immediately bring the matter to the attention of the Homeroom Supervisor, and the Assistant Deputy Superintendent of Education and Training. All current Chicago Police Department procedures related to allegation of this nature will be followed. If the accused is a member of another department or agency, a thorough investigation will be conducted, but in lieu of a complaint register number the employing department or agency will be notified.

No retaliatory action may be taken against any trainee who has filed such a complaint in good faith.

Ex. E, ¶ 3, Ex. 1, pp. 19-21.

**RESPONSE:** Plaintiff only admits that Rule 4 of the CPD Education and Training

Division Basic Recruit Procedural Manual states this. Defendant did not follow or enforce these

policies as evidenced by the continued sexual harassment Bray was subjected to by Askew and

Adams during her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 321-322; Ex. 13 Plaintiff's

Answers to Interrogatories p. 3, 8; Ex. 4 Jones dep. p. 23-27) )

## IV.    FIELD TRAINING IN THE SEVENTH DISTRICT, ENGLEWOOD

23.    Following training at the Academy, PPO's are detailed to a police district for field

training. Ex. D, ¶ 6.

**RESPONSE:** Admit.

Field training typically consists of three (3) cycles, each cycle lasts twenty-eight (28) days. Ex. D, ¶ 6; Ex. G, pp. 10-11.; Ex. C, pp. 229-30.

**RESPONSE:** Admit.

During each cycle, a PPO is assigned an FTO who trains the PPO and observes the PPO's performance. Ex. D, ¶ 6; Ex. C, pp. 230-31.

**RESPONSE:** Plaintiff only admits that during each cycle PPO's are assigned to work with veteran officers such as FTO's. (Pl LR56.1(b) Ex. 2 Askew dep. p. 10)

After observing the PPO's performance, the FTO assesses it in a Daily Observation Report ("DOR"). Ex. D, ¶ 6; Ex. C, pp. 231-35.

**RESPONSE:** Admit with clarification. A FTO is supposed to assess a PPO's performance on a Daily Observation Report. However, in plaintiff's case, on at least 6 occasions, Adams completed DOR's after Bray had signed a blank form. (Pl LR56.1(b) Ex. 1 Bray dep. p. 324-328, 383-384, 394; Ex. 41 Daily Observation Reports D306, 308, 282, 284, and 288)

The FTO then discusses his or her assessment of the PPO's performance and the PPO and FTO then sign the DOR to verify the PPO read the assessment. Ex. D, ¶ 6; Ex. C, pp. 231, 234-35.

**RESPONSE:** Deny. A FTO is supposed to discuss his or her assessment of the PPO's performance on a Daily Observation Report and then the PPO and FTO sign the document. However, in plaintiff's case, on at least 6 occasions, Adams forged Bray's signature on the DOR's. (Pl LR56.1(b) Ex. 1 Bray dep. p. 324-328, 383-384, 394; Ex. 41 Daily Observation Reports D306, 308, 282, 284, and 288)

At the end of each training cycle, the FTO completes a Training Cycle Summary Report ("TCSR"). Ex. D, ¶ 6; Ex. C, pp. 239-40.

**RESPONSE:** Admit.

The DORs contain numerous categories for rating a PPO's performance numerically, on a scale of one (1) to seven (7), with one being the worst, four passing, and seven being the best. Ex. D, ¶ 6; Ex. C, pp. 232-33.

**RESPONSE:** Admit with clarification. A "1" actually stands for "Not Acceptable," a "4" "Acceptable" and a "7" "Superior Performance." (Pl LR56.1(b) Ex. 30-41 Daily Observation Reports)

Along with the section in which a PPO is rated numerically, a section for comments on the PPO's performance is provided. Ex. D, ¶ 6; Ex. C, pp. 231-34.

**RESPONSE:** Admit.

To become Field Qualified ("FQ"), a PPO has to receive at a minimum a four (4) in each

category. Ex. D, ¶ 6; Ex. C, p. 234.

**RESPONSE:** Admit.

FQ means a PPO completed his or her training with an FTO. Ex. D, ¶ 6.

**RESPONSE:** Admit. Bray was Field Qualified on or about July 24, 2000. (Pl

LR56.1(b) Ex. 1 Bray dep. p. 340, 563; Ex. Askew dep. 54, 56; Ex. 3 Adams dep. p. 55; Ex. 42

Remedial Summary Report [D295-298])

Regardless of whether a PPO is FQ, she must still successfully complete her probationary

period before becoming a PO. Ex. D, ¶ 6.

**RESPONSE:** Admit.

24.     At times, acting FTO's are utilized. Ex. D, ¶ 7.

**RESPONSE:** Admit.

However, acting FTO's are not trained as FTO's. Ex. D, ¶ 7; Ex. C, pp. 229-31, <u>see</u> 246.

**RESPONSE:** Deny. Defendant cites a document that does not establish how, if ever,

FTO's receive training.

Because of their training, observations and evaluations of FTO's are more reliable in the

evaluation of a PPO's performance. Ex. D, ¶ 7; Ex. C, pp. 378-79.

**RESPONSE:** Deny. Askew testified at his deposition that he lied on Bray's Observation

Reports. (Pl LR56.1(b) Ex. 2 Askew dep. p. 89, 133) He stated that he, in fact, "lied on these

evaluations." (Pl LR56.1(b) Ex. 2 Askew dep. p. 89, 133) Accordingly, no Observation Report can be deemed reliable evaluations of plaintiff. Plaintiff admits that the FTO's are supposed to receive training. However, the cited record does not establish whether the acting FTO's Bray worked with received any training at any time during their careers. Askew states in his deposition that all he had to do to become a Field Training Officer was to take an exam that lasted four hours. (Pl LR56.1(b) Ex. Askew dep. 12-13) He does not state he received any training. (Pl LR56.1(b) Ex. Askew dep. p. 12-13)

To qualify as an FTO, a PO must pass an exam and then undergo about three weeks of training, including on sexual harassment. Ex. D, ¶ 7; Ex. G, pp. 12-13, 175-76; see Ex. H, pp. 134-36.

**RESPONSE:** Deny. FTO's supposed to receive training, however, the cited record does not establish whether the acting FTO's Bray worked with received any training at any time during their careers. Askew states in his deposition that all he had to do to become a Field Training Officer was to take an exam that lasted four hours. (Pl LR56.1(b) Ex. Askew dep. 12-13) He does not state he received any training. (Pl LR56.1(b) Ex. Askew dep. p. 12-13)

25. FTO's are not supervisors of PPO's. Ex. D, ¶ 8.

**RESPONSE:** Deny. As her Field Training Officers, Askew and Adams were Bray's supervisors. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 74, 77; Ex. 6 Crawley dep. p. 28; Ex. 23 EEOC notes) It was always Bray's understanding that Field Training Officers could discipline and terminate probationary police officers. (Pl LR56.1(b) Ex. 1 Bray dep. p. 583) Askew in

particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 4 Jones dep. p. 16) In fact, Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray complained to her that Askew and Adams were "always threatening her job." (Pl LR56.1(b) Ex. 4 Jones dep. 6, 23-24) Jones further testified at her deposition that Bray told her she was "scared" to report the sexual harassment by Askew and Adams because, "They were always telling her, you know, 'I have got your job in my hand. I can fire you just like that. It only takes . . . a pen." (Pl LR56.1(b) Ex. 4 Jones dep. p. 26, 36) Jones also testified that on or about June or July 2000, she confirmed to Bray that Askew and Adams did have power over her employment. (Pl LR56.1(b) Ex. 4 Jones dep. p. 7-8, 16, 48-49, 53) Jones, who was a police officer with the City of Chicago for 10 years at the time, advised Bray to "keep a record of everything, dates and times. . . because you are still on probation and pretty much [Askew and Adams] can get you fired at any time." (Pl LR56.1(b) Ex. 4 Jones dep. p. 6, 16) Askew and Adams, as Bray's Field Training Officers, had control of Bray's job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90) Further, Eileen Bell, Assistant Corporation Counsel for the City of Chicago, on or about December 13, 2000, agreed with investigator Batog of the EEOC during his investigation into Bray's Charge that Field Training Officers are in supervisory positions over Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes)

In his report summarizing his conversation with Bell, Batog writes, in part:

> Bell and I discussed whether FTO's are in supervisory positions. Bell and I agreed that FTO's are in supervisory positions because of they evaluate PPO's and make recommendations on whether PPO's become PO's. (Pl LR56.1(b) Ex. 23 EEOC notes)

They are trained Field Training Officers that train PPO's. Ex. D, ¶ 8; see Ex. C, pp. 75-76, 544, Ex. 1, D0017.

**RESPONSE:** Plaintiff admits that FTO's train PPO's but denies any implication that they only train without any supervisory authority or power. As her Field Training Officers, Askew and Adams were Bray's supervisors. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 74, 77; Ex. 6 Crawley dep. p. 28; Ex. 23 EEOC notes) It was always Bray's understanding that Field Training Officers could discipline and terminate probationary police officers. (Pl LR56.1(b) Ex. 1 Bray dep. p. 583) Askew in particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 4 Jones dep. p. 16) In fact, Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray complained to her that Askew and Adams were "always threatening her job." (Pl LR56.1(b) Ex. 4 Jones dep. 6, 23-24) Jones further testified at her deposition that Bray told her she was "scared" to report the sexual harassment by Askew and Adams because, "They were always telling her, you know, 'I have got your job in my hand. I can fire you just like that. It only takes . . . a pen." (Pl LR56.1(b) Ex. 4 Jones dep. p. 26, 36) Jones also testified that on or about June or July 2000, she confirmed to Bray that Askew and Adams did have power over her employment. (Pl LR56.1(b) Ex. 4 Jones dep. p. 7-8, 16, 48-49, 53) Jones, who was a police officer with the City of Chicago

for 10 years at the time, advised Bray to "keep a record of everything, dates and times. . . because you are still on probation and pretty much [Askew and Adams] can get you fired at any time." (Pl LR56.1(b) Ex. 4 Jones dep. p. 6, 16) Askew and Adams, as Bray's Field Training Officers, had control of Bray's job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90) Further, Eileen Bell, Assistant Corporation Counsel for the City of Chicago, on or about December 13, 2000, agreed with investigator Batog of the EEOC during his investigation into Bray's Charge that Field Training Officers are in supervisory positions over Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes)

In his report summarizing his conversation with Bell, Batog writes, in part:

> Bell and I discussed whether FTO's are in supervisory positions. Bell and I agreed that FTO's are in supervisory positions because of they evaluate PPO's and make recommendations on whether PPO's become PO's. (Pl LR56.1(b) Ex. 23 EEOC notes)

FTO's cannot hire PPO's. Ex. D, ¶ 8.

1. **RESPONSE:** Deny. FTO's evaluate PPO's which affected their employment. (Pl LR56.1(b) Ex. Askew dep. p. 90) Plaintiff felt that FTO's had control of her job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her

29

evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90) Askew in particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77) In fact, Eileen Bell, Assistant Corporation Counsel for the City of Chicago, agreed with Investigator Batog of the EEOC during his investigation into Bray's Charge that Field Training Officers are in supervisory positions over Probationary Police Officers because their evaluations determined whether PPO's became PO's. (Pl LR56.1(b) Ex. 23 EEOC notes p. 000354) In his report summarizing his conversation with Bell, Batog writes, in part:

> Bell and I discussed whether FTO's are in supervisory positions. Bell and I agreed that FTO's are in supervisory positions because of they evaluate PPO's and make recommendations on whether PPO's become PO's. (Pl LR56.1(b) Ex. 23 EEOC notes)

FTO's cannot promote PPO's. Ex. D, ¶ 8.

**RESPONSE:** Deny. FTO's evaluate PPO's which affected their employment. (Pl LR56.1(b) Ex. Askew dep. p. 90) Plaintiff felt that FTO's had control of her job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90) Askew in particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her

employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77) In fact, Eileen Bell, Assistant

Corporation Counsel for the City of Chicago, agreed with Investigator Batog of the EEOC during

his investigation into Bray's Charge that Field Training Officers are in supervisory positions over

Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes p. 000354) In his report

summarizing his conversation with Bell, Batog writes, in part:

> Bell and I discussed whether FTO's are in supervisory positions. Bell and I
> agreed that FTO's are in supervisory positions because of they evaluate PPO's
> and make recommendations on whether PPO's become PO's. (Pl LR56.1(b) Ex.
> 23 EEOC notes)

FTO's cannot transfer PPO's. Ex. D, ¶ 8.

**RESPONSE:** Deny. FTO's evaluate PPO's which affected their employment. (Pl

LR56.1(b) Ex. Askew dep. p. 90) Plaintiff felt that FTO's had control of her job because their

evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray

dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this

power over Bray's employment when he testified that he gave Bray scores of "4" on her

evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl

LR56.1(b) Ex. Askew dep. p. 90) Askew in particular made it clear to Bray at the time she

started training with him on her second cycle that he was her supervisor and had control over her

employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77) In fact, Eileen Bell, Assistant

Corporation Counsel for the City of Chicago, agreed with Investigator Batog of the EEOC during

his investigation into Bray's Charge that Field Training Officers are in supervisory positions over

Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes p. 000354)

FTO's cannot demote PPO's. Ex. D, ¶ 8.

**RESPONSE:** Deny. FTO's evaluate PPO's which can lead to disciplinary action. (Pl LR56.1(b) Ex. Askew dep. p. 90) Plaintiff felt that FTO's had control of her job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90) Askew in particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77) In fact, Eileen Bell, Assistant Corporation Counsel for the City of Chicago, agreed with Investigator Batog of the EEOC during his investigation into Bray's Charge that Field Training Officers are in supervisory positions over Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes p. 000354) After Bray threatened to report him, Askew contacted the Police Academy and requested that they evaluate Bray's performance and recommended to the Review Board that her employment be terminated. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter) Askew along with Adams presented the Review Board with inaccurate and malicious "rumors" they allegedly heard from unidentified individuals about Bray's performance in an effort to secure her termination. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80, 347-348, 350-351, 353, 569-571; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter; Ex. 47 Review Board Decision) As the result, on or about October 20, 2000, Bray was taken off the street and restricted to desk duty. (Pl LR56.1(b) Ex. 1 Bray dep. p. 396-397; Ex. 15 Bray's

32

Notes p. 000111) This was a demotion.

FTO's cannot discharge PPO's. Ex. D, ¶ 8.

**RESPONSE:** Deny. FTO's evaluate PPO's which can lead to disciplinary action. (Pl LR56.1(b) Ex. Askew dep. p. 90) Plaintiff felt that FTO's had control of her job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90) Askew in particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77) In fact, Eileen Bell, Assistant Corporation Counsel for the City of Chicago, agreed with Investigator Batog of the EEOC during his investigation into Bray's Charge that Field Training Officers are in supervisory positions over Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes p. 000354) After Bray threatened to report him, Askew contacted the Police Academy and requested that they evaluate Bray's performance and recommended to the Review Board that her employment be terminated. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter) Askew along with Adams presented the Review Board with inaccurate and malicious "rumors" they allegedly heard from unidentified individuals about Bray's performance in an effort to secure her termination. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80, 347-348, 350-351, 353, 569-571; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter; Ex.

47 Review Board Decision) As the result, on or about October 20, 2000, Bray was taken off the street and restricted to desk duty. (Pl LR56.1(b) Ex. 1 Bray dep. p. 396-397; Ex. 15 Bray's Notes p. 000111) Less than two weeks after she threatened to report Askew, on or about October 23, 2000, Bray was notified of her termination effective October 24, 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 214; Ex. 25 Def's Position Statement p. 2)

FTO's cannot discipline PPO's. Ex. D, ¶ 8.

**RESPONSE:** Deny. FTO's evaluate PPO's which can lead to disciplinary action. (Pl LR56.1(b) Ex. Askew dep. p. 90) Plaintiff felt that FTO's had control of her job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28) In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90) Askew in particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77) In fact, Eileen Bell, Assistant Corporation Counsel for the City of Chicago, agreed with Investigator Batog of the EEOC during his investigation into Bray's Charge that Field Training Officers are in supervisory positions over Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes p. 000354) After Bray threatened to report him, Askew contacted the Police Academy and requested that they evaluate Bray's performance and recommended to the Review Board that her employment be terminated. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex.

34

27 Askew's letter)  Askew along with Adams presented the Review Board with inaccurate and malicious "rumors" they allegedly heard from unidentified individuals about Bray's performance in an effort to secure her termination.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 80, 347-348, 350-351, 353, 569-571; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter; Ex. 47 Review Board Decision)  As the result, on or about October 20, 2000, Bray was taken off the street and restricted to desk duty.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 396-397; Ex. 15 Bray's Notes p. 000111)

FTO's make observations and recommendations regarding a PPO's being FQ and can make recommendations that a PPO is in need of remedial training. Ex. D, ¶ 8.

**RESPONSE:** Plaintiff admits that FTO's train PPO's but denies any implication that they only train without any supervisory authority or power.

FTO's may also recommend a PPO's performance be reviewed by a Field Training Evaluation Board.  Ex. D. ¶ 8.

**RESPONSE:** Admit.  In fact, Askew and Adams requested that they evaluate Bray's performance and recommended to the Review Board that they terminate her employment.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Askew dep. p;. 72-73; Ex. 3 Adams dep. p. 80-82; Askew's letter [Askew dep. ex. 3])

26.     Plaintiff was assigned to the 7th District in Englewood ("7th District").  Ex. C, pp. 225-28.

**RESPONSE:** Admit.

27. The 7th District, a high crime area, is reputed to be the most violent police district in the City. Ex. C, pp. 227-28.

**RESPONSE:** Admit.

Because just about everything happens in the 7th District, a PPO should learn fast. Ex. C, p. 227.

**RESPONSE:** Admit with clarification. Plaintiff states in her deposition "you learn fast because you have some of everything there, from rape, burglary, everything you can think of just about happens in that district." (Pl LR56.1(b) Ex. 1 Bray dep. p. 227)

28. Field training in the 7th District is a para-military environment where a PPO takes orders from her superior. Ex. C, p. 308.

**RESPONSE:** Admit. Plaintiff agrees with the statement presented by counsel in the deposition, "the academy and training in the 7[th] District was a quasi- or semi-military environment where you take orders from someone, you do what they tell you to do." (Pl LR56.1(b) Ex. 1 Bray dep. p. 308) Plaintiff took orders from her supervisors, her FTO's. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 74, 77; Ex. 6 Crawley dep. p. 28; Ex. 23 EEOC notes)

**A.** **PLAINTIFF'S FIRST CYCLE OF FIELD TRAINING**

29. Plaintiff's first FTO was Renee Daniels in April 2000. Ex. C, pp. 241-42.

36

**RESPONSE:** Admit with clarification. The first actual FTO plaintiff was assigned to was Daniels. Plaintiff only worked with Daniels for a total of three days. (Pl LR56.1(b) Ex. 30 Daily Observation Reports by Daniels) During her first cycle, she also worked with Officers Davis, Stewart, DuBose, and Hayne. (Pl LR56.1(b) Ex. 31 Daily Observation Reports prepared by Davis and Stewart; Ex. 32 Daily Observation Reports prepared by Hayne; Ex. 33 Daily Observation Reports prepared by Dubose)

Plaintiff worked the 3rd watch, which is generally from 3:00 p.m. to 11:00 p.m. Ex. C, pp. 266-67.

**RESPONSE:** Admit.

It is a fast watch, meaning it receives a large number of calls to which officers must respond. Ex. C, p. 267.

**RESPONSE:** Admit.

After her first day with plaintiff, Daniels rated plaintiff below the minimum acceptable level and observed that plaintiff was not responding to training (Daniels' DORs and TCSR attached hereto as Exhibit J, D365-70, D383-85).

**RESPONSE:** Admit, however, Daniels only observed Bray for a total of three days. (Pl LR56.1(b) Ex. 30 Daily Observation Reports by Daniels) Daniels writes in Bray's first Observation Report that "PPO has been assigned to numerous P.O. during her first cycle. Today is the "first" PPO has been assigned a FTO." (Pl LR56.1(b) Ex. 30 Daily Observation Reports

by Daniels signed and dated April 15, 2000)

Daniels commented in a DOR that plaintiff must learn to write her reports without assistance, include important details, listen to the victim and proofread her reports. Ex. J, D368.

**RESPONSE:** Plaintiff admits that Daniels wrote this, however, Daniels only observed Bray three times during her first cycle. (Pl LR56.1(b) Ex. 30 Daily Observation Reports by Daniels signed and dated April 16, 2000)

Plaintiff states she would write her reports the way she knew how, but Daniels, "liked perfect writing; she wanted everything right, you know. And I'm like: Well, that's you . . . The way you do yours is the way you do yours, and the way I do mine is the way I do mine." Ex. C, pp. 244-45, see 262-63.

**RESPONSE:** Admit with clarification. Plaintiff states in her deposition that she adjusted her writing style for Daniels, but she also realized that when she was on her own she had to be comfortable with her style of writing as well. (Pl LR56.1(b) Ex. 1 Bray dep. p. 245)

30.   Daniels wrote in the same DOR that plaintiff did not complete her assignment sheets before the end of that day's tour and that she did not use the radio properly. Ex. J, D368.

**RESPONSE:** Admit in part. Deny in part. The DOR actually states that Bray is "not attentive to the radio." (Pl LR56.1(b) Ex. 30 Daily Observation Reports by Daniels signed and dated April 16, 2000)

Daniels also wrote that plaintiff had "no" knowledge of her location, including the sector or beat, despite having the beat maps and a map that breaks down each beat with street names and numbers. Ex. J, D368.

**RESPONSE:** Plaintiff admits that she was not familiar with the area and was bounced around from beat to beat making it hard to learn exact locations. (Pl LR56.1(b) Ex. 1 Bray dep. p. 248)

Plaintiff states she did not know her location because "each beat consists of so many, you know, blocks, and it's like this large area. I didn't know it because the beat that we were assigned to, I don't think I was really familiar with it. And she expected me to right off the bat [to] know these places . . . I'm like, if I'm not familiar with this area, how am I going to know?" Ex. C, pp. 247-48.

**RESPONSE:** Plaintiff admits that she was not familiar with the area and was bounced around from beat to beat making it hard to learn exact locations. (Pl LR56.1(b) Ex. 1 Bray dep. p. 248)

31.    Daniels repeatedly wrote in her DORs and TCSR that "P.P.O. DOESN'T 'LISTEN / COMPREHEND'." Ex. J, D368, D370, D384.

**RESPONSE:** Plaintiff objects to the characterization "repeatedly." Daniels made this comment only twice and did not provide any explanation. (Pl LR56.1(b) Ex. 30 Daily Observation Reports prepared by Daniels signed and dated: April 16, 2000, D368, D370)

In a DOR, Daniels wrote she directed plaintiff to guard a crime scene, while she spoke to witnesses. Ex. J, D370.

**RESPONSE:** Deny. Plaintiff believed that Daniels had instructed her to sit in the vehicle. (Pl LR56.1(b) Ex. 30 Daily Observation Reports prepared by Daniels signed and dated April 16, 2000, D370)

Daniels wrote that when she returned, plaintiff was sitting in the vehicle. Ex. J, D370.

