## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PAMELA BRAY )
)
    Plaintiff, )
)
    v. )    Civil No.  01 C 7770
)
)    JUDGE HOLDERMAN
THE CITY OF CHICAGO, a municipal )
Corporation )
)
    Defendant. )
)

**DOCKETED**

SEP 2 3 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

FILED
SEP 2 0 2002

### PLAINTIFF'S LR 56.1(b) COUNTER-STATEMENT
### OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

**JURISDICTION**

    1.  Plaintiff's complaint is brought under Title VII of the Civil Rights Act of 1991, 42 U.S.C. §2000e-2(a)(1) and §2000e-3(a). (Pl LR56.1(b) Ex. 11 Complaint; Ex. 12 Answer) Jurisdiction is invoked under 28 U.S.C. §1343(d). (Pl LR56.1(b) Ex. 11 Complaint; Ex. 12 Answer)

    2.  Defendant is an employer within the meaning of the Act and doing business within this judicial district, in the city of Chicago (Cook County) Illinois. (Pl LR56.1(b) Ex. 11 Complaint p. 1; Ex. 12 Answer) The defendant is an "employer" within the meaning of 29 U.S.C. 203 (a) and (d). (Pl LR56.1(b) Ex. 11 Complaint; Ex. 12 Answer; Ex. 19 EEOC Determination)

**THE PARTIES AND WITNESSES**

3.   The Plaintiff, Pamela Bray ("Bray"), was a single 31 year-old mother of five residing in Chicago, Illinois during the relevant time period.  (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 2; Ex. 1 Bray dep. p. 473; Ex. 51 Employee Profile)

4.   Bray was hired as a Probationary Police Officer for the City of Chicago in the 7th District on or about October 25, 1999.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 175; Ex. 11 Complaint p. 2; Ex. 25 Def's Position Statement; Ex. 51 Employee Profile)

5.   The Defendant, the City of Chicago, is a municipal corporation.  (Pl LR56.1(b) Ex. 11  Complaint; Ex. 12 Answer)

6.   Bruce Askew ("Askew") is a 47 year-old married man.  (Pl LR56.1(b) Ex. Askew dep. p. 4-5)

7.   Askew was employed as a police officer for the City of Chicago in the 7th District during the relevant time period and is an accused sexual harasser.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 64; Ex. 2 Askew dep. p. 7-8; Ex. 13 Bray's Answers to Ints p. 3)

8.   Donna Adams ("Adams") is a single female.  (Pl LR56.1(b) Ex. 3 Adams dep. p. 7)

2

9.   Adams was employed by the City of Chicago as a police officer in the 7th District during the relevant time period and is also an accused sexual harasser. (Pl LR56.1(b) Ex. 1 Bray dep. p. 64; Ex. 3 Adams dep. p. 13; Ex. 13 Bray's Answers to Ints p. 8)

## BACKGROUND & SUMMARY OF CASE

10.   After an individual enters the Police Academy they are on probation for a period of one year. (Pl LR56.1(b) Ex. 2 Askew dep. p. 10-11; Ex. 25 Def's Position Statement p. 2)

11.   During this one year period, they remain under the Police Academy's jurisdiction and are considered "Probationary Police Officers" or "PPO's." (Pl LR56.1(b) Ex. 2 Askew dep. p. 10)

12.   Bray became a PPO on October 25, 1999. (Pl LR56.1(b) Ex. 1 Bray dep. p. 175; Ex. Complaint p. 2; Ex. 15 Bray's notes p. 000104; Ex. 25 Def's Position Statement p. 2; Ex. 51 Employee Profile)

13.   Bray attended classes at the Police Academy from on or about October 25, 1999 to the end of March 2000. (Pl LR56.1(b) Ex. 25 Def's Position Statement p. 2)

14.   Bray was then assigned to District 7, commonly known as Englewood, for field training. (Pl LR56.1(b) Ex. 1 Bray dep. p. 227)

15.     Englewood is known as a high crime area and has the nickname "Home of Homicide." (Pl LR56.1(b) Ex. 1 Bray dep. p. 227-228; Ex. 2 Askew dep. p. 32-33, 65; Ex. 3 Adams dep. p. 41)

16.     At the end of March 2000, Bray began her field training. (Pl LR56.1(b) Ex. 25 Def's Position Statement p. 2)

17.     A PPO is required to have a veteran officer with them who will grade their performance as they typically move through three cycles of training. (Pl LR56.1(b) Ex. 2 Askew dep. p. 10) Each cycle lasts approximately 28-30 days. (Pl LR56.1(b) Ex. 1 Bray dep. p. 230; Ex. 2 Askew dep. p. 11; Ex. 25 Def's Position Statement p. 2)

18.     During the training cycles, PPO's are taught proper patrol procedures, such as how to make arrests, how to interview and how to communicate with citizens. (Pl LR56.1(b) Ex. 1 Bray dep. p. 229)

19.     Many PPO's are shy when they first start. (Pl LR56.1(b) Ex. 1 Askew dep. p. 29)

20.     It is common for PPO's right out of the Police Academy to lack confidence in their ability to perform as a police officer. (Pl LR56.1(b) Ex. 2 Askew dep. p. 163) It is the job of the veteran police officer to bring them out slowly. (Pl LR56.1(b) Ex. 2 Askew dep. p. 29)

21.     When their training cycles are completed and they are "Field Qualified", the PPO's will work with veteran officers but are no longer graded. (Pl LR56.1(b) Ex. 2 Askew dep. p. 10-11)

22.     Being "Field Qualified" means the individual has the ability to be a basic police officer – they can work on the streets alone as a police officer. (Pl LR56.1(b) Ex. 2 Askew dep. p. 60; Ex. 3 Adams dep. p. 55) They can write a report, issue a ticket and make an arrest. (Pl LR56.1(b) Ex. 2 Askew dep. p. 60)

23.     Bray was "Field Qualified" on or about July 24, 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 340, 563; Ex. 2 Askew dep. p. 54, 56; Ex. 3 Adams dep. p. 55; Ex. 42 Remedial Summary Report; Ex. 14 Def's Answers to Ints p. 15)

24.     Bruce Askew, one of Bray's Field Training Officers, sexually harassed Bray on numerous occasions from on or about May 2000 through the duration of her employment to on or about October 2000 (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 3; Ex. 19 EEOC Determination)

25.     Donna Adams, another one of Bray's Field Training Officers, sexually harassed Bray from on or about July 2000 through August 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 321-322; Ex. 13 Bray's Answers to Ints p. 8; Ex. 19 EEOC Determination)

26.     On or about October 4, 2000, Bray finally had enough of Askew's sexual

harassment and threatened to report Askew to his supervisor if he touched her again. (Pl

LR56.1(b) Ex. 1 Bray dep. p. 87-90, 436; Ex. 13 Bray's Answers to Ints p. 8)

27.     In retaliation, Askew contacted the Police Academy and requested that

they evaluate Bray's performance and recommended to the Review Board that they

terminate her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 2 Askew dep. p. 72-

73; Ex. 3 Adams dep. p. 80-82; Ex. 27 Askew's letter)

28.     Askew along with Adams presented the Review Board with inaccurate and

malicious "rumors" they allegedly heard from unidentified individuals about Bray's

performance in an effort to secure her termination. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80,

347-348, 350-351, 353, 569-571; Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82;

Ex. 27 Askew's letter; Ex. 47 Review Board Decision)

29.     Less than two weeks after she threatened to report Askew, on or about

October 23, 2000, Bray was notified of her termination effective October 24, 2000. (Pl

LR56.1(b) Ex. 1 Bray dep. p. 214; Ex. 25 Def's Position Statement p. 2)

30.     Bray's one year probationary period would have ended October 25, 2000,

just one day after her termination was effective. (Pl LR56.1(b) Ex. 1 Bray dep. p. 398,

414, 422, 577; Ex. 2 Askew dep. p. 10-11; Ex. 16 Termination Letter; Ex. 51 Employee

Profile)

31.     On or about October 30, 2000, Bray filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Pl LR56.1(b) Ex. 17 Charge of Discrimination)

32.     On or about March 21, 2001, the Equal Employment Opportunity Commission issued a Determination that there was reasonable cause to believe that Bray was sexually harassed by her Field Training Officers in violation of Title VII and that there was reasonable cause to believe that the City of Chicago retaliated against her by discharging her. (Pl LR56.1(b) Ex. 19 EEOC Determination)

## FIELD TRAINING OFFICERS ARE SUPERVISORS

33.     As her Field Training Officers, Askew and Adams were Bray's supervisors. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 74, 77; Ex. 6 Crawley dep. p. 28; Ex. 23 EEOC notes)

34.     It was always Bray's understanding that Field Training Officers could discipline and terminate probationary police officers. (Pl LR56.1(b) Ex. 1 Bray dep. p. 583)

35.     Askew in particular made it clear to Bray at the time she started training with him on her second cycle that he was her supervisor and had control over her employment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 4 Jones dep. p. 16)

36.     In fact, Officer Gloria Jones, an officer with the City of Chicago since 1990, testified at her deposition that Bray complained to her that Askew and Adams were "always threatening her job." (Pl LR56.1(b) Ex. 4 Jones dep. 6, 23-24)

37.     Jones further testified at her deposition that Bray told her she was "scared" to report the sexual harassment by Askew and Adams because, "They were always telling her, you know, 'I have got your job in my hand. I can fire you just like that. It only takes . . . a pen." (Pl LR56.1(b) Ex. 4 Jones dep. p. 26, 36)

38.     Jones also testified that on or about June or July 2000, she confirmed to Bray that Askew and Adams did have power over her employment. (Pl LR56.1(b) Ex. 4 Jones dep. p. 7-8, 16, 48-49, 53)

39.     Jones, who was a police officer with the City of Chicago for 10 years at the time, advised Bray to "keep a record of everything, dates and times. . . because you are still on probation and pretty much [Askew and Adams] can get you fired at any time." (Pl LR56.1(b) Ex. 4 Jones dep. p. 6, 16)

40.     Askew and Adams, as Bray's Field Training Officers, had control of Bray's job because their evaluations would determine whether or not she would keep her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 72, 77; Ex. 6 Crawley dep. p. 28)

41.     In fact, at his deposition Askew confirmed he had this power over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) Ex. Askew dep. p. 90)

42.     Further, Eileen Bell, Assistant Corporation Counsel for the City of Chicago, on or about December 13, 2000, agreed with investigator Batog of the EEOC during his investigation into Bray's Charge that Field Training Officers are in supervisory positions over Probationary Police Officers. (Pl LR56.1(b) Ex. 23 EEOC notes)

43.     In his report summarizing his conversation with Bell, Batog writes, in part:

> Bell and I discussed whether FTO's are in supervisory positions. Bell and I agreed that FTO's are in supervisory positions because of they evaluate PPO's and make recommendations on whether PPO's become PO's. (Pl LR56.1(b) Ex. 23 EEOC notes)

**BRUCE ASKEW**

44.     Bruce Askew was Bray's Field Training Officer during her second
training cycle from on or about late April to mid-May 2000.  (Pl LR56.1(b) Ex. 13 Bray's
Answers to Ints p. 3; Ex. 2 Askew dep. p. 12, 17, 25, 108; Ex. 1 Bray dep. p. 266; Ex. 35
Daily Observation Reports)


45.     Prior to Bray, Askew had only trained three to five Probationary Police
Officers.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 14)


46.     Askew sexually harassed Bray on numerous occasions beginning on or
about May 2000 through the duration of her employment to on or about October 2000 (Pl
LR56.1(b) Ex. 13 Bray's Answers to Ints p. 3; Ex. 11 Complaint; Ex. 17 Charge of
Discrimination; Ex. 19 EEOC Determination)


47.     Jones testified at her deposition that every time she worked with Bray
from on or about June 2000 to the time Bray was terminated, Bray complained to her
about Askew's and Adam's sexually offensive comments and behavior but was too afraid
to report it to anyone else.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 11-12, 15-19, 23-26, 53)


