IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA BRAY, Plaintiff, v. CITY OF CHICAGO, a municipal corporation, Defendant. | ) | Civil No.: 01 C 7770 JUDGE HOLDERMAN |

DOCKETED
SEP 2 3 2002

FILED
SEP 2 0 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

NOTICE OF FILING

TO: CITY OF CHICAGO
Through their Attorney:
Valerie Depies Harper
Stan Stec
CITY OF CHICAGO LAW DEPARTMENT
30 N. LaSalle Street, Room 1020
Chicago, Illinois 60606

PLEASE TAKE NOTICE that on Friday, September 20, 2002, Plaintiff filed with the Clerk of the Court the following documents:

1. Plaintiff's Answer Brief In Opposition of Defendant's Motion for Summary Judgment;

2. Plaintiff's LR56.1(b) Counter-Statement of Material Facts As To Which There Is No Genuine Issue;

3. Plaintiff's Appendix to LR56.1(b) Statement in Opposition to Defendant's Motion For Summary Judgment (Seven Volumes);

4. Plaintiff's Response to Defendant's Statement of Material Facts.



18

LARA A. WALICEK

Ernest T. Rossiello
& Associates, P.C.
300 W. Washington St., Suite. 1004
Chicago, Illinois 60606
(312) 346-8920

Attorney for Plaintiffs

Dated: September 20, 2002
Chicago, Illinois

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the within and foregoing notice and listed documents were served by hand delivery on September 20, 2002, before 5:00 p.m., upon the defendants at their addresses of record.

LARA A. WALICEK

DOCKETED
SEP 2 3 2002

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAMELA BRAY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 01 C 7770 |
| | ) | JUDGE HOLDERMAN |
| CITY OF CHICAGO, a municipal Corporation, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S ANSWER BRIEF IN OPPOSITION OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

FILED
SEP 2 0 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT



18

## I. PRELIMINARY STATEMENT

The plaintiff, Pamela Bray, has brought this case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1) and §2000e-3(a), as amended, against her former employer, the City of Chicago, because she was repeatedly sexually harassed by two of her supervisors and then discharged in retaliation for opposing sexual harassment. §2000e-2(a)(1) prohibits sexual harassment in the workplace. §2000e-3(a) protects employees, like Bray, who suffer adverse employment actions for opposing sexual harassment.

Bray, a single mother of five, was hired as a Probationary Police Officer ("PPO") for the City of Chicago on October 25, 1999. (Pl LR56.1(b) ¶ 3, 4, 12) She was terminated on October 24, 2000, one day before her probationary period would have ended. (Pl LR56.1(b) ¶ 29-30, 271) Just three weeks earlier, Bray had threatened to report Bruce Askew if he ever touched her again. (Pl LR56.1(b) ¶ 26, 109-112, 219) It is undisputed that Askew caused Bray's termination.

Bruce Askew, a reputed "sexist" who kept a mistress and defends his retaliatory actions against Bray incredibly by asserting he is a liar and falsified Chicago Police Department records, was Bray's Field Training Officer during her second cycle. (Pl LR56.1(b) ¶ 44, 62-63, 115, 364) Donna Adams, a "loud, boisterous and belligerent" officer who moonlighted as a dominatrix, was Bray's Field Training Officer during part of her third training cycle and all of her fourth training cycle. (Pl LR56.1(b) ¶ 128, 131, 157) On a persistent basis, these two officers subjected Bray to clearly offensive, demeaning and utterly reprehensible sexual harassment by any reasonable person's standards. (Pl LR56.1(b) ¶ 32, 46-111, 130-201, 338)

In this case, the sexual harassment was extremely pervasive, occurring virtually every day for approximately five months. (Pl LR56.1(b) ¶ 24-25, 46-48, 81, 130, 132) Most of the

demeaning and sexually offensive comments occurred when Bray was alone in the police squad car with either Askew or Adams. She was a captive audience who did not have a choice but to sit within inches of her perpetrators and endure their sexually offensive comments and conduct everyday, all day long during her eight hour shift. (Pl LR56.1(b) ¶ 24-25, 46-48, 130, 132)