**RESPONSE:** Admit.

32.     Daniels also wrote in this DOR that plaintiff made numerous errors while conducting a crash investigation and writing the crash report, even though plaintiff claimed she had prepared several already. Ex. J, D370.

**RESPONSE:** Plaintiff only admits that the document states this.

33.     Near the end of her first training cycle with Daniels, plaintiff was in an accident while responding to an emergency call. Ex. C, pp. 255-60.

**RESPONSE:** Admit.

After a suspect hit someone, he attempted to escape in a stolen car and plaintiff was driving when the call came over the radio. Ex. C, p. 256.

**RESPONSE:** Admit.

Daniels told plaintiff to turn on the sirens, "and hurry up and go help your fellow

officers."

**RESPONSE:** Deny. Daniels was screaming commands at Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 256)

So at this time, [plaintiff told her], you know, Renee, . . . The weather is kind of bad, I don't think I'm really ready to be in an emergency call where it requires really fast driving. . . . And she [Daniels] was like, . . . Follow my directions . . . I'm like, I'm not going to go that fast, you know. I was like, Not-with this my first time, I'm going to go with what I'm comfortable with." Ex. C, pp. 256-57.

**RESPONSE:** Admit with clarification. Bray was not supposed to even be behind the wheel because at the request of the Commander, PPO's fresh out of the Academy were not to operate the vehicles because their inexperience caused accidents. (Pl LR56.1(b) Ex. 1 Bray dep. p. 259)

During this emergency chase, plaintiff stopped at each intersection, looked both ways, and sounded her horn. Ex. C, p. 257.

**RESPONSE:** Admit. Plaintiff was trained at the Academy to stop at the intersection, make sure it's clear, look both ways, sound the horn and let people know to make sure that everybody stops. (Pl LR56.1(b) Ex. 1 Bray dep. p. 257) However, Bray was not supposed to even be behind the wheel because at the request of the Commander, PPO's fresh out of the Academy were not to operate the vehicles because their inexperience caused accidents. (Pl LR56.1(b) Ex. 1 Bray dep. p. 259)

Daniels told plaintiff to "[j]ust pay attention to me and listen to me. Keep on going, go, go, go." Ex. C, p. 257. (Pl LR56.1(b) Ex. 1 Bray dep. p. 257)

**RESPONSE:** Admit.


Plaintiff was "arguing back." Ex. C, p. 257.

**RESPONSE:** Deny. Plaintiff wanted to see for herself that the intersection was clear. (Pl LR56.1(b) Ex. 1 Bray dep. p. 257)


Then, at an intersection, plaintiff "looked, and everybody kind of stopped . . . By the time [she] eased out, . . . this older guy hit [her]." Ex. C, pp. 257-58.

**RESPONSE:** Admit.


Plaintiff states she was found responsible for the accident and was suspended a day. Ex. C, pp. 258-61; see Ex. H, pp. 18-19.

**RESPONSE:** Deny. The man was brought into the district and he wrote a statement saying it was his fault because he was unable to stop due to the bad weather conditions. (Pl LR56.1(b) Ex. 1 Bray dep. p. 258)


After the accident, plaintiff went on injured on duty ("IOD") leave. Ex. C, pp.260-61.

**RESPONSE:** Admit with clarification. Plaintiff went on IOD because Daniels told her to, even though she wanted to return to work. (Pl LR56.1(b) Ex. 1 Bray dep. p. 260-261) Daniels took off three weeks of work after telling Bray, "I'm going to complain of my neck or

whatever, and you go see about your neck just to make sure." (Pl LR56.1(b) Ex. 1 Bray dep. p. 260)

34. In her TCSR on plaintiff's first cycle, Daniels failed plaintiff and wrote:

 P.P.O. needs improvement in all areas of grading. . . . F.T.O. feels P.P.O. "lacks" self-confidence, takes "no" initiative, has "no" knowledge of what is occurring, doesn't "listen", doesn't comprehend, has "no" knowledge of location, even when observed driving has to be directed on directions, and operating vehicle . . . Refuses to utilize beat map. F.T.O. constantly telling P.P.O. to clear from job and utilizing P.D.T. . . . Recommendation–Additional cycle / training ("remedial") needed—All remaining with F.T.O.'s.

Ex. J, D384-85; see Ex. H, pp. 16-19; Ex. G, pp. 29-30, 90.

**RESPONSE:** Plaintiff only admits that Daniels wrote this in her TCSR.

Plaintiff was miserable training with Daniels because she "had an attitude where everything she said was right." Ex. C, pp. 264-66.

**RESPONSE:** Admit with clarification. Plaintiff was miserable because Daniels was not supportive and called her stupid which discouraged Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 264-266) Some of the other officers she worked with had taken their time to explain things to Bray and to help her with her paperwork. (Pl LR56.1(b) Ex. 1 Bray dep. p. 264-266) **MORE**

When plaintiff returned from IOD leave she began a new training cycle. Ex. C, pp. 261-62.

**RESPONSE:** Admit.

43

## B. PLAINTIFF'S SECOND CYCLE OF FIELD TRAINING

35. During plaintiff's second cycle of training, working the midnight shift, her FTO was Bruce Askew. Ex. C, p. 266-67; Ex. G, pp. 12, 17, 25-26.

**RESPONSE:** Admit.

This cycle began in late April and ended mid-May 2000. Ex. C, p. 266.

**RESPONSE:** Admit.

Plaintiff received below acceptable and acceptable ratings during her second cycle (Askew's DORs and TCSR attached as Exhibit K, D333-44, D353-362).

**RESPONSE:** Admit with clarification. Plaintiff as well received above acceptable ratings during her second cycle and was given a 7 (Superior Performance) in Community Interaction. (Pl LR56.1(b) Ex. 29 Daily Observation Report Summary p. 3) Plaintiff received mostly 4's and her average for cycle two was acceptable. (Pl LR56.1(b) Ex. 29 Daily Observation Report Summary p. 3)

Askew stated she actually deserved lower ratings. Ex. G, pp. 90-91.

**RESPONSE:** Admit with clarification. Askew testified at his deposition that he did not honestly prepare Bray's Daily Observation Reports and consequently did not uphold the CPD's honesty policy. (Pl LR56.1(b) Ex. 2 Askew dep. p. 89-90, 133) He stated that he, in fact, "lied on these evaluations." (Pl LR56.1(b) Ex. 2 Askew dep. p. 89-90, 133)

44

36.     Askew wrote in one DOR that "suspects can be handcuffed anytime officer safety is a question." Ex. K, D336.

**RESPONSE:** Admit that cited document states this.


In another DOR, Askew wrote that "P.P.O. is aware whenever a driver is in her control and she has been informed that this driver is a T[raffic] V[iolator] [on] B[ond] the driver is to be cuffed and placed into squad after frisk without delay!!!" Ex. K, D338; Ex. G, pp. 26-28.

**RESPONSE:** Admit that cited document states this.


Askew stated two days after this incident, plaintiff did not frisk and handcuff a driver who did not have a license or ticket on which he was allegedly driving. Ex. G, p. 36.

**RESPONSE:** Deny.  Askew states this in his deposition, although there is no evidence of such an occurrence written in any Daily Reports.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 36)


On the next DOR, Askew wrote that plaintiff must become more aggressive during arrest situations.  Once suspect or arrestee is to be taken into custody P.P.O. cannot allow her feelings to allow her to drop her guard.  During arrest for agg[ravated] batt[ery] a passive female arrestee was permitted to stand outside of veh[icle] for about 10 min[utes] when complaints were signed and transport was to be made P.P.O. asked "Should I cuff her?"  To which FTO replied 10 min[utes] ago. . . .

Ex. K, D340; Ex. G, pp. 37-39.

**RESPONSE:** Admit that the cited document states this, however, Askew states that in his deposition that because "PPO's are shy when they first start, it is the job of the veteran police officer to bring the PPO's out slowly." (Pl LR56.1(b) Ex. 2 Askew dep. p. 29) Benny Spurgeon graduated from the Police Academy at the same time as Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 8) Spurgeon testified at his deposition that he also had Askew as a Field Training Officer and that Askew made the same negative comments about him that he did about Bray when he was PPO, including a comment that Spurgeon did not like to cuff people. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 10, 27) At his deposition, Spurgeon described an incident wherein Askew became "pissed" at him because he hesitated in cuffing an individual involved in an aggravated battery. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 12, 27) In fact, Spurgeon relayed an incident about a domestic situation wherein a young woman hit a man with a bottle, which was virtually identical to an incident Askew criticized Bray about at his deposition. (Pl LR56.1(b) Ex. 2 Askew dep. p. 37-38; Ex. 5 Spurgeon dep. p. 27-28)

In her TCSR, Askew commented that plaintiff "needs to work on prisoner control." Ex. K, D348, D354.

**RESPONSE:** Admit that document states this, however, Askew states that in his deposition that because "PPO's are shy when they first start, it is the job of the veteran police officer to bring the PPO's out slowly." (Pl LR56.1(b) Ex. 2 Askew dep. p. 29)

37.     Also during her second cycle, plaintiff received a Summary Punishment Action Request ("SPAR") for failure to "[p]urchase a city vehicle registration [sticker]" (SPARs attached

hereto as Exhibit L, D205). Plaintiff explained that she did not purchase a City sticker because she just purchased a new car for "$17,000, or something like that," and did not have enough money to pay for one until she got paid. Ex. C, pp. 288-91; Judon Dep., pp. 8-9 (Judon's Deposition is attached as Exhibit M). She received a one-day suspension. Ex.C, pp.290-1; Ex. L.

**RESPONSE:** Admit with clarification. Bray stated that when she went to purchase a City Vehicle Sticker, she was told that she needed a proof of purchase for her vehicle. Bray did not have her bills of sales at the time. When she found her bill of sales and had the money, she rectified the situation and purchased the sticker. (Pl LR56.1(b) Ex. 1 Bray dep. p. 288-291)

38. While Askew trained plaintiff, he commented in her DORs on her lack of self confidence, and wrote in her TCSR that "her career may be dependent upon her gaining self confidence." Ex. K, D334, D336, D348, D354.

**RESPONSE:** Admit with clarification. In one DOR, Askew states, "PPO Bray is a good officer needs to be more sure of himself. She has the talent." (Pl LR56.1(b) Ex. 35 Daily Observation Reports prepared by Askew signed and dated: May 5, 2000) Askew states that in his deposition that because "some PPO's are shy when they first start. We try to bring them out slowly." (Pl LR56.1(b) Ex. 2 Askew dep. p. 29) Askew states in his deposition, "I've had Recruits before who were troubled Recruits and turned out to be excellent Police Officers. (Pl LR56.1(b) Ex. 2 Askew dep. p. 30) Askew commented in a DOR that Bray "has talent." (D334) Askew criticized other PPO's for their lack of self-confidence. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 12, 28, 29) Officer Spurgeon states in his deposition that Askew criticized his confidence and assertiveness and complained that he was soft-spoken. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p.

12, 28, 29)

Plaintiff never voiced her disagreement with Askew about his comments that she needs to work on her self-confidence. Ex. C, p. 276; Ex. G, p. 26.

**RESPONSE:** Admit, however, Askew's sexually offensive conduct and comments caused Bray stress at work and damaged her self-esteem and self-confidence. (Pl LR56.1(b) Ex. 1 Bray dep. p. 275, 287, 473)

He passed plaintiff with a "D-minus with a red circle around it." Ex. G, p. 48.

**RESPONSE:** Deny. PPO's are not rated with letters, they are rated numerically with a "1" standing for "Not Acceptable," a "4" "Acceptable" and a "7" "Superior Performance." (Pl LR56.1(b) Ex. 30-41 Daily Observation Reports)

Askew considered her performance subpar because she had problems following direction, being aggressive, and being confident. Ex. G, pp. 20, 47-48.

**RESPONSE:** Deny. Askew's Daily Observation Reports do not signify that her performance was "subpar." (Pl LR56.1(b) Ex. 29 Daily Observation Report Summary p. 3) He rated her performance Acceptable and her average rating from her second cycle was a "4," Acceptable. (Pl LR56.1(b) Ex. 29 Daily Observation Report Summary p. 3)

## C.  PLAINTIFF'S THIRD CYCLE OF FIELD TRAINING

39.  Plaintiff's third cycle began in late May and ended in mid-June of 2000. Ex. C,

48

p. 291.

**RESPONSE:** Admit.

Plaintiff worked the day shift from 7:00 a.m. to 3:00 p.m. Ex. C, pp. 291-92.

**RESPONSE:** Admit.

40.     Plaintiff began her third training cycle with FTO Kevin Scott. Ex. C, p. 292. She worked briefly with him. Ex. C, p. 292.

**RESPONSE:** Admit.

Scott stated to plaintiff that she needed to work on her confidence. Ex. C, pp. 434, 565.

**RESPONSE:** Admit with clarification. Askew said in his deposition that he approached Scott before he started working with her that "Bray lacked confidence and the one thing he was basically going to have to work on was her confidence." (Pl LR56.1(b) Ex. 2 Askew dep. p. 47)

His DORs also commented on plaintiff's need to work on her confidence. Ex. C, p. 434; (Scott's DORs are attached hereto as Exhibit N , D322, D292, D290).

**RESPONSE:** Admit with clarification. Scott's DORs repeatedly state that Bray "accepts constructive criticism and is eager to work and perform well." (Pl LR56.1(b) Ex. 20 Daily Observation Reports prepared by Scott, 000279, 000281, 000283, 000285, 000287) Furthermore, Scott's Daily Observation Report dated June 1, 2000 states "confidence in ability improving." (Pl LR56.1(b) Ex. 37 Daily Observation Reports prepared by Scott, 000287)

41.    Scott wrote in plaintiff's DORs that she had difficulty in providing the proper content and sequence of events in her written communication and took too much time to do so. Ex. N, D320, D322, D294, D292, D290.

**RESPONSE:** Admit with clarification.  Scott's DORs repeatedly state that Bray "accepts constructive criticism and is eager to perform well." (Pl LR56.1(b) Ex. 37 Daily Observation Reports prepared by Scott, 0000279, 000281, 000283, 000285, 000287)

Scott also wrote in a DOR that plaintiff "needs to develop [an] 'ear' for beat assignment when called [over radio]." Ex. N, D320.

**RESPONSE:** Admit, however Scott's DORs repeatedly state that Bray "accepts constructive criticism and is eager to perform well."  (Pl LR56.1(b) Ex. 37 Daily Observation Reports prepared by Scott, 000279, 000281, 000283, 000285, 000287)

Scott also wrote in his DORs that plaintiff needs to be aware of her location when driving on patrol and responding to calls.  Ex. N, D294, D292.

**RESPONSE:** Admit, however, Scott's DORs repeatedly state that Bray "accepts constructive criticism and is eager to perform well." (Pl LR56.1(b) Ex. 37 Daily Observation Reports prepared by Scott, 000279, 000281, 000283 000285, 000287)

42.    Because Scott was going to be promoted and Donna Adams did not have a PPO, she became plaintiff's FTO.  Ex. C, pp. 291-92, 294; Ex. H, pp. 15-16; Ex. G, pp. 51-52.

**RESPONSE:** Admit.

Adams wrote in a DOR and the TCSR that plaintiff is not aware of her location (Adams' DORs and TCSRs are attached hereto as Exhibit O, D312, see D332).

**RESPONSE:** Admit, however Adams also states, "PPO not only accepts constructive criticism well but requests feedback on performance and self-critiques." (Pl LR56.1(b) Ex. 38 Daily Observation Reports prepared by Adams, 000290) Adams also gives Bray an average rating of 5 on this particular day these comments were written. (Pl LR56.1(b) Ex. 29 Daily Observation Reports Summary p. 4; Ex. 38 Daily Observation Reports prepared by Adams, 000288)

Adams commented that as a result plaintiff "still is unsure of when she should pick up speed when an emergency call is dispatched." Ex. O, D312.

**RESPONSE:** Admit, however Adams also states, "PPO not only accepts constructive criticism well but requests feedback on performance and self-critiques." (Pl LR56.1(b) Ex. 38 Daily Observation Reports prepared by Adams, 000290)

Plaintiff stated that "I wasn't really aware of my location because we did not stay on our beat. And when you're not staying on your beat, how are you going to know your locations." Ex. C, p. 300.

**RESPONSE:** Admit, however, this was because when she was supposed to be field training Bray, Adams frequently left the district for personal business. (Pl LR56.1(b) Ex. 1 Bray

51

Plaintiff does not remember if she asked for a beat map. Ex. C, p. 300.

**RESPONSE:** Admit.

43.    Adams also commented in a DOR that "PPO has yet to develop an 'ear' when driving. She maintains too much of a focus on driving and does not listen to the radio. She may hear the call numbers, but miss calls / assignments to other cars that we could handle or that we are near enough to take or assist." Ex. O, D312.

**RESPONSE:** Admit however, on or about June 11, 2000, the day the comment was written on the Daily Observation Report, Adams also gives Bray an average rating of 5. (Pl LR56.1(b) Ex. 29 Daily Observation Reports Summary p. 4; Ex. 38 Daily Observation Reports prepared by Adams, 000290)

Adams wrote that plaintiff "[d]oes not understand the proper use or appropriate time to use a certain code [for identifying a crime]." Ex. O, D312.

**RESPONSE:** Admit, however on June 11, 2000, the day the comment was written , Adams also gives Bray an average rating of 5. (Pl LR56.1(b) Ex. 29 Daily Observation Reports Summary p. 4; Ex. 38 Daily Observation Reports prepared by Adams, 000290)

44.    In the same DOR, Adams wrote that plaintiff "has some difficulty controlling situations through verbal commands. She has a 'small' voice." Ex. O, D312.

**RESPONSE:** Admit, however, on or about June 11, 2000, the day the comments are written on the Daily Observation Report, Adams also gives Bray an average rating of 5. (Pl LR56.1(b) Ex. 29 Daily Observation Reports Summary p. 4; Ex. 38 Daily Observations Reports) She also gave her a "4" for Verbal Communication and checked that she was responding to training in this area. Pl LR56.1(b) Ex. 38 Daily Observations Reports prepared by Adams, 000288)

Adams also wrote that plaintiff "is getting better at initiating activity but should be more aggressive in this area. She still lacks the self-confidence needed. Hesitates to make decisions for fear of being wrong." Ex. O, D312.

**RESPONSE:** Admit that document states this, however, Adams also states, "PPO not only accepts constructive criticism well but requests feedback on performance and self-critiques." (Pl LR56.1(b) Ex. 38 Daily Observation Reports prepared by Adams, 000290) On or about June 11, 2000, the day the comments are written on the Daily Observation Report, Adams also gave Bray an average rating of 5. (Pl LR56.1(b) Ex. 29 Daily Observation Reports Summary p. 4; Ex. 38 Daily Observation Reports prepared by Adams, 000288)

Adams also wrote that "PPO has tunnel vision and does not see anything outside of what she has focused on." Ex. O, D313.

**RESPONSE:** Admit that the document states this, however Adams also states, "PPO not only accepts constructive criticism well but requests feedback on performance and self-critiques." (Pl LR56.1(b) Ex. 29 Daily Observation Reports prepared by Adams, 000290) On or

about June 11, 2000, the day the comments are written on the Daily Observation Report, Adams gives Bray an average rating of 5. (Pl LR56.1(b) Ex. 29 Daily Observation Reports Summary p. 4; Ex. 38 Daily Observation Report prepared by Adams, 000288)

45.     In her TCSR for plaintiff's third cycle, Adams checked in most rating areas that plaintiff was not responding to training. Ex. O, D331.

**RESPONSE:** Admit, however, that Adams only did this at Bray's request so she could go on to another cycle. Pl LR56.1(b) Ex. 1 Bray dep. p. 263, 311-312, 316-320) When her third cycle was completed, on or about June 18, 2000, Bray requested a fourth cycle of training because of everything she endured during her training she felt she needed to learn more. (Pl LR56.1(b) Ex. 1 Bray dep. p. 263, 311-312, 316-320) In fact, in requesting that Bray be given a fourth training cycle, Adams stated that one of the reasons for the request was because Bray had worked with "officers who had just a little over a year on the job" who did not allow Bray to "assume any responsibility, and due to their lack of experience were unable to provide adequate training." (Pl LR56.1(b) Ex. 3 Adams dep. p. 37-38) Adams went on to explain that "the first cycle is the most important. It builds the foundation and confidence" and an officer who does not receive adequate training during the first cycle will suffer during their second and third cycles. (Pl LR56.1(b) Ex. 3 Adams dep. p. 38)

Also in the TCSR, Adams wrote that plaintiff "needs more work" in vehicle operation. Plaintiff "is over cautious when responding to an emergency call." Ex. O, D331-32.

**RESPONSE:** Admit, however, that Adams only did this at Bray's request so she could

go on to another cycle. Pl LR56.1(b) Ex. 1 Bray dep. p. 263, 311-312, 316-320)

Adams wrote that plaintiff "exhibited the most difficulty" in verbal communication. Ex.
O, D331-32. "PPO will not take charge of a situation verbally for fear of offending or getting a
CR#. She's polite. She is not assertive enough. She has stated several times that she 'doesn't
want to get in trouble.'" Ex. O, D332; see Ex.C, p. 302.

**RESPONSE:** Plaintiff admits that Adams wrote this, however, Adams urged her to use
profanity with citizens and to be rude to them (Pl LR56.1(b) Ex. 1 Bray dep. p. 126, 297-299)
Adams repeatedly told Bray to "mother fuck people." (Pl LR56.1(b) Ex. 1 Bray dep. 303)
Adams explained at her deposition that it is necessary for her to use profanity with citizens "for
understanding." (Pl LR56.1(b) Ex. 3 Adams dep. p. 41-42) Bray felt such actions were
unprofessional. (Pl LR56.1(b) Ex. 1 Bray dep. p. 126)

Adams also wrote that "PPO has had difficulty [in] identifying ways to establish field
contact and is hesitant to approach for the purpose of making field contact. She is not
authoritative enough." Ex. O, D310. "PPO is . . . hesitant to make traffic stops." Ex. O, D310.

**RESPONSE:** Plaintiff only admits that Adams states this in the TCSR.

46.    Adams wrote in her TCSR that in a foot chase plaintiff "was slow to start and did
not pursue offender with any speed." Ex. O, D310.

**RESPONSE:** Deny. Plaintiff stated that "then when he saw us, he took out running. I
took out running behind him. (Pl LR56.1(b) Ex. 1 Bray dep. p. 306) It was me and another
officer jumped in. I don't know his name, but he was running too." Plaintiff states that Adams

"stood at the car laughing. She was supposed to be involved and she wasn't. She just stood at the car." (Pl LR56.1(b) Ex. 1 Bray dep. p. 306)

Plaintiff stated that the offender "had a warrant out for his arrest for–I think it was for aggravated battery. . . He had broke her ribs, broke her nose, and did a lot of damage to her. He was standing out there with a can of beer . . . So I was like, Excuse me, sir, and I was calling him. And then when he saw us, he took out running. I took out running behind him. It was me and another officer jumped in. I don't know his name, but he was running too. . . . I was over the radio, and I was giving my location. I was letting them know that he had just entered a house. . . and I told them that I'm not familiar with the area, so I'm going to–I'm going back to the car, you know. . . . And then [Adams] goes over the radio and starts telling me, Well, tell them this and tell them that. I'm like, First let me, you know, get myself together; this is my first foot chase. And she was just putting a lot of pressure on me, Hurry up and go do this thing, and go do that." Ex. C, pp. 305-07.