48.     On a daily basis, Askew would make lewd, sexually offensive comments
to Bray about women they would see while working together.  (Pl LR56.1(b) Ex. 1 Bray
dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

49.     Askew would say such things as, "look at the tits on that broad," or "look at the ass on that woman".   (Pl LR56.1(b) Ex. 1 Bray dep. p. 441-442; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

50.     At his deposition, Askew admitted that he "probably" made such sexually offensive comments and displayed the extent of his bravado by adding that he probably remarked, "nice rack" as well.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 111-112)

51.     Askew also admitted that while he was Bray's Field Training Officer, he and Bray would park outside the Taste Nightclub at 4:00 o'clock in the morning on Saturday nights where there are "a lot of scantily clad women" and he would "sit there and just kind of ogle."  (Pl LR56.1(b) Ex. 2 Askew dep. p. 112)

52.     Askew testified that when he ogled at the women, Bray would make comments like, "you ought to quit," or "you already have a girlfriend.  What do you need with them?"  (Pl LR56.1(b) Ex. 2 Askew dep. p. 113)

53.     On several occasions, while Bray was in the presence of a group of officers, Askew yelled comments to them about Bray's fertility such as, "you better get away from Bray because she's very fertile.  If you get near her, she'll get pregnant," or "if you look at [Bray], she'll get pregnant."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 70, 270, 275, 473; Ex. 2 Askew dep. p. 119, 121; Ex. 5 Spurgeon dep. p. 24-25; Ex. 7 Johnson

dep. p. 65; Ex. 13 Bray's Answers to Ints p. 5; Ex. 15 Bray's Notes p. 000106; Ex. 18

EEOC Questionnaire)

54.     He also commented to Bray that, "I got to get away from you, because if I

bump you, you just might get pregnant."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 70)

55.     Askew also made a comment to Bray in August 2000 that she was the "old

lady in the shoe, who had so many children she didn't know what to do."  (Pl LR56.1(b)

Ex. 2 Askew dep. p. 121; Ex. 15 Bray's Notes p. 000107, 000114)

56.     On another occasion, in July or August 2000, after the 8 a.m. roll-call,

Askew told Bray, "you wouldn't have so many children if you swallowed."  (Pl

LR56.1(b) Ex. 1 Bray dep. p. 54; Ex. 7 Johnson dep. p. 64-65; Ex. 13 Bray's Answers to

Ints p. 5; Ex. 15 Bray's Notes p. 000114; Ex. 18 EEOC Questionnaire)  Bray understood

his comment to mean that she should have engaged in fellatio instead of intercourse to

avoid having so many children.  (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 5)

57.     Bray responded by telling Askew, "you have a disgusting mouth."  (Pl

LR56.1(b) Ex. 13 Bray's Answers to Ints p. 5)

58.     Each time Askew made a derogatory comment about her fertility, Bray felt

awkward, uncomfortable, humiliated, embarrassed, and degraded.  (Pl LR56.1(b) Ex. 1

Bray dep. p. 71, 271; Ex. 13 Bray's Answers to Ints p. 5)

59.    However, she did not say anything because she feared losing her job.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 71; Ex. 4 Jones dep. p. 26; Ex. 13 Bray's Answers to Ints p. 4)

60.    At his deposition, Askew admitted making comments about Bray's fertility.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 119, 121)

61.    Askew's sexually offensive conduct and comments caused Bray stress at work and damaged her self-esteem and self-confidence.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 275, 287, 473)

62.    Almost every day that Bray worked with Askew, they would pick up Askew's mistress and drive her to her place of employment.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 104-105; Ex. 2 Askew dep. p. 110-111; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

63.    Additionally, approximately twice an evening when they were on duty, Askew would visit his girlfriend and leave Bray in the squad car for ten to thirty minutes at a time.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 23; Ex. 13 Bray's Answers to Ints p. 4; Ex. 15 Bray's Notes p. 000107)

64.     During an approximate two-week period on or about May 2000, Bray witnessed Askew repeatedly put notes on a car owned by a female civilian, LaTonya McCloud.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 125-126; Ex. 13 Bray's Answers to Ints p. 5; Ex. 15 Bray's Notes p. 000107)

65.     Bray then heard Askew threaten to ticket McCloud if she refused to go on a date with him.  (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 5)  McCloud confided in Bray that Askew frightened her.  (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 5)

66.     On one occasion after midnight on or about May 2000, Askew brought Bray to a viaduct in a secluded area while they were on-duty.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 65-67; Ex. Bray's Answers to Ints p. 3; Ex. 15 Bray's notes p. 000106)

67.     Askew parked the car and turned it off.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 67)  He then told Bray that when he was a teenager he used to have sex under the viaduct.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 65; Ex. 13 Bray's Answers to Ints p. 3; Ex. 15 Bray's Notes p. 000106)

68.     Askew also informed Bray that police officers came to the viaduct while they were on duty to have sex.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 65; Ex. 13 Bray's Answers to Ints p. 3; Ex. 15 Bray's Notes 000106)

69. Askew then stated to Bray that she might end up back there. (Pl LR56.1(b) Ex. 1 Bray dep. p. 65; Ex. 13 Bray's Answers to Ints p. 3)

70. Bray responded that she did not "do things like that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 68; Ex. 13 Bray's Answers to Ints p. 3-4)

71. Bray was very embarrassed by Askew's comment. (Pl LR56.1(b) Ex. 1 Bray dep. p. 65; Ex. 13 Bray's Answers to Ints p. 4)

72. On another occasion, Askew drove Bray to 74th and Damen, another secluded area near the railroad tracks and a factory. (Pl LR56.1(b) Ex. 1 Bray dep. p. 68-69)

73. Askew then proceeded to tell Bray about an incident in which two sergeants were caught in the area performing oral sex. (Pl LR56.1(b) Ex. 1 Bray dep. p. 69)

74. Askew explained to Bray that they joked in the district about whether the sergeant liked his lunch. (Pl LR56.1(b) Ex. 1 Bray dep. p. 69)

75. Bray did not say anything, but just shook her head. (Pl LR67.1(b) Ex. 1 Bray dep. p. 69, 71) Bray felt humiliated and degraded by Askew's comments. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71; Ex. 13 Bray's Answers to Ints p. 4)

76.     However, Bray feared that Askew would retaliate against her and cause her to lose her job if she did or said anything. (Pl LR56.1(b) Ex. 1 Bray dep. p. 71; Ex. 4 Jones dep. p. 26; Ex. 13 Bray's Answers to Ints p. 4)

77.     On or about June 2000, Askew began sending messages to Bray over the "PDT," Personal Data Computer, asking her out on dates. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78, 584-585; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000108, 000114; Ex. 18 EEOC Questionnaire)

78.     The Personal Data Computer is located in the patrol car and is able to receive messages and calls. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78, 584-585) These messages are not kept on the computer, but simply flashed across the screen. (Pl LR56.1(b) Ex. 1 Bray dep. p. 79)

79.     Askew's messages asked Bray to bring her children to the movie theater where he worked a second job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000108, 000114) He promised he would treat them to hot dogs, soda, and popcorn if she did. (Pl LR56.1(b) Ex. 1 Bray dep. p. 78-79; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000108, 000114)

80.     At the same time Askew would ask Bray out to the movie theater, he would remind her how many days she had left before her probationary period was over. (Pl LR56.1(b) Ex. 15 Bray's Notes p. 000108)

81.     Askew asked Bray out on approximately 10 separate occasions.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 80)  Bray refused every offer.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 79; Ex. 13 Bray's Answers to Ints p. 6)

82.     Even after she repeatedly refused his advances, Askew would continue to ask her out. (Pl LR56.1(b) Ex. 1 Bray dep. 80)

83.     Askew's messages on the PDT made Bray feel uncomfortable and embarrassed.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 585)

84.     After Bray's second training cycle ended, Askew began to physically sexually harass her.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 80-83; Ex. 13 Bray's Answers to Ints p. 6)

85.     On two separate occasions on or about August or September 2000, Askew approached Bray and asked her if she had her bulletproof vest on. (Pl LR56.1(b) Ex. 1 Bray dep. p. 82; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000110)

86.     Before Bray could answer, Askew grabbed her breasts. (Pl LR56.1(b) Ex. 1 Bray dep. p. 81-83, 140; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000110; Ex. 18 EEOC Questionnaire)

87.     Bray was "shocked," "disgusted," "extremely horrified and humiliated" by Askew's actions and immediately instructed him to stop. (Pl LR56.1(b) Ex. 1 Bray dep. p. 83, 141; Ex. 13 Bray's Answers to Ints p. 6)

88.     Askew responded by laughing at her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 83)

89.     It is neither a normal procedure nor a requirement for supervisors to check for bulletproof vests. (Pl LR56.1(b) Ex. 1 Bray dep. p. 84)

90.     No one had previously touched Bray during a uniform inspection. (Pl LR56.1(b) Ex. 1 Bray dep. 84)

91.     Moreover, Bray's bulletproof vest was visible when she wore it. (Pl LR56.1(b) Ex. 1 Bray dep. 138)

92.     On or about September 19, 2000, Bray was required to appear at the Cook County District Court at 26th and California to testify as a witness to a felony. (Pl LR56.1(b) Ex. 1 Bray dep. p. 93; Ex. 13 Bray's Answers to Ints p. 6; Ex. 15 Bray's Notes p. 000109)

93. Bray was not familiar with the standard procedures in testifying, so she asked Askew to accompany her to the courtroom since he was her Field Training Officer at the time of the incident. (Pl LR56.1(b) Ex. 1 Bray dep. p. 93, 102; Ex. 2 Askew dep. p. 135; Ex. 13 Bray's Answers to Ints p. 6-7; Ex. 15 Bray's Notes p. 000109)

94. While court was in session, Askew grabbed Bray's leg and rubbed her ankle. (Pl LR56.1(b) Ex. 1 Bray dep. p. 94-95, 144-145; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109)

95. Bray quickly pulled her leg away from Askew and whispered for him to stop. (Pl LR56.1(b) Ex. 1 Bray dep. p. 94-95; Ex. 13 Bray's Answers to Ints p. 7)

96. Askew then "got an instant attitude" and abruptly left the courtroom while court was in session. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97, 145; Ex. 13 Bray's Answers to Ints p. 7)

97. Bray was left alone without knowing the proper procedures. (Pl LR56.1(b) Ex. 1 Bray dep. p. 88-90; Ex. 13 Bray's Answers to Ints p. 7) Consequently, court had to be continued. (Pl LR56.1(b) Ex. 1 Bray dep. p. 97-98)

98.     Askew returned to the courtroom approximately 30 minutes later. (Pl LR56.1(b) Ex. 1 Bray dep. p. 98; Ex. 13 Bray's Answers to Ints p. 7)  Bray and Askew then left together. (Pl LR56.1(b) Ex. 1 Bray dep. p. 98)  While riding down in the elevator, Askew asked Bray, "What is your waist size, a 22 or 23?" (Pl LR56.1(b) Ex. 1 Bray dep. p. 98; Ex. 13 Bray's Answers to Ints p. 7)

99.     Bray responded, "none of your business." (Pl LR56.1(b) Ex. 1 Bray dep. p. 99; Ex. 13 Bray's Answers to Ints p. 7)

100.    When they exited the building through the revolving doors, Askew jumped in the partition with Bray, grabbed her waist and gave her a bear hug. (Pl LR56.1(b) Ex. 1 Bray dep. p. 99; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109)

101.    Askew pressed Bray up against the window of the partition and pushed his body against hers so hard that she could feel his penis on her buttocks. (Pl LR56.1(b) Ex. 1 Bray dep. p. 99-101, 147; Ex. 13 Bray's Answers to Ints p. 7)

102.    When Askew pressed up against her, she could feel that his penis was hard. (Pl LR56.1(b) Ex. 1 Bray dep. p. 148; Ex. 13 Bray's Answers to Ints p. 7)

103.    Bray felt humiliated and very embarrassed by Askew's conduct. (Pl LR56.1(b) Ex. 1 Bray dep. p. 148; Ex. 13 Bray's Answers to Ints p. 7)

104.    As they exited the revolving doors, Bray told Askew to stop.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 101)

105.    Askew then asked Bray if she had a boyfriend.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 102; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109)  Bray responded "no" and that she was not interested in a relationship.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 102; Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109).