Askew's sexual harassment of Bray began in late April 2000 and continued to October 2000. (Pl LR56.1(b) ¶ 24, 44) It started as very offensive verbal sexual harassment and increased in severity with Askew grabbing at Bray's breasts and pressing his body up against hers so she could feel his hard penis against her buttocks. (Pl LR56.1(b) ¶ 46-111) At his deposition, Askew admitted to much of the sexual harassment Bray accuses him of committing. For example, Askew admitted making sexually offensive comments to Bray about other women while they were patrolling such as, "look at the tits on that broad", and "look at the ass on that woman." (Pl LR56.1(b) ¶ 49-50) In fact, Askew displayed his bravado at his deposition by offering additional sexually offensive remarks he made such as, "nice rack" (referring to a woman's breasts) (Pl LR56.1(b) ¶ 50). Bray felt humiliated and degraded by Askew's comments but feared he would retaliate against her and cause her to lose her job if she said or did anything. (Pl LR56.1(b) ¶ 37, 59, 75-76) Her fears were obviously well-founded.

Askew also admitted at his deposition that while he and Bray were on duty, he would park the squad car near a nightclub at 4:00 a.m. so that, as Askew put it, he could "ogle" at the "scantily clad" women leaving the establishment. (Pl LR56.1(b) ¶ 51) Askew also admitted to making numerous sexually derogatory comments to Bray and other officers about Bray's fertility. (Pl LR56.1(b) ¶ 53-60) He even advised Bray, "you wouldn't have so many children if you swallowed." (Pl LR56.1(b) ¶ 56) Each time Askew made a derogatory comment about her

fertility, Bray felt awkward, uncomfortable, humiliated, embarrassed and degraded. (Pl LR56.1(b) ¶ 58)

Askew, a married man with admittedly at least one mistress at the time, also admitted to asking Bray out.[1] (Pl LR56.1(b) ¶ 62-63, 77-82) Askew would actually attempt to intimidate Bray into dating him by reminding her of how many days she had left in her probationary period. (Pl LR56.1(b) ¶ 80) Despite her refusals, Askew continued to hound Bray for dates throughout her employment. (Pl LR56.1(b) ¶ 81-82) Askew also took Bray in the squad car to several secluded areas while they were on duty and informed Bray that these were spots where officers went to have sex. (Pl LR56.1(b) ¶ 66-76) He suggested to Bray that she would end up back there. (Pl LR56.1(b) ¶ 69)

In August 2000 and then again in September 2000, Askew "grabbed" Bray's breasts in an alleged attempt to determine if she was wearing her bullet proof vest. (Pl LR56.1(b) ¶ 85-86) Bray was "shocked", "disgusted" and "extremely horrified and humiliated" by Askew's extremely offensive and intrusive actions. (Pl LR56.1(b) ¶ 87) Also in September 2000, Askew rubbed Bray's ankle while they were sitting in court. (Pl LR56.1(b) ¶ 94-96) Then, as they were leaving the courthouse, Askew jumped in the same partition as Bray in a revolving door, grabbed her around the waist in a bear hug, and pressed his body up against her so she could feel his hard penis against her buttocks. (Pl LR56.1(b) ¶ 100-102) Bray was humiliated and embarrassed by Askew's assault. (Pl LR56.1(b) ¶ 103) Askew's sexually offensive conduct and comments

---

[1] Lorraine Johnson, a former co-worker of Askew, testified at her deposition that Askew never let her into the movies for free. (Pl LR56.1(b) Ex. 7 Johnson dep. p. 92 ) Rather, on one occasion when she saw Askew at the movie theatre, he lifted up her coat and looked at her behind. (Pl LR56.1(b) ¶ 118-119) Johnson was "surprised", "hurt" and "humiliated" by this degrading act. (Pl LR56.1(b) ¶ 119)

caused Bray great stress at work and damaged her self-esteem and self-confidence. (Pl LR56.1(b) ¶ 61)