**RESPONSE:** Admit, however, plaintiff states that Adams "stood at the car laughing. She was supposed to be involved and she wasn't. She just stood at the car." (Pl LR56.1(b) Ex. 1 Bray dep. p. 306) Bray followed procedure and radioed in her exact location. (Pl LR56.1(b) Ex. 1 Bray dep. p. 306)

47.     Adams failed plaintiff in her third cycle and wrote in the TCSR that "PPO needs more work . . . to understand the elements of various offenses." Ex. O, D310, see D332; Ex. G, pp. 56-57.

**RESPONSE:** Plaintiff admits this, however, she also states that she did not feel that Adams taught her anything she needed to know to become a good Police Officer. (Pl LR56.1(b) Ex. 1 Bray dep. p. 129) When she was supposed to be field training Bray, Adams frequently left the district for personal business. (Pl LR56.1(b) Ex. 1 Bray dep. p. 333; Ex. 3 Adams dep. p. 42-43. 106)

Adams wrote that plaintiff "is not confident when performing. She is unable to make decisions effectively." Ex. O, D310.

**RESPONSE:** Admit, however, Adams states "PPO Bray accepts and seeks constructive criticism. She wants to do well and welcomes feedback." (Pl LR56.1(b) Ex. 56 Daily Observation Training Cycle Summary Report)

"Plaintiff needed to become competent in listening to the radio, case report writing, assertiveness, and taking direction and knowing her location when driving." Ex. H, pp. 33-35.

**RESPONSE:** Admit, however, Adams states "PPO Bray accepts and seeks constructive criticism. She wants to do well and welcomes feedback. A fourth training cycle will provide her with the time she needs to improve in all areas. She is capable." (Pl LR56.1(b) Ex. 36 Daily Observation Training Cycle Summary Report)

48.     Plaintiff requested a fourth training cycle. Ex. C, pp. 310-11; (Plaintiff's and Adams' request for a fourth remedial training cycle and Lt. Charles Flynn's counseling session report attached hereto as Exhibit P, D166).

**RESPONSE:** Admit.

Plaintiff wrote in a memorandum to the Commander of the 7th District that:

> P.P.O. is submitting this report requesting that a fourth cycle be given. P.P.O.
> strongly feels that having a fourth cycle would benefit me to help me to
> strengthen areas of weakness. Since training with F.T.O. D. Adams, has help
> [sic] P.P.O. identify weak areas and is making progress and gaining the needed
> confidence to handle situations as they arise. P.P.O. is definite that a 4[th] cycle
> with F.T.O. Adams will continue to help build the foundation and confidence
> P.P.O. needs to perform the tasks needed to maintain my duties as a police officer.

Ex. P, D166.

**RESPONSE:** Admit, however, Adams had not started sexually harassing her yet.

(Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 321-322; Ex. 13 Bray's Answers to Ints p. 8; Ex. 19 EEOC

Determination)

49.     Adams submitted a memorandum to the Commander of the 7th District

requesting that "PPO Pamela Bray #14176 be given a fourth cycle." Ex. P, D165.

Adams wrote that plaintiff could greatly benefit from a fourth cycle, explaining that

> PPO has continued to have difficulty in the majority of the rating areas.
> This has been documented. PPO has a basic understanding of what is
> required of her but is hesitant to make decisions and is timid in her
> approach: PPO lacks the self confidence needed to perform the tasks she is
> capable of doing.

Ex. P, D165.

**RESPONSE:** Admit, however, Adams also states in this memorandum that "Through

the majority of her first cycle PPO worked with officers who had just a little over a year on the

job. These officers did not allow PPO Bray to assume any responsibility and due to their lack of experience were unable to provide adequate training. The first cycle is the most important it builds the foundation and confidence." (Pl LR56.1(b) Ex. 60 Adams' 4[th] Cycle Request Memo)

50.     After receiving Adams' request for a fourth remedial cycle, Lieutenant Charles Flynn counseled plaintiff about her performance. Ex. P, D167.

**RESPONSE:** Admit that plaintiff believes that was part of procedure. (Pl LR56.1(b) Ex. 1 Bray dep. p. 320)

In his counseling session report, Lt. Flynn wrote in relevant part that

P.O. Adams indicated that, although competent in many areas, P.P.O. Bray needed to be more assertive and confident before being rated as field qualified. The Final Summary Report prepared by P.O. Adams indicated that this lack of assertiveness was present in many aspects of Bray's job performance: driving, verbal communication, street stops, and apprehension of criminal offenders. . . .

P.P.O. Bray acknowledged her weaknesses and requested that she have a fourth training cycle. Bray stated that she expected to make significant progress while being trained by P.O. Adams. Bray stated that her first training cycle was not particularly helpful, in that she worked with many different officers, making it difficult to develop rapport with any one trainer and difficult to understand what was expected of her. However, P.P.O. Bray took responsibility for her continuing development, and is aware that unsatisfactory performance could lead to her termination from the department.

Ex. P, D167.

**RESPONSE:** Plaintiff only admits that Flynn's counseling session report states this.

D.     **PLAINTIFF'S FOURTH REMEDIAL FIELD TRAINING CYCLE**

51.    Plaintiff requested to work with FTO Adams for her remedial cycle. Ex. C, pp. 320-21; Ex. P, D166-67.

**RESPONSE:** Admit, however, Adams had not started sexually harassing her yet at this point.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 321-322)

Plaintiff stated that according to procedure, she was supposed "to go out of the district for a fourth cycle." Ex. C, p. 320-21; Ex. H, pp. 34-35.

**RESPONSE:** Admit.

But plaintiff did not want to go outside of the 7th District and requested not to because it "would have been more stressful . . . to learn that area and that environment." Ex. C, p. 321.

**RESPONSE:** Admit.  Plaintiff had been bumped around from beat to beat before and she wanted to remain in the district so she could concentrate on becoming a good police officer.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 248, 321-322)

Plaintiff's remedial cycle began in June and ended in late July of 2000. Ex. C, p. 320.

**RESPONSE:** Admit with clarification.  Plaintiff's training cycle began specifically in late June and in ended in mid-July 2000.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 320)

Plaintiff worked days again, from 7:00 a.m. to 3:00 p.m. Ex. C, p. 320.

**RESPONSE:** Admit.

52.     During plaintiff's fourth cycle, Adams wrote in a DOR that "PPO is still not sure of where she is. Does not pay attention to the streets." Ex. O, D304.

**RESPONSE:** Admit, however, plaintiff states in her deposition that "if she [Adams] figured that I didn't know my location, it was because of not staying on the beat like we were supposed to." (Pl LR56.1(b) Ex. 1 Bray dep. p. 333) "We never stayed in the district because she used that time for her own personal use. (Pl LR56.1(b) Ex. 1 Bray dep. p. 333)

It is important for an officer to know her location "[b]ecause we're supposed to know where we are at all times. If you're trying to get to an emergency situation, you need to know." Ex. C, p. 333.

**RESPONSE:** Admit, however, as plaintiff testified, "I was bounced around a lot, and a lot of officers don't stay on their beat. And if you don't stay on your beat, how are you going to know the area. (Pl LR56.1(b) Ex. 1 Bray dep. p. 248)

In the same DOR, Adams wrote that "PPO is hesitant to enter aband[on]ed buildings for the purpose of a premise check." Ex. O, D304.

**RESPONSE:** Deny. Adams states in her deposition that "I don't recall that particular incident [an occasion where she had Bray search a building by herself]. (Pl LR56.1(b) Ex. 3 Adams dep. p. 52)

An officer on the day shift works alone and is required to do a check on abandoned

buildings on her beat as one of her duties. Ex. H, pp. 52-53.

**RESPONSE:** Plaintiff only admits that Adams states this is a requirement at her deposition. (Pl LR56.1(b) Ex. 3 Adams dep. p. 52-53)

53. Adams wrote in another DOR that "PPO cannot remember to notify O[ffice of] E[mergency] C[ommunications dispatcher] when making a stop." Ex. O, D276.

**RESPONSE:** Plaintiff admits the cite document states this.

Adams wrote in another DOR that "PPO Bray is overcautious when engaging in emergency driving which means we are amongst the last to arrive to in progress assignments." Ex. O, D278.

**RESPONSE:** Admit, however, Adams rates Bray a "4" and "Responding to Training" for "Vehicle Operations" on or about June 11, 2000 on the day of that specific observation report. (Pl LR56.1(b) Ex. 41 Daily Observation Reports prepared by Adams, 000318)

Further, Adams commented that the "daily watch assignment log is filled out twice with numerous mistakes" and a "To-From report [was] not completed properly." Ex. O, D278.

**RESPONSE:** Admit, however, Adams rates Bray a "4" and "Responding to Training" for "Written Communication" on the day of that specific observation report. (Pl LR56.1(b) Ex. 41 Daily Observation Reports prepared by Adams, 000318)

Plaintiff stated that "everybody would do their logs differently, the assignment logs differently, so me and [Adams] kind of had conflict." Ex. C, p. 331.

62

**RESPONSE:** Admit, however, plaintiff explains that she was accustomed to doing them the way "we did them when I came from midnights." (Pl LR56.1(b) Ex. 1 Bray dep. p. 331)

54.     Plaintiff drafted a memorandum to Commander Maurice Ford of the 7th District explaining why she did not notify the dispatcher that she and Adams were "clear", i.e. had completed a job assignment. Ex. C, pp. 334-36; (Memorandum to Commander Maurice Ford attached as Exhibit Q, D198-99).

**RESPONSE:** Plaintiff admits that she drafted a memorandum to Commander Ford at Adams' request. However, plaintiff states in her deposition that Adams was "rushing her because, like I said, she did her—she had her sessions on a Friday,....and I pulled off because she—you know, whenever she had somewhere to go, she would rush. And before I knew it, she was like 'Hurry up, I'm ready to go home; I'm ready to go home. It was Friday. And I pulled off." (Pl LR56.1(b) Ex. 1 Bray dep. p. 334)

It is important for an officer to notify the dispatcher that she is clear "[b]ecause if anything comes up on the beat, then we have—you know, we'll be available [for the next call]". Ex. C, p. 336.

**RESPONSE:** Admit, however, shortly after she notified the dispatcher. (Pl LR56.1(b) Ex. 1 Bray dep. p. 336)

55.     At the end of plaintiff's fourth remedial cycle, Adams wrote in her TCSR that "PPO still spends an unnecessary amount of time on case reports." Ex. O, D296.

**RESPONSE:** Admit, however, Adams continues on in her TCSR to say that "she does check reports for grammar and spelling." (Def LR56.1(a) Ex. 0, D296)

Adams wrote that "patrol procedures in general, PPO does OK, in particular crimes in progress are not her forté." Ex. O, D296.

**RESPONSE:** Admit, however, Adams continues on to say "I believe this will improve over time." (Def LR56.1(a) Ex. O, D296)

56.     Adams also wrote in her remedial TCSR that "Bray uses the radio properly, but still has problems interviewing the citizens. She needs to work on her communication skills both verbal as well as body language." Ex. O, D296.

**RESPONSE:** Admit, however, Adams continues on to say, "She does understand how the interaction with the community should work and applies it best when addressing CAPS related problems. (Def LR56.1(a) Ex. O, D296) Adams gives Bray a "4," an Acceptable rating in both "Verbal Communication" and "Community Interaction" on the report for that day. (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 000169) She also rates her field qualified in those categories along with every other category. (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 000169)

For example, at a domestic dispute between two large, angry, mentally disturbed brothers arguing over a woman they were sharing, plaintiff stood between the men with her hands behind her back asking them to "please be quiet" without projecting her voice. Ex. H, pp. 26-28.

**RESPONSE:** Deny. This incident happened previous to the July 24, 2000 Daily

Observation Report on which Adams gives Bray a "4," an Acceptable rating in both "Verbal Communication" and "Community Interaction." (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 000169) She also rates her field qualified in those categories along with every other category. (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 000169)

Regarding community interaction, Adams commented that in "this area PPO Bray's lack of communication skills is clearly evident." Ex. O, D296.

**RESPONSE:** Admit, however, Adams continues on to say, "She does understand how the interaction with the community should work and applies it best when addressing CAPS related problems. (Def LR56.1(a) Ex. O, D296) Adams gives Bray a "4" rating in both "Verbal Communication" and "Community Interaction" on the report for that day. (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 000169) She also rates her field qualified in those categories along with every other category. (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 000169)

For example, Adams asked plaintiff to disperse a crowd off a street corner. Ex. H, pp. 29-30. Plaintiff approached the crowd and with her hands behind her back told them, "I am going to ask you to get off the corner;" when the crowd did not move, plaintiff did not know how to handle the situation. Ex. H, pp. 30-31.

**RESPONSE:** Deny. This incident happened previous to the July 24, 2000 Daily Observation Report on which Adams gives Bray a "4," an Acceptable rating in both "Verbal Communication" and "Community Interaction." (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 000169) She also rates her field qualified in those categories along with every other

category. (Pl LR56.1(b) Ex. 42 Remedial Summary Report 000169)

57. On July 24, 2000, Adams rated plaintiff at the minimum possible level to become FQ. Ex. C, pp. 337-38, 340; Ex. H, p. 55, 75.

**RESPONSE:** Deny. Adams Field Qualified Bray. (Pl LR56.1(b) Ex. 42 Remedial Summary Report, 00069)

Adams had no further personal interaction with plaintiff after this date, other than to say "hello" in the hall if they saw each other. Ex. H, p. 57.

**RESPONSE:** Admit, however, Adams had invited Bray to a dominatrix party. (Pl LR56.1(b) Ex. 1 Bray dep. p. 125, 435; Ex. 13 Plaintiff's Answers to Interrogatories p. 10-11) When Bray did not attend the party, Adams stopped speaking to Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 124, 435; Ex. 13 Plaintiff's Answers to Interrogatories p. 10-11)

Adams considered plaintiff to be a stupid recruit, meaning plaintiff was "[u]nable to comprehend, unable to attempt to learn, refuse to learn, refuse to try." Ex. H, pp. 10-11.

**RESPONSE:** Deny. Adams states that in her opinion "there were quite a few [stupid recruits]." Adams states in her Daily Observation Report that Bray "not only accepts constructive criticism well but requests feedback and self-critiques." (Pl LR56.1(b) Ex. 38 Daily Observation Reports, 000290) Furthermore, Adams states in her Remedial Summary Report that "PPO Bray understands the law and department policies. PPO Bray is personable, gets along well with her peers and requests constructive criticism." (Def LR56.1(a) Ex. O, D297)

## V. PLAINTIFF'S PROBATIONARY PERIOD IN THE SEVENTH DISTRICT, AFTER HER FOURTH REMEDIAL TRAINING CYCLE

58. Following her fourth remedial training cycle, plaintiff began working "with different officers every day." Ex. C, p. 341.

**RESPONSE:** Admit. Plaintiff states every PPO "bounces as part of the learning process." (Pl LR56.1(b) Ex. Bray dep. p. 341)

Askew stated nobody wanted to work with her as a regular partner. Ex. G, pp. 65-68.

**RESPONSE:** Deny. When asked to give names of officers that did not want to work with her, Askew stated, "I couldn't give names, per say." (Pl LR56.1(b) Ex. 2 Askew dep. p. 66)

Plaintiff worked day and midnight shifts. Ex. C, pp. 340-42, 366-67.

**RESPONSE:** Admit.

59. While stationed at police headquarters on 35th street, plaintiff received a SPAR for tardiness in reporting for duty and failure to notify. Ex. C, pp. 343-46; Ex. L, D206. Plaintiff stated that "all my electricity went out. So when I woke up, I was running late. I wasn't able to call the job. I was on the expressway coming off of 35th." Ex. C, p. 343.

**RESPONSE:** Plaintiff admits that she was five minutes late. (Pl LR56.1(b) Ex. 1 Bray dep. p. 344) Plaintiff also states that she does not have a cell phone and was stuck in traffic so she was unable to call in to work. (Pl LR56.1(b) Ex. 1 Bray dep. p. 345) Plaintiff also states that

she was on time when she got in her car. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346) She states, "It was just the traffic, you know, was heavy and I couldn't get out of it. I didn't have a cell phone; I couldn't park my car in the side and run to a pay phone." (Pl LR56.1(b) Ex. 1 Bray dep. p. 346)

60.    On a midnight shift, plaintiff and her partner came to assist on a call. Ex. C, pp. 346-47.

**RESPONSE:** Admit. While on a midnight shift back in May 2000, she and her partner, Mike Cleary, came to assist a call. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346)

When they arrived, Lieutenant Edward Zapolsky "was out there with a prisoner who was already cuffed. . . . I was like, We might as well take the prisoner [who was a big stocky guy] because Lieutenant Zapolsky doesn't have a cage and that's not safe. Because if you put prisoners in the back and they come out of their cuffs and you don't have a cage, then they can kind of like, you know, grab you from the back and do anything while you're driving. . . . So by this time, [my partner] jumped out. . . . So he jumped out the car . . . He goes over to the guy, and then he starts to do a search. So at the same time, I'm bumping on my door because it was jammed, and I'm hitting it. By this time, Lieutenant Zapolsky pulls up on the side of me, and he was like, You get out the car and assist your partner. I said, That's what I'm trying to do. And then he just pulled off." Ex. C, pp. 346-48, 350.

**RESPONSE:** Plaintiff admits she says this in her deposition.

68

61.     Plaintiff was driving at the time that her partner exited their vehicle and "ran over there, and he grabbed the guy and brought him back to the car" to search him. Ex. C, p 351.

**RESPONSE:** Admit that plaintiff states this at her deposition.

That is when Lt. Zapolsky "pulled up really fast . . . and he was like, You get out the car and you assist your partner now. And that's when I was like, That's what I'm trying to do, you know. Because he was just—first he was asking me, you know, Why are you not getting out the car instead of just coming to me. . . . Everything happened quick. Like when you get an arrestee, you hurry up and get them in the car before they start to resist." Ex. C, pp. 351-52.

**RESPONSE:** Admit that plaintiff states this at her deposition.

Plaintiff is supposed to assist her partner for safety reasons. Ex. C, p. 353.

**RESPONSE:** Admit, however, plaintiff was trying to assist her partner. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353) She states that she bumped, hit and pushed her door to get it open. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353) Everything happened really fast and by the time her partner was starting to search the prisoner, Bray was able to get her door open and to get out and assist him. (Pl LR56.1(b) Ex. 1 Bray p. 352)

62.     Plaintiff's explanation for failing to immediately assist her partner is that her door jammed. Ex. C, p. 353.

**RESPONSE:** Admit that plaintiff's car door was jammed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-49, 351, 353) She states that she bumped, hit and pushed her door to get it open. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353) Everything happened really fast and by the time her

69

partner was starting to search the prisoner, Bray was able to get her door open and to get out and assist him. (Pl LR56.1(b) Ex. 1 Bray p. 352)

The door was not jammed when she got into the car. Ex. C, p. 353.

**RESPONSE:** Admit, however, that was jammed when she tried to exit the vehicle. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-49, 351, 353) Plaintiff states that she bumped, hit and pushed her door to get it open. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353) Everything happened really fast and by the time her partner was starting to search the prisoner, Bray was able to get her door open and to get out and assist him. (Pl LR56.1(b) Ex. 1 Bray p. 352)

"And, see, we have on the side of the car, it's like a lot of buttons. And if they're not lit up, you can't see, you know. So I don't know if my door was locked from my side; I don't know. But I was hitting buttons and trying to hurry up and trying to push out (indicating), trying to hurry up and get out to assist my partner." Ex. C, p. 353.

**RESPONSE:** Plaintiff admits she states this at her deposition.

Plaintiff did not try to get out and exit through the other door. Ex. C, p. 354.

**RESPONSE:** Admit, however, plaintiff states that she bumped, hit and pushed her door to get it open. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353) Everything happened really fast and by the time her partner was starting to search the prisoner, Bray was able to get her door open and to get out and assist him. (Pl LR56.1(b) Ex. 1 Bray p. 352)

When plaintiff returned, she did not fill out a report or any paperwork that her door was jammed in the squad car. Ex. C, p. 356.

**RESPONSE:** Admit, however, no one said anything else to Bray about this matter after Zapolsky pulled away from the car. (Pl LR56.1(b) Ex. 1 Bray dep. p. 354-355, 356; Ex. 28 Zapolsky Statement; Ex. 20 EEOC notes p. 000185) At no time did Cleary ever mention it to Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 356, 570-571) Cleary never reprimanded or counseled Bray for it either. (Pl LR56.1(b) Ex. 1 Bray dep. p. 570-571) Cleary did not even cite this matter in the Daily Observation Reports he prepared for Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 570-571; Ex. 36 Daily Observation Reports by Cleary) To the contrary, Cleary gave Bray "above adequate" scores for the areas of performance he observed during the period she worked with him. (Pl LR56.1(b) Ex. 1 Bray dep. p. 569-571; Ex. 36 Daily Observation Reports prepared by Cleary; Ex. 29 Daily Observation Report Summary)

To plaintiff's knowledge, the car did not need to be repaired. Ex. C, p. 356.

**RESPONSE:** Plaintiffs admits that "a lot of cars were messed up" and that to her knowledge the car didn't need to be repaired. (Pl LR56.1(b) Ex. 1 Bray dep. p. 356)

63.     After Lt. Zapolsky told plaintiff to get out of the car and assist her partner, he "pulled off. He kind of hot-headed pulled off. So when we go back to the district, you know, he didn't say anything to me. Because I was kind of upset at the way he approached me, you know; he first should have found out." Ex. C, p.354.

**RESPONSE:** Plaintiff admits that she states this at her deposition and that Zapolsky

never reprimanded Bray for this incident. (Pl LR56.1(b) Ex. 1 Bray dep. p. 354-355, 356; Ex. 28 Zapolsky Statement; Ex. 20 EEOC notes p. 000185)

64. On October 20, 2000, Lt. Zapolsky wrote of this incident that "the reporting lieutenant went to an assignment and found PPO Bray's partner searching a prisoner on the street while PPO Bray sat in the squad car. The reporting lieutenant addressed the circumstances immediately, and informed PPO Bray of her obligation to exit the vehicle and to be available to assist her partner if needed." Ex. D, ¶ 12; (Lt. Virginia Drozd Affidavit attached hereto as Ex. R ¶ 7, D202).

**RESPONSE:** Deny as characterized. On October 19, 2000, Lieutenant Jeff Murphy requested that Lieutenant Zapolsky was requested to prepare a written evaluation of Bray. (Pl LR56.1(b) Ex. 28 Zapolsky Statement) In his statement, Zapolsky mentions this "incident" which occurred five months earlier, but does not give it much significance. (Pl LR56.1(b) Ex. 28 Zapolsky Statement) Rather, he states that this was the only incident he had involving Bray and that since then he has not had sufficient time to "properly and fairly evaluate PPO BRAY" on his watch and therefore cannot offer an opinion on her performance. (Pl LR56.1(b) Ex. 28 Zapolsky Statement)

Plaintiff does not know of any other PPO who stayed in their car while their partner was making an arrest. Ex. C, p. 427.