106.    Askew commented that, "You are too young to be thinking like that.  You should go out and just fuck everybody."  (Pl LR5.1(b) Ex. 13 Bray's Answers to Ints p. 7; Ex. 15 Bray's Notes p. 000109)

107.    Bray got in the car and did not respond.  (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 7)

108.    Once again Bray felt uncomfortable and embarrassed by Askew's comments.  (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 7)

109. The last incident of sexual harassment occurred on or about October 4, 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 85-86; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)  On or about October 4, 2000 when they were in the interviewing room together with an arrestee, Askew grabbed Bray's breast again, allegedly to check to see if her bulletproof vest was on. (Pl LR56.1(b) Ex. 1 Bray dep. p. 85-86; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

110. After grabbing Bray's breast, Askew began laughing. (Pl LR56.1(b) Ex. 1 Bray dep. p. 86)

111. Askew then advised Bray that she "owed him some [sexual favors]." (Pl LR56.1(b) Ex. 1 Bray dep. p. 88, 436; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

112. Bray was very upset and offended by Askew's actions and informed Askew that if he ever touched her again, she would go to the supervisor. (Pl LR56.1(b) Ex. 1 Bray dep. p. 87-90, 436; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

113. Askew never talked to Bray from that point on. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

114.   Rather, Askew retaliated against Bray by causing her termination. (Pl LR56.1(b) Ex. 2 Askew dep. p. 72-73)


115.   Lorraine Johnson, a retired police officer who used to work with Askew, described him as a "sexist" because of comments he made in her presence, the way he talks about women and the way he interacts with women.  (Pl LR56.1(b) Ex. 7 Johnson dep. p. 106)


116.   Johnson testified at her deposition that she began riding with Askew because his former female partner complained about him making unwelcome advances toward her.  (Pl LR56.1(b) Ex. 7 Johnson dep. p. 72-73; Ex. 4 Jones dep. p. 55-56)


117.   Askew's former partner, Farrow, had requested a transfer out of the district because she did not want to work with Askew due his sexual harassment of her. (Pl LR56.1(b) Ex. 4 Jones dep. p. 56-57)


118.   One example of Askew's sexist behavior Johnson recalled at her deposition occurred on one occasion when she went to the movie theater where Askew worked as a security guard.  (Pl LR56.1(b) Ex. 7 Johnson dep. p. 92-93)


119.   Askew lifted her coat and looked at her behind.  (Pl LR56.1(b) Ex. 7 Johnson dep. p. 92-93)  Johnson was "surprised", "hurt" and "humiliated" by Askew's degrading actions.  (Pl LR56.1(b) Ex. 7 Johnson dep. p. 93)


23

120.    Davina Loggins, another police officer, reported to Investigator Batog of the EEOC that Askew had made sexual comments to her on at least three occasions. (Pl LR56.1(b) Ex. 20 EEOC Notes)

121.    On or about July or August 2000, when Loggins was bending down, Askew told her to be careful "bending down in front of me". (Pl LR56.1(b) Ex. 20 EEOC Notes)

122.    Also on or about July or August 2000, Askew told Loggins to "be careful how you back that thing up" referring to a song about a woman's butt. (Pl LR56.1(b) Ex. 20 EEOC Notes)

123.    On or about July or August 2000, Askew informed Loggins that he wanted to have her baby. (Pl LR56.1(b) Ex. 20 EEOC Notes)

124.    Loggins also reported that she witnessed Askew make sexual comments toward other women such as, "girl, you look good," or "mmmmh" when a woman walked by. (Pl LR56.1(b) Ex. 20 EEOC Notes)

125.    Shortly after Bray was terminated, on or about December 2000, while at St. Bernard's Hospital Askew stated to Officer Gloria Jones, "I remember when we went through the Academy, I always wanted to touch those big old titties of yours." (Pl LR56.1(b) Ex. 4 Jones dep. p. 28, 50)

126.    Jones found this comment to be very offensive. (Pl LR56.1(b) Ex. 4 Jones dep. p. 28, 50-51)

127.    Jones testified at her deposition taken on July 18, 2002, that Askew is still making comments of a sexual nature at the department. (Pl LR56.1(b) Ex. 4 Jones dep. p. 29-30)

**DONNA ADAMS**

128.    Donna Adams was Bray's Field Training Officer during part of her third cycle and all of her fourth cycle from on or about June 2000 through August 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 291, 321-322; Ex. 2 Askew dep. p. 52; Ex. 13 Bray's Answers to Ints p. 8)

129.    Adams had only been a Field Training Officer since March 1999. (Pl LR56.1(b) Ex. 3 Adams dep. p. 131)

130.    Adams sexually harassed Bray from on or about June 2000 through August 2000.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 321-322; Ex. 13 Bray's Answers to Ints p. 8)

131.    Gloria Jones, a police officer in the 7th district of the City of Chicago since 1990, described Adams at her depositions as "loud, boisterous and belligerent."  (Pl LR56.1(b) Ex. 4 Jones dep. p. 6-7, 14, 22-23)

132.    Jones further testified that from the first day she worked with defendant, she heard Adams make sexually offensive comments on a daily basis.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 20)

133.    Bray believed Adams was trying to get her to solicit sex in exchange for money. (Pl LR56.1(b) Ex. 1 Bray dep. p. 219-220, 222, 382)

134.    During her fourth cycle, on or about mid July 2000, Bray became so uncomfortable from Adams' attempts to get her to sleep with men, it negatively impacted her working relationship with Adams.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 321-322)

135.    On or about the end of June 2000 when Adams and Bray were on-call together at 59th and Halsted, Adams gave Bray a RC Cola card with a man's name on it. (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 105; Ex. 3 Adams dep. p. 85; Ex. 13 Bray's Answers to Ints p. 8)

26

136.    Adams told her that the guy was interested in her and that he had left the card with Adams so that Bray could call him.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 105; Ex. 3 Adams dep. p. 85; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000121)

137.    Bray responded that she was not interested in dating at that time.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 91, 106)

138.    Adams told her that she should "go out with him and sleep with him for the money." (Pl LR56.1(b) Ex. 1 Bray dep. p. 91-92, 106)

139.    Bray responded by just shaking her head.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 92, 106)

140.    On many occasions, Adams would leave Bray in the squad car and go into hardware stores and attempt to "lure" men into having sex in exchange for money.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 596)

141.    On one of these occasions in mid-July 2000, Adams left Bray in the squad car and went into a hardware store located on 75th and Vicennes.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 107, 109, 596; Ex. 13 Bray's Answers to Ints p. 8)  While Adams was in the store, an older man approached Bray in the car.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 107, 597)

142.    When Adams exited the hardware store, she asked the man, "Are you still giving out applications?" (Pl LR56.1(b) Ex. 1 Bray dep. p. 107, 597; Ex. 13 Bray's Answers to Ints p. 9; Ex. 15 Bray's Notes p. 000122)

143.    The man responded in the affirmative. (Pl LR56.1(b) Ex. 1 Bray dep. p. 107, 597; Ex. 13 Bray's Answers to Ints p. 9; Ex. 15 Bray's Notes p. 000121)

144.    Adams informed the man, "She [Bray] wants an application". (Pl LR56.1(b) Ex. 1 Bray dep. p. 108, 597) Bray responded, "No, I don't." (Pl LR56.1(b) Ex. 1 Bray dep. p. 108)

145.    The man then informed Bray, "I am not looking for you to be my woman. I am just looking for convenience." (Pl LR56.1(b) Ex. 1 Bray dep. p. 108, 598; Ex. 13 Bray's Answers to Ints p. 9) He went on to say that he pays well. (Pl LR56.1(b) Ex. 1 Bray dep. p. 108, 598)

146.    Bray again declared that she did not do things like that. (Pl LR56.1(b) Ex. 1 Bray dep. p. 108; Ex. 13 Bray's Answers to Ints p. 9)

147.    Adams told the man that they would be right back and that Bray would change her mind. (Pl LR56.1(b) Ex. 1 Bray dep. p. 108, 598; Ex. 13 Bray's Answers to Ints p. 9)

148.    As they were pulling away in their car Adams told Bray, "You're stupid. You're just like my daughter, you need a sugar daddy." (Pl LR56.1(b) Ex. 1 Bray dep. p. 108, 598)

149.    Adams advised Bray, "older men like that don't like to fuck, they like to be sucked." (Pl LR56.1(b) Ex. 1 Bray dep. p. 108, 597; Ex. 13 Bray's Answers to Ints p. 9; Ex. 15 Bray's Notes p. 000122)

150.    Adams proceeded to explain that all Bray would have to do is get drunk. (Pl LR56.1(b) Ex. 1 Bray dep. p. 109, 598; Ex. 13 Bray's Answers to Ints p. 9; Ex. 15 Bray's Notes p. 000122)

151.    Bray again responded that "she doesn't do things like that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 109)

152.    She expressed to Adams that she thought that it was disgusting. (Pl LR56.1(b) Ex. 1 Bray dep. p. 109)

153.    On another occasion in July 2000, while working with Bray, Adams picked up a homeless man and went to breakfast with him at a restaurant on 74th and Ashland. (Pl LR56.1(b) Ex. 1 Bray dep. p. 30, 587-590; Ex. 3 Adams dep. p. 99; Ex. 13 Bray's Answers to Ints p. 10-11)

154.    While the three of them sat there, Adams made overt sexual advances toward the homeless man. (Pl LR56.1(b) Ex. 1 Bray dep. p. 588; Ex. 13 Bray's Answers to Ints p. 10)

155.    For example, when the homeless man indicated he was trying to become a preacher, Adams told him that she could "preach to" him in her bed and that they could "pray together" in her bed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 588).

156.    Bray was so embarrassed by Adams' conduct, she got up and left the table. (Pl LR56.1(b) Ex. 1 Bray dep. p. 588, 622-623; Ex. 13 Bray's Answers to Ints p. 10)

157.    On or about late July 2000, Adams revealed to Bray that she earned additional income as a dominatrix and was into "S & M" (sadism and masochism). (Pl LR56.1(b) Ex. 1 Bray dep. p. 109, 592; Ex. 13 Bray's Answers to Ints p. 9; Ex. 15 Bray's Notes p. 000122)

158.    Adams informed Bray that she was in a club up north for dominatrixes and that she held dominatrix sessions at her house on Fridays and Saturdays. (Pl LR56.1(b) Ex. 1 Bray dep. p. 110; Ex. 13 Plaintiffs Answers to Interrogatories p. 9)

159.    At his deposition, Askew would not confirm that Adams was a dominatrix but did testify that it was rumored around the station for the past couple years that Adams was a dominatrix.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 161-162)

160.    Askew testified that he did know that Adams sold sex toys.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 162)

161.    Similarly, Jones testified at her deposition that she had heard about four or five years earlier that Adams was a dominatrix.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 17)

162.    When Adams informed Bray she was a dominatrix, she asked Adams what being a dominatrix meant.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 112)

163.    Adams went into detail with Bray about how it had to do with men in power that liked being in bondage or tied up.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 112-113)

164.    Adams told Bray she received money and gifts for her "sessions."  (Pl LR56.1(b) Ex. 15 Bray's Notes p. 000122)

165.    After revealing she was a dominatrix, Adams constantly talked to Bray about being a dominatrix and her "sessions" with her "slaves."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 110, 113, 127, 128-129, 594)

166.    Adams told Bray she would make a good dominatrix and could make "easy money" as a dominatrix.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 110; Ex. 13 Bray's Answers to Ints p.  9; Ex. 15 Bray's Notes p. 000122)

167.    Adams told Bray that she liked to put her slaves in cages and that most of her clientele were white guys from the 7th district.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 110)

168.    Adams told Bray that she "liked white guys because they paid well and black guys was [sic] not into S&M."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 593).