Finally, on or about October 4, 2000, Askew again grabbed Bray's breast allegedly to see if she had her bullet proof vest on. (Pl LR56.1(b) ¶ 26, 109-111, 216-218) Askew laughed at Bray's indignant response and then advised Bray that she "owed him some [sexual favors]". (Pl LR56.1(b) ¶ 110-111, 217-218) Bray was extremely upset and offended by Askew's brazen sexual harassment. (Pl LR56.1(b) ¶ 112, 219) Bray had enough and informed Askew that if he ever touched her again, she would report him to his supervisor. (Pl LR56.1(b) ¶ 26, 112, 219) Less than three weeks later she was terminated. (Pl LR56.1(b) ¶ 29)

Bray was also sexually harassed on a daily basis by Donna Adams when she was Bray's Field Training Officer during Bray's fourth cycle. (Pl LR56.1(b) ¶ 25, 32) From late June 2000 through August 2000, Adams repeatedly urged Bray to solicit sex from men in exchange for money. (Pl LR56.1(b) ¶ 128, 130-152, 165-179) Adams went so far as to introduce Bray to men interested in using her for sex in exchange for money. (Pl LR56.1(b) ¶ 135-152 ) In fact, Adams was so persistent and resolute that Bray sleep with men for money, that she and Bray would frequently get into verbal arguments over the matter. (Pl LR56.1(b) ¶ 175-176) Adams' constant urging that Bray have sex with men for money caused Bray great stress at work. (Pl LR56.1(b) ¶ 177) Bray became so uncomfortable that it negatively impacted her working relationship with Adams. (Pl LR56.1(b) ¶ 134)

After Bray threatened to report Askew on October 4, 2000, Askew retaliated against her by causing her termination. (Pl LR56.1(b) ¶ 26-27, 32, 112, 114, 219, 338) Askew enlisted the help of Adams in complaining about Bray to the Police Academy. (Pl LR56.1(b) ¶ 28, 222) Despite the fact that both Askew and Adams had given Bray satisfactory performance

evaluations and despite the fact Adams "Field Qualified" Bray, they represented to the Review Board that Bray's performance was actually unsatisfactory. (Pl LR56.1(b) ¶ 207, 223-225, 351-381, 387-395) They both claimed at their depositions that they lied and provided false information on the Daily Observation Reports they prepared for Bray during her training cycles. (Pl LR56.1(b) ¶ 224, 364-365, 394) They explained that they decided to reveal their deceptions, coincidentally, just after Bray threatened to report Askew in October 2000. However, the numerous Daily Observation Reports prepared by the several officers who worked with Bray during her training cycles, including Askew and Adams, evidence that her performance was satisfactory. (Pl LR56.1(b) ¶ 223-225, 351-381, 387-395) She was field qualified in July 2000 and moving forward with her career. (Pl LR56.1(b) ¶ 23, 207, 393)

In terminating Bray, the Review Board was directly and indisputably influenced by Askew and Adams, relying solely on the false and misleading information they provided. (Pl LR56.1(b) ¶ 325-328, 333-336, 338) The Review Board did not talk to Bray or consider her statement or the statements of four officers who attested to Bray's good performance and safe conduct. (Pl LR56.1(b) ¶ 289, 290-315, 334-336) Shortly after her termination, on October 30, 2000, Bray filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Pl LR56.1(b) ¶ 31, 337) After conducting an investigation, on March 21, 2000, the EEOC issued a Determination in Bray's favor on both the sexual harassment and retaliation issues.[2] (Pl LR56.1(b) ¶ 32, 338) Thereafter, Bray filed this lawsuit. (Pl LR56.1(b) ¶ 1)