**RESPONSE:** Plaintiff admits that she states this at her deposition. However, Zapolsky never reprimanded Bray for this incident. (Pl LR56.1(b) Ex. 1 Bray dep. p. 354-355, 356; Ex. 28

Zapolsky Statement; Ex. 20 EEOC notes p. 000185)  On October 19, 2000, Lieutenant Zapolsky was requested to prepare a written evaluation of Bray.  (Pl LR56.1(b) Ex. 28 Zapolsky Statement)  In his statement, Zapolsky mentions this "incident" which occurred five months earlier, but does not give it much significance.  (Pl LR56.1(b) Ex. 28 Zapolsky Statement) Rather, he states that this was the only incident he had involving Bray and that since then he has not had sufficient time to "properly and fairly evaluate PPO BRAY" on his watch and therefore cannot offer an opinion on her performance.  (Pl LR56.1(b) Ex. 28 Zapolsky Statement) plaintiff's car door was jammed.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-49, 351)  She states that she bumped, hit and pushed her door to get it open.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353) Everything happened really fast and by the time her partner was starting to search the prisoner, Bray was able to get her door open and to get out and assist him.  (Pl LR56.1(b) Ex. 1 Bray p. 352)

65.     After plaintiff's fourth cycle, Sgt. Cassandra Judon had several officers approach her and request not to work with plaintiff.  Ex. M, p. 10.

**RESPONSE:** Deny.  When asked which officers approached her, she stated, "I can't recall specific names.  (Pl LR56.1(b) Ex. Judon dep. p. 9)

Adams also had several officers complain to her that plaintiff was lazy, did not know how to write reports, and that they were afraid to work with plaintiff.  Ex. H, pp. 64-66.

**RESPONSE:** Deny.  When asked to provide names of officers that complained, Adams stated, "I don't bother to remember their names."  (Pl LR56.1(b) Ex. 3 Adams dep. p. 64-66)She

further states these were "casual conversations" in the form of "gossip." (Pl LR56.1(b) Ex. 3 Adams dep. p. 64-66)

Adams also heard that plaintiff failed to get out of the vehicle to respond to assignments and on one occasion to assist her partner. Ex. H, pp. 64-65, 70.

**RESPONSE:** Deny. Adams does not recall who Bray's partner was at the time this incident occurred and who told her the story because she "doesn't bother to remember their names." (Pl LR56.1(b) Ex. 3 Adams dep. p. 64-66, 137-138) She states "the police department is one big gossip bin" and this story was just something she heard but doesn't remember from who or the exact details pertaining to the story. (Pl LR56.1(b) Ex. 3 Adams dep. p. 64-66) Adams considered such stories to be "rumors" and she didn't generally believe them." Adams further testified at her deposition that if she hears a rumor which is important enough to her, she will "go find out" by going "to the source." (Pl LR56.1(b) Ex. 3 Adams dep. p. 130) However, Adams never spoke to Bray about the alleged incident she claims she heard gossiped around the station. (Pl LR56.1(b) Ex. 3 Adams dep. p. 73) (Pl LR56.1(b) Ex. 3 Adams dep. p. 130, 136) plaintiff states that she bumped, hit and pushed her door to get it open. (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353) Everything happened really fast and by the time her partner was starting to search the prisoner, Bray was able to get her door open and to get out and assist him. (Pl LR56.1(b) Ex. 1 Bray p. 352)

Adams confirmed this with Lt. Zapolsky. Ex. H, p. 136.

**RESPONSE:** Admit that Adams testified at her deposition that if she hears a rumor

which is important enough to her, she will "go find out" by going "to the source." (Pl LR56.1(b) Ex. 3 Adams dep. p. 130)  However, Adams never spoke to Bray about the alleged incident she claims she heard gossiped around the station.  (Pl LR56.1(b) Ex. 3 Adams dep. p. 73) Adams instead asked Zapolsky "is it true that you had to order her—Bray out of the car and to go and help her partner." (Pl LR56.1(b) Ex. 3 Adams dep. p. 137)  Lieutenant Zapolsky, who did not know Bray was having trouble getting out of the car, had pulled along side the car, ordered Bray out of it and then immediately left.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 351-352, 570; Ex. 3 Adams dep. p. 136; Ex. 28 Zapolsky Statement; Ex. 20 EEOC notes p. 000185) Plaintiff states at her deposition that she bumped, hit and pushed her door to get it open.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 346-353)  Everything happened really fast and by the time her partner was starting to search the prisoner, Bray was able to get her door open and to get out and assist him.  (Pl LR56.1(b) Ex. 1 Bray p. 352)

One officer stated to Sgt. Judon that she searched someone improperly, placing herself and her partner in danger.  Ex. M, p. 10.

**RESPONSE:** Deny.  When questioned further, Sgt. Judon can't recall which officer told her this.  (Pl LR56.1(b) Ex. 9 Judon dep. p. 10-11)

Sgt. Judon spoke to Lt. Zapolsky because this was the third or fourth person that told her they did not want to work with plaintiff and that plaintiff's performance had dropped off.  Ex. M, pp. 11-12, 21-24.

**RESPONSE:** Deny. Judon admits that she has no direct knowledge of plaintiff's

performance. (Pl LR56.1(b) Ex. 9 Judon dep. p. 21)

Plaintiff's performance productivity after her fourth cycle was low. Ex. R, ¶ 8, Ex. 1, D1040-45.

**RESPONSE:** Plaintiff only admits that Drozd's Affidavit states this.

Adams also learned from several officers who worked with plaintiff that they would not work with her again. Ex. H, pp. 73-74.

**RESPONSE:** Deny. At her deposition, Adams could not recall any of these officers' names. (Pl LR56.1(b) Ex. 3 Adams dep. 74)

66.     Adams and Askew wrote memoranda to the Commander of the 7th District recommending that plaintiff be separated from the CPD. Ex. G, pp. 91-94; Ex. H, pp. 80-83 (Adams' and Askew's memoranda are attached hereto as Exhibit AA, D203-04).

**RESPONSE:** Admit, however on or about October 4, 2000, when they were in the interviewing room together, Askew grabbed Bray's breast again, allegedly to check to see if her bulletproof vest was on. (Pl LR56.1(b) Ex. 1 Bray dep. p. 85-86; Ex. 13 Bray's Answers to Ints. p. 8; Ex. 15 Bray's Notes p. 000110) Bray was very upset and offended by Askew's unwelcome actions and informed Askew that if he ever touched her again, she would go to the supervisor. (Pl LR56.1(b) Ex. 1 Bray dep. p. 87-90, 436; Ex. 13 Bray's Answers to Ints. p. 8; Ex. 15 Bray's Notes p. 000110) Askew contacted the Police Academy and requested that they evaluate Bray's performance. (Pl LR56.1(b) Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82) Askew

enlisted the help of Adams to assist in his complaint of Bray to the Academy. (Pl LR56.1(b) Ex. 3 Adams dep. p. 80-82) Askew and Adams then recommended to the Review Board that Bray be terminated. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 27 Askew's Statement; Ex. 53 Adams' Statement) Both Askew and Adams claimed at their depositions that they requested Bray be evaluated and recommended her termination specifically because they heard from "someone" that Bray had to be ordered out of her car to assist her partner on one occasion. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams's dep. p. 70-72) Therefore, they felt she was too unsafe to become a police officer. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82) Askew described this as the "incident that basically launched the whole re-evaluation." (Pl LR56.1(b) Ex. 2 Askew dep. p. 81) Similarly, Adams testified at her deposition that it was this "particular incident that concerned [her] the most." (Pl LR56.1(b) Ex. 3 Adams dep. p. 82) However, neither Askew nor Adams could identify the person who told them about this "incident." (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams dep. p. 65) Neither Askew nor Adams could even identify which partner Bray allegedly failed to assist. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams dep. 65) This "incident" actually occurred five months earlier in May 2000, during Bray's second cycle of training while she was working with Officer Mike Cleary. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571)

Askew wrote in his memorandum that he made his recommendation because plaintiff had to be ordered out of her vehicle to assist her partner. Ex. AA, D204.

**RESPONSE:** Admit, however, both Askew and Adams claimed at their depositions that they requested Bray be evaluated and recommended her termination specifically because they

heard from "someone" that Bray had to be ordered out of her car to assist her partner on one

occasion. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams's dep. p. 70-72) Therefore,

they felt she was too unsafe to become a police officer. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73,

82) Askew described this as the "incident that basically launched the whole re-evaluation." (Pl

LR56.1(b) Ex. 2 Askew dep. p. 81) Similarly, Adams testified at her deposition that it was this

"particular incident that concerned [her] the most." (Pl LR56.1(b) Ex. 3 Adams dep. p. 82)

However, neither Askew nor Adams could identify the person who told them about this

"incident." (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams dep. p. 65) Neither Askew

nor Adams could even identify which partner Bray allegedly failed to assist. (Pl LR56.1(b) Ex. 2

Askew dep. p. 73, 82; Ex. 3 Adams dep. 65) This "incident" actually occurred five months

earlier in May 2000, during Bray's second cycle of training while she was working with Officer

Mike Cleary. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571)


Adams wrote in her memorandum that she made her recommendation because plaintiff

had to be ordered out of a vehicle to assist plaintiff's partner and because several POs approached

Adams and told her they would not work with her. Ex. AA, D203.

**RESPONSE:** Admit, however, both Askew and Adams claimed at their depositions that

they requested Bray be evaluated and recommended her termination specifically because they

heard from "someone" that Bray had to be ordered out of her car to assist her partner on one

occasion. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams's dep. p. 70-72) Therefore,

they felt she was too unsafe to become a police officer. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73,

82) Askew described this as the "incident that basically launched the whole re-evaluation." (Pl

78

LR56.1(b) Ex. 2 Askew dep. p. 81) Similarly, Adams testified at her deposition that it was this "particular incident that concerned [her] the most." (Pl LR56.1(b) Ex. 3 Adams dep. p. 82) However, neither Askew nor Adams could identify the person who told them about this "incident." (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams dep. p. 65) Neither Askew nor Adams could even identify which partner Bray allegedly failed to assist. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams dep. 65) This "incident" actually occurred five months earlier in May 2000, during Bray's second cycle of training while she was working with Officer Mike Cleary. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571) In May 2000, there was an occasion in which Bray was unable to get out of her squad car to assist Cleary because her car door was jammed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571) Lieutenant Zapolsky, who did not know Bray was having trouble getting out of the car, had pulled along side the car, ordered Bray out of it and then immediately left. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 351-352, 570; Ex. 3 Adams dep. p. 136; Ex. 28 Zapolsky Statement; Ex. 20 EEOC notes p. 000185) No one said anything else to Bray about this matter after Zapolsky pulled away from the car. (Pl LR56.1(b) Ex. 1 Bray dep. p. 354-355, 356; Ex. 28 Zapolsky Statement; Ex. 20 EEOC notes p. 000185) At no time did Cleary ever mention it to Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 356, 570-571) Cleary never reprimanded or counseled Bray for it either. (Pl LR56.1(b) Ex. 1 Bray dep. p. 570-571) Cleary did not even cite this matter in the Daily Observation Reports he prepared for Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 570-571; Ex. 36 Daily Observation Reports) To the contrary, Cleary gave Bray "above adequate" scores for the areas of performance he observed during the period she worked with him. (Pl LR56.1(b) Ex. 1 Bray dep. p. 569-571; Ex. 36 Daily Observation Report; Ex. 29 Daily

Observation Report Summary) Neither Askew or Adams were present when this incident occurred. (Pl LR56.1(b) Ex. 2 Askew dep. p. 81; Ex. 3 Adams dep. p. 64-65) Neither Askew or Adams even bothered to ask Bray about this rumored incident. (Pl LR56.1(b) Ex. 3 Adams dep. p. 126) Despite the fact the "incident" was not a concern of anyone's at the time it occurred in May 2000, Askew alleges that mere rumor of it in October 2000 – coincidentally right after Bray threatened to report him for sexual harassment – was sufficient to cause Askew to seek Bray's termination. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 27 Askew's Statement; Ex. 15 Bray's Notes p. 000110; Ex. 20 EEOC). Ironically, Adams testified at her deposition that she does not generally believe the rumors she hears around the station. (Pl LR56.1(b) Ex. 3 Adams dep. p. 130) Adams further testified at her deposition that if she hears a rumor which is important enough to her, she will "go find out" by going "to the source". (Pl LR56.1(b) Ex. 3 Adams dep. p. 130) However, Adams never spoke to Bray about the alleged incident she claims she heard gossiped around the station. (Pl LR56.1(b) Ex. 3 Adams dep. p. 73) In fact, after Bray's fourth cycle, Adams never spoke to anyone about Bray's performance. (Pl LR56.1(b) Ex. 3 Adams dep. p. 67-70) Adams also testified at her deposition that in her 17 years as a police officer, this was the first time Adams felt it was necessary to come forward about another officer. (Pl LR56.1(b) Ex. 3 Adams dep. 72-73)

## VI.  THE FIELD TRAINING AND EVALUATION REVIEW BOARD REVIEWS PLAINTIFF'S PERFORMANCE AND PLAINTIFF'S TERMINATION

67.  Maurice Ford, Commander of the 7th District, requested a Field Training and

Evaluation Review Board convene to review plaintiff's performance (attached hereto as Exhibit S, D200); Ex. D, ¶ 9; Ex. R, ¶ 3.

**RESPONSE:** Plaintiff only admits that Drozd's Affidavit states this.

68. On October 20, 2000, plaintiff received a Field Training and Evaluation Review Board Notice that her performance was going to be reviewed, and if it determined her performance was not sufficient, she would be terminated. Ex. C, pp. 390-96; (Review Board Notice attached hereto as Exhibit T, D201).

**RESPONSE:** Admit with clarification. On or about October 20, 2000, approximately two weeks after Bray threatened to report Askew if he touched her again, Bray was called into a meeting with Lieutenant Zapolsky, Lieutenant Duesworth and Sergeant Judon and given a notice that her performance during her probationary period was going to be reviewed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 390-392; Ex. 9 Judon dep. p. 14; Ex. 13 Bray's Answers to Ints. p. 23-24; Ex. 15 Bray's Notes p. 000111) Bray inquired what the purpose for the review was. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392) Lieutenant Zapolsky told Bray that he did not know and that it was her Field Training Officers who requested the evaluation. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392-393, 435-436; Ex. 15 Bray's Notes p. 000111) Bray expressed that she did not understand why they had let her get this far in the process and asked why they would Field Qualify her if they did not think she was a good officer. (Pl LR56.1(b) Ex. 1 Bray dep. p. 394) Bray then attempted to tell Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints. p. 24; Ex. 1 Bray dep. p. 393-394) However, Judon cut her off stating,

"it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394) Bray also tried to tell them

that she believed Adams had forged her signature on some of the Daily Observation Reports she

prepared during Bray's fourth cycle. (Pl LR56.1(b) Ex. 1 Bray dep. p. 324-328, 383-384, 394)

at her deposition, Bray identified D306, 308, 282, 284, 286, and 288 Daily Observation Reports

which clearly contained forged signatures. (Pl LR56.1(b) Ex. 1 Bray dep. 324-328; Ex. 41 Daily

Observation Reports D306, 308, 282, 284, and 288) Before the meeting ended, Bray requested

to see her file. (Pl LR56.1(b) Ex. 1 Bray dep. p. 395) The Lieutenants looked though the file

and noticed that the signatures on the Daily Observation Reports prepared by Adams during

Bray's fourth cycle did not match Bray's signature on other documents. (Pl LR56.1(b) Ex. 1

Bray dep. p. 395) Bray requested copies of her file for "when she obtained an attorney." (Pl

LR56.1(b) Ex. 1 Bray dep. p. 395) Upon hearing that Bray intended to retain an attorney, Judon

snatched Bray's file out of her hands. (Pl LR56.1(b) Ex. 1 Bray dep. p. 396-397)


69.     The Review Board Notice states that

        An assessment of your performance while on probation has resulted in a
        request that a Field Training and Evaluation Review Board review your
        performance and make recommendations regarding the continuation of your
        employment with the Chicago Police Department.

        The Board will review observations made by the Field Training and
        Evaluation Officers, Supervisors and others that monitored your performance
        while on probation.  You will be afforded the opportunity to submit a written
        statement to the Board.

        During the review process you will be restricted to desk duty.  You are not
        authorized to represent yourself as a police officer, take police action or carry a
        weapon.  If the Board review results in a recommendation to terminate your
        employment your detail to Patrol Division will be canceled.  If the Board review
        results in a recommendation for retention you will be restored to full duty.

Ex. T.

**RESPONSE:** Admit that the Review Board Notice states this.

The notice was presented to plaintiff by Lt. Zapolsky, Lt. Robert Deusworth, and Sgt. Judon. Ex. C, pp. 391-96; Ex. M, pp. 14-15.

**RESPONSE:** Admit with clarification. On or about October 20, 2000, approximately two weeks after Bray threatened to report Askew if he touched her again, Bray was called into a meeting with Lieutenant Zapolsky, Lieutenant Duesworth and Sergeant Judon and given a notice that her performance during her probationary period was going to be reviewed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 390-392; Ex. 9 Judon dep. p. 14; Ex. 13 Bray's Answers to Ints. p. 23-24; Ex. 15 Bray's Notes p. 000111) Bray inquired what the purpose for the review was. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392) Lieutenant Zapolsky told Bray that he did not know and that it was her Field Training Officers who requested the evaluation. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392-393, 435-436; Ex. 15 Bray's Notes p. 000111) Bray expressed that she did not understand why they had let her get this far in the process and asked why they would Field Qualify her if they did not think she was a good officer. (Pl LR56.1(b) Ex. 1Bray dep. p. 394) Bray then attempted to tell Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints. p. 24; Ex. 1 Bray dep. p. 393-394) However, Judon cut her off stating, "it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394) Bray also tried to tell them that she believed Adams had forged her signature on some of the Daily Observation Reports she

83

prepared during Bray's fourth cycle. (Pl LR56.1(b) Ex. 1 Bray dep. p. 324-328, 383-384, 394)

at her deposition, Bray identified D306, 308, 282, 284, 286, and 288 Daily Observation Reports

which clearly contained forged signatures. (Pl LR56.1(b) Ex. 1 Bray dep. 324-328; Ex. 41 Daily

Observation Reports D306, 308, 282, 284, and 288) Before the meeting ended, Bray requested

to see her file. (Pl LR56.1(b) Ex. 1 Bray dep. p. 395) The Lieutenants looked though the file

and noticed that the signatures on the Daily Observation Reports prepared by Adams during

Bray's fourth cycle did not match Bray's signature on other documents. (Pl LR56.1(b) Ex. 1

Bray dep. p. 395) Bray requested copies of her file for "when she obtained an attorney." (Pl

LR56.1(b) Ex. 1 Bray dep. p. 395) Upon hearing that Bray intended to retain an attorney, Judon

snatched Bray's file out of her hands. (Pl LR56.1(b) Ex. 1 Bray dep. p. 396-397)


70.     Plaintiff was then to report for desk duty. Ex. C, p. 397.

**RESPONSE:** Plaintiff admits that she was placed on desk duty where her duties were

drastically reduced. (Pl LR56.1(b) Ex. 1 Bray dep. p. 397) The only task she was given was to

file papers. (Pl LR56.1(b) Ex. 1 Bray dep. p. 397) While Bray was sitting at the desk, officers

would approach her and ask why she was being terminated. (Pl LR56.1(b) Ex. 1 Bray dep. p.

398) Bray explained that she was being re-evaluated and asked several officers to prepare

statements on her behalf. (Pl LR56.1(b) Ex. 1 Bray's dep. p. 397; Ex. 15 Bray's Notes p.

000111)


While on desk duty, plaintiff began drafting a statement for the Review Board. Ex. C, p.

398.

**RESPONSE:** Admit.


Plaintiff wrote in the statement she submitted to the Review Board that

The [sic] following report will describe details of my training . . . and provide
insight as to what, if any trtraining [sic] deficiensies [sic] on my behalf may have
resulted.

(Plaintiff's Statement to the Review Board is attached hereto as Exhibit V, D508).

    **RESPONSE:** Plaintiff admits that Bray was allowed to submit a written statement to the

Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 398) Bray wrote a statement delineating all the

sexual harassment she had experienced and had Lieutenant Murphy review it. (Pl LR56.1(b) Ex.

1 Bray dep. p. 401, 426) After Murphy read Bray's initial statement, he instructed her to re-write

it. (Pl LR56.1(b) Ex. 1 Bray dep. p. 426) Murphy told Bray that "this isn't about the Field

Training Officers, this is about you." (Pl LR56.1(b) Ex. 1 Bray dep. p. 401; Ex. 15 Bray's Notes

p. 000112) Murphy then recommended that Officer Joyce, who was in school to be an attorney,

help Bray re-write the statement. (Pl LR56.1(b) Ex. 1 Bray dep. p. 401; Ex. 15 Bray's Notes p.

000112) Murphy advised Bray she would "be in good hands" with Joyce. (Pl LR56.1(b) Ex. 1

Bray dep. p. 407) Joyce called Bray and recommended that Bray not "say anything bad about

Bruce [Askew] because Bruce [Askew] is going to be the one to help you get your job back." (Pl

LR56.1(b) Ex. 1 Bray dep. p. 402-403, 408; Ex. 15 Bray's Notes p. 000111-000112) Joyce

emphasized to Bray, "Just don't write anything negative about him [Askew], put good things

about him in your report." (Pl LR56.1(b) Ex. 1 Bray dep. p. 403; Ex. 15 Bray's Notes p.

000112) Bray confided in Joyce about the sexual harassment. (Pl LR56.1(b) Ex. 1 Bray dep. p.

406; Ex. 21 EEOC notes p. 000186) Joyce advised Bray, "Don't speak of anything, because

that's like sour grapes." (Pl LR56.1(b) Ex. 1 Bray dep. p. 406, 409; Ex. 15 Bray's Notes p. 000113)  Bray trusted Joyce because he was a law student and believed he meant well so she left the allegations of sexual harassment out of her statement.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 406, 409)  On the morning of October 23, 2000, Joyce re-wrote a statement for Bray.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 405, 407)  Bray then copied the statement in her own handwriting before she met with the Review Board.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 405, 407)  Bray thought what Joyce was having her write would save her job.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 408)  Therefore, Bray did not really read the statement Joyce wrote as she was copying it.  (Pl LR56.1(b) Ex. 1  Bray dep. p. 408-409)  Joyce then took her statement and escorted her to the Police Academy.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 405; Ex. 15 Bray's Notes p. 000113)

Plaintiff attributed her problems with FTO Daniels to a "personality conflict."  Ex. V, D508.

**RESPONSE:** Admit, however, plaintiff continues on to state that "however R/O continued training with FTO Daniels without letting conflict adversely affect my positive attitude."  (Pl LR56.1(b) Ex. 63  Bray's Statement to the Review Board)

71.     Plaintiff wrote that Askew stopped providing her positive feedback after he spoke with Daniels.  Ex. V, D509.  Plaintiff wrote, reporting officer ("RO") "feels that the personality conflict between R/O and FTO Daniels inappropriately colorered [sic] FTO Askews [sic] judgment as to abilities after F.T.O. Askewss [sic] conversation with F.T.O. Daniels, F.T.O. Askew's attitude towaards [sic] R/O changed." Ex. V, D509; Ex. H, p. 37.