169.    Adams frequently spoke of a client by the name of "Bob" who spent Fridays with her in "sessions."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 593-594)

170.    Adams told Bray that Bob liked bondage and would give her gifts or money in exchange for intercourse.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 594; Ex. 13 Bray's Answers to Ints p. 10)

171.    On occasion, Adams complained to Bray that she was too sore to get out of the car from being beat the night before in one of her "sessions."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 322, 593-594; Ex. 13 Bray's Answers to Ints p. 10)

172.    Adams urged Bray to become a dominatrix because the additional income would help support her five children.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 114; Ex. 13 Bray's Answers to Ints p. 9-10; Ex. 15 Bray's Notes p. 000122)

173.    Adams also suggested Bray just "sleep with men for money."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 114; Ex. 13 Bray's Answers to Ints p. 9-10)

174.    Bray repeatedly told Adams that she was not interested.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 114)

175.    Adams and Bray would actually get into verbal arguments over Adams' insistence that Bray sleep with men for money.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 333; Ex. 13 Bray's Answers to Ints p. 12; Ex. 15 Bray's Notes p. 000122)

176.    Bray testified at her deposition that, "the more that she tried to convince me to sleep with men [for money], the meaner she got."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 323; Ex. 13 Bray's Answers to Ints p. 12)

177.    Adam's consistent urging that Bray have sex with men for money caused Bray stress at work.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 474-475)

178.    At one point in July 2000, Bray told Adams that she felt intimidated by Adam's behavior.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 595)

33

179.    Adams responded by laughing at Bray.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 595)

180.    Adams also revealed to Bray that she liked to wash her dog naked.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 113-114; Ex. 15 Bray's Notes p. 000123)

181.    On another occasion on or about July 2000, Adams took Bray to 74th and Ashland to pick up a custom-built "cage for bondage" from an old storage warehouse.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 115, 120, 123; Ex. 5 Spurgeon dep. p. 17-19; Ex. 13 Bray's Answers to Ints p. 10; Ex. 15 Bray's Notes p. 000123)

182.    Adams told Bray that the cage was for her slaves. (Pl LR56.1(b) Ex. 1 Bray dep. p. 150; Ex. 13 Bray's Answers to Ints p. 10)

183.    Adams explained to Bray that her "slaves loved being locked in a cage." (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 10; Ex. 15 Bray's Notes p. 000123)

184.    Adams also told Bray that some of her clients liked to be "laid out on a cross and beaten."  (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 10; Ex. Bray's Notes p. 15  000123-000124)

185. Officers Hebein and Spurgeon met Bray and Adams at 74th and Ashland. (Pl LR56.1(b) Ex. 1 Bray dep. p. 117; Ex. 31 Bray's Answers to Ints p. 10)

186. Officers Hebein and Spurgeon helped her load the cage into a police wagon. (Pl LR56.1(b) Ex. 1 Bray dep. p. 115, 118-119; Ex. 13 Bray's Answers to Ints p. 10)

187. They then drove to her home, unloaded the cage and took it to the basement. (Pl LR56.1(b) Ex. 1 Bray dep. p. 115, 118-119; Ex. 13 Bray's Answers to Ints p. 10)

188. The cage was wooden and came unassembled. (Pl LR56.1(b) Ex. 1 Bray p. 117, 118)

189. At her deposition, Adams claimed that it was only "a joke" that the item being picked up and transported by the police vehicle to her home was a cage for people. (Pl LR56.1(b) Ex. 3 Adams dep. p. 110-111)

190. Frequently during their shift, Adams would search the alleyways and garbage canisters for discarded furniture to use in her dominatrix sessions. (Pl LR56.1(b) Ex. 1 Bray dep. p. 127-128; Ex. 13 Bray's Answers to Ints p. 10; Ex. 15 Bray's Notes p. 000121)

35

191.  Adams spent more time looking in alleys for furniture to use during her dominatrix sessions than field training Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 119)

192.  Bray did not feel that Adams taught her anything she needed to know to become a good police officer. (Pl LR56.1(b) Ex. 1 Bray dep. p. 129)

193.  When she was supposed to be field training Bray, Adams frequently left the district for personal business. (Pl LR56.1(b) Ex. 1 Bray dep. p. 333; Ex. 3 Adams dep. p. 42-43, 106)

194.  Adams also would tell Bray that her walk was "too feminine" and that she should walk like Officer Fernandez because she has a more masculine walk. (Pl LR56.1(b) Ex. 1 Bray dep. p. 126)

195.  Adams even went so far as to suggest that Bray walk with a dip. (Pl LR56.1(b) Ex. 1 Bray dep. p. 126)

196.  Bray responded that she "wasn't masculine, and I shouldn't have to change my walk for a job." (Pl LR56.1(b) Ex. 1 Bray dep. p. 339)

197.  Adams would also urge Bray to use profanity with citizens and to be rude to them. (Pl LR56.1(b) Ex. 1 Bray dep. p. 126, 297-299)

198.    Adams repeatedly told Bray to "mother fuck people". (Pl LR56.1(b) Ex. 1 Bray dep. p. 303)

199.    Adams explained at her deposition that it is necessary for her to use profanity with citizens "for understanding." (Pl LR56.1(b) Ex. 3 Adams dep. p. 41-42)

200.    Bray refused to act in such a manner because she felt it was unprofessional. (Pl LR56.1(b) Ex. 1 Bray dep. p. 126)

201.    After Bray's last training cycle, Adams invited her to a dominatrix party. (Pl LR56.1(b) Ex. 1 Bray dep. p. 125, 435; Ex. 13 Bray's Answers to Ints p. 10-11)

202.    When Bray did not attend the party, Adams stopped speaking to Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 125, 435; Ex. 13 Bray's Answers to Ints p. 10-11)

203.    Adams stated at her deposition that after Bray's fourth training cycle, she did not have any further contact with Bray except perhaps saying, "hi" in passing. (Pl LR56.1(b) Ex. 2 Adams dep. p. 57, 73)

204.    Adams quit being a field training officer approximately 6 months after she worked with Bray. (Pl LR56.1(b) Ex. 3 Adams dep. p. 8-9)

205.    At her deposition, Adams stated she quit being a field training officer because she "was fed up with the stupid recruits." (Pl LR56.1(b) 3 Adams dep. p. 10)

206.    Although Bray was very uncomfortable with the things Adams was doing, she did not understand them to be sexual harassment at the time they occurred. (Pl LR56.1(b) Ex. 1 Bray dep. p. 219, 222, 382)

207.    Adams passed and "Field Qualified" Bray on her fourth cycle on or about July 24, 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 337)

208.    This meant Bray was qualified and able to work without a Field Training Officer. (Pl LR56.1(b) Ex. 1 Bray dep. p. 337)

209.    Eileen Bell, Assistant Corporation Counsel for the City of Chicago, agreed with Investigator Batog of the EEOC that it was "odd" that Bray was field qualified but then told she was not qualified to be a police officer. (Pl LR56.1(b) Ex. 23 EEOC notes)

210.    In fact, even Askew testified at his deposition that during his 10 years with the City, he could only recall one other probationary police officer ever being terminated right before their probationary period ended. (Pl LR56.1(b) Ex. 2 Askew dep. p. 58-59, 148; Ex. 43 Jones Statement)

211.    Similarly, Loggins has never heard of a PPO being discharged when Field Qualified.  (Pl LR56.1(b) Ex. 20 EEOC notes)


212.    Not surprisingly, that individual is deceased and therefore unavailable for questioning.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 58)


213.    In its answers to interrogatories, defendant states that in 2000, it employed 720 probationary police officers.  (Pl LR56.1(b) Ex. 14 Def's Answers to Ints p. 18) However, the defendant refused to indicate how many of those probationary police officers did not complete their probationary period.  (Pl LR56.1(b) Ex. 14 Def's Answers to Ints p. 18-19)


**SEXUAL HARASSMENT POLICY**

214.    The City of Chicago's Sexual Harassment Policy as stated in the Training Bulletin reads as follows:

> "Hostile Environment harassment" occurs when unwelcome sexual conduct unreasonably interferes with an individual's job performance or creates an intimidating, hostile, or offensive working environment, even if it leads to no tangible or economic job consequences.  What is unwelcome sexual conduct?  It is harassing conduct that includes touching, slurs, innuendos, propositions, vulgar jokes, pinups, obscene drawings or other such behavior directed toward one sex.  The use of colloquial nicknames such as 'darling,' 'honey,' 'sweetheart,' 'dear,' etc. can be construed as harassing conduct.  Unwelcomeness, a key element, is not to be confused with voluntary participation. To be harassment, the conduct must be unwelcome."  (Pl LR56.1(b) Ex. 52 Def's Sexual Harassment Policy)

215.    Under this policy, Bray was sexually harassed by both Askew and Adams. (Pl LR56.1(b) Ex. 52 Def's Sexual Harassment Policy)

## AFTER FIELD TRAINING – THE EVENTS LEADING TO BRAY'S TERMINATION

216.    On or about October 4, 2000, when they were in the interviewing room together, Askew grabbed Bray's breast again, allegedly to check to see if her bulletproof vest was on.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 85-86; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

217.    After grabbing Bray's breast, Askew began laughing.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 86)

218.    Askew then advised Bray that she "owed him some [sexual favors]".  (Pl LR56.1(b) Ex. 1 Bray dep. p. 88, 436; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

219.    Bray was very upset and offended by Askew's unwelcome actions and informed Askew that if he ever touched her again, she would go to the supervisor.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 87-90, 436; Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

220. Askew did not reply. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 8; Ex. 15 Bray's Notes p. 000110)

221. Rather, Askew contacted the Police Academy and requested that they evaluate Bray's performance. (Pl LR56.1(b) Ex. 2 Askew dep. p. 72-73; Ex. 3 Adams dep. p. 80-82)

222. Askew enlisted the help of Adams to assist in his complaint of Bray to the Academy. (Pl LR56.1(b) Ex. 3 Adams dep. p. 80-82)

223. Askew and Adams then recommended to the Review Board that Bray be terminated. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 27 Askew's Statement; Ex. 53 Adams' Statement)

224. In his statement to the District Commander, Askew claims:

> R/O [Reporting Officer] was alarmed that P.P.O. Bray had to be given an order to get out of her vehicle to assist her partner who was searching a subject.
> R/O had warned P.P.O. Bray that steps backwards in training could have a negative effect on her employment.
> In this R/Os opinion a mistake was made in making this P.P.O. field qualified and in the interest of safety for P.P.O. Bray and any officer who may be assigned to work with her that her position as P.P.O. be terminated. (Pl LR56.1(b) Ex. 27 Askew's Statement)

225. In her statement to the District Commander, Adams states:

> R/O [Reporting Officer] trained and field qualified PPO Bray based on minimum effort on her part. R/O realizes that different people learn at different rates. This was the reason R/O requested fourth cycle for PPO Bray. R/O felt that PPO would improve as she gained more confidence and had more street time. During the fourth cycle it appeared that PPO was making an effort. Upon completion of the fourth cycle PPO had reached a bare minimum skill/knowledge. It was brought to R/O's attention by several PO's who had worked with PPO Bray that they would not work with her. Based on these conversations R/O has come to the conclusion that PPO has reverted to the attitude that she did not have to perform. R/O seriously regrets having field qualified PPO Bray based on what R/O was told and the fact that she had to be ordered out of the vehicle to assist her partner.
>
> R/O feels that it is apparent that PPO Bray is unsafe, a danger to herself and others and should not continue to be a police officer working on the streets of the City of Chicago. (Pl LR56.1(b) Ex. 53 Adams' Statement)

226. Both Askew and Adams claimed at their depositions that they requested Bray be evaluated and recommended her termination specifically because they heard from "someone" that Bray had to be ordered out of her car to assist her partner on one occasion. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adam's dep. p. 70-72) Therefore, they felt she was too unsafe to become a police officer. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82)

227. Askew described this as the "incident that basically launched the whole re-evaluation." (Pl LR56.1(b) Ex. 2 Askew dep. p. 81)

228. Similarly, Adams testified at her deposition that it was this "particular incident that concerned [her] the most." (Pl LR56.1(b) Ex. 3 Adams dep. p. 82)