---

[2] The Determination states, in part, "I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent violated Title VII by subjecting Charging Party to sexual harassment by her Field Training Officers. Furthermore, I have determined that the evidence obtained in the investigation establishes reasonable cause to be believe that Respondent violated Title VII in that it retaliated against Charging Party by discharging her." (Pl LR56.1(b) ¶ 338)

## II. STANDARD FOR REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). "Where, however, there are such disputed questions of fact, and the plaintiff has presented some evidence to support the bare allegations of her complaint, she is entitled to proceed to trial." Smith v. Sheriff of Cook County, 189 F.3d 529, 532 (7th Cir. 1999). Indeed, "evidence is [to be] viewed as favorably to [the non-moving party] as reason will permit." Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir. 1990). When there are factual matters in dispute, the court is "obligated to credit [plaintiff's] version of events over the defendants." Hostetler v. Quality Dining, 218 F.3d 798, 802-803 (7th Cir. 2000), citing, Valance v. Wisel, 110 F.3d 1269, 1267 (7th Cir. 1997).

## III. ARGUMENT

Summary judgment is completely inappropriate in this case and Defendant's motion should be denied in its entirety. This is a case fraught with questions of fact and significant credibility issues. Throughout its statement of facts and supporting memoranda, Defendant blatantly ignores undisputed facts, mischaracterizes other facts and even invents some facts not supported by any of the record evidence. Defendant then disingenuously attacks virtually every element of plaintiff's prima facie cases apparently hoping that something sticks. However, despite Defendant's efforts, the evidence clearly establishes that Bray was sexually harassed by two supervisors. The evidence also clearly shows that Bray was terminated in retaliation for complaining about the sexual harassment and defendant's purported reason for her termination is completely unworthy of belief.

### A. Bray Was Subjected To Actionable Sexual Harassment

Defendant ignores many of the facts of this case and claims that the sexual harassment Bray was subjected to is neither objectively or subjectively severe or pervasive enough to be actionable. To be actionable, the conduct must be "sufficiently severe *or* pervasive" to "alter the conditions of [the victim's] employment and create an abusive working environment." Meritor at 66; Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000). "There is no minimum number of incidents required to establish a hostile work environment." Worth v. Tyer, 276 F.3d 249, (7th Cir. 2001). Whether a hostile environment exists is made "in light of the record as a whole" and considering the "totality of the circumstances." Harris v. Forklift Systems, Inc., 510 U.S. 17, 25 (1993); Saxton v. AT&T, 10 F.3d 526, 534 (7th Cir. 1993). The court "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." Mason v. Southern Illinois Univ. 233 F. 3d 1036, 1045 (7th Cir. 2000).

Defendant attempts to mislead the court by claiming that Askew's conduct consisted of only three or four "puerile comments." This hardly represents the facts of this case. Defendant ignores the numerous sexually offensive comments Askew made daily while patrolling with Bray. (Pl LR56.1(b) ¶ 24, 46-50, 53-56, 106, 111, 115) It disregards the trips to the nightclub at 4:00 a.m. Askew subjected Bray to so he could "ogle" at the "scantily clad" women. (Pl LR56.1(b) ¶ 51) It makes light of his vulgar groping of Bray's breasts and discounts the frequency all the sexually offensive, degrading and demeaning remarks that were made to Bray. (Pl LR56.1(b) ¶ 46-53, 81, 85-87, 94, 100-103, 108-112) When viewing the record as a whole and considering the "totality of the circumstances," as the court must on a motion for summary

judgment, there is no question that Bray was subjected to a sexually harassing work environment. Harris, 510 U.S. at 25; Saxton, 10 F.3d at 534.