**RESPONSE:** Admit.

72.     Plaintiff concluded that, "R/O is willing toto [sic] do another cycle in [sic] effort to improve any deeficiencies [sic] that I may have. I feel that I have been prejudged by a lot of officers who never gave me a chance. There has been so many negative rumors oon [sic] my part. R/O has every intention of improving on any areas needed. R/O is aware of officer's safety. R/O is requesting additional training and rerespectfully [sic] request [sic] the opportunity to further prove it to thhe [sic] police dept." Ex. V, D510.

**RESPONSE:** Admit.

73.     This statement does not mention any alleged sexual harassment. Ex. C, p. 409; Ex. V, D508-10.

**RESPONSE:** Admit, however, Bray wrote a statement delineating all the sexual harassment she had experienced and had Lieutenant Murphy review it. (Pl LR56.1(b) Ex. 1 Bray dep. p. 401, 426) After Murphy read Bray's initial statement, he instructed her to re-write it. (Pl LR56.1(b) Ex. 1 Bray dep. p. 426) Murphy told Bray that "this isn't about the Field Training Officers, this is about you." (Pl LR56.1(b) Ex. 1 Bray dep. p. 401; Ex. 15 Bray's Notes p. 000112) Murphy then recommended that Officer Joyce, who was in school to be an attorney, help Bray re-write the statement. (Pl LR56.1(b) Ex. 1 Bray dep. p. 401; Ex. 15 Bray's Notes p. 000112) Murphy advised Bray she would "be in good hands" with Joyce. (Pl LR56.1(b) Ex. 1 Bray dep. p. 407) Joyce called Bray and recommended that Bray not "say anything bad about Bruce [Askew] because Bruce [Askew] is going to be the one to help you get your job back." (Pl

LR56.1(b) Ex. 1 Bray dep. p. 402-403, 408; Ex. 15 Bray's Notes p. 000111-000112) Joyce

emphasized to Bray, "Just don't write anything negative about him [Askew], put good things

about him in your report." (Pl LR56.1(b) Ex. 1 Bray dep. p. 403; Ex. 15 Bray's Notes p.

000112) Bray confided in Joyce about the sexual harassment. (Pl LR56.1(b) Ex. 1 Bray dep. p.

406; Ex. 21 EEOC notes p. 000186) Joyce advised Bray, "Don't speak of anything, because

that's like sour grapes." (Pl LR56.1(b) Ex. 1 Bray dep. p. 406, 409; Ex. 15 Bray's Notes p.

000113) Bray trusted Joyce because he was a law student and believed he meant well so she left

the allegations of sexual harassment out of her statement. (Pl LR56.1(b) Ex. 1 Bray dep. p. 406,

409) On the morning of October 23, 2000, Joyce re-wrote a statement for Bray. (Pl LR56.1(b)

Ex. 1 Bray dep. p. 405, 407) Bray then copied the statement in her own handwriting before she

met with the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 405, 407) Bray thought what

Joyce was having her write would save her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 408)

Therefore, Bray did not really read the statement Joyce wrote as she was copying it. (Pl

LR56.1(b) Ex. 1 Bray dep. p. 408-409) Joyce then took her statement and escorted her to the

Police Academy. (Pl LR56.1(b) Ex. 1 Bray dep. p. 405; Ex. 15 Bray's Notes p. 000113)

Plaintiff also submitted statements to the Review Board about her performance from POs on her

behalf. Ex. C, pp. 409-10. Further, when Bray attempted to tell Lieutenant Zapolsky, Sergeant

Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been

trying to get her to solicit sex. Judon cut her off stating, "it's too late for that." (Pl LR56.1(b)

Ex. 13 Bray's Answers to Ints p. 24; Ex. 1 Bray dep. p. 393-394)


None of these statements were from FTO's or mentioned any alleged sexual harassment.

Ex. C, p. 410.

**RESPONSE:** Admit that Bray submitted statements from four officers she had worked

with. (Pl LR56.1(b) Ex. 1 Bray dep. p. 409) Bray submitted a statement from Officer Gloria

Jones to the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 552-553; Ex. 4 Jones dep. p. 31,

33) At the time she wrote this letter, Jones had been a police officer for at least 10 years. (Pl

LR56.1(b) Ex. 1 Bray dep. p. 605; Ex. 43 Jones Statement) Bray worked with Jones quite a few

times. (Pl LR56.1(b) Ex. 1 Bray dep. p. 555; Ex. 4 Jones dep. p. 8) Bray was partnered with

Jones from on or about June or July of 2000 through the time Bray was terminated. (Pl

LR56.1(b) Ex. 4 Jones dep. p. 8, 53) As her partner, Jones had many opportunities to observe

Bray and stated at her deposition that Bray was "professional" and "seemed to know what she

was doing." (Pl LR56.1(b) Ex. 4 Jones dep. p. 10) Jones also testified at her deposition that she

was never fearful to work with Bray. (Pl LR56.1(b) Ex. 4 Jones dep. p. 10) In fact, Jones

requested to work with Bray. (Pl LR56.1(b) Ex. 4 Jones dep. p. 10) Jones went through the

Police Academy with Askew and has been on the police force for the same amount of time as

Askew – since 1990. (Pl LR56.1(b) Ex. 2 Askew dep. p. 148; Ex. 4 Jones dep. 22-23) Bray also

submitted a statement from Officer Jenkins to the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep.

p. 552-553) Jenkins was the last partner Bray had before she was assigned to desk duty. (Pl

LR56.1(b) Ex. 1 Bray dep. p. 555-556) Jenkins told Bray that on the date she was put on desk

duty, on or about October 20, 2000, Lieutenant Murphy and Lieutenant Zapolsky approached

Jenkins and attempted to get him to write a negative statement about Bray. (Pl LR56.1(b) Ex. 1

Bray dep. p. 556; Ex. 13 Bray's Answers to Ints. p. 18) Jenkins told Bray that he refused to write

such a statement because he did not have any problems with her and would continue to work

with her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 556-557; Ex. 13 Bray's Answers to Ints p. 18)

Bray also submitted a letter from Officer Kimbrough to the Review Board. (Pl LR56.1(b) Ex. 1

Bray dep. p. 558-559) Kimbrough has been a police officer for over 20 years. (Pl LR56.1(b) Ex.

2 Askew dep. p. 147) At his deposition, Askew stated that Kimbrough was "definitely a good

Officer" and that he valued her opinion. (Pl LR56.1(b) Ex. 2 Askew dep. p. 147) Bray also

submitted a statement from Officer Davina Loggins to the Review Board. (Pl LR56.1(b) Ex. 1

Bray dep. p. 560-561) Bray worked with Loggins "quite a few times" after her training cycles

were completed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 561) Askew testified at his deposition that

Loggins was "a damned good Police Officer." (Pl LR56.1(b) Ex. 2 Askew dep. p. 146)

74.     On October 20, 2000, Lt. Virginia Drozd was the Chairperson of the Field

Evaluation and Review Board ("Review Board") convened at the request of the 7th District

Commander, Maurice D. Ford, to review the performance of recruit Pamela Bray, and make a

recommendation regarding her future in the CPD. Ex. R, ¶ 3.

**RESPONSE:** Plaintiff only admits that the Affidavit states this.

75.     A Review Board may be convened to review and evaluate the performance of

recruits throughout their probationary period. An evaluation of the recruit's performance

includes, but is not limited to, a review of disciplinary records, medical records, field

performance, and academic training. Ex. R, ¶ 5.

**RESPONSE:** Plaintiff only admits that the Affidavit states this.

76.     A recruit's performance can be reviewed until the end of his or her probationary period in order to obtain as much information about the recruit's performance to make the most informed decision.

**RESPONSE:** Plaintiff only admits that the Affidavit states this.


There have been Review Board's in the past that have been convened shortly before a recruit's probationary period ends. Ex. R, ¶ 4.

**RESPONSE:** Deny. The defendant has presented no evidence that there have Review Board's in the past that have been convened shortly before a recruit probationary period ends.


77.     The Review Board that evaluated Pamela Bray's performance consisted of Lieutenant Michael Mealer, Sergeant Gertrude West, Sergeant Teresa Williams, Field Training Officer ("FTO") Kathy Purvis, and FTO Robert Tapia. As is general practice, this Review Board met at the Chicago Police Academy. Ex. R, ¶ 6.

**RESPONSE:** Plaintiff only admits that the Affidavit states this.


78.     The Review Board examined DORs and TCSRs on Bray's performance during her probationary period; a Final Summary Report; requests from Bray and an FTO for Bray to undergo a fourth remedial training cycle; a counseling session report regarding Bray's fourth remedial training cycle that reminds Bray that unsatisfactory performance could lead to her termination; a Remedial Summary Report; memoranda from two FTO's; Lt. Edward Zapolsky's memorandum on Bray's failure to exit her vehicle and assist her partner; and two SPARs. In the

course of its proceedings, the Review Board reviewed documentation containing evaluations of Bray. Ex. R, ¶ 7.

**RESPONSE:** Plaintiff only admits that the Affidavit states this. Plaintiff denies the characterization of Lt. Zapolsky's Memorandum. He states in the memo, "The reporting lieutenant finds that there was been too little time to properly and fairly evaluate PPO BRAY while assigned to patrol functions on the first watch. The reporting lieutenant therefore has to remain unsure of PPO BRAY"S ability to become a proficient police officer." (Pl LR56.1(b) Ex. 28 Zapolsky's Statement)

79. The Review Board also considered Bray's activity reports after she completed her fourth remedial cycle of training. The reports indicated low productivity consistent with a lack of initiative and a lack of confidence in the performance of her police duties. In fact, for Bray's period of activity from September 14, 2000 through October 18, 2000, Bray worked twenty (20) days and recorded 1 arrest, 1 recovered vehicle, 8 parking tickets, and 3 Chicago Transit checks. This is the amount of work an average police officer might complete in one day. Ex. R, ¶ 8.

**RESPONSE:** Deny. This statement is contradicted by the Review Board's own report. (Pl LR56.1(b) Ex. 47 Review Board Decision) In that report, the Review Board lists all documents reviewed. (Pl LR56.1(b) Ex. 47 Review Board Decision) Bray's activity reports were not listed. (Pl LR56.1(b) Ex. 47 Review Board Decision) These reports were not submitted to the EEOC during their investigation or to the plaintiff in response to plaintiff's Request for Production of Documents. (Pl LR56.1(b) Ex. 61-62 Defendants' First and Second Reponses to Plaintiff's Request for Production of Documents)

80.     After a Review Board reviews a particular recruit's performance, the Review

Board makes a recommendation to the Assistant Deputy Superintendent ("ADS") of the

Education and Training Division regarding the recruit. Ex. R, ¶ 9. The recommendations range

from a request for further academic and/or field training, counseling, termination, or no further

action. Ex. R, ¶ 9.

**RESPONSE:** Deny. Defendant does not cite evidence in the record to support these

assertions.


81.     At the conclusion of its proceedings, the Review Board examining Pamela Bray's

performance unanimously recommended that she be separated from the CPD based on her

conduct which revealed the following: 1) she was unable to adequately perform police duties; 2)

she was unwilling to assist and back up her partner when elements of danger and stress exist; 3)

and she failed to follow safety procedures. Some of plaintiff's unsafe conduct included failing to

handcuff prisoners until ordered to do so and sitting in the squad car while her partner was

effecting an arrest. Ex. R, ¶ 10.

**RESPONSE:** Deny. The Review Board based its decision to terminate Bray on

inaccurate and misleading gossip intentionally provided to it by Askew and Adams. (Pl

LR56.1(b) Ex. 47 Review Board Decision) Bray scored well on her Daily Observation Reports.

(Pl LR56.1(b) Ex. 29 Daily Observation Reports Summary) In fact, in a daring attempt to justify

his retaliatiatory actions, Askew claimed at his deposition he lied on Bray's evaluations and gave

her better scores so she would not be terminated. (Pl LR56.1(b) Ex. 2 Askew dep. p. 89, 133) At

his deposition Askew claimed that Bray did not actually deserve the rankings that he gave her on his Daily Observation Reports. (Pl LR56.1(b) Ex. 2 Askew dep. p. 90-91)

82.     As is the Review Board's general practice, the recruit being reviewed and evaluated, Pamela Bray, was not present when the Review Board convened. She did not speak to any of its members while it met to discuss her performance. Ex. R, ¶ 13; Ex. C, p. 410. In fact, plaintiff did not speak to any of the Review Board members before, during, or after they met to discuss her performance. Ex. C, pp. 411-12.

**RESPONSE:** Admit. The Review Board never spoke to Bray nor did their findings reflect that they reviewed or even received Bray's statement or the statements prepared by other officers on her behalf. (Pl LR56.1(b) Ex. 47 Review Board Decision)

83.     Also, as is the Review Board's general practice, no one besides members of the Review Board were present while the Review Board reviewed and evaluated Bray's performance, while the Review Board reached and summarized its findings, while the Review Board reached its conclusion, or while the Review Board reached its recommendation that Bray be separated from the CPD. Ex. R, ¶ 14. Askew and Adams were not present when the Review Board convened. Ex. G, pp. 183-84; Ex. H, pp. 79-80.

**RESPONSE:** Deny. The defendant has presented no evidence concerning how Review Boards in the past have been conducted. However, although Askew and Adams were not present, the Review Board relied on their statements which contained false and misleading information about Bray's performance. (Pl LR56.1(b) Ex. 47 Review Board Decision)

84.     The Review Board was convened and reviewed Bray's progress and performance in the same manner it does for all recruits whose performance is brought before it. Ex. R, ¶ 15. The Review Board summarized its deliberations during that session, reached a conclusion, and made a recommendation on Pamela Bray's future with the CPD in the same manner it does for all recruits whose performance is brought before it. Ex. R, ¶ 16.

**RESPONSE:** Deny. There is no evidence in the record that the Review Board was convened and reviewed Bray's progress and performance in the same manner it does for all recruits whose performance is brought before it. When PPO Spurgeon was accused of failing to do his job when he was working lock-up for not effectively searching a criminal who subsequently tried to hang himself with a bandana and a shoestring. (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 31-32) This incident occurred in July or August 2000, during Spurgeon's probationary period. (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 33, 36) Spurgeon did not get a hearing until March 2002, over a year and one half later. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 33-36) Spurgeon stated at his deposition that it was typical of the department to take a year to reprimand (or commend) someone. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 36)

85.     Based on its findings, the Review Board unanimously recommended to ADS Schenkel that plaintiff be separated from the CPD and that she be removed from her present detailed unit of assignment until a final determination of her status could be made. Lt. Drozd reported the Review Board's recommendation in a memorandum dated October 23, 2000 to ADS

Schenkel. Along with the Review Board's recommendation, Lt. Drozd included all the materials the Review Board considered during its conference. Ex. R, ¶ 11.

**RESPONSE:** Admit only that the Affidavit states this.

86. ADS Schenkel received written notice that the Review Board determined plaintiff's performance was substandard and a package containing the materials the Review Board examined during its session (Gary W. Schenkel's Deposition is attached hereto as Exhibit W, pp. 6-7); Ex. R, ¶ 11.

**RESPONSE:** Deny. The Review Board's Decision was based on false and misleading gossip provided to it by Askew and Adams. (Pl LR56.1(b) Ex. 47 Review Board Decision) However, the Board then goes on to rely on the "incident" which Askew claims he heard about in October 2000 from an unknown individual wherein Bray was ordered out of her car to assist her partner. (Pl LR56.1(b) Ex. 47 Review Board Decision) The Board's decision fails to note, however, that this "incident" took place five months earlier in May 2000 during Bray's second cycle of training – before she was rated "field qualified". (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571) The Board's decision also fails to note that the reason Bray did not get out of her car on that occasion in May 2000, was because the door had jammed and not because she was unwilling to assist her partner. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571) The decision also notes that allegedly "several police officers" in the district had requested not to be partnered with Bray because they do not feel safe working with her. (Pl LR56.1(b) Ex. 47 Review Board Decision) However, not one of these alleged police officers is identified. (Pl LR56.1(b) Ex. 47 Review Board Decision) Not one single police officer ever

requested in writing or in any other official police document no to work with Bray. (Pl LR56.1(b) Ex. 28 Zapolsky Statement) Jones stated at her deposition that she was never fearful of working with Bray and would not have asked to work with her again if she was. (Pl LR56.1(b) Ex. 4 Jones dep. p. 10) The Review Board based its decision to terminate Bray on inaccurate and misleading gossip intentionally provided to it by Askew. (Pl LR56.1(b) Ex.47 Review Board Decision) The Review Board's findings do not reflect that they reviewed or even received Bray's statement or the statements prepared by other officers on her behalf. (Pl LR56.1(b) Ex. 47 Review Board Decision)

ADS Schenkel does not always accept the Review Board's recommendation. Ex. D, ¶

**RESPONSE:** Deny. The defendant does not provide cited evidence of previous Review Boards' recommendations not accepted.

ADS Schenkel reviewed all the materials the Review Board did, plus plaintiff's statement and PO statements attached thereto, and her academy file, and independently determined to support the Review Board's recommendation. Ex. D, ¶¶ 9-15; Ex. W, pp. 9-10, 12.

**RESPONSE:** Deny. Schenkle did not review Bray's Statement or the statement's she submitted from the other police officers. (Def LR56.1(a) Ex. D Schenkle's Affidavit) In his Affidavit, Schenkle simply claims that he received the documents in addition to the initial packet he received from the Review Board. (Def LR56.1(a) Ex. D Schenkle's Affidavit) In fact, the First Amended Position Statement submitted by the City of Chicago to the EEOC, which lists and attaches the documents it claims were relied upon in making the decision to terminate Bray,

does not list nor attach Bray's statement nor the statements of the officers submitted by Bray. (Pl LR56.1(b) Ex. 26 City's Amended Position Statement)

87.     ADS Schenkel decided plaintiff should be terminated primarily because of her unsafe actions, including her unwillingness or inability to back up her partner and perform duties to which she was assigned.  Ex. W, p. 12; Ex. D, ¶¶ 9-15.

**RESPONSE:** Deny.  ADS Schenkle decided plaintiff should be terminated based on the false and misleading gossip provided to him by Askew and Adams.  (Pl LR56.1(b) Ex. 47 Review Board Decision)  Schenkle did not review Bray's Statement or the statements she submitted from the other police officers. (Def LR56.1(a) Ex. D Schenkle's Affidavit)  In his Affidavit, Schenkle simply claims that he received the documents in addition to the initial packet he received from the Review Board.  (Def LR56.1(a) Ex. D Schenkle's Affidavit)

88.     The Review Board's recommendation was unanimously approved by Commander of the Education and Training Division, Samuel T. Christian, and ADS Schenkel. Ex. R, ¶ 12, Ex. 2, D65.

**RESPONSE:** Plaintiff admits the documents state this.  Plaintiff also admits that ADS Schenkle and Samuel T. Christian approved plaintiff's termination based on the false and misleading gossip provided to them by Askew and Adams.  (Pl LR56.1(b) Ex. 47 Review Board Decision)

89.     On October 24, 2000, in accordance with his termination procedures, ADS

98

Schenkel notified plaintiff that her employment with the CPD was terminated, effective at the close of business on October 24, 2000. Ex. W, pp. 13-18, 20, Ex. 1, 000055. Lt. Skahill and Commander Christian were also present. Ex. C, pp. 421; Ex. W, p. 16; Ex. I, pp. 11-12.

**RESPONSE:** Admit, Skahill gave Bray a termination notification. (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 10 Skahill dep. p. 15) When she asked why she was being terminated, Deputy Superintendent Schenkel responded, "I don't have to give you a reason." (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 15 Bray's Notes p. 000115) Bray refused to sign the termination notification. (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 15 Bray's Notes p. 000115) In the Review Board's written decision, although it mentions a couple of minor problems Bray had during her training cycles, it also notes that during her fourth cycle of training she improved her performance and was rated "qualified." (Pl LR56.1(b) Ex. 47 Review Board Decision )

Bray did not attempt to report any alleged sexual harassment, alleged inappropriate behavior, or alleged retaliation during her termination. Ex. D, ¶ 16; Ex. C, p. 428; Ex. I, pp. 19, 21.

**RESPONSE:** Admit, however, this was because as plaintiff continues on to state, "I was not going to because I figured that with the way that they were discharging me was unfair, so, like I said I did not really trust anybody in the department. (Pl LR56.1(b) Ex. 1 Bray dep. p. 428) She had previously tried to report it and been told, it was "too late." (Pl LR 56.1 Ex. Bray dep. p. 393-394)

Plaintiff does not believe that ADS Schenkel or Lt. Skahill knew she was allegedly

99

sexually harassed by Askew or Adams. Ex. C, pp. 428-29.

**RESPONSE:** Deny. Plaintiff attempted to tell Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 24; Ex. 1 Bray dep. p. 393-394) However, Judon cut her off stating, "it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394)

90.     ADS Schenkel read plaintiff his standard termination statement and gave her a termination letter in the same manner he has to all individuals for whom he approved terminations. Ex. W, pp. 14-17; Ex. D, ¶ 17; (Plaintiff's Answers to Interrogatories are attached hereto as Exhibit U, No. 20).

**RESPONSE:** Deny. There is no evidence in the record that states in what manner he has given all individuals letters for whom he approved terminations. Furthermore, when she asked why she was being terminated, Deputy Superintendent Schenkel responded, "I don't have to give you a reason." (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 15 Bray's Notes p. 000115)

Plaintiff received the termination letter. Ex. C, p. 424; (Schenkel's Termination Procedures and Plaintiff's Termination Letter attached hereto as Exhibit X, D1021).

**RESPONSE:** Admit, Skahill gave Bray a termination notification. (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 10 Skahill dep. p. 15) When she asked why she was being terminated, Deputy Superintendent Schenkel responded, "I don't have to give you a reason." (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 15 Bray's Notes p. 000115) Bray refused to sign the termination

notification. (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 15 Bray's Notes p. 000115)

This was three or four days after she was notified that her performance would be reviewed and if the board found it insufficient, she would be terminated. Ex. C, p. 424.

**RESPONSE:** Admit that at this initial notification meeting when she received this notice, plaintiff attempted to report the sexual harassment she endured from Askew and Adams Bray then attempted to tell Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 24; Ex. 1 Bray dep. p. 393-394) However, Judon cut her off stating, "it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394) This meeting and Bray's termination occurred also approximately two weeks after Bray threatened to report Askew if he touched her again. (Pl LR56.1(b) Ex. 1 Bray dep. p. 390-392; Ex. 9 Judon dep. p. 14; Ex. 13 Bray's Answers to Ints p. 23-24; Ex. 15 Bray's Notes p. 000111)

The letter stated plaintiff's termination was in compliance with Rule IX, Section 2 of the City's Personnel Rules and Regulations. Ex. C, pp. 9-10; Ex. X, D1021. Rule IX, Section 2 states a department head may discharge an employee during the probationary period (City of Chicago Personnel Rules attached hereto as Exhibit Y, Rule 9, § 2, p. 20).

**RESPONSE:** Deny. Bray's termination was not in compliance with the law. Plaintiff was terminated based on the false and misleading gossip provided to the Review Board by Askew and Adams in retaliation for opposing sexual harassment. (Pl LR56.1(b) Ex. 47 Review Board Decision) It is illegal to terminate an employee in retaliation for threatening to report their

supervisor for sexual harassment. Pursuant to <u>Burlington Industries v. Ellerth</u> 118 S.Ct. 2257(1998), a supervisor is vicariously liable for the sexual harassment he commits upon an employee below him regardless of whether or not the employee complained.