42

229.    However, neither Askew nor Adams could identify the person who told them about this "incident." (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams dep. p. 65)

230.    Neither Askew nor Adams could even identify which partner Bray allegedly failed to assist. (Pl LR56.1(b) Ex. 2 Askew dep. p. 73, 82; Ex. 3 Adams dep. 65)

231.    This "incident" actually occurred five months earlier in May 2000, during Bray's second cycle of training while she was working with Officer Mike Cleary. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571)

232.    In May 2000, there was an occasion in which Bray was unable to get out of her squad car to assist Cleary because her car door was jammed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571)

233.    Lieutenant Zapolsky, who did not know Bray was having trouble getting out of the car, had pulled along side the car, ordered Bray out of it and then immediately left. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 351-352, 570; Ex. 3 Adams dep. p. 136; Ex. 28 Zapolsky Statement; Ex. 20 EEOC notes p. 000185)

234.    No one said anything else to Bray about this matter after Zapolsky pulled away from the car. (Pl LR56.1(b) Ex. 1 Bray dep. p. 354-355, 356; Ex. 28 Zapolsky Statement; Ex. 20 EEOC notes p. 000185)

235.    At no time did Cleary ever mention it to Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 356, 570-571)

236.    Cleary never reprimanded or counseled Bray for it either. (Pl LR56.1(b) Ex. 1 Bray dep. p. 570-571)

237.    Cleary did not even cite this matter in the Daily Observation Reports he prepared for Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 570-571; Ex. 36 Daily Observation Reports)

238.    To the contrary, Cleary gave Bray "above adequate" scores for the areas of performance he observed during the period she worked with him. (Pl LR56.1(b) Ex. 1 Bray dep. p. 569-571; Ex. 36 Daily Observation Report; Ex. 29 Daily Observation Report Summary)

239.    Neither Askew nor Adams were present when this incident occurred. (Pl LR56.1(b) Ex. 2 Askew dep. p. 81; Ex. 3 Adams dep. p. 64-65)

240. Neither Askew nor Adams even bothered to ask Bray about this rumored incident. (Pl LR56.1(b) Ex. 3 Adams dep. p. 126)

241. Despite the fact the "incident" was not a concern of anyone's at the time it occurred in May 2000, Askew alleges that mere rumor of it in October 2000 – coincidentally right after Bray threatened to report him for sexual harassment – was sufficient to cause Askew to seek Bray's termination. (Pl LR56.1(b) Ex. 1 Bray dep. p. 80; Ex. 27 Askew's Statement; Ex. 15 Bray's Notes p. 000110; Ex. 20 EEOC).

242. Ironically, Adams testified at her deposition that she does not generally believe the rumors she hears around the station. (Pl LR56.1(b) Ex. 3 Adams dep. p. 130)

243. Adams further testified at her deposition that if she hears a rumor which is important enough to her, she will "go find out" by going "to the source." (Pl LR56.1(b) Ex. 3 Adams dep. p. 130)

244. However, Adams never spoke to Bray about the alleged incident she claims she heard gossiped around the station. (Pl LR56.1(b) Ex. 3 Adams dep. p. 73)

245. In fact, after Bray's fourth cycle, Adams never spoke to anyone about Bray's performance. (Pl LR56.1(b) Ex. 3 Adams dep. p. 67-70)

246.    Adams also testified at her deposition that in her 17 years as a police officer, this was the first time Adams felt it was necessary to come forward about another officer.  (Pl LR56.1(b) Ex. 3 Adams dep. 72-73)

247.    On October 19, 2000, Lieutenant Zapolsky was requested to prepare a written evaluation of Bray.  (Pl LR56.1(b) Ex. 28 Zapolsky Statement)

248.    In his statement, Zapolsky mentions this "incident" which occurred five months earlier, but does not give it much significance.  (Pl LR56.1(b) Ex. 28 Zapolsky Statement)

249.    Rather, he states that this was the only incident he had involving Bray and that since then he has not had sufficient time to "properly and fairly evaluate PPO BRAY" on his watch and therefore cannot offer an opinion on her performance.  (Pl LR56.1(b) Ex. 28 Zapolsky Statement)

250.    On or about October 20, 2000, approximately two weeks after Bray threatened to report Askew if he touched her again, Bray was called into a meeting with Lieutenant Zapolsky, Lieutenant Duesworth and Sergeant Judon and given a notice that her performance during her probationary period was going to be reviewed.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 390-392; Ex. 9 Judon dep. p. 14; Ex. 13 Bray's Answers to Ints p. 23-24; Ex. 15  Bray's Notes p. 000111)

251.    Bray inquired what the purpose for the review was. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392)

252.    Lieutenant Zapolsky told Bray that he did not know and that it was her Field Training Officers who requested the evaluation. (Pl LR56.1(b) Ex. 1 Bray dep. p. 392-393, 435-436; Ex. 15 Bray's Notes p. 000111)

253.    Bray expressed that she did not understand why they had let her get this far in the process and asked why they would Field Qualify her if they did not think she was a good officer. (Pl LR56.1(b) Ex. 1Bray dep. p. 394)

254.    Bray then attempted to tell Lieutenant Zapolsky, Sergeant Judon and Lieutenant Duesworth that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl LR56.1(b) Ex. 13 Bray's Answers to Ints p. 24; Ex. 1 Bray dep. p. 393-394)

255.    Bray also tried to tell them that she believed Adams had forged her signature on some of the Daily Observation Reports she prepared during Bray's fourth cycle. (Pl LR56.1(b) Ex. 1 Bray dep. p. 324-328, 383-384, 394) at her deposition, Bray identified D306, 308, 282, 284, 286, and 288 Daily Observation Reports which clearly contained forged signatures. (Pl LR56.1(b) Ex. 1 Bray dep. 324-328; Ex. 41 Daily Observation Reports D306, 308, 282, 284, and 288)

47

256.    However, Judon cut her off stating, "it's too late for that." (Pl LR56.1(b) Ex. 1 Bray dep. p. 393-394)

257.    Before the meeting ended, Bray requested to see her file. (Pl LR56.1(b) Ex. 1 Bray dep. p. 395)

258.    The Lieutenants looked though the file and noticed that the signatures on the Daily Observation Reports prepared by Adams during Bray's fourth cycle did not match Bray's signature on other documents. (Pl LR56.1(b) Ex. 1 Bray dep. p. 395)

259.    Bray requested copies of her file for "when she obtained an attorney." (Pl LR56.1(b) Ex. 1 Bray dep. p. 395)

260.    Upon hearing that Bray intended to retain an attorney, Judon snatched Bray's file out of her hands. (Pl LR56.1(b) Ex. 1 Bray dep. p. 396-397)

261.    That evening, October 20, 2000, Bray telephoned Askew at home and asked him "what was happening." (Pl LR56.1(b) Ex. 2 Askew dep. p. 94) Askew refused to talk to Bray. (Pl LR56.1(b) Ex. 2 Askew dep. p. 94)

262.    Also on or about October 20, 2000, Bray was taken off the street and restricted to desk duty. (Pl LR56.1(b) Ex. 1 Bray dep. p. 396-397; Ex. 15 Bray's Notes p. 000111)

263.    On desk duty, her duties were drastically reduced.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 397)  The only task she was given was to file papers.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 397)

264.    While Bray was sitting at the desk, officers would approach her and ask why she was being terminated.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 398)

265.    Bray explained that she was being re-evaluated and asked several officers to prepare statements on her behalf.  (Pl LR56.1(b) Ex. 1 Bray's dep. p. 397; Ex. 15 Bray's Notes p. 000111)

266.    The following day on or about October 22, 2000, Bray was assigned to the radio room.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 398, 577; Ex. 15 Bray's Notes p. 000111.)

267.    The radio room was located in a secluded area, preventing Bray from interacting or communicating with other officers.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 578)

268.    The only time she saw other people was for approximately one hour a day when radios were passed out.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 398, 578)

269.    Bray was not allowed to dispense the radios; consequently she had to watch while another officer distributed the radios.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 398,

578)  At all other times, the door to the radio room was shut.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 578)

270.    Bray felt embarrassed and humiliated when she was in the radio room.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 577-578

271.    Bray remained assigned to the radio room until she was terminated on or about October 24, 2000.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 577; Ex. 16 Termination Letter)

272.    Bray was allowed to submit a written statement to the Review Board.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 398)

273.    Bray wrote a statement delineating all the sexual harassment she had experienced and had Lieutenant Murphy review it.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 401, 426)

274.    After Murphy read Bray's initial statement, he instructed her to re-write it.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 426)

275.    Murphy told Bray that "this isn't about the Field Training Officers, this is about you."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 401; Ex. 15 Bray's Notes p. 000112)

276.     Murphy then recommended that Officer Joyce, who was in school to be an attorney, help Bray re-write the statement.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 401; Ex. 15 Bray's Notes p. 000112)

277.     Murphy advised Bray she would "be in good hands" with Joyce.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 407)

278.     Joyce called Bray and recommended that Bray not "say anything bad about Bruce [Askew] because Bruce [Askew] is going to be the one to help you get your job back."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 402-403, 408; Ex. 15 Bray's Notes p. 000111-000112)

279.     Joyce emphasized to Bray, "Just don't write anything negative about him [Askew], put good things about him in your report."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 403; Ex. 15 Bray's Notes p. 000112)

280.     Bray confided in Joyce about the sexual harassment.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 406; Ex. 21 EEOC notes p. 000186)

281.     Joyce advised Bray, "Don't speak of anything, because that's like sour grapes."  (Pl LR56.1(b) Ex. 1 Bray dep. p. 406, 409; Ex. 15 Bray's Notes p. 000113)

282.    Bray trusted Joyce because he was a law student and believed he meant well so she left the allegations of sexual harassment out of her statement. (Pl LR56.1(b) Ex. 1 Bray dep. p. 406, 409)

283.    On the morning of October 23, 2000, Joyce re-wrote a statement for Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 405, 407)

284.    Bray then copied the statement in her own handwriting before she met with the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 405, 407)

285.    Bray thought what Joyce was having her write would save her job. (Pl LR56.1(b) Ex. 1 Bray dep. p. 408) Therefore, Bray did not really read the statement Joyce wrote as she was copying it. (Pl LR56.1(b) Ex. 1 Bray dep. p. 408-409)

286.    Joyce then took her statement and escorted her to the Police Academy. (Pl LR56.1(b) Ex. 1 Bray dep. p. 405; Ex. 15 Bray's Notes p. 000113)

287.    When she arrived at the Academy, Bray was told to report at 8:00 a.m. the following day, October 24, 2000, in civilian clothes and to bring her star and ID. (Pl LR56.1(b) Ex. 1 Bray's dep. p. 415-416; Ex. 15 Bray's Notes p. 000113)

288.    During the entire review process, Bray felt she was being "rushed out" of the police department. (Pl LR56.1(b) Ex. 1 Bray dep. p. 405-406, 408, 415, 425)

289. She was never given an opportunity to talk to anyone on the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 411-413, 425)

290. In addition to the statement Joyce drafted for her, Bray also submitted statements from four officers she had worked with. (Pl LR56.1(b) Ex. 1 Bray dep. p. 409)

291. Bray submitted a statement from Officer Gloria Jones to the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 552-553; Ex. 4 Jones dep. p. 31, 33)

292. Bray worked with Jones quite a few times. (Pl LR56.1(b) Ex. 1 Bray dep. p. 555; Ex. 4 Jones dep. p. 8)

293. Bray was partnered with Jones from on or about June or July of 2000 through the time Bray was terminated. (Pl LR56.1(b) Ex. 4 Jones dep. p. 8, 53)

294. As her partner, Jones had many opportunities to observe Bray and stated at her deposition that Bray was "professional" and "seemed to know what she was doing." (Pl LR56.1(b) Ex. 4 Jones dep. p. 10)

295. Jones also testified at her deposition that she was never fearful to work with Bray. (Pl LR56.1(b) Ex. 4 Jones dep. p. 10)