Askew's sexual harassment of Bray was also quite severe. In addition to making sexually offensive remarks and constantly asking Bray out on dates, Askew "grabbed" her breasts three times, rubbed her ankle once with his hand, grabbed her around the waist in a bear hug and pushed against her entire body once so she could feel his hard penis against her buttocks. (Pl LR56.1(b) ¶ 85-87, 94, 100-103, 108-112 ) These incidents are "beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers," but rather are significantly more intimate, intrusive forms of unwelcome contact. Hostetler, 218 F.3d at 808. The on-going verbal sexual harassment coupled with Askew's groping of intimate body parts, is "the kind of male attentions that can make the workplace hellish for women." Ferguson v. Chicago Housing Authority, 155 F. Supp. 2d 913, 917 (N.D. Ill. August 6, 2001), quoting, Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

Similarly, defendant tries to temper Adam's sexual harassment of Bray by asserting that Bray's complaints were limited to Adams' discussions related to her dominatrix exploits. However, Bray's primary complaint was that Adams kept coercing her into soliciting sex in exchange for money. (Pl LR56.1(b) ¶ 133-152, 166, 172-179) There is no evidence that Adams urged men to solicit sex in exchange for money. Bray was victimized in this fashion due to her gender. It is well established that any kind of harassment that is gender-based is protected by Title VII. Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986). "The law deliberately does not take a 'laundry list' approach to [prohibited Title VII activity], because unfortunately its forms are as varied as the human imagination will permit." Knox v. State of Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996). The fact that the perpetrator in this case is a woman does not make

the acts any less egregious. At a minimum, it is a question of fact for a jury to decide. Anderson, 477 U.S. at 248.

Bray testified at her deposition that not only did she feel "humiliated", "degraded" and "embarrassed" by Askew's and Adams' sexual harassment, but it affected her self-esteem and self-confidence and caused her great stress at work. (Pl LR56.1(b) ¶ 58, 61, 71, 75, 83, 87, 103, 108, 112, 152, 156, , 175, 177, 206, 219) There can be no question that Bray's working environment was subjectively hostile. Moreover, a reasonable person could view Askew's and Adams' conduct serious and pervasive enough to alter Bray's work environment. This is evident by the fact that an investigator for the EEOC, presumably a reasonable person, has already made such a determination in this case. (Pl LR56.1(b) ¶ ) Certainly if the investigator from the EEOC can find reasonable cause to believe that defendant violated Title VII by subjecting Bray to sexual harassment, so too could a jury in this case. Accordingly, Bray "is entitled to proceed to trial." Smith v. Sheriff of Cook County, 189 F.3d 529, 532 (7th Cir. 1999).

**B. Askew and Adams Were Bray's Supervisors**

Whether or not Askew and Adams were Bray's supervisors is a very crucial question of fact at issue in this case. The United States Supreme Court has established that "an employer is subject to vicarious liability to a victimized employee for actionable hostile environment created by a supervisor with immediate (or successfully higher) authority over the employee." Burlington Industries v. Ellerth, 118 S. Ct. 2257, 2271 (1998), Faragher v. Boca Raton, 118 S. Ct. 2275, 2292-93 (1998).

Askew and Adams were Bray's Field Training Officers. (Pl LR56.1(b) ¶ 24-25, 33, 44, 128) As such, they had the ability to affect her employment through their evaluations of her job performance. (Pl LR56.1(b) ¶ 34-43) This is clearly evidenced by the fact that it was Askew's

and Adams' representations and recommendations to the Review Board which actually caused Bray's termination. Significantly, "but for" Askew's and Adams' false and misleading representations, Bray would not have been terminated. Ellerth, 118 S. Ct. at 2271, Faragher, 118 S. Ct. at 2292-93. In fact, her performance would not have even been reviewed. See, Carl v. Parmely, 188 F. Supp. 2d 991 (S.D. Ill. June 28, 2001) (individual who assigned tasks to employee and could cause employee to be disciplined or fired if he reported she was insubordinate or refused to take assignments, was presumed to be employee's supervisor).