91. Plaintiff does not allege that any of the members of the Review Board sexually harassed her or created a sexually hostile environment. Ex. C, p. 412.

**RESPONSE:** Plaintiff admits that Bruce Askew, one of Bray's Field Training Officers, sexually harassed Bray on numerous occasions from on or about May 2000 through the duration of her employment to on or about October 2000 (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 3; Ex. 19 EEOC Determination) Donna Adams, another one of Bray's Field Training Officers, sexually harassed Bray from on or about July 2000 through August 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 321-322; Ex. 13 Bray's Answers to Ints p. 8; Ex. 19 EEOC Determination) sexually harassed her.

Plaintiff has no reason to believe the Review Board knew that Askew or Adams were allegedly harassing her. Ex. C, p. 425.

**RESPONSE:** Deny. Plaintiff attempted to tell Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 24; Ex. 1 Bray dep. p. 393-394) However, Judon cut her off stating, "it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394)

also believes the Review Board treated her differently than other PPO's because, "like I say, even with the whole firing process, it was unheard of. I mean, the whole rushing me down to the academy, you know, not receiving all my performances, this was–this was all that I was told. No one explained. No one took out the time to say anything. The whole seven hours, no one–I sat down there, no one said anything, so I feel that the department is just as guilty." Ex. C, pp. 425-26. Plaintiff also believes ADS Schenkel and Lt. Skahill retaliated against her because, "the way that [my termination] was done and with these officers submitting To / Froms [sic] regarding me, the way I was terminated, I don't think that it was done correctly." Ex. C, p. 428. Plaintiff does not know if ADS Schenkel and Lt. Skahill treated her differently than they treated other PPO's. Ex. C, p. 429. They did not. Ex. D, ¶ 17; Ex. W, pp. 14-18; Ex. I, p. 19.

**RESPONSE:** Plaintiff admits that she feels she was retaliated against. In the Review Board's written decision, although it mentions a couple of minor problems Bray had during her training cycles, it also notes that during her fourth cycle of training she improved her performance and was rated "qualified." (Pl LR56.1(b) Ex. 47 Review Board Decision) However, the Board then goes on to rely on the "incident" which Askew claims he heard about in October 2000 from an unknown individual wherein Bray was ordered out of her car to assist her partner. (Pl LR56.1(b) Ex. 47 Review Board Decision) The Board's decision fails to note, however, that this "incident" took place five months earlier in May 2000 during Bray's second cycle of training – before she was rated "Field Qualified." (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571) The Board's decision also fails to note that the reason Bray did not get out of her car on that occasion in May 2000, was because the door had jammed and not because she was unwilling to assist her partner. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-

351, 353, 570-571) The decision also notes that allegedly "several police officers" in the district had requested not to be partnered with Bray because they do not feel safe working with her. (Pl LR56.1(b) Ex. 47 Review Board Decision) However, not one of these alleged police officers is identified. (Pl LR56.1(b) Ex. 47 Review Board Decision) Not one single police officer ever requested in writing or in any other official police document not to work with Bray. (Pl LR56.1(b) Ex. 28 Zapolsky Statement) Jones stated at her deposition that she was never fearful of working with Bray and would not have asked to work with her again if she was. (Pl LR56.1(b) Ex. 4 Jones dep. p. 10) The Review Board based its decision to terminate Bray on inaccurate and misleading gossip intentionally provided to it by Askew. (Pl LR56.1(b) Ex.47 Review Board Decision) The Review Board's findings do not reflect that they reviewed or even received Bray's statement or the statements prepared by other officers on her behalf. (Pl LR56.1(b) Ex. 47 Review Board Decision) The Review Board did not review any documents or statements submitted by Bray. (Pl LR56.1(b) Ex. 47 Review Board Decision; Ex. 26 Def's Amended Position Statement) In fact, the First Amended Position Statement submitted by the City of Chicago to the EEOC, which lists and attaches the documents it claims were relied upon in making the decision to terminate Bray, does not list nor attach Bray's statement nor the statements of the officers submitted by Bray. (Pl LR56.1(b) Ex. 26 Def's Amended Position Statement) Moveover, Bray was treated differently than Officer Spurgeon who graduated from the Police Academy at the same time as Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 8) Spurgeon testified at his deposition that he also had Askew as a Field Training Officer and that Askew made the same negative comments about him that he did about Bray when he was PPO, including a comment that Spurgeon did not like to cuff people. (Pl

LR56.1(b) Ex. 5 Spurgeon dep. p. 10, 27) At his deposition, Spurgeon described an incident

wherein Askew became "pissed" at him because he hesitated in cuffing an individual involved in

an aggravated battery. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 12, 27) In fact, Spurgeon relayed

an incident about a domestic situation wherein a young woman hit a man with a bottle, which

was virtually identical to an incident Askew criticized Bray about at his deposition. (Pl

LR56.1(b) Ex. 2 Askew dep. p. 37-38; Ex. 5 Spurgeon dep. p. 27-28) During his probationary

period, Askew criticized Spurgeon's confidence and assertiveness and complained that he was

too soft-spoken. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 12, 28, 29) Spurgeon admitted that he

was reprimanded on one occasion when he was working lock-up for not effectively searching a

criminal who subsequently tried to hang himself with a bandana and a shoestring. (Pl LR56.1(b)

Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 31-32) This incident occurred in July or August

2000, during Spurgeon's probationary period. (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5

Spurgeon dep. p. 33, 36) Spurgeon did not get a hearing until March 2002, over a year and one

half later. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 33-36) Spurgeon stated at his deposition that it

was typical of the department to take a year to reprimand (or commend) someone. (Pl LR56.1(b)

Ex. 5 Spurgeon dep. p. 36) At one point things got so bad between Askew and Spurgeon, Askew

did not want to work with Spurgeon. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 26, 37) In fact,

Spurgeon admitted at his deposition that "a lot of guys don't want to work with me." (Pl

LR56.1(b) Ex. 5 Spurgeon dep. p. 37) Spurgeon testified that one female officer told him she did

not want to work with him because she did not feel he was safe. (Pl LR56.1(b) Ex. 5 Spurgeon

dep. p. 37) Spurgeon also admitted that another female officer threatened to report him to the

commander because she did not feel he was doing his job and was not being assertive. (Pl

LR56.1(b) Ex. 5 Spurgeon dep. p. 60) Askew told Bray that he wanted to terminate Spurgeon. (Pl LR56.1(b) Ex. 1 Bray dep. p. 547) Despite the similarities between Bray and Spurgeon, Spurgeon was not terminated. (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 7)

## VII.   THE ALLEGED SEXUAL HARASSMENT

### A.   BRUCE ASKEW

93.   Askew never had a romantic interest in plaintiff. Ex. G, p. 159.

**RESPONSE:** Deny. Plaintiff states that on or about June 2000, Askew began sending messages to Bray over the "PDT", Personal Data Computer, asking her out on dates. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78, 584-585; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000108, 000114; Ex. 18 EEOC Questionnaire) At the same time Askew would ask Bray out to the movie theater, he would remind her how many days she had left before her probationary period was over. (Pl LR56.1(b) Ex. 15 Bray's Notes p. 000108) Askew asked Bray out on approximately 10 separate occasions. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80) Bray refused every offer. (Pl LR56.1(b) Ex. 1 Bray dep. p. 79; Ex. 13 Bray's Answers to Ints p. 6) Even after she repeatedly refused his advances, Askew would continue to ask her out. (Pl LR56.1(b) Ex. 1 Bray dep. 80) Askew's messages on the PDT made Bray feel uncomfortable and embarrassed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 585)

Plaintiff alleges the first incident of sexual harassment with Askew occurred during her second cycle, while performing routine patrols. Ex. C, pp. 65-66.

**RESPONSE:** Admit in part. Deny in part. Plaintiff admits that this occurred. Plaintiff

denies that this was the "first incident" of sexual harassment. On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107) Askew would say such things as, "look at the tits on that broad," or "look at the ass on that woman." (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107) At his deposition, Askew admitted that he "probably" made such sexually offensive comments and displayed the extent of his bravado by adding that he probably remarked, "nice rack" as well. (Pl LR56.1(b) Ex. 2 Askew dep. p. 111-112) Askew also admitted that while he was Bray's Field Training Officer, he and Bray would park outside the Taste Nightclub at 4:00 o'clock in the morning on Saturday nights where there are "a lot of scantily clad women" and he would "sit there and just kind of ogle." (Pl LR56.1(b) Ex. 2 Askew dep. p. 112) Askew testified that when he ogled at the women, Bray would make comments like, "you ought to quit," or "you already have a girlfriend. What do you need with them?" (Pl LR56.1(b) Ex. 2 Askew dep. p. 113)

Routine patrolling requires and officer to observe and "look for crimes, look for suspicious people. Do traffic stops, look for traffic violators. Respond to calls, though, mostly." Ex. C, p. 66.

**RESPONSE:** Admit that plaintiff states this in her deposition.

They were in the squad car and Askew drove to 74th and Lowe under a viaduct. Ex. C, p. 65.

**RESPONSE:** Admit, however, Askew parked the car and turned off the engine. (Pl LR56.1(b) Ex. 1 Bray dep. p. 67)

Plaintiff does not recall any advice or training Askew gave her while on routine patrol. Ex. C, p. 68.

**RESPONSE:** Plaintiff admits that Askew never stated why they were at the viaduct. (Pl LR56.1(b) Ex. 1 Bray dep. p. 67-68)

Askew allegedly stated that "when he was a teenager, he used to come to this lot to have sex, and that other officers would come there while on duty. And he then made the comment that one day I might end up back there." Ex. C, p. 65.

**RESPONSE:** Admit.

Plaintiff does not recall if Askew told her anything else. Ex. C, p. 67.

**RESPONSE:** Admit.

Plaintiff's response was, "I don't do things like that." Ex. C, p. 65, 68.

**RESPONSE:** Admit.

94.     Plaintiff alleges the second incident of sexual harassment with Askew occurred during her second cycle while at 74th and Damen. Ex. C, pp. 68-69.

**RESPONSE:** Plaintiff admits Askew took her to this secluded area. (Pl LR56.1(b) Ex. 1

Bray dep. p. 68)

Plaintiff stated that this is "like a railroad track, a factory; it's a wooded area. He took me back there, and he told me that sometimes they find dead bodies back there." Ex. C, pp. 68-69.

**RESPONSE:** Admit.

Then Askew allegedly stated that "two sergeants . . . got caught in the same area having–performing oral sexual [sic]." Ex. C, p. 69. He allegedly said "it was a joke going around the district where they were asking that sergeant how he enjoyed his lunch." Ex. C, p. 69. Plaintiff states she did not "say anything [in response.] I just shook my head." Ex. C, p. 69.

**RESPONSE:** Admit that Askew said this, however even though Bray didn't say anything when Askew made such comments she felt humiliated and degraded by Askew's comments. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71; Ex. 13 Bray's Answers to Ints p. 4)

95.     The first couple of days plaintiff states that Askew was "polite, he cracked a lot of jokes, he was okay. He would teach me procedures, burglaries and things like that, showed me how to do alarms, how to ticket companies that alarms–were false alarms, things like that." Ex. C, p. 269.

**RESPONSE:** Admit.

And "when I was telling him things like, you know, that I have five children and stuff like that, that's when he started with the, Get away from Bray stuff. . . . he started cracking jokes and

stuff, saying I was so fertile, I better not get too close to you because you might get pregnant."
Ex. C, pp. 269-70, see 473.

**RESPONSE:** Admit, however, Bray states "it seems like shortly after that [the first couple

of days] that's when he started like getting my history and asking me a little about myself. And

when I was telling him things like, you know, that I had five children and stuff like that, that's

when he started with the get away from Bray stuff...he started cracking jokes and stuff, saying

that I was so fertile, I better not get too close to you because you might get pregnant." Ex. C. pp.

269-70, see 473. (Pl LR56.1(b) Ex. 1 Bray dep. p. 269-270, 473) His remarks became

increasingly more offensive when on another occasion, in July or August 2000, after the 8 a.m.

roll-call, Askew told Bray, "you wouldn't have so many children if you swallowed." (Pl

LR56.1(b) Ex. 1 Bray dep. p. 54; Ex. 7 Johnson dep. p. 64-65; Ex. 13 Bray's Answers to Ints p.

5; Ex. 15 Bray's Notes p. 000114; Ex. 18 EEOC Questionnaire) Bray understood his comment

to mean that she should have engaged in fellatio instead of intercourse to avoid having so many

children. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 5) Bray responded by telling Askew,

"you have a disgusting mouth." (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 5) Each time

Askew made a derogatory comment about her fertility, Bray felt awkward, uncomfortable,

humiliated, embarrassed, and degraded. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71, 271; Ex. 13 Bray's

Answers to Ints p. 5)


Plaintiff, who has never been married, has five children by three different fathers. Ex. C,
pp. 160-63, 453-67.

**RESPONSE:** Admit, however, plaintiff fails to see how this fact is relevant to this case.

111

Plaintiff alleges Askew's comments about her fertility constitute the third incident of sexual harassment. These comments usually happened in the parking lot with other people present. Ex. C, pp. 70-71.

**RESPONSE:** Admit in part. Deny in part. Deny this was the "third incident" of sexual harassment. On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107) Askew would say such things as, "look at the tits on that broad," or "look at the ass on that woman". (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107) At his deposition, Askew admitted that he "probably" made such sexually offensive comments and displayed the extent of his bravado by adding that he probably remarked, "nice rack" as well. (Pl LR56.1(b) Ex. 2 Askew dep. p. 111-112) Askew also admitted that while he was Bray's Field Training Officer, he and Bray would park outside the Taste Nightclub at 4:00 o'clock in the morning on Saturday nights where there are "a lot of scantily clad women" and he would "sit there and just kind of ogle." (Pl LR56.1(b) Ex. 2 Askew dep. p. 112) Askew testified that when he ogled at the women, Bray would make comments like, "you ought to quit," or "you already have a girlfriend. What do you need with them?" (Pl LR56.1(b) Ex. 2 Askew dep. p. 113) Admit that Askew would say things like, "You all better get away from Bray because she's very fertile; if you get near her, she'll get pregnant" while she was in a parking lot with a group of guys. He would also say, "Don't touch her; she'll get pregnant." (Pl LR56.1(b) Ex. 1 Bray dep. p. 70, 270, 275, 473; Ex. 2 Askew dep. p. 119, 121; Ex. 5 Spurgeon dep. p. 24-25; Ex. 7 Johnson

dep. p. 65; Ex. 13 Bray's Answers to Ints p. 5; Ex. 15 Bray's Notes p. 000106; Ex. 18 EEOC

Questionnaire) This occurred more than three times. (Pl LR56.1(b) Ex. 1 Bray dep. p. 70) He

also commented to Bray that, "I got to get away from you, because if I bump you, you just might

get pregnant." (Pl LR56.1(b) Ex. 1 Bray dep. p. 70) Askew also made a comment to Bray in

August 2000 that she was the "old lady in the shoe, who had so many children she didn't know

what to do." (Pl LR56.1(b) Ex. 2 Askew dep. p. 121; Ex. 15 Bray's Notes p. 000107, 000114)

On another occasion, in July or August 2000, after the 8 a.m. roll-call, Askew told Bray, "you

wouldn't have so many children if you swallowed." (Pl LR56.1(b) Ex. 1 Bray dep. p. 54; Ex. 7

Johnson dep. p. 64-65; Ex. 13 Bray's Answers to Ints p. 5; Ex. 15 Bray's Notes p. 000114; Ex.

18 EEOC Questionnaire) Bray understood his comment to mean that she should have engaged in

fellatio instead of intercourse to avoid having so many children. (Pl LR56.1(b) Ex. 13 Bray's

Answers to Ints p. 5) Bray responded by telling Askew, "you have a disgusting mouth." (Pl

LR56.1(b) Ex. 13 Bray's Answers to Ints p. 5)


Some people laughed. Ex. C, p. 71.

**RESPONSE:** Deny. Plaintiff states, "some guys laughed." (Pl LR56.1(b) Ex. 1 Bray

dep. p. 70)


Officer Spurgeon was allegedly present during one time. Ex. C, pp. 121-22.

**RESPONSE:** Admit that Spurgeon was present.


Officer Spurgeon testified that plaintiff did not appear upset by the one comment he heard

113

(Benny Spurgeon's Deposition is attached hereto as Exhibit BB, pp. 24-26).

**RESPONSE:** Deny. Each time Askew made a derogatory comment about her fertility, Bray felt awkward, uncomfortable, humiliated, embarrassed, and degraded. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71, 271; Ex. 13 Bray's Answers to Ints p. 5) However, she did not say anything because she feared losing her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71; Ex. 4 Jones dep. p. 26; Ex. 13 Bray's Answers to Ints p. 4)

Plaintiff said nothing to Askew about these alleged comments. Ex. C, p. 71.

**RESPONSE:** Each time Askew made a derogatory comment about her fertility, Bray felt awkward, uncomfortable, humiliated, embarrassed, and degraded. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71, 271; Ex. 13 Bray's Answers to Ints p. 5) However, she did not say anything because she feared losing her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71; Ex. 4 Jones dep. p. 26; Ex. 13 Bray's Answers to Ints p. 4) Jones, who was a police officer with the City of Chicago for 10 years at the time, advised Bray to "keep a record of everything, dates and times. . . because you are still on probation and pretty much [Askew and Adams] can get you fired at any time." (Pl LR56.1(b) Ex. 4 Jones dep. p. 6, 16)

97.    The fourth alleged incident of sexual harassment by Askew involved "sending messages on the PDT [personal data computer in the car] asking" plaintiff and her children to the movies. Ex. C, p. 78. Askew only asked plaintiff to come with her children to the movies. Ex. C, pp. 78-80. Plaintiff always responded, "No." Ex. C, pp. 79-80. Plaintiff does not know if

Askew invited other officers. Ex. C, p. 79. Askew worked part-time at a movie theater and invited his co-workers to come because he could get them in for free. Ex. G, pp.61,130-31.

**RESPONSE:** Deny in part. Admit in part. Deny that this was the "fourth alleged incident" of sexual harassment. On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107) Admit that the Personal Data Computer is located in the patrol car and is able to receive messages and calls. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78, 584-585) These messages are not kept on the computer, but simply flashed across the screen. (Pl LR56.1(b) Ex. 1 Bray dep. p. 79) Askew's messages asked Bray to bring her children to the movie theater where he worked a second job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000108, 000114) He promised he would treat them to hot dogs, soda, and popcorn if she did. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78-79; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000108, 000114) At the same time Askew would ask Bray out to the movie theater, he would remind her how many days she had left before her probationary period was over. (Pl LR56.1(b) Ex. 15 Bray's Notes p. 000108) Askew asked Bray out on approximately 10 separate occasions. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80) Bray refused every offer. (Pl LR56.1(b) Ex. 1 Bray dep. p. 79; Ex. 13 Bray's Answers to Ints p. 6) Even after she repeatedly refused his advances, Askew would continue to ask her out. (Pl LR56.1(b) Ex. 1 Bray dep. 80) Askew's messages on the PDT made Bray feel uncomfortable and embarrassed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 585) Askew also would call Bray "fatso" and "made some kind of joke about shoving something down my throat." (Pl LR56.1(b) Ex. 1 Bray dep. p. 585) Plaintiff

states that she deleted this message "really fast because I didn't want the other officer to see it because it was embarrassing." (Pl LR56.1(b) Ex. 1 Bray dep. p. 585

Plaintiff did not consider Askew to be her supervisor when he was not her FTO. Ex. C, pp. 80-81. Askew was no longer her FTO after mid-May 2000. Ex. C, 266-67.

**RESPONSE:** Deny. Plaintiff feared that Askew would retaliate against her and cause her to lose her job if she did or said anything. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71; Ex. 4 Jones dep. p. 26; Ex. 13 Bray's Answers to Ints p. 4) On or about October 4, 2000, when Bray finally had enough of Askew's sexual harassment and threatened to report Askew to his supervisor if he touched her again. (Pl LR56.1(b) Ex. 1 Bray dep. p. 87-90, 436; Ex. 13 Bray's Answers to Ints p. 8) In retaliation, then Askew contacted the Police Academy and requested that they evaluate Bray's performance and recommended to the Review Board that they terminate her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter)

The fifth incident of alleged sexual harassment happened on September 19, 2000 in felony court at 26th and California. Ex. C, p. 93.

**RESPONSE:** Admit in part. Deny in part. Admit this occurred. Deny that this was the "fifth incident of alleged sexual harassment." On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

116

Askew went with plaintiff and another PPO to court at her request "to, you know, show me how to do the court procedures because I wasn't familiar with court." Ex. C, p. 93, see 102-03. While court was in session and while they were sitting, Askew allegedly touched plaintiff's leg near her ankle and her ankle through her sock. Ex. C, pp. 93-94, 142-146. This lasted one second. Ex. C, pp. 94, 97. Plaintiff had her legs crossed and was wearing pants. Ex. C, p. 144. Askew did not say anything to plaintiff before or after he allegedly touched the bottom of her leg and ankle. Ex. C, p. 94. Plaintiff claims she told Askew to stop. Ex. C, pp. 94-95. Askew allegedly got up shortly thereafter and left the court room. Ex. C., pp. 97-98, 145. Askew tapped her on the leg to indicate it was time to be briefed by the State's Attorney. Ex. G, pp. 137-39.

**RESPONSE:** Deny. Plaintiff admits that on or about September 19, 2000, Bray was required to appear at the Cook County District Court at 26th and California to testify as a witness to a felony. (Pl LR56.1(b) Ex. 1 Bray dep. p. 93; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000109) Bray was not familiar with the standard procedures in testifying, so she asked Askew to accompany her to the courtroom since he was her Field Training Officer at the time of the incident. (Pl LR56.1(b) Ex. 1 Bray dep. p. 93, 102; Ex. 2 Askew dep. p. 135; Ex. 13 Bray's Answers to Ints p. 6-7; Ex. 15 Bray's Notes p. 000109) While court was in session, Askew grabbed Bray's leg and rubbed her ankle. (Pl LR56.1(b) Ex. 1 Bray dep. p. 94-95, 144-145; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109) Bray quickly pulled her leg away from Askew and whispered for him to stop. (Pl LR56.1(b) Ex. 1 Bray dep. p. 94-95; Ex. 13 Bray's Answers to Ints p. 7) Askew then "got an instant attitude" and abruptly left the courtroom while court was in session. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97, 145; Ex. 13 Bray's

Answers to Ints p. 7) Bray was left alone without knowing the proper procedures. (Pl LR56.1(b) Ex. 1 Bray dep. p. 88-90; Ex. 13 Bray's Answers to Ints p. 7) Consequently, court had to be continued. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97-98)

Askew tapped her on the leg to indicate it was time to be briefed by the State's Attorney. Ex. G, pp. 137-39.