296.    In fact, Jones requested to work with Bray.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 10)

297.    Jones went through the Police Academy with Askew and has been on the police force for the same amount of time as Askew – since 1990.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 148; Ex. 4 Jones dep. 22-23)

298.    In her statement dated October 22, 2000, Jones states:

> I have worked with Officer Bray on several occasions [sic].  I always felt secure with her as a partner.  Officer Bray always presented herself in a sure and knowledgeable manner.  Due to the fact that I have ten years on the job, there was a lot of information that I learned and welcomed from Officer Bray.
> R\O [Reporting Officer] has no second thoughts about P.O. [Police Officer] Bray's effectiveness as a police officer and welcomes the opportunity to work with her again.  (Pl LR56.1(b) Ex. 43 Jones Statement; Ex. 4 Jones dep. p. 31)

299.    At the time she wrote this letter, Jones had been a police officer for at least 10 years.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 605; Ex. 43 Jones Statement)

300.    Despite the extensive amount of time Jones spent working with Bray after her training cycles, no one, including the Chicago Police Department , ever interviewed Jones regarding Bray.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 33-34)

301.    However, on one occasion, Adams did ask Jones how she liked working with Bray.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 34)

302. Jones responded, "she is no problem." (Pl LR56.1(b) Ex. 4 Jones dep. p. 34)

303. Bray also submitted a statement from Officer Jenkins to the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 552-553)

304. Jenkins was the last partner Bray had before she was assigned to desk duty. (Pl LR56.1(b) Ex. 1 Bray dep. p. 555-556)

305. In his statement dated October 22, 2000, Jenkins states:

> RO [Reporting Officer] is submitting this to from at the request of PPO [Probationary Police Officer] Bray. P.O. [Police Officer] Jenkins worked with PPO Bray on 12 Oct 00 & 13 Oct 00.
> On the above dates RO observed PPO Bray worked the events that we handled safely and effectively. (Pl LR56.1(b) Ex. 44 Jenkins statement)

306. Jenkins told Bray that on the date she was put on desk duty, on or about October 20, 2000, Lieutenant Murphy and Lieutenant Zapolsky approached Jenkins and attempted to get him to write a negative statement about Bray. (Pl LR56.1(b) Ex. 1 Bray dep. p. 556; Ex. 13 Bray's Answers to Ints p. 18)

307. Jenkins told Bray that he refused to write such a statement because he did not have any problems with her and would continue to work with her. (Pl LR56.1(b) Ex. 1 Bray dep. p. 556-557; Ex. 13 Bray's Answers to Ints p. 18)

308.    Bray also submitted a letter from Officer Kimbrough to the Review Board. (Pl LR56.1(b) Ex. 1 Bray dep. p. 558-559)

309.    Kimbrough has been a police officer for over 20 years.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 147)

310.    At his deposition, Askew stated that Kimbrough was "definitely a good Officer" and that he valued her opinion.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 147)

311.    In her statement dated October 22, 2000, Kimbrough states:

> R/O [Reporting Officer] is writing this To-From on behalf of PPO [Probationary Police Officer] Pamela Bray.  R/O had the opportunity to work w/ PPO Bray on at least two occasions and experienced no problems with her capability as an officer or her knowledge of the job.
> R/O at no time felt in fear for her safety or well-being and would have no problem w/working with PPO Bray in the future.  (Pl LR56.1(b) Ex. 45 Kimbrough Statement)

312.    Bray also submitted a statement from Officer Davina Loggins to the Review Board.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 560-561)

313.    Bray worked with Loggins "quite a few times" after her training cycles were completed.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 561)

314.    Askew testified at his deposition that Loggins was "a damned good Police Officer."  (Pl LR56.1(b) Ex. 2 Askew dep. p. 146)

315.    In her statement dated October 22, 2000, Loggins states:

PO [Police Officer] is writing this to-from report at the request of PPO [Probationary Police Officer] Bray. I've had the opportunity to work with PPO Bray on several occasions. I had no problems with how show handled our jobs. We had several domestic and PPO Bray handled all of them in a very professional and aggressive manner. I personally would not mind working with PPO Bray if given the chance again. (Pl LR56.1(b) Ex. 46 Loggins statement)

316.    As instructed, on or about October 24, 2000, Bray went to the Police Academy and was escorted into a room where she sat for seven and a half hours. (Pl LR 56.1(b) Ex. 1 Bray dep. p. 417, 426; Ex. 15 Bray's Notes p. 000114)

317.    While she waited at the Police Academy, Bray bumped into her former teacher, Officer Smith. (Pl LR56.1(b) Ex. 1 Bray dep. p. 418-420; Ex. 15 Bray's Notes p. 000114)

318.    Bray broke down crying and told Smith that she was sexually harassed by her Field Training Officers and believed that they were behind her termination. (Pl LR56.1(b) Ex. 1 Bray dep. p. 418-420)

319.    Officer Smith advised Bray, "Whatever you do . . . don't sign shit." (Pl LR56.1(b) Ex. 1 Bray dep. p. 420-421, 423; Ex. 15 Bray's Notes p. 000114).

320.    Smith also added, "They don't even want me talking to you." (Pl LR56.1(b) Ex. 1 Bray dep. p. 420; Ex. 15 Bray's Notes p. 000114)

321. Finally, at approximately 4:00 p.m. on or about October 24, 2000, Bray met with Deputy Superintendent Schenkel and Lieutenant Skahill. (Pl LR56.1(b) Ex. 1 Bray dep. p. 421, 427; Ex. 15 Bray's Notes p. 000115; Ex. 10 Skahill dep. p. 11)

322. Skahill gave Bray a termination notification. (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 10 Skahill dep. p. 15)

323. When she asked why she was being terminated, Deputy Superintendent Schenkel responded, "I don't have to give you a reason." (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 15 Bray's Notes p. 000115)

324. Bray refused to sign the termination notification. (Pl LR56.1(b) Ex. 1 Bray dep. p. 422; Ex. 15 Bray's Notes p. 000115)

325. In the Review Board's written decision, although it mentions a couple of minor problems Bray had during her training cycles, it also notes that during her fourth cycle of training she improved her performance and was rated "qualified." (Pl LR56.1(b) Ex. 47 Review Board Decision )

326. However, the Board then goes on to rely on the "incident" which Askew claims he heard about in October 2000 from an unknown individual wherein Bray was ordered out of her car to assist her partner. (Pl LR56.1(b) Ex. 47 Review Board Decision)

327. The Board's decision fails to note, however, that this "incident" took place five months earlier in May 2000 during Bray's second cycle of training – before she was rated "Field Qualified." (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571)

328. The Board's decision also fails to note that the reason Bray did not get out of her car on that occasion in May 2000, was because the door had jammed and not because she was unwilling to assist her partner. (Pl LR56.1(b) Ex. 1 Bray dep. p. 347-348, 350-351, 353, 570-571)

329. The decision also notes that allegedly "several police officers" in the district had requested not to be partnered with Bray because they do not feel safe working with her. (Pl LR56.1(b) Ex. 47 Review Board Decision)

330. However, not one of these alleged police officers is identified. (Pl LR56.1(b) Ex. 47 Review Board Decision)

331. Not one single police officer ever requested in writing or in any other official police document not to work with Bray. (Pl LR56.1(b) Ex. 28 Zapolsky Statement)

332.     Jones stated at her deposition that she was never fearful of working with Bray and would not have asked to work with her again if she was.  (Pl LR56.1(b) Ex. 4 Jones dep. p. 10)


333.     The Review Board based its decision to terminate Bray on inaccurate and misleading gossip intentionally provided to it by Askew.  (Pl LR56.1(b) Ex.47  Review Board Decision)


334.     The Review Board's findings do not reflect that they reviewed or even received Bray's statement or the statements prepared by other officers on her behalf.  (Pl LR56.1(b) Ex. 47 Review Board Decision)


335.     The Review Board did not review any documents or statements submitted by Bray.  (Pl LR56.1(b) Ex. 47 Review Board Decision; Ex. 26 Def's Amended Position Statement)


336.     In fact, the First Amended Position Statement submitted by the City of Chicago to the EEOC, which lists and attaches the documents it claims were relied upon in making the decision to terminate Bray, does not list nor attach Bray's statement nor the statements of the officers submitted by Bray.  (Pl LR56.1(b) Ex. 26 Def's Amended Position Statement)

337.     Shortly after her termination, on or about October 30, 2000, Bray filed a

Charge of Discrimination with the Equal Employment Opportunity Commission.  (Pl

LR56.1(b) Ex. 1 Bray dep. p. 430; Ex. 17 Charge of Discrimination )


338.     On or about March 21, 2001, the Equal Employment Opportunity

Commission issued a Determination in Bray's favor.  The Determination states, in part:

> I have determined that the evidence obtained in the investigation
> establishes reasonable cause to believe that Respondent violated Title VII
> by subjecting Charging Party to sexual harassment by her Field Training
> Officers.  Furthermore, I have determined that the evidence obtained in the
> investigation establishes reasonable cause to be believe that Respondent
> violated Title VII in that it retaliated against Charging Party by
> discharging her.  (Pl LR56.1(b) Ex. 19 EEOC Determination)

339.     Askew testified at his deposition that he first became aware that Bray was

accusing him of sexual harassment when he read a newspaper article published in the

Chicago Defender on December 4, 2000.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 102)


340.     However, he also admitted that he was never identified by name in the

newspaper article.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 98)


341.     The newspaper article refers to a "male field training officer".  (Pl

LR56.1(b) Ex. 2 Askew dep. p. 99, 103)

342.    Askew was not the only male Field Training Officer assigned to Bray.
Scott Keith was also Bray's Field Training Officer on May 25, 28, 30, 31 and June 1,
2000.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 564-565; Ex. 2 Askew dep. p. 47; Ex. 29 Daily
Observation Reports)

343.    On December 8, 2000, the District Commander asked Askew to prepare a
statement in response to Bray's sexual harassment allegations.  (Pl LR56.1(b) Ex. 2
Askew dep. p. 150)

344.    In his statement, Askew states:

> This statement is not being given voluntarily, but under duress.
> Reporting Officer is only giving this statement at this time because
> Reporting Officer knows Reporting Officer could be terminated from
> employment if Reporting Officer refuses.  This statement is being given at
> the order of Police Agent Draper-Sibley.
> This "To-From-Subject" Report should not be considered a
> verbatim statement but only a summary regarding the requested
> information.
> R/O [Reporting Officer] was the Field Training Officer for P.P.O.
> Pamela Bray during her second cycle.  At no time did R/O observe any
> sexual harassment of P.P.O. Pamela Bray.  (Pl LR56.1(b) Ex. 2 Askew
> dep. p. 150; Ex. 27 Askew's Statement)

345.    No one ever discussed the matter with Askew.  (Pl LR56.1(b) Ex. 2
Askew dep. p. 150, 152, 154-155)

346.    No one from Human Resources or Internal Affairs ever contacted Askew
regarding Bray's sexual harassment allegations.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 103-104)

**BRAY'S PERFORMANCE**

347. During their training cycles, Probationary Police Officers' performance is rated on a scale of 1, being not acceptable, to 7, indicating superior performance, on Daily Observation Reports. (Pl LR56.1(b) Ex. 29-41 Daily Observation Reports)

348. A score of 4 is acceptable performance. (Pl LR56.1(b) Ex. 29-41 Daily Observation Reports).

349. Renee Daniels was Bray's Field Training Officer during her first cycle. (Pl LR56.1(b) Ex. 2 Askew dep. p. 17)

350. However, Bray worked with Daniels only two or three times. (Pl LR56.1(b) Ex. 29 Summary of Daily Observation Reports; Ex. 30 Daily Observation Reports; Ex. 54 Training Cycle Summary)

351. On March 24, 2000, Bray worked with Field Training Officer Davis. (Pl LR56.1(b) Ex. 31 Daily Observation Report)

352. On the Daily Observation Report for March 24, 2000, Davis gave Bray scores of 5's and 6's in all categories of performance he observed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 566; Ex. 31 Daily Observation Report)