Defendant's claim that Askew and Adams were not Bray's supervisors is belied by Askew's own deposition testimony. At his deposition Askew confirmed he had this control over Bray's employment when he testified that he gave Bray scores of "4" on her evaluations because "getting twos in her second cycle would have gotten her terminated." (Pl LR56.1(b) ¶ 41) Obviously, Askew was aware of the full extent of his power over Bray's employment and what he could do to get Bray terminated if he so desired. This is further evidenced by the fact that Askew frequently threatened Bray by telling her, "I have your job in my hand. I can fire you just like that. It only takes . . . a pen." (Pl LR56.1(b) ¶ 37) Additionally, Police Officer Gloria Jones advised Bray in June or July 2000 to document the sexual harassment she endured by Askew and Adams rather than report it "because you are still on probation and pretty much [Askew and Adams] can get you fired *at any time*." (emphasis added) (Pl LR56.1(b) ¶ 39) Based on these statements alone, a "fair-minded jury could return a verdict" for Bray, the non-moving party, on this issue.[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); accord Michas v. Health Cost Controls of Illinois, 209 F.3d 687, 692 (7th Cir. 2000)

---

[3] It is noteworthy that defendant's counsel originally took the position that Askew and Adams were Bray's supervisors. Eileen Bell, Assistant Corporate Counsel for the City of Chicago, on

Viewing all the evidence "as favorably to [Bray, the non-moving party] as reason will permit," there is no question that Askew and Adams were Bray's supervisors. Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir. 1990). The defendant is vicariously liable for the sexual harassment perpetrated by Askew and Adams on Bray. Due to the fact that Bray suffered a tangible employment action, her termination, (see section C of this brief), the defendant is not entitled to the Ellerth affirmative defenses in this case. [4]

**C. Bray Was Terminated In Retaliation for Opposing Sexual Harassment**

Contrary to defendant's assertion, Bray can establish a prima facie case for retaliation. On October 4, 2000, Bray threatened to report Askew if he ever touched her again. (Pl LR56.1(b) ¶ 26, 112, 219) Clearly, Bray was opposing a practice made unlawful by Title VII.[5] Title VII does not require a formal complaint for its protection to be invoked. Bray's opposition to Askew's sexual harassment is sufficient. Bray was terminated less than three weeks later on October 24, 2000. (Pl LR56.1(b) ¶ 29) The United States Supreme Court in Burlington

---

December 13, 2000, agreed with investigator Batog of the EEOC during his investigation that Field Training Officers are in supervisory positions over PPOs because they evaluate PPO's and make recommendations on whether PPO's become PO's. (Pl LR56.1(b) ¶ 43)

[4] In the event the court finds otherwise, the defendant is still unable to avail its of the Ellerth affirmative defenses. Bray attempted to report the sexual harassment to supervisory personnel on October 20, 2000, but was told "it's too late for this." (Pl LR56.1(b) ¶ 250-256) In a motion for summary judgment, the court is "obligated to credit [plaintiff's] version of the events over defendants. Hostetler, 218 F.3d at 802-803. Additionally, "summary judgment is singularly inappropriate time to resolve a 'he said, she said' kind of dispute." Russell v. Bd. of Trustees of the Univ. of Chicago, 243 F.3d 336, 340 (7th Cir. 2001). Based on these facts, defendant clearly failed to take prompt, appropriate corrective action to correct the sexual harassment.

[5] §2000e-3(a) of Title VII states that "it shall be an unlawful employment practice for an employer to discriminate against any of its employees . . . because [they have] opposed any practice made an unlawful employment practice by this subchapter, or, because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. §2000e-3(a).

Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) established that "a tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits. Certainly, Bray's termination was an adverse employment action.