**RESPONSE:** Deny. Askew "got an instant attitude" and abruptly left the courtroom while court was in session. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97, 145; Ex. 13 Bray's Answers to Ints p. 7) Bray was left alone without knowing the proper procedures. (Pl LR56.1(b) Ex. 1 Bray dep. p. 88-90; Ex. 13 Bray's Answers to Ints p. 7) Consequently, court had to be continued. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97-98) Askew returned to the courtroom approximately 30 minutes later. (Pl LR56.1(b) Ex. 1 Bray dep. p. 98; Ex. 13 Bray's Answers to Ints p. 7) Bray and Askew then left together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 98) While riding down in the elevator, Askew asked Bray, "What is your waist size, a 22 or 23?" (Pl LR56.1(b) Ex. 1 Bray dep. p. 98; Ex. 13 Bray's Answers to Ints p. 7) Bray responded, "none of your business." (Pl LR56.1(b) Ex. 1 Bray dep. p. 99; Ex. 13 Bray's Answers to Ints p. 7)

98.     Then as they were leaving the courthouse, plaintiff alleges Askew jumped into the same revolving-door partition "and grabbed my waist and started like giving me a bear hug." Ex. C, p. 99; Ex. U, No. 3(1)(h). This lasted a "couple of seconds." Ex. C, p. 101. She said nothing else to him. Ex. C, p. 101. There was a crowd going in and coming out of the courthouse. Ex. C, pp. 99-100. When they were coming out of the door, plaintiff claims she told him to stop. Ex. C,

p. 101.

RESPONSE: Admit that when they exited the building through the revolving doors, Askew jumped in the partition with Bray, grabbed her waist and gave her a bear hug. (Pl LR56.1(b) Ex. 1 Bray dep. p. 99; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109) Askew pressed Bray up against the window of the partition and pushed his body against hers so hard that she could feel his penis on her buttocks. (Pl LR56.1(b) Ex. 1 Bray dep. p. 99-101, 147; Ex. 13 Bray's Answers to Ints p. 7) When Askew pressed up against her, she could feel that his penis was hard. (Pl LR56.1(b) Ex. 1 Bray dep. p. 148; Ex. 13 Bray's Answers to Ints p. 7) Bray felt humiliated and very embarrassed by Askew's conduct. (Pl LR56.1(b) Ex. 1 Bray dep. p. 148; Ex. 13 Bray's Answers to Ints p. 7) As they exited the revolving doors, Bray told Askew to stop. (Pl LR56.1(b) Ex. 1 Bray dep. p. 101) Askew then asked Bray if she had a boyfriend. (Pl LR56.1(b) Ex. 1 Bray dep. p. 102; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109) Bray responded "no" and that she was not interested in a relationship. (Pl LR56.1(b) Ex. 1 Bray dep. p. 102; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109). Askew commented that, "You are too young to be thinking like that. You should go out and just fuck everybody." (Pl LR5.1(b) Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109) Bray got in the car and did not respond. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 7) Once again Bray felt uncomfortable and embarrassed by Askew's comments. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 7)

99.     Plaintiff asked Askew about Officer Corey Walker, who used to be Askew's partner, because she was interested in him. Ex. G, pp. 121-124. After dropping plaintiff off near

119

her car in the 7th District, Askew allegedly commented that Walker, whom plaintiff dated off and on, was not the marrying type. Ex. C, pp. 101-02, 103. Askew then allegedly said, "Anyway, you're too young to be thinking about marriage, you should go out and fuck everybody." Ex. C, p. 103. Plaintiff "just shook her head and got in [her] car." Ex. C, p. 104. She said nothing. Ex. C, p. 104.

**RESPONSE:** Deny. Plaintiff admits that Askew then asked Bray if she had a boyfriend. (Pl LR56.1(b) Ex. 1 Bray dep. p. 102; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109) Bray responded "no" and that she was not interested in a relationship. (Pl LR56.1(b) Ex. 1 Bray dep. p. 102; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109). Askew commented that, "You are too young to be thinking like that. You should go out and just fuck everybody." (Pl LR5.1(b) Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109) Bray got in the car and did not respond. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 7) Once again Bray felt uncomfortable and embarrassed by Askew's comments. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 7)

100.    The sixth alleged incident of sexual harassment also occurred after Askew was plaintiff's FTO. Ex. C, p. 80.

**RESPONSE:** Admit that this occurred after Askew was her FTO. Deny that this was the "sixth alleged incident." On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

At this time, plaintiff did not consider Askew her supervisor. Ex. C, p. 81.

**RESPONSE:** Deny. Plaintiff believed that Askew could retaliate against her and cause her to lose her job if she ever complained to him about the sexual harassment, which he did by contacting the Police Academy after she threatened to report him and requested that they evaluate Bray's performance and recommended to the Review Board that they terminate her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71, 80; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter; Ex. 4 Jones dep. p. 26; Ex. 13 Bray's Answers to Ints p. 4)

Plaintiff could not pinpoint whether this allegedly happened in July, August, September or October 2000. Ex. C, pp. 81, 434; Ex. U, No. 3(1)(g).

**RESPONSE:** Deny. On two separate occasions on or about August or September 2000, Askew approached Bray and asked her if she had her bulletproof vest on. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000110)

Plaintiff states that twice, while in the hall in the 7th District, FTO Askew "came up to me and said, Bray, do you have on your [bullet-proof] vest?" Plaintiff claims that before she could answer he touched her bullet-proof vest. Ex. C, pp. 81-82.

**RESPONSE:** Plaintiff admits that this occurred, however, Askew did not simply touch her breast as defendant tries to characterize, Bray states explicitly he "grabbed" her breast. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82)

Each time Askew allegedly touched her bullet-proof vest in the vicinity of where

121

plaintiff's breasts are, she had on a cotton bra, a cotton T-shirt over her bra, a cotton shirt over her T-shirt, a uniform shirt over that, and then the bullet-proof vest. Ex. C, pp. 137-38. The bullet-proof vest was visible. Ex. C, p. 138.

**RESPONSE:** Admit, however, plaintiff states she felt the grasp he had on her breast when he grabbed her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82, 139-140) Askew did not merely "touch" Bray "in the vicinity of her breasts," he "grabbed" her breasts. . (Pl LR56.1(b) Ex. 1 Bray dep. p. 82)


101.    The vest is designed to stop bullets and is made of a dense nylon material. Ex. C, p. 139; Ex. R, ¶ 2. Plaintiff describes it "like a metal coverage," and about an inch thick. Ex. C, p. 139-40. The bullet-proof vest is made of a thick, stiff, firm material that deadens sensation beneath it. Ex. R, ¶ 2; Ex. E, ¶ 2. It is body-armor designed to absorb and distribute the force of contact made by any object that touches it. Ex. E, ¶ 2. On the two occasions Askew allegedly touched plaintiff's vest, she "could feel pressure." Ex. C, p. 140.

**RESPONSE:** Admit, however, plaintiff states she felt the grasp he had on her breast when he grabbed her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82, 139-140)


When Askew allegedly touched plaintiff on her bullet-proof vest, it lasted one second. Ex. C, p. 97.

**RESPONSE:** Deny. Defendant cites evidence that refers to the instance when he touched her ankle. Plaintiff's response is not specifically in reference to this incident. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97)

Plaintiff states people were around, but does not recall who, except the second time, Officer Arlene Tankson allegedly was one of the people present. Ex. C, p. 82.

**RESPONSE:** Plaintiff admits that Arlene Tankson was present the second time. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82)

At her deposition, plaintiff claimed she told Askew to stop afterwards and he just started laughing. Ex. C, p. 83.

**RESPONSE:** Admit.

In her interrogatories, however, plaintiff does not claim she told Askew to stop; instead, she wrote that she immediately walked away. Ex. U, No. 3(1)(g).

**RESPONSE:** Deny. The cited document does not refer to this specific incident that occurred when her grabbed her breasts.

102.    Plaintiff's seventh alleged incident of sexual harassment is when Askew allegedly touched plaintiff's bullet-proof vest a third time. Ex. C, pp. 84-85.

**RESPONSE:** Deny. Admit that Askew "grabbed" Bray's chest. (Pl LR56.1(b) Ex. 1 Bray dep. p. 85) She felt the grasp he had on her breast when he grabbed her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82, 139-140) Deny that this was the "seventh alleged incident of sexual harassment." On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442;

Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

This allegedly occurred in the 7th District's interview room on October 4, 2000 with an arrestee present. Ex. C, pp. 85-86.

**RESPONSE:** Admit.

Askew came into the interview room to help plaintiff and Officer Davina Loggins with an arrest. Ex. C, p. 85.

**RESPONSE:** Admit.

While Officer Loggins left to make notification, Askew allegedly touched plaintiff's bullet-proof vest in the vicinity of where her breasts are. Ex. C, p. 85-86.

**RESPONSE:** Deny. Askew "grabbed" Bray's chest. (Pl LR56.1(b) Ex. 1 Bray dep. p. 85) She felt the grasp he had on her breast when he grabbed her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82, 139-140)

This lasted one second. Ex. C, p. 97.

**RESPONSE:** Deny. Defendant cites evidence that refer to the instance when her touched her ankle. Plaintiff's response is not specifically in reference to this incident. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97)

Plaintiff had on four layers of clothes and a bullet-proof vest on top. Ex. C, pp. 137-38.

124

The bullet-proof vest was visible. Ex. C, p. 139.

**RESPONSE:** Admit, however, plaintiff states she felt the grasp he had in her breast when he grabbed her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82, 139-140)

Plaintiff did not say anything to Askew. Ex. C, pp. 86-87.

**RESPONSE:** Admit, however, plaintiff was too upset to say anything. Askew continued on the make a "comment about when he was in the academy and he said a young lady that he used to do like that all the time, he used to grab her in the same manner, one day she surprised him and didn't have her vest on." (Pl LR56.1(b) Ex. 1 Bray dep. p. 86)

When Officer Loggins came in, plaintiff did not tell her what happened. Ex. C, p. 87.

**RESPONSE:** Admit, however plaintiff was too upset to do anything. (Pl LR56.1(b) Ex. 1 Bray dep. p. 87)

103.    The eighth incident allegedly happened on October 4, 2000. Ex. C, pp. 85, 87. Plaintiff was speaking to Officer Tankson about getting a partner and Tankson "was telling me to write a To/From letter to the lieutenant requesting to work with Davina or, you know, somebody I felt comfortable with. . . . And by this time, she told me–she said, I'll type it. She said, You don't have to; I'll type your letter for request to work with Loggins." Ex. C, pp. 87-88. Askew allegedly "was like, Oh, don't do that because we're already spoon feeding her now. And he was like, She–you already owe me some anyway." Ex. C, p. 88. Plaintiff "took it to be sexual." Ex. C, p. 88.

**RESPONSE:** Deny in part. Admit in part. Admit this occurred. Deny that this was the "eighth incident." On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

Askew stated she owed him, but not sexually, because he worked extra hard with plaintiff. Ex. G, pp. 132-33,143-44.

**RESPONSE:** Deny. After all the other things Askew had said to her, "she took it to be sexual. (Pl LR56.1(b) Ex. 1 Bray dep. p. 88)

Plaintiff claims later that day she "told him, Bruce, if you touch me again, I'm going to go to the supervisor." Ex. C, pp. 88-89. No one else was present. Ex. C, p. 89.

**RESPONSE:** Admit that on or about October 4, 2000, Bray finally had enough of Askew's sexual harassment and threatened to report Askew to his supervisor if he touched her again. (Pl LR56.1(b) Ex. 1 Bray dep. p. 87-90, 436; Ex. 13 Bray's Answers to Ints p. 8)

After plaintiff said this, Askew never touched or made sexual comments to plaintiff. Ex. C, p. 89-90.

**RESPONSE:** Admit, however he retaliated against Bray instead. Askew contacted the Police Academy and requested that they evaluate Bray's performance and recommended to the Review Board that they terminate her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter)

126

Askew never threatened to give plaintiff a poor DOR or TCSR.  Ex. C, p. 435.

**RESPONSE:** Admit that plaintiff states this in her deposition, however Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray complained to her that Askew and Adams were "always threatening her job."  (Pl LR56.1(b) Ex. 4 Jones dep. 6, 23-24)

He never threatened to get plaintiff in trouble after her training cycles.  Ex. C, p. 435.  He never threatened her job.  Ex. C, p. 435.

**RESPONSE:** Admit that plaintiff states this in her deposition, however Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray complained to her that Askew and Adams were "always threatening her job."  (Pl LR56.1(b) Ex. 4 Jones dep. 6, 23-24)

Askew never physically threatened or intimidated plaintiff. Ex. C, pp. 621-22.

**RESPONSE:** Admit that plaintiff was not physically threatened or intimidated. However, Askew did threaten her in other ways.  For example, Askew would threaten her job, as Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray told her she was "scared" to report the sexual harassment by Askew and Adams because, "They were always telling her, you know, 'I have got your job in my hand.  I can fire you just like that.  It only takes . . . a pen."  (Pl LR56.1(b) Ex. 4 Jones dep. p. 26, 36)

105.    Plaintiff admits that she told the EEOC that she never complained about the alleged harassment until the day when she was discharged. Ex. C, p. 433.

**RESPONSE:** Deny.  Plaintiff does not admit that she told the EEOC that she never complained about the harassment until the day she was discharged. (Pl R56.1(b) Ex. 1  Bray dep. p. 87)  When asked that question, she replied, "I don't recall." (Pl LR56.1(b) Ex. 1  Bray dep. p. 433-434)  On or about October 20, 2000, approximately two weeks after Bray threatened to report Askew if he touched her again, Bray was called into a meeting with Lieutenant Zapolsky, Lieutenant Duesworth and Sergeant Judon and given a notice that her performance during her probationary period was going to be reviewed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 390-392; Ex. 9 Judon dep. p. 14; Ex. 13 Bray's Answers to Ints p. 23-24; Ex. 15  Bray's Notes p. 000111)  Bray inquired what the purpose for the review was. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392)  Lieutenant Zapolsky told Bray that he did not know and that it was her Field Training Officers who requested the evaluation. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392-393, 435-436; Ex. 15 Bray's Notes p. 000111)  Bray expressed that she did not understand why they had let her get this far in the process and asked why they would Field Qualify her if they did not think she was a good officer. (Pl LR56.1(b) Ex. 1Bray dep. p. 394)  Bray then attempted to tell Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 24; Ex. 1 Bray dep. p. 393-394)  Bray also tried to tell them that she believed Adams had forged her signature on some of the Daily Observation Reports she prepared during Bray's fourth cycle. (Pl LR56.1(b) Ex. 1 Bray dep. p. 324-328, 383-384, 394)  at her deposition, Bray identified D306, 308, 282, 284, 286, and 288 Daily Observation Reports which clearly contained forged signatures. (Pl

LR56.1(b) Ex. 1 Bray dep. 324-328; Ex. 41 Daily Observation Reports D306, 308, 282, 284, and 288) However, Judon cut her off stating, "it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394) Moreover, from June 2001 to October 2001, Bray complained to Officer Jones about Askew and Adams sexually harassing her. (Pl LR56.1(b) Ex. 4 Jones dep. p. 23-27) Jones, a Police Officer with the Chicago Police Department since 1990 never notified a supervisory member or prepared a written report regarding Bray's complaints. (Pl LR56.1(b) Ex. 4 Jones dep. p. 23-27) Pursuant to General Order 93-3 of the Chicago Police Department (Complaint and Disciplinary Procedures), addendum 2A (Specific Responsibilities), which was in effect during 1999 and 2000, states in part that "When misconduct is observed or a complaint relative to misconduct is received by a non-supervisory member, such member will immediately notify a supervisory member and prepare a written report to his commanding officer containing the information received, observations, and any action taken." Had Jones followed defendant's policy, a supervisory member would have known about the sexual harassment much earlier.

She also stated to the EEOC that the only officer she complained to was PO Joyce. Ex. C, p. 433.

**RESPONSE:** Deny. Plaintiff states that they discussed a lot of stuff and he did not put down everything word for word. (Pl LR56.1(b) Ex. 1 Bray dep. p. 433) Plaintiff states that she "complained verbally to him [Joyce]" and the other lieutenant and sergeant that was present." (Pl LR56.1(b) Ex. 1 Bray dep. p. 433) Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray complained to her that Askew and Adams were "always threatening her job." (Pl LR56.1(b) Ex. 4 Jones dep. 6, 23-24) Jones further testified at

129

her deposition that Bray told her she was "scared" to report the sexual harassment by Askew and Adams because, "They were always telling her, you know, 'I have got your job in my hand. I can fire you just like that. It only takes . . . a pen.'" (Pl LR56.1(b) Ex. 4 Jones dep. p. 26, 36) Jones also testified that on or about June or July 2000, she confirmed to Bray that Askew and Adams did have power over her employment. (Pl LR56.1(b) Ex. 4 Jones dep. p. 7-8, 16, 48-49, 53) Jones, who was a police officer with the City of Chicago for 10 years at the time, advised Bray to "keep a record of everything, dates and times. . . because you are still on probation and pretty much [Askew and Adams] can get you fired at any time." (Pl LR56.1(b) Ex. 4 Jones dep. p. 6, 16)

### B. DONNA ADAMS

106. Plaintiff did not believe Donna Adams' behavior towards her constituted sexual harassment while she was employed by the City. Ex. C, pp. 381-83, see 219-20, 222.

**RESPONSE:** Deny. Plaintiff did not know that it was sexual harassment. (Pl LR56.1(b) Ex. 1 Brapy dep. p. 383) Plaintiff states in her deposition that, "it was never explained that if someone tried to push you into having sexual intercourse with someone, that was a form of sexual harassment. That's why it was unclear to me that I really looked at it as being sexual harassment, but I know it was a feeling—an ugly feeling I did not like." (Pl LR56.1(b) Ex. 1 Brapy dep. p. 383)

107. The first alleged incident of sexual harassment involving Adams occurred while on call at 59th and Halstead in June or July 2000 during her third cycle. Ex. C, pp. 91, 106-07.

Adams allegedly handed an RC Cola card with a man's name on it to plaintiff. Ex. C, pp. 91, 106. Adams allegedly responded that plaintiff "should go out and sleep with him for money." Ex. C, pp. 91-92, see 106. Plaintiff stated she was not interested in dating anyone at the time. Ex. C, pp. 91, 106.

**RESPONSE:** Admit in part. Deny in part. Admit this occurred. Deny that this was the "first incident." Adams made sexually offensive comments on a daily basis. (Pl LR56.1(b) Ex. 4 Jones dep. p. 20)

108.    The second alleged incident of sexual harassment involving Adams occurred in July 2000 while they were on call at 75th and Vincennes at a hardware store during plaintiff's fourth cycle. Ex. C, pp. 107, 109. When Adams came out of the store, plaintiff was talking to an older guy. Ex. C, p. 107. Adams allegedly asked him, "Are you still giving applications? And he's like, Yeah, I'm still giving applications. And then she was like, Well, she wants an application. And I told her, I said, No, I don't, like that. And he told me, Well, I'm not looking for anybody to—I'm not looking for you to be my woman, I'm just looking for you for convenience, and he was telling me he pays well." Ex. C, pp. 107-08. Plaintiff "told him no. And when I—when I told her no, that I don't do things like that, that's when she tells me, You're so stupid, you're just like my daughter; you need a sugar daddy." Ex. C, p. 108. Adams allegedly told plaintiff that "men like that, they don't like to fuck, they like to suck. She was telling me, That's all you have to do is get drunk. And I told her, I don't do that; I said, That's disgusting." Ex. C, pp. 108-09.

**RESPONSE:** Admit in part. Deny in part. Deny that this was the "second alleged incident of sexual harassment." (Pl LR56.1(b) Ex. 4 Jones dep. p. 20) Adams made sexually offensive comments on a daily basis. (Pl LR56.1(b) Ex. 4 Jones dep. p. 20) Admit that this occurred and that Adams also told her that the guy was interested in her and that he had left the card with Adams so that Bray could call him. (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 105; Ex. 3 Adams dep. p. 85; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000121) Bray believed Adams was trying to get her to solicit sex in exchange for money. (Pl LR56.1(b) Ex. 1 Bray dep. p. 219-220, 222, 382)

109. The third alleged incident of sexual harassment by Adams is in late July 2000. Ex. C, pp. 109-10. Adams allegedly told plaintiff in the squad car about her a dominatrix sessions," and "she revealed . . . that she was in a club up north that's called Underground or something, and it was for people who were involved in dominatrix, and . . . that [plaintiff] would make a good dominatrix. She started telling [plaintiff] . . . some of the things that she did, like how she like to put her slaves in cages." Ex. C, p. 110. No one else was present. Ex. C, p. 111. Adams allegedly told plaintiff this during a conversation in late July. Ex. C, pp. 110-11. Plaintiff does not know what her response to this was. Ex. C, p. 112. Plaintiff alleges that is "when she went into detail of telling me it's some kind of bondage thing where like men–people with power who have higher authority like being like in bondage or tied down." Ex. C, pp. 112-13. Adams allegedly suggested plaintiff take up the practice because plaintiff "could use the money because [she] was a single mom of five children and that the extra income would help [her] out." Ex. C, p. 114.