353.    On April 9 and 10, 2000, Bray worked with Police Officer Hayne. (Pl LR56.1(b) Ex. 1 Bray dep. p. 566; Ex. 29 Observation Report Summary; Ex. 32 Daily Observation Reports)

354.    On the Daily Observation Reports for April 9 and 10, 2000, Hayne gave Bray scores of 5's and 6's in all categories of performance he observed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 566-567; Ex. 29 Daily Observation Report Summary; Ex. 32 Daily Observation Report)

355.    On April 5 and 13, 2000, Bray worked with Police Officer DuBose. (Pl LR56.1(b)Ex. 1 Bray dep. p. 568; Ex. 33 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

356.    On the Daily Observation Reports for April 5 and 13, 2000, DuBose gave Bray scores of 4's, 5's and 6's in all categories of performance she observed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 568; Ex. 33 Daily Observation Report; Ex. 29 Daily Observation Report Summary)

357.    On April 26, 2000, Bray worked with Officer Morris. (Pl LR56.1(b) Ex. 1 Bray dep. p. 568; Ex. 34 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

358.    On the Daily Observation Reports for April 26, 2000, Morris gave Bray

scores of 6's and one 7 in all categories of performance he observed.  (Pl LR56.1(b) Ex. 1

Bray dep. p. 568-569; Ex. 33 Daily Observation Report; Ex. 29 Daily Observation Report

Summary).  Officer Morris gave Bray a 7, Superior Performance, in the category of

"Community Interaction."  (Pl LR56.1(b) Ex. 34 Daily Observation Report; Ex. 29 Daily

Observation Report Summary)


359.    A summary of the scores Bray received on her Daily Observation Reports

during her first cycle are listed below:

| | 3/24/00 Davis | 3/31/00 Stewart | 4/1/00 Stewart | 4/2/00 Stewart | 4/5/00 DuBose | 4/9/00 Hayne |
|---|---|---|---|---|---|---|
| Vehicle Operation | | 3 | | 2 | | |
| Written Communication | 5 | 4 | | 2 | 5 | 5 |
| Verbal Communication | 5 | 2 | 2 | 3 | 6 | 5 |
| Community Interaction | 6 | | 2 | | 6 | 6 |
| Patrol Procedures | 5 | 3 | | 2 | 4 | 5 |
| Arrest Procedures | | | | | | 5 |
| Traffic Enforcement | 6 | 2 | 2 | 2 | | 5 |
| Physical Skills/ Force | | | | 3 | | 5 |
| Criminal Laws/Policy | | 2 | 2 | 2 | 5 | 5 |
| Demeanor/ Attitude | 6 | 3 | 3 | 3 | 6 | 7 |

| | 4/10/00 Hayne | 4/13/00 DuBose | 4/14/00 Daniels | 4/15/00 Daniels | Average |
|---|---|---|---|---|---|
| Vehicle Operation | | 4 | | | 3 |
| Written Communication | 5 | 5 | 4 | 3 | 4 |
| Verbal Communication | 6 | 5 | 4 | 2 | 4 |
| Community Interaction | 5 | 5 | | 4 | 5 |
| Patrol Procedures | 5 | 4 | 4 | 2 | 4 |
| Arrest Procedures | 5 | 4 | | | 5 |
| Traffic Enforcement | 5 | 5 | 4 | 4 | 4 |
| Physical Skills/ Force | 5 | | | | 4 |
| Criminal Laws/Policy | 5 | 4 | | | 4 |
| Demeanor/ Attitude | 6 | 6 | 4 | 4 | 5 |

(Pl LR56.1(b) Ex. 29 Daily Observation Report Summary; Ex. 30-33 Daily Observation
Reports)

360.    Bray worked with Askew during her second cycle of training on April 29, 30, May 1, 2, 3, 4, 8, 9, 10, 11 and 12, 2000. (Pl LR56.1(b) Ex. 2 Askew dep. p. 25; Ex. 35 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

361.    On the Daily Observation Reports for May 8 and 10, 2000, Askew gave Bray scores of 4's, Acceptable Performance, in all categories of performance he observed. (Pl LR56.1(b) Ex. 35 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

362.    On the Daily Observation Reports for May 4, 11, and 12, 2000, Askew gave Bray scores of 4's, Acceptable Performance, in all categories he observed, with the exception of 3's given in the category of "Criminal Laws/Policy". (Pl LR56.1(b) Ex. 35 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

363.    At the end of her second cycle, Askew passed Bray. (Pl LR56.1(b) Ex. 2 Askew dep. p. 30; Ex. 55 Training Cycle Summary)

364.    However, Askew testified at his deposition that he did not honestly prepare Bray's Daily Observation Reports. (Pl LR56.1(b) Ex. 2 Askew dep. p. 89, 133) He stated that he, in fact, "lied on these evaluations." (Pl LR56.1(b) Ex. 2 Askew dep. p. 89, 133)

365. At his deposition Askew claimed that Bray did not actually deserve the rankings that he gave her on his Daily Observation Reports (Pl LR56.1(b) Ex. 2 Askew dep. p. 90-91)

366. A summary of the scores Bray received on her Daily Observation Reports during her second cycle are listed below:

| | 4/26/00 Morris | 4/29/00 Askew | 4/30/00 Askew | 5/1/00 Askew | 5/2/00 Askew | 5/4/00 Askew |
|---|---|---|---|---|---|---|
| Vehicle Operation | | | | | | |
| Written Communication | 6 | 3 | 3 | 3 | 4 | 4 |
| Verbal Communication | 6 | 4 | 3 | 4 | 4 | 4 |
| Community Interaction | 7 | 3 | 4 | 4 | 3 | 4 |
| Patrol Procedures | 6 | 3 | 3 | 4 | 4 | 4 |
| Arrest Procedures | 6 | | | | | |
| Traffic Enforcement | 6 | 3 | 3 | 4 | 3 | |
| Physical Skills/ Force | 6 | 3 | 3 | 3 | | 4 |
| Criminal Laws/Policy | 6 | 3 | 3 | 3 | 3 | 3 |
| Demeanor/ Attitude | 6 | 4 | 4 | 4 | 4 | |

| | 5/8/00 Askew | 5/9/00 Askew | 5/10/00 Askew | 5/11/00 Askew | 5/12/00 Askew | Average |
|---|---|---|---|---|---|---|
| Vehicle Operation | | | 4 | | 4 | 4 |
| Written Communication | 4 | 4 | 4 | 4 | 4 | 4 |
| Verbal Communication | | 4 | 4 | 4 | 4 | 4 |
| Community Interaction | | 4 | 4 | 4 | 4 | 4 |
| Patrol Procedures | 4 | 3 | 4 | 4 | 4 | 4 |
| Arrest Procedures | 4 | 3 | | 4 | 4 | 4 |
| Traffic Enforcement | | | | | 4 | 4 |
| Physical Skills/ Force | | | | | 4 | 4 |
| Criminal Laws/Policy | | | 4 | 3 | 3 | 3 |
| Demeanor/ Attitude | 4 | 4 | 4 | 4 | 4 | 4 |

(Pl LR56.1(b) Ex. 29 Daily Observation Report Summary; Ex. 34-35 Daily Observation Reports)

367. On May 17, 18, 19, 20 and 21, 2000, Bray worked with Police Officer Cleary. (Pl LR56.1(b) Ex. 1 Bray dep. p. 569-570; Ex. 36 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

67

368.   On the Daily Observation Reports for May 18, 19, 20 and 21, Cleary gave Bray scores of 5's and 7's in all categories of performance he observed, with the exception of a 3 given in the category of "traffic enforcement." (Pl LR56.1(b) Ex. 1 Bray dep. p. 569-571; Ex. 36 Daily Observation Report; Ex. 29 Daily Observation Report Summary)

369.   Of the Daily Observation Reports prepared by Cleary for Bray, only the one dated May 21, 2000 indicates that Cleary observed Bray in the performance of "arrest procedures." (Pl LR56.1(b) Ex. 29 Daily Observation Report Summary; Ex. 36 Daily Observation Reports)

370.   On the Daily Observation Report for May 21, 2000, Clearly gave Bray the score of 5 in the category of "arrest procedures". (Pl LR56.1(b) Ex. 29 Daily Observation Report Summary; Ex. 36 Daily Observation Report)

371.   For each of the four days observed, Cleary gave Bray a 7, Superior Performance, in the category of "Demeanor/Attitude". (Pl LR56.1(b) Ex. 1 Bray dep. p. 569-571; Ex. 36 Daily Observation Report; Ex. 29 Daily Observation Report Summary)

372.   On May 23, 2000, Bray worked with Police Officer Davis. (Pl LR56.1(b) Ex. 31 Daily Observation Report )

373. On the Daily Observation Report for May 23, 2000, Davis gave Bray scores of 5's and 6's in all categories of performance he reviewed. (Pl LR56.1(b) Ex. 31 Daily Performance Report; Ex. 29 Daily Observation Report Summary)

374. During her third training cycle, Bray worked with Field Training Officer Kevin Scott on May 25, 28, 30, 31 and June 1, 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 564-565; Ex. 2 Askew dep. p. 47; Ex. 37 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

375. In the Daily Observation Reports that Officer Scott prepared for Bray, he gave her scores of 4, 5 and 6 for her performance in the various categories. (Pl LR56.1(b) Ex. 37 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

376. Officer Scott was promoted and Officer Donna Adams was then assigned to be Bray's Field Training Officer. (Pl LR56.1(b) Ex. 2 Askew dep. p. 52)

377. During her third cycle, Adams worked with Bray on June 11, 2000. (Pl LR56.1(b) Ex. 1 Bray dep. p. 295-296; Ex. 38 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

378.    The only Daily Observation Report Adams prepared for Bray during her third cycle is for June 11, 2000.  On that Report, Adams gave Bray the following scores:

| Category | Score |
|---|---|
| Demeanor/Attitude | 6 |
| Community Interaction | 5 |
| Patrol Procedures | 5 |
| Traffic Enforcement | 5 |
| Physical Skills/Force | 5 |
| Verbal Communication | 4 |
| Vehicle Operation | 3 |

Pl LR56.1(b) Ex. 38 Daily Observation Report; Ex. 29 Daily Observation Report Summary)

379.    On June 16, 2000, Bray worked with Officer Cantrell.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 571-572; Ex. 39 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

380.    On the Daily Observation Reports for June 16, 2000, Cantrell gave Bray scores of 5's and 6's in all categories of performance she observed.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 571-572; Ex. 39 Daily Observation Report; Ex. 29 Daily Observation Report Summary).