There is a strong casual connection between Bray's opposition to Askew's sexual harassment and her termination which "took place on the heels of" her threat to report him. Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1458 (7th Cir. 1994). Less than three weeks after she opposed Askew's sexual harassment, Bray was terminated. (Pl LR56.1(b) ¶ )

Defendant's claims that Bray was terminated for unsatisfactory performance is merely guise for its retaliatory actions[6]. "A plaintiff can establish pretext with evidence suggesting that retaliation was the most likely motive for the [termination], or by showing that the defendant's proffered reason was not worthy of belief." Sanchez v. Henderson, 188 F.3d 740, 746 (7th Cir. 1999). Defendant's reason for Bray's termination is unworthy of belief for several reasons.

It is undisputed that the information Askew provided the Review Board completely contradicts the evaluations he previously prepared for Bray. (Pl LR56.1(b) ¶ 224-225, 241, 361-366, 378, 390-394) Askew's explanation is that he lied on the earlier evaluations. (Pl LR56.1(b) ¶ 364, 394 ) However, those evaluations are comparable to the evaluations other officers gave Bray during the same time period – all of which indicate satisfactory performance by Bray. (Pl

---

[6] To support its claim that Bray's performance was unsatisfactory, defendant creates facts not supported by the record. First, it claims Bray cheated on tests at the academy. There is absolutely no evidence supporting this allegation. In her deposition, Bray did state that she felt the way certain classes were conducted amounted to cheating. (Pl LR56.1(b) ¶ ) However, she was never accused of cheating. The record reflects that Bray did what every other recruit did in class. (Pl LR56.1(b) ¶ ) Defendant also submits documents allegedly of Bray's productivity after her training cycles were completed. These documents were never produced during discovery and should be stricken.

LR56.1(b) ¶ 351-359, 367-375, 379-381, 387-389, 392, 395) To believe Askew, the finder of fact would have to believe that all the other officers gave Bray inflated evaluations as well. "'Intent and credibility are crucial' issues in employment discrimination cases, and therefore the summary judgment standard is 'applied with added rigor' in such cases . . . this means that defendants get cut no slack." Schaffner v. Hispanic Housing Development Corporation, 76 F. Supp. 2d 881, 882 (N.D. Ill. November 24, 1999), citing, Huff v. UARCO, Inc., 122 F.3d 374, 380 (7th Cir. 1997).

Bray's good performance is also evidenced by four statements provided by police officers Bray worked with after her training cycles were complete. (Pl LR56.1(b) ¶ 290-315) Significantly, the only negative information concerning Bray are the reports prepared by Askew and Adams *after* Bray opposed Askew's sexual harassment. (Pl LR56.1(b) ¶ 224-225, 290-315, 351-395 ) Viewing these facts in a light "as favorably to [Bray] as reason will permit," there is substantial evidence that Askew purposely lied to the Review Board about Bray's performance in order to get her terminated in retaliation for her opposing his sexual harassment. Shager, 913 F.2d at 401. At a minimum, these facts create a genuine issues of fact as to whether Bray's performance was satisfactory and what really motivated Askew to contact the Police Academy.

Askew and Adams also both claimed that they were concerned that Bray was unsafe because they allegedly heard from some unidentified person that Bray had to be ordered out of her car to assist her partner on one occasion. (Pl LR56.1(b) ¶ 226, 229) This alleged incident which Askew testified "launched the whole reevaluation," had occurred *five months* earlier in May 2000, during Bray's second cycle of training when she was working with Officer Cleary. (Pl LR56.1(b) ¶ 227, 231-241) Significantly, Bray was not reprimanded or even counseled for the incident. (Pl LR56.1(b) ¶ 236) Cleary did not even make mention of it in the Daily

Observation Reports he prepared for Bray. (Pl LR56.1(b) ¶ 237) To the contrary, Cleary gave Bray "above adequate" scores for the areas of performance he observed during the period she worked with him. (Pl LR56.1(b) ¶ 238, 367-371, 381) Lieutenant Zapolsky, who ordered her out of her car, gave the incident such little significance that he refused to provide an opinion about Bray's performance to the Review Board. (Pl LR56.1(b) ¶ 241, 248-249)

There is also substantial evidence that Bray was treated differently than similarly situated employees. Benny Spurgeon, who was a PPO the same time as Bray, testified at his deposition that he also had Askew as a Field Training Officer and that Askew made the same negative comments about him that he did about Bray. (Pl LR56.1(b) ¶ 398-402) In fact, Askew told Bray that he wanted to terminate Spurgeon. (Pl LR56.1(b) ¶ 406, 409) However, Askew did not take any steps to terminate Spurgeon. Spurgeon did not oppose Askew's sexist behavior.