**RESPONSE:** Admit in part. Deny in part. Deny that this is the "third alleged incident of sexual harassment." Adams made sexually offensive comments on a daily basis. (Pl LR56.1(b) Ex. 4 Jones dep. p. 20) Admit that this occurred and that Bray believed Adams was trying to get her to solicit sex in exchange for money. (Pl LR56.1(b) Ex. 1 Bray dep. p. 219-220, 222, 382) Admit that on or about late July 2000, Adams revealed to Bray that she earned additional income as a dominatrix and was into "S & M" (sadism and masochism). (Pl LR56.1(b) Ex. 1 Bray dep. p. 109, 592; Ex. 13 Bray's Answers to Ints p. 9; Ex. 15 Bray's Notes p. 000122) Adams informed Bray that she was in a club up north for dominatrixes and that she held dominatrix sessions at her house on Fridays and Saturdays. (Pl LR56.1(b) Ex. 1 Bray dep. p. 110; Ex. 13 Plaintiffs Answers to Interrogatories p. 9) At his deposition, Askew would not confirm that Adams was a dominatrix but did testify that it was rumored around the station for the past couple years that Adams was a dominatrix. (Pl LR56.1(b) Ex. 2 Askew dep. p. 161-162) Askew testified that he did know that Adams sold sex toys. (Pl LR56.1(b) Ex. 2 Askew dep. p. 162) Similarly, Jones testified at her deposition that she had heard about four or five years earlier that Adams was a dominatrix. (Pl LR56.1(b) Ex. 4 Jones dep. p. 17) When Adams informed Bray she was a dominatrix, she asked Adams what being a dominatrix meant. (Pl LR56.1(b) Ex. 1 Bray dep. p. 112) Adams went into detail with Bray about how it had to do with men in power that liked being in bondage or tied up. (Pl LR56.1(b) Ex. 1 Bray dep. p. 112-113) Adams told Bray she received money and gifts for her "sessions." (Pl LR56.1(b) Ex. 15 Bray's Notes p. 000122) After revealing she was a dominatrix, Adams constantly talked to Bray about being a dominatrix and her "sessions" with her "slaves." (Pl LR56.1(b) Ex. 1 Bray dep. p. 110, 113, 127, 128-129, 594) Adams told Bray she would make a good dominatrix and could

133

make "easy money" as a dominatrix. (Pl LR56.1(b) Ex. 1 Bray dep. p. 110; Ex. 13 Bray's Answers to Ints p. 9; Ex. 15 Bray's Notes p. 000122) Adams told Bray that she liked to put her slaves in cages and that most of her clientele were white guys from the 7th district. (Pl LR56.1(b) Ex. 1 Bray dep. p. 110) Adams told Bray that she "liked white guys because they paid well and black guys was [sic] not into S&M." (Pl LR56.1(b) Ex. 1 Bray dep. p. 593). Adams frequently spoke of a client by the name of "Bob" who spent Fridays with her in "sessions." (Pl LR56.1(b) Ex. 1 Bray dep. p. 593-594) Adams told Bray that Bob liked bondage and would give her gifts or money in exchange for intercourse. (Pl LR56.1(b) Ex. 1 Bray dep. p. 594; Ex. 13 Bray's Answers to Ints p. 10) On occasion, Adams complained to Bray that she was too sore to get out of the car from being beat the night before in one of her "sessions." (Pl LR56.1(b) Ex. 1 Bray dep. p. 322, 593-594; Ex. 13 Bray's Answers to Ints p. 10) Adams urged Bray to become a dominatrix because the additional income would help support her five children. (Pl LR56.1(b) Ex. 1 Bray dep. p. 114; Ex. 13 Bray's Answers to Ints p. 9-10; Ex. 15 Bray's Notes p. 000122) Adams also suggested Bray just "sleep with men for money." (Pl LR56.1(b) Ex. 1 Bray dep. p. 114; Ex. 13 Bray's Answers to Ints p. 9-10) Bray repeatedly told Adams that she was not interested. (Pl LR56.1(b) Ex. 1 Bray dep. p. 114) Adams and Bray would actually get into verbal arguments over Adams' insistence that Bray sleep with men for money. (Pl LR56.1(b) Ex. 1 Bray dep. p. 333; Ex. 13 Bray's Answers to Ints p. 12; Ex. 15 Bray's Notes p. 000122) Bray testified at her deposition that, "the more that she tried to convince me to sleep with men [for money], the meaner she got." (Pl LR56.1(b) Ex. 1 Bray dep. p. 323; Ex. 13 Bray's Answers to Ints p. 12) Adams's consistent urging that Bray have sex with men for money caused Bray stress at work. (Pl LR56.1(b) Ex. 1 Bray dep. p. 474-475)

110.    On this same day, Adams also allegedly invited plaintiff to three parties, one for a housewarming for Adams' new house, one for a dominatrix and one for her daughter.  Ex. C, pp. 111-12.

**RESPONSE:** Admit that this occurred and that Adams' said that Bray didn't have to join in [at the dominatrix party], she could just watch.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 111)

Plaintiff claims she said she would come to the housewarming party but not the dominatrix party.  Ex. C, p. 112.

**RESPONSE:** Admit, however, Adams also stated that she was not interested in dominatrix.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 111)

Plaintiff did not attend any of Adams' parties.  Ex. C, p. 112.

**RESPONSE:** Admit.

Plaintiff's failure to attend Adams' housewarming party did not offend Adams.  Ex. H, p. 107.

**RESPONSE:** Deny. Adams did not talk to Bray after she did not come to her parties.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 125)

The parties were after plaintiff's training cycles.  Ex. C, pp. 125-26.

**RESPONSE:** Admit.

Plaintiff alleges Adams did not talk to her after she did not attend the parties. Ex. C, pp. 125, 435.

**RESPONSE:** Admit.

111. The fourth alleged incident is Adams allegedly telling plaintiff "crazy things about [how] she liked to wash her dog [while] naked." Ex. C, pp. 113-14.

**RESPONSE:** Admit in part. Deny in part. Admit that this occurred. Deny that this was the "fourth alleged incident." Adams made sexually offensive comments on a daily basis. (Pl LR56.1(b) Ex. 4 Jones dep. p. 20)

112. The fifth alleged incident of sexual harassment by Adams happened near the end of July 2000. Ex. C, p. 115. Plaintiff alleges that "we went to pick up on 74th and Ashland her cage, and present was officer Hebein [and officer Spurgeon]." Ex. C, pp. 115-16. Plaintiff states she knew it was a cage for bondage because Adams talked about this cage during the cycle. Ex. C, pp. 120, see 123-24. They went to a storage warehouse where Adams allegedly had a cage for her sessions built. Ex. C, p. 115, 117. The alleged "cage" did not have any specific characteristics nor was it distinctive in any way. Ex. C, p. 124. "It was just like–like a storage box with the openings, slats." Ex. C, p. 124. Adams allegedly had Officer Hebein and Officer Spurgeon load the cage into the "paddy wagon" and take it to her house and into her basement. Ex. C, p. 115. Plaintiff did not go into the basement, she waited in the car. Ex. C, pp. 118-19. The "cage" was "wooden and it had like four or five slats in. It wasn't assembled . . . So during

136

that course of time, as she was putting it in the car, . . . she told Spurgeon-he asked her what it was for. And when I spoke to him on the phone, he told me that in-not in so many words, she told him that she was dominatrix, that she-she kind of let him know but not in so many words that it was a cage." Ex. C, pp. 117-18.

**RESPONSE:** Admit in part. Deny in part. Admit that this occurred. Deny that this was the "fifth alleged incident." Adams made sexually offensive comments on a daily basis. (Pl LR56.1(b) Ex. 4 Jones dep. p. 20)

Officer Spurgeon testified that Adams never told him she was a dominatrix. Ex. BB, pp. 19-20.

**RESPONSE:** Deny. Plaintiff states that "he told me that in-not in so many words, she told him that she was dominatrix, that she-she kind of let him know but not in so many words that it was a cage." (Pl LR56.1(b) Ex. 1 Bray dep. p. 117-118)

She "didn't see [the cage] as good [sic] as Spurgeon and Hebein because they were the once [sic] that carried it." Ex. C, p. 124.

**RESPONSE:** Plaintiff admits she states this at her deposition this, however, she saw the cage well enough to notice that it was "like a storage box with the openings, slats." (Pl LR56.1(b) Ex. 1 Bray dep. p. 124)

Plaintiff states Adams told her directly the "cage" was for her slaves. Ex. C, p. 150.

**RESPONSE:** Admit.

Someone may have made a joke about these wooden pallets being a cage. Ex. H, pp. 110-111. Adams testified that anybody with common sense would know that was a joke. Ex. H, p. 110.

**RESPONSE:** Deny. Plaintiff states that Adams told her directly the cage was for her slaves. (Pl LR56.1(b) Ex. 1 Bray dep. p. 150)

Officer Spurgeon does not remember any mention of a cage for sex slaves or jokes about it. Ex. BB, pp. 19-20. Plaintiff did not believe Adams was joking. Ex. C, p. 150. Adams said nothing about the cage after it was delivered to her basement. Ex. C, p. 125.

**RESPONSE:** Deny. Adams claimed that it was only "a joke" that the item being picked up and transported by the police vehicle to her home was a cage for people. (Pl LR56.1(b) Ex. 3 Adams dep. p. 110-111)

Adams said nothing about the cage after it was delivered to her basement. Ex. C, p. 125.

**RESPONSE:** Admit, however, as plaintiff states in her deposition "it was near the end, so the cycle was almost over. So I don't even know what happened because she stopped talking to me shortly after I didn't show for both her parties." (Pl LR56.1(b) Ex. 1 Bray dep. p. 125)

113. Adams admits that she brought pallets or skids to her house in a squad roll, but states they were to store things on because a vent pipe broke in her basement, flooding her floor with water. Ex. H, p. 94-97.

**RESPONSE:** Deny. Plaintiff states that Adams told her directly the cage was for her slaves. (Pl LR56.1(b) Ex. 1 Bray dep. p. 150)

114.    Plaintiff claims while training with Adams during her fourth cycle, Adams met a homeless guy she thought was cute and offered him a ride to a shelter. Ex. C, p. 586. According to plaintiff, the homeless guy offered to treat them all to breakfast with his last ten dollars, but plaintiff claims she refused because it is against regulations to accept gifts from citizens. Ex. C, pp. 586-88. At breakfast, plaintiff claims the homeless man told them he was looking for a place to stay and Adams began making sexual advances towards him by stating, "I can preach to you in my bed." Ex. C, p. 588. Plaintiff alleges she left the table because she was embarrassed. Ex. C, p. 588. Plaintiff claims Adams then brought the homeless man to her house to call Texas and he moved in with her. Ex. C, pp. 590-92. Adams allegedly told plaintiff the man eventually left her house hysterical because he witnessed one of her sado-masochism sessions. Ex. C, pp. 592-93.

**RESPONSE:** Plaintiff admits that this occurred.

115.    Plaintiff also alleges that Adams told plaintiff that she walked "too feminine and that I was too small, so with me being a small person I should be loud. She was trying to force me to cuss citizens and be like real rude, and I wouldn't do it. . . . so she told me to change my walk and even walk with a dip." Ex. C, p. 126.

**RESPONSE:** Admit this occurred and that Bray responded that she "wasn't masculine, and I shouldn't have to change my walk for a job." (Pl LR56.1(b) Ex. 1 Bray dep. p. 339) Adams would also urge Bray to use profanity with citizens and to be rude to them. (Pl

139

LR56.1(b) Ex. 1 Bray dep. p. 126, 297-299) Adams repeatedly told Bray to "mother fuck

people". (Pl LR56.1(b) Ex. 1 Bray dep. p. 303) Adams explained at her deposition that it is

necessary for her to use profanity with citizens "for understanding." (Pl LR56.1(b) Ex. 3 Adams

dep. p. 41-42) Bray refused to act in such a manner because she felt it was unprofessional. (Pl

LR56.1(b) Ex. 1 Bray dep. p. 126)


Adams told plaintiff she needed to eat to put on some weight to be able to carry all the

equipment and look substantial. Ex. H, pp. 103-04.

**RESPONSE:** Plaintiff that Adams states this, however, Adams also states that "I used to

be as small as her." Adams testified that when she started as a police officer she weighed under

90 pounds and is five feet tall. (Pl LR56.1(b) Ex. 3 Adams dep. p. 103-104) There is no height

or weight requirement to be a police officer in Chicago. (Pl LR56.1(b) Ex. Adams dep. p. 103)


116.    Adams states that she probably told plaintiff that her walk does not convey a

sense that she is "in charge of this situation." Ex. H, pp. 105-06.

**RESPONSE:** Deny. Adams actually states that she probably told her that her walk was

"inappropriate." (Pl LR56.1(b) Ex. Adams dep. p. 105)


Plaintiff also generally alleges that "mainly my whole training with Donna Adams

consisted of looking for furniture for her dominatrix sessions at her house." Ex. C, p. 119, <u>see</u>

pp. 127-28. Plaintiff alleges in July 2000 during training Adams picked up a chair in an alley

and took it home for her dominatrix sessions. Ex. C, p. 127-28. Plaintiff alleges Adams told her

it was for her dominatrix sessions. Ex. C, p. 127. Plaintiff states she would talk to Adams about motherhood, "about being a black single mom. Sometimes we talked about college." Ex. C, p. 129.

**RESPONSE:** Admit that this occurred.

118. Adams never threatened to give plaintiff poor DORs or TCSRs. Ex. C, p. 435. She never threatened to get plaintiff in trouble after her training cycles. Ex. C, p. 435. Adams never physically threatened or intimidated plaintiff. Ex. C, pp. 621-22. Plaintiff never told Adams that she intimidated her. Ex. H, p. 108. Plaintiff told the EEOC that she never asked Adams to stop talking about sado-masochism. Ex. C, pp. 432-33. Plaintiff never complained to Adams that she felt uncomfortable or that she was being sexually harassed in any way. Ex. H, p. 133.

**RESPONSE:** Deny. In fact, Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray complained to her that Askew and Adams were "always threatening her job." (Pl LR56.1(b) Ex. 4 Jones dep. 6, 23-24) Jones further testified at her deposition that Bray told her she was "scared" to report the sexual harassment by Askew and Adams because, "They were always telling her, you know, 'I have got your job in my hand. I can fire you just like that. It only takes . . . a pen." (Pl LR56.1(b) Ex. 4 Jones dep. p. 26, 36)

**VIII. PLAINTIFF CONTACTS THE EEOC AND THE CITY RECEIVES NOTICE OF PLAINTIFF'S COMPLAINT OF ALLEGED SEXUAL HARASSMENT AND**

## THOROUGHLY INVESTIGATES

119.    Plaintiff contends that two days after her termination she contacted the EEOC.

Ex. C, p. 430. Plaintiff contacted the EEOC because she wanted them to investigate what

occurred during her probationary period.  Ex. C, p. 431.

**RESPONSE:** Admit.  On or about October 30, 2000, Bray filed a Charge of

Discrimination with the Equal Employment Opportunity Commission.  (Pl LR56.1(b) Ex. 1 Bray

dep. p. 430; Ex. 17 Charge of Discrimination )


She claims she cooperated with the EEOC as best she could and answered their questions

honestly and completely.  Ex. C, p. 431.

**RESPONSE:** Admit.


120.    Plaintiff never filed a sexual harassment complaint with the police department's

OPS.  Ex. C, p. 210.

**RESPONSE:** When Bray attempted to tell Lieutenant Zapolsky, Sergeant Judon and

Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to

get her to solicit sex. Judon cut her off stating, "it's too late for that.  (Pl LR56.1(b) Ex. 13 Bray's

Answers to Ints p. 24; Ex. 1 Bray dep. p. 393-394)


121.    In November 2000, IAD received from OPS a copy of plaintiff's EEOC charge,

assigned CR number 267043. (Police Agent Draper-Sibley Affidavit is attached hereto as Exhibit

CC, ¶ 2, Ex. 1. Police Agent Denise Draper-Sibley immediately began a thorough investigation of plaintiff's EEOC charge. Ex. CC, ¶ 2. She first contacted plaintiff by speaking over the telephone in an attempt to interview plaintiff. Ex. CC, ¶ 3.

**RESPONSE:** Plaintiff only states that the cited document states this, however, it does not provide evidence of when the investigation commenced or phone calls were made.

Plaintiff did not wish to speak over the telephone and agreed to meet Draper-Sibley for a formal statement. Ex. CC, ¶ 3; Ex. C, p. 211.

**RESPONSE:** Deny. Plaintiff never stated that she did not want to speak over the telephone, rather she said, "I wanted to first speak to my attorney before I come down and talk to her." (Pl LR56.1(b) Ex. 1 Bray dep. p. 211)

Plaintiff did not appear as scheduled or contact Draper-Sibley to reschedule. Ex. CC, ¶ 3; Ex. C, pp. 212-14.

**RESPONSE:** Admit that Affidavit states this, however plaintiff states in her deposition that she responded to Draper-Sibley's notice by telling her that "I wanted to first speak to my attorney before I come down and talk to her," plaintiff did not agree to meet her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 211) She received advice from several attorneys not to speak to anyone regarding her case. (Pl LR56.1(b) Ex. 1 Bray dep. p. 211) Bray trusted the attorneys that told her not to provide a statement because they were attorneys. She was told to "wait and hold out." (Pl LR56.1(b) Ex. 1 Bray dep. p. 211)

122. Draper-Sibley sent a certified letter to plaintiff requesting that she contact Draper-Sibley. Ex. CC, ¶ 4; Ex. C, pp. 210-11, 213. Plaintiff did not contact Draper-Sibley. Ex. CC, ¶ 4.

**RESPONSE:** Plaintiff only states that the cited document states this.

Draper-Sibley again telephoned plaintiff about her CR, and plaintiff refused to discuss her EEOC charge with Draper-Sibley on the advice of her attorney. Ex. CC, ¶ 5. Plaintiff did not identify her attorney. Ex. CC, ¶ 5; Ex. C, pp.211-13.

**RESPONSE:** Plaintiff only states that the cited document states this, however, it does not provide evidence of phone calls made or that Draper-Sibley informed plaintiff that her lack of cooperation impeded investigation into her EEOC charge.

Plaintiff acknowledged that she understood and indicated she would relay their conversation to her attorney. Plaintiff never contacted Draper-Sibley after this conversation nor did her alleged attorney.

**RESPONSE:** Plaintiff only admits that the cited document states this.

124. Plaintiff did not reveal to Draper-Sibley the specifics of her EEOC charge. Ex. CC, ¶ 7. Namely, plaintiff did not reveal who allegedly harassed her, where these events occurred, or when they occurred. Ex. CC, ¶ 7; see Ex. C, p. 220. However, because the EEOC charge alleges plaintiff's FTO sexually harassed her, Draper-Sibley obtained statements from her FTO's. Ex. CC, ¶ 7. None of the statements supported plaintiff's EEOC charge. Ex. CC, ¶ 7.

**RESPONSE:** Deny. Defendant does not cite documents that provide evidence of what the FTOs' statements said.

125.   Without plaintiff's cooperation, the investigation slowed until Draper-Sibley noticed an article in the *Chicago Defender* dated December 4, 2000, in which plaintiff provided an interview to a reporter, Ferman Beckless. Ex. CC, ¶ 8. The article did not contain the names of the alleged harasser but insinuated that Officer Jerry Crawley had information on plaintiff's EEOC charge. Ex. CC, ¶ 8.

**RESPONSE:** Deny. Askew testified at his deposition that he first became aware that Bray was accusing him of sexual harassment when he read a newspaper article published in the Chicago Defender on December 4, 2000. (Pl LR56.1(b) Ex. 2 Askew dep. p. 102) However, he also admitted that he was never identified by name in the newspaper article. (Pl LR56.1(b) Ex. 2 Askew dep. p. 98) The newspaper article refers to a "male field training officer". (Pl LR56.1(b) Ex. 2 Askew dep. p. 99, 103) Askew was not the only male Field Training Officer assigned to Bray. Scott Keith was also Bray's Field Training Officer on May 25, 28, 30, 31 and June 1, 2000. (PlLR56.1(b) Ex. 1 Bray dep. p. 564-565; Ex. 2 Askew dep. p. 47; Ex. 29 Daily Observation Reports)

126.   Draper-Sibley contacted Ferman Beckless, who did not identify the alleged harassers. Ex. CC, ¶ 9. Beckless stated he had notes on the interviews for his article and would contact Draper-Sibley with the information but he never called her back. Ex. CC, ¶ 9. Draper-Sibley sent a follow-up certified letter for him to contact Draper-Sibley but he did not contact

her. Ex. CC, ¶ 9.

**RESPONSE:** Admit that the document states this.

127.    Draper-Sibley also made several attempts to obtain a witness report from Officer
Crawley, who either was on medical leave, in the hospital or on furlough. Ex. CC, ¶ 10. On
May 11, 2001, Draper-Sibley sent an additional request when he returned to duty, but Officer
Crawley did not respond. Ex. CC, ¶ 10. Draper-Sibley learned soon after that Officer Crawley
resigned on May 14, 2001. Ex. CC, ¶ 10. He never contacted Draper-Sibley. Ex. CC, ¶ 10.

**RESPONSE:** Deny. Defendant does not cite document that provides evidence of when
the attempts were made.

128.    The article identified an event that allegedly occurred on September
19, 2000 at Felony Court at 26th and California. Ex. CC, ¶ 11. Draper-Sibley obtained all the
court log sheets she could for that date and reviewed them for officer signatures from the 7th
District. Ex. CC, ¶ 11. After finding all officers from the 7th District, Draper-Sibley contacted
each to obtain a witness statement about September 19, 2000 and whether any officer observed
any alleged sexual harassment at the courthouse. Ex. CC, ¶ 11. None of the twenty-plus witness
reports supported plaintiff's allegation of events on September 19, 2000 at Felony Court at 26th
and California. Ex. CC, ¶ 11.

**RESPONSE:** Deny. Despite the extensive amount of time Jones spent working with
Bray after her training cycles, no one, including the Chicago Police Department , ever
interviewed Jones regarding Bray. (Pl LR56.1(b) Ex. 4 Jones dep. p. 33-34)

129.     Because of insufficient evidence and plaintiff's lack of cooperation,

Draper-Sibley's investigation did not sustain plaintiff's allegations in her EEOC charge or that

she was sexually harassed in Felony court or on her way out through the revolving door at 26th

and California on September 19, 2000. Ex. CC, ¶ 12. Draper-Sibley memorialized her

investigation in a detailed report. Ex. CC, ¶ 13.

**RESPONSE:** Deny.  Defendant does not cite evidence of this report.


130.     Plaintiff contacted the *Chicago Defender* in about November 2000 to "let people

see what goes on in the district." Ex. C, p. 216.  She hoped that through this article something

could be changed or done.  Ex. C, p. 222.  Plaintiff told the author of the December 4, 2000

article everything she alleges happened to her.  Ex. C, pp. 215-19.  The article does not identify

plaintiff's alleged harassers.  Ex. C, p. 220; (*Chicago Defender* article dated December 4, 2000

attached as Exhibit Z).  According to plaintiff, the article edited events out that included Adams

and plaintiff "didn't really focus on Donna because, like I said, . . . I didn't look at it as a form of

sexual harassment."  Ex. C, p. 218-19, 221-22.  The article contains nothing on Askew's alleged

touching of her bullet-proof vest.  Ex. Z.

**RESPONSE:** Askew testified at his deposition that he first became aware that Bray was

accusing him of sexual harassment when he read a newspaper article published in the Chicago

Defender on December 4, 2000.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 102)  However, he also

admitted that he was never identified by name in the newspaper article.  (Pl LR56.1(b) Ex. 2

Askew dep. p. 98)The newspaper article refers to a "male field training officer".  (Pl LR56.1(b)

147

Ex. 2 Askew dep. p. 99, 103)  Askew was not the only male Field Training Officer assigned to

Bray.  Scott Keith was also Bray's Field Training Officer on May 25, 28, 30, 31 and June 1,

2000.  (PILR56.1(b) Ex. 1 Bray dep. p. 564-565; Ex. 2 Askew dep. p. 47; Ex. 29 Daily

Observation Reports) On December 8, 2000, the District Commander asked Askew to prepare a

statement in response to Bray's sexual harassment allegations.  (Pl LR56.1(b) Ex. 2 Askew dep.

p. 150)

> In his statement, Askew states:

> 1.       This statement is not being given voluntarily, but under duress.  Reporting
> Officer is only giving this statement at this time because Reporting Officer knows
> Reporting Officer could be terminated from employment if Reporting Officer refuses.
> This statement is being given at the order of Police Agent Draper-Sibley.
> 2.       This "To-From-Subject" Report should not be considered a verbatim
> statement but only a summary regarding the requested information.

> R/O [Reporting Officer] was the Field Training Officer for P.P.O. Pamela
> Bray during her second cycle.  At no time did R/O observe any sexual harassment of
> P.P.O. Pamela Bray.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 150; Ex. 27 Askew's Statement)

No one ever discussed the matter with Askew.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 150, 152,

154-155) No one from Human Resources or Internal Affairs ever contacted Askew regarding

Bray's sexual harassment allegations.  (Pl LR56.1(b) Ex. 2 Askew dep. p.  103-104)

131.     Plaintiff filed her complaint in federal court on October 9, 2001.  Ex. A, p. 1.

**RESPONSE:** Admit.

Respectfully submitted,

LARA A. WALICEK

BY:  *Lara Walicek*

LARA A. WALICEK

Dated: September 20, 2002
Chicago, Illinois