70

381.    A summary of the scores Bray received on her Daily Observation Reports

during her third cycle are listed below:

| | 5/17/00 Cleary | 5/18/00 Cleary | 5/19/00 Cleary | 5/20/00 Cleary | 5/21/00 Cleary | 5/23/00 Davis |
|---|---|---|---|---|---|---|
| Vehicle Operation | | 5 | | 5 | | |
| Written Communication | | | | 5 | 5 | 6 |
| Verbal Communication | 5 | 5 | 5 | 5 | 5 | 5 |
| Community Interaction | 5 | 5 | 5 | 5 | 5 | |
| Patrol Procedures | 5 | 5 | 5 | 5 | 5 | 5 |
| Arrest Procedures | | | | | 5 | 6 |
| Traffic Enforcement | 3 | 3 | 3 | 3 | 3 | 5 |
| Physical Skills/ Force | 5 | 5 | 5 | 5 | 5 | |
| Criminal Laws/Policy | 5 | 5 | 5 | 5 | 5 | 5 |
| Demeanor/ Attitude | 7 | 7 | 7 | 7 | 7 | 6 |

| | 5/25/00 Scott | 5/28/00 Scott | 5/30/00 Scott | 5/31/00 Scott | 6/1/00 Scott | 6/11/00 Adams |
|---|---|---|---|---|---|---|
| Vehicle Operation | | | 4 | 4 | 5 | 3 |
| Written Communication | 4 | 4 | 4 | 4 | 4 | |
| Verbal Communication | 4 | 5 | 5 | 6 | 5 | 4 |
| Community Interaction | 5 | 6 | 6 | 6 | 6 | 5 |
| Patrol Procedures | 5 | 6 | 5 | 6 | 5 | 5 |
| Arrest Procedures | | | | | | |
| Traffic Enforcement | | 5 | | | | 5 |
| Physical Skills/ Force | | | | | 4 | 5 |
| Criminal Laws/Policy | 4 | 4 | 4 | 6 | | |
| Demeanor/ Attitude | 6 | 4 | 4 | 4 | 5 | 6 |

| | 6/16/00 Cantrell | 6/17/00 Pietrowski | 6/23/00 Ball | Average |
|---|---|---|---|---|
| Vehicle Operation | | | 4 | 4 |
| Written Communication | 5 | 3 | 6 | 5 |
| Verbal Communication | 5 | 3 | 6 | 5 |
| Community Interaction | 6 | 4 | 6 | 5 |
| Patrol Procedures | 5 | 3 | 6 | 6 |
| Arrest Procedures | | | | 6 |
| Traffic Enforcement | | 4 | 7 | 4 |
| Physical Skills/ Force | 6 | | | 5 |
| Criminal Laws/Policy | 5 | 4 | 7 | 5 |
| Demeanor/ Attitude | 6 | 4 | 7 | 6 |

(Pl LR56.1(b) Ex. 29 Daily Observation Report Summary; Ex. 36-40 Daily Observation

Reports)

71

382.     When her third cycle was completed, on or about June 18, 2000, Bray requested a fourth cycle of training because of everything she endured during her training with Askew and Adams she felt she needed to learn more. (Pl LR56.1(b) Ex. 1 Bray dep. p. 263, 311-312, 316-320)

383.     In fact, in requesting that Bray be given a fourth training cycle, Adams stated that one of the reasons for the request was because Bray had worked with "officers who had just a little over a year on the job" who did not allow Bray to "assume any responsibility, and due to their lack of experience were unable to provide adequate training." (Pl LR56.1(b) Ex. 3 Adams dep. p. 37-38)

384.     Adams went on to explain that "the first cycle is the most important. It builds the foundation and confidence" and an officer who does not receive adequate training during the first cycle will suffer during their second and third cycles. (Pl LR56.1(b) Ex. 3 Adams dep. p. 38)

385.     Adams also explained at her deposition that what probationary police officers are taught at the academy does not work in the real world. (Pl LR56.1(b) Ex. 3 Adams dep. p. 46-48)

386.     Therefore, despite the above-acceptable scores given by Field Training Officer Kevin Scott, Officer Cantrell, and even herself during Bray's third cycle, Adams did not Field Qualify Bray in her Final Summary Report dated June 18, 2000, so that

Bray could obtain a fourth cycle of training. (Pl LR56.1(b) Ex. 37-39 Daily Observation Reports; Ex. 56 Training Cycle Summary; Ex. 29 Daily Observation Report Summary)

387. On June 24, 2000, Bray worked with Officer Maravia Ball. (Pl LR56.1(b) Ex. 1 Bray dep. p. 572; Ex. 40 Daily Observation Reports)

388. On the Daily Observation Report for June 24, 2000, Ball gave Bray scores of 6's and 7's and one 4 in all categories of performance she observed. (Pl LR56.1(b) Ex. 1 Bray dep. p. 572-573; Ex. 40 Daily Observation Report; Ex. 29 Daily Observation Report Summary).

389. Officer Ball gave Bray 7's, Superior Performance, in the categories of "Traffic Enforcement", "Criminal Laws/Policy" and "Demeanor/Attitude". (Pl LR56.1(b) Ex. 40 Daily Observation Report; Ex. 29 Daily Observation Report Summary)

390. During her fourth cycle, Adams worked with Bray on June 27, 28, 29, July 5, 8, 11, 13, 14, 15, 16, and 17. (Pl LR56.1(b) Ex. 41 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

391. On the Daily Observation Reports for June 27, July 5, 11, 13, 14, 15, 16 and 17, Adams gave Bray scores of 4's, 5's and 6's in all categories of performance she observed. (Pl LR56.1(b) Ex. 41 Daily Observation Reports; Ex. 29 Daily Observation Report Summary)

392.    A summary of the scores Bray received on her Daily Observation Reports during her fourth cycle are listed below:

| | 6/27/00 Adams | 6/28/00 Adams | 6/29/00 Adams | 7/5/00 Adams | 7/8/00 Adams | 7/11/00 Adams |
|---|---|---|---|---|---|---|
| Vehicle Operation | 4 | 3 | 3 | | | 4 |
| Written Communication | | 4 | 4 | | | 4 |
| Verbal Communication | 5 | 4 | 3 | 5 | 5 | 5 |
| Community Interaction | | | 4 | 6 | 5 | 5 |
| Patrol Procedures | 5 | 3 | 4 | 5 | 3 | 4 |
| Arrest Procedures | | | | | | |
| Traffic Enforcement | 5 | 3 | | 5 | | 5 |
| Physical Skills/ Force | | | | | 5 | |
| Criminal Laws/Policy | 5 | 3 | 3 | | 5 | 4 |
| Demeanor/ Attitude | 6 | 5 | 5 | 6 | 5 | 5 |

| | 7/13/00 Adams | 7/14/00 Adams | 7/15/00 Adams | 7/16/00 Adams | 7/17/00 Adams | Average |
|---|---|---|---|---|---|---|
| Vehicle Operation | | | | | | 4 |
| Written Communication | | 4 | 4 | 4 | 4 | 4 |
| Verbal Communication | 5 | 4 | 4 | 4 | 4 | 4 |
| Community Interaction | 5 | | 4 | 4 | 4 | 5 |
| Patrol Procedures | 5 | 4 | 4 | | 4 | 4 |
| Arrest Procedures | | | | | 4 | 4 |
| Traffic Enforcement | 5 | | | 4 | | 5 |
| Physical Skills/ Force | | | 4 | | | 5 |
| Criminal Laws/Policy | 5 | 4 | 4 | 4 | 4 | 4 |
| Demeanor/ Attitude | 5 | 5 | 5 | 6 | 6 | 5 |

(Pl LR56.1(b) Ex. 29 Daily Observation Report Summary; Ex. 41Daily Observation Reports)

393.    Adams passed Bray at the end of her fourth cycle and Field Qualified her

on or about July 24, 2000.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 340, 563; Ex. 2 Askew dep.

p. 54, 56; Ex. 3 Adams dep. p. 55; Ex. 42 Remedial Summary Report; Ex. 14 Def's

Answers to Ints p. 15)


394.    However, Askew claimed at his deposition that Adams passed Bray after

her fourth cycle only at his insistence.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 53, 56-57)


395.    The average scores based on the Daily Observation Reports for each of

Bray's cycles is listed below:

|                         | CYCLE ONE | CYCLE TWO | CYCLE THREE | CYCLE FOUR |
|-------------------------|-----------|-----------|-------------|------------|
| Vehicle Operation       | 3         | 4         | 4           | 4          |
| Written Communication   | 4         | 4         | 5           | 4          |
| Verbal Communication    | 4         | 4         | 5           | 4          |
| Community Interaction   | 5         | 4         | 5           | 5          |
| Patrol Procedures       | 4         | 4         | 6           | 4          |
| Arrest Procedures       | 5         | 4         | 6           | 4          |
| Traffic Enforcement     | 4         | 4         | 4           | 5          |
| Physical Skills/ Force  | 4         | 4         | 5           | 5          |
| Criminal Laws/Policy    | 4         | 3         | 5           | 4          |
| Demeanor/ Attitude      | 5.        | 4         | 6           | 5          |
| AVERAGE                 | 4         | 4         | 5           | 4          |

(Pl LR56.1(b) Ex. 29 Daily Observation Report Summary; Ex. 30-41 Daily Observation

Reports)

75

396.    Bray never received any complaints from the police officers she worked with who were not Field Training Officers.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 265, 390, 399)

397.    During her training, Bray received an honorable mention for her work in apprehending two criminals who were burglarizing a church.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 551-552)  Bray was the only probationary police officer to receive such an honorable mention.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 303, 551)

**OTHER OFFICERS SIMILARLY SITUATED**

398.    Benny Spurgeon graduated from the Police Academy at the same time as Bray.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 8)

399.    Spurgeon testified at his deposition that he also had Askew as a Field Training Officer and that Askew made the same negative comments about him that he did about Bray when he was PPO, including a comment that Spurgeon did not like to cuff people.  (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 10, 27)

400.    At his deposition, Spurgeon described an incident wherein Askew became "pissed" at him because he hesitated in cuffing an individual involved in an aggravated battery.  (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 12, 27)

401.     In fact, Spurgeon relayed an incident about a domestic situation wherein a young woman hit a man with a bottle, which was virtually identical to an incident Askew criticized Bray about at his deposition.  (Pl LR56.1(b) Ex. 2 Askew dep. p. 37-38; Ex. 5 Spurgeon dep. p. 27-28)

402.     During his probationary period, Askew criticized Spurgeon's confidence and assertiveness and complained that he was too soft-spoken.  (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 12, 28, 29)

403.     Spurgeon admitted that he was reprimanded on one occasion when he was working lock-up for not effectively searching a criminal who subsequently tried to hang himself with a bandana and a shoestring.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 31-32)

404.     This incident occurred in July or August 2000, during Spurgeon's probationary period.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 33, 36)  Spurgeon did not get a hearing until March 2002, over a year and one half later.  (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 33-36)

405.     Spurgeon stated at his deposition that it was typical of the department to take a year to reprimand (or commend) someone.  (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 36)

406.    At one point things got so bad between Askew and Spurgeon, Askew did

not want to work with Spurgeon. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 26, 37)  In fact,

Spurgeon admitted at his deposition that "a lot of guys don't want to work with me." (Pl

LR56.1(b) Ex. 5 Spurgeon dep. p. 37)


407.    Spurgeon testified that one female officer told him she did not want to

work with him because she did not feel he was safe.  (Pl LR56.1(b) Ex. 5 Spurgeon dep.

p. 37)


408.    Spurgeon also admitted that another female officer threatened to report

him to the commander because she did not feel he was doing his job and was not being

assertive. (Pl LR56.1(b) Ex. 5 Spurgeon dep. p. 60)


409.    Askew told Bray that he wanted to terminate Spurgeon.  (Pl LR56.1(b) Ex.

1 Bray dep. p. 547)


410.    Despite the similarities between Bray and Spurgeon, Spurgeon was not

terminated.  (Pl LR56.1(b) Ex. 1 Bray dep. p. 546; Ex. 5 Spurgeon dep. p. 7)


411.    Cedric Taylor was initially failed by his Field Training Officer but given

another chance and allowed to become a police officer.  (Pl LR56.1(b) Ex. 2 Askew dep.

p. 30)

412.   At his deposition, Askew described Taylor as "one of the best Officers in this City." (Pl LR56.1(b) Ex. 2 Askew dep. p. 30)

413.   At her deposition, Adams stated that she felt Officer Jones was an incompetent police officer and described an incident wherein Jones failed to assist her after she was hit and knocked down by an offender. (Pl LR56.1(b) Ex. 3 Adams dep. p. 122-123)

414.   Adams did not report Jones to any of her superiors when she failed to assist her. (Pl LR56.1(b) Ex. 3 Adams dep. p. 123)

415.   Jones was never investigated nor reprimanded for failing to assist Adams. (Pl LR56.1(b) Ex. 3 Adams dep. p. 123-124)

416.   Jones stated at her deposition that there are several Chicago Police Officers who are smaller than Bray. (Pl LR56.1(b) Ex. 4 Jones dep. 40)

417.   In Jones' opinion, Bray was assertive and professional. (Pl LR56.1(b) Ex. 4 Jones dep. p. 40)

LARA A. WALICEK

ERNEST T. ROSSIELLO
    & ASSOCIATES, P.C.
300 W. Washington Street
Suite 1004
Chicago, Illinois 60606
312.346.8920

Attorney for Bray

Dated:        September 20, 2002
                Chicago, Illinois