Spurgeon also admitted at his deposition that there were a lot of officers who did not want to work with him. (Pl LR56.1(b) ¶ 407-408) However, this fact did not effect his employment. Additionally, during his probation period, Spurgeon was reprimanded on one occasion when he was working lock-up for not effectively searching a criminal who subsequently tried to hang himself. (Pl LR56.1(b) ¶ 403) This was certainly a more egregious error than Bray's inability to get out of her squad car and assist her partner. Spurgeon did not get a hearing regarding this matter until March 2002, over a year and one half later. (Pl LR56.1(b) ¶ 404-405) Bray, on the other hand, was "rushed" through and terminated within days of Askew's and Adams' inaccurate report of her incident. (Pl LR56.1(b) ¶ 288, 405) Despite the similarities between Bray and Spurgeon, and the fact Spurgeon committed serious mistake resulting in injury to an arrestee, Spurgeon was not terminated. (Pl LR56.1(b) ¶ 410)

Also similar to Bray, Cedric Taylor was initially failed by his Field Training Officer. (Pl LR56.1(b) ¶ 411) However, he was given another chance and allowed to become a police officer. (Pl LR56.1(b) ¶ 411 ) Interestingly, Adams testified that in her 17 years as a police officer, she had never reported another police officer other than Bray. (Pl LR56.1(b) ¶ 246, 413-415) Askew testified at his deposition that during his 10 years with defendant, he could only recall one other PPO ever being terminated right before their probationary period ended, making Bray's termination quite unusual. (Pl LR56.1(b) ¶ 210)

In order for summary judgment to be granted, defendant's evidence must be so strong that it eliminates "any doubt as to whether [retaliation] played at least a motivating role [the termination.] Locsmondy v. Arrow Pneumatics, 2001 U.S. Dist. LEXIS 964, Case No. 99 C 6463, 12 (N.D. Ill. February 2, 2001), citing, Venters v. City of Delphi, 123 F.3d 956, 974 (7th Cir. 1997). The Seventh Circuit has noted that "summary judgment will 'rarely (if ever) be appropriate' where the plaintiff presents evidence reasonably suggesting that an impermissible factor played a motivating role in an adverse employment decision." Porter v. Illinois Dept. of Children and Family Services, 1998 U.S. App. LEXIS 30145 *12-13 (7th Cir. November 23, 1998), citing, Venters v. City of Delphi, 123 F.3d 956, 973 (7th Cir. 1997). In this case, there can be no doubt that Askew retaliated against Bray. If the EEOC could find evidence establishing reasonable cause to believe that defendant retaliated against Bray by discharging her, so too could a "fair-minded jury". (Pl LR56.1(b) ¶ 338) Anderson 477 U.S. at 252. Accordingly, defendant's motion for summary judgment should be denied and the issue of whether Bray was terminated in retaliation for opposing sexual harassment should "be determined by the jury – not the court." Sheehan v. Donlen Corp., 173 F.3d 1039, 1046 (7th Cir. 1999), quoting, Weisbrot v. Medical of Wisconsin, 79 F.3d 677, 681-682 (7th Cir. 1996)

LARA A. WALICEK

ERNEST T. ROSSIELLO
& ASSOCIATES, P.C.
300 W. Washington Street
Suite 1004
Chicago, Illinois 60606
312.346.8920

Attorney for Bray

Dated: September 20, 2002
Chicago, Illinois