# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7770 | **DATE** | 10/29/2002 |
| **CASE TITLE** | BRAY vs. CITY OF CHICAGO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendant's motion for summary judgment is denied. Defendant's motion strike is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 3 0 2002 | |
| | Notified counsel by telephone. | | date docketed | 27 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 10/29/2002 | |
| | | | date mailed notice | |
| JS | courtroom deputy's initials | | JS | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
OCT 30 2002

| | |
|---|---|
| Pamela Bray, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 01 C 7770 |
| | ) |
| City of Chicago, a municipal corporation, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On October 9, 2001, plaintiff Pamela D. Bray ("Bray") filed a complaint against defendant City of Chicago ("City") alleging sexual harassment, in violation of 42 U.S.C. § 2000e-2(a)(1), and retaliation, in violation of 42 U.S.C. § 2000e-3(a). On August 23, 2002, City moved, pursuant to Federal Rule of Civil Procedure 56, for summary judgment. Having considered this matter fully, for the reasons stated herein, City's motion for summary judgment is denied.

## STATEMENT OF FACTS[1]

On October 25, 1999, plaintiff Bray began as a probationary police officer ("PPO") with the Chicago Police Department ("CPD"). A PPO's probationary period lasts for one year from the date

---

[1] The facts assumed to be true for purposes of this summary judgment motion are derived from City's Local Rule 56.1(a) Statement of Facts and Bray's Local Rule 56.1(b) Statement of Facts and Response.

1

of appointment. During this probationary period, a PPO can be terminated at any time for any reason, except for an illegal reason, with or without notice.

Following training at the Police Academy, PPOs are detailed to a police district for field training. Field training typically consists of three cycles, with each cycle lasting twenty-eight days. During each cycle, a PPO is assigned a field training officer ("FTO") who trains and observes the PPO's performance. The FTO is supposed to assess a PPO's performance in a daily report and also, at the end of a cycle, complete a summary report detailing the PPO's overall performance.

Bray's first cycle was with FTO Renee Daniels ("Daniels") in April 2000. Daniels's daily evaluations of Bray were critical of her performance, and Daniels noted in the summary report that "P.P.O. [Bray] needs improvement in all areas of grading. . . ." (Def.'s Rule 56.1(a) Stmt., Ex. 11 at D384). Bray contends that her low evaluations were the result of Daniels's discouragement and lack of support. (Pl.'s Rule 56.1(b) Response, Ex. 1 at 264-66).

During Bray's second cycle of training, her FTO was Bruce Askew ("Askew"). Askew gave Bray primarily below acceptable and acceptable ratings. Bray claims that from the time Askew was her FTO to the end of her employment Askew sexually harassed her.

The following, for purposes of summary judgment, occurred during the time when Askew was Bray's FTO. On a daily basis, Askew would make lewd, sexually offensive comments to Bray about women they would see while working together. Askew said such things as: "look at the tits on that broad," "look at the ass on that woman," and "nice rack." On Sunday mornings at 4:00 a.m., Askew, with Bray alongside, would park outside "Taste Nightclub" where Askew would "sit there and just kind of ogle" at the scantily-clad women leaving the bar. Bray told Askew that he should quit doing this.

2

On one occasion, Askew drove Bray to a viaduct at 74th and Lowe where he told her that when he was a teenager he used to come to this spot and have sex. He said that other officers would come to this spot while on duty and that one day Bray might end up there. On another occasion, Askew drove Bray to a secluded location at 74th and Damen. Askew told Bray that sometimes the police find dead bodies at this location. Askew also told her that two sergeants were caught having oral sex there and that officers were asking the sergeant how he enjoyed his lunch.

Askew also made derogatory comments about Bray's fertility. On at least three occasions, Askew told other officers not to get too close to Bray or touch her because she might become pregnant. He also said to Bray, "I got to get away from you, because if I bump you, you just might get pregnant," and Askew said that Bray was the "old lady in the shoe, who had so many children she didn't know what to do." (Pl.'s Rule 56.1(b) Response, Ex. 1 at 70; 121). Worse yet, in July or August 2000, Askew told Bray, "you wouldn't have so many children if you swallowed." After these comments, Bray felt awkward, uncomfortable, humiliated, embarrassed, and degraded. Finally, on at least ten separate occasions, Askew asked Bray and her children to a movie theater where Askew worked a second job. Bray refused each of Askew's offers. Bray did not report any of these incidents because she feared Askew would retaliate against her and cause her to lose her job. (Pl.'s Rule 56.1(b) Response, Ex. 1 at 71).

The following, for purposes of summary judgment, occurred after Askew ceased being Bray's FTO. While together at a hearing in a Cook County courtroom, Askew, who was to teach Bray the standard procedures for testifying in court, grabbed Bray's leg and rubbed her ankle. Bray pulled her leg away from Askew and whispered for him to stop. On their way out of the courthouse, Askew jumped into the same revolving-door partition as Bray, grabbed her waist, and gave her a bear hug.

Askew pressed Bray up against the window of the partition and pushed his body against hers so hard that she could feel his erect penis on her buttocks. As they exited the revolving doors, Bray told Askew to stop. Askew then asked Bray if she had a boyfriend. Bray responded "no," and Askew said, "you are too young to be thinking like that. You should go out and just fuck everybody." (Pl.'s Rule 56.1(b) Response, Ex. 13 at 7).

On two separate occasions in August or September 2000, Askew approached Bray and asked her if she had a bulletproof vest on. Prior to Bray answering, Askew grabbed her breast, over which she was wearing several cotton shirts and a bulletproof vest. Bray told Askew to stop, but he just started laughing. On October 4, 2000, Askew again grabbed Bray's breast. Bray did not say anything to Askew nor anyone else. The final incident happened on October 4, 2000. Bray was talking with another officer about getting a partner. The other officer offered to write a memo to a lieutenant in support of such request. Askew told the other officer not to help Bray because Bray "already owe[s] me some anyway," which Bray took to be a sexual innuendo. (Def.'s Rule 56.1(a) Statement, Ex. C at 88). Later that day, Bray advised Askew that if he touched her again, she was going to report him to a supervisor. After Bray said this, Askew never again touched Bray nor made sexual comments to her. Approximately two weeks later, however, Bray was called into a meeting and given a notice that her probationary period performance was going to be reviewed. This review occurred after Askew contacted the Police Academy, requested that it evaluate Bray's performance, and recommended that it terminate Bray's employment.

Donna Adams ("Adams") was Bray's FTO during Bray's third and fourth cycles. Adams's evaluations and comments regarding Bray were mixed. Adams stated that Bray had a variety of areas in which to improve but nonetheless, overall, gave Bray acceptable or above daily ratings.

4

During these cycles, the following alleged incidents of sexual harassment took place. First, Adams handed Bray a card with a man's name on it and told Bray that she should go out and sleep with the man for money. Second, while Bray was talking with an older man, Adams approached and asked him if he was giving out applications to become a prostitute. Bray told them both that she was not interested. Adams told Bray that she needed a "sugar daddy" and that "men like that, they don't like to fuck, they like to suck." (Def.'s Rule 56.1(b) Statement, Ex. C at 108). Third, Adams told Bray about being a dominatrix and encouraged Bray to take up the practice. Adams also, on several occasions, suggested that Bray sleep with men for money. Bray repeatedly told Adams that Bray was not interested. In addition, Adams invited Bray to Adams's dominatrix parties. Fourth, Adams told Bray that she liked to wash her dog while naked. Fifth, Adams had Bray and other officers assist her in picking up, loading, transporting, and delivering a "cage" that Adams used for her "slaves" during her dominatrix sessions. Bray did not report these incident of alleged harassment to a direct supervisor.

Prior to and during Bray's probationary period, CPD had a comprehensive sexual harassment policy in effect. Bray claims that she complained on numerous occasions to the alleged perpetrators and to other officers.[2]

On October 24, 2000, one day before her probationary period was to end, City terminated Bray's employment. City claims that it fired Bray because of substandard performance. Bray asserts that her dismissal was in violation of Title VII.

This court now considers City's motion for summary judgment.

---

[2] These alleged conversations will be discussed in greater detail in the analysis section of this opinion.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.

It is not the function of this court to scour the record in search of evidence to defeat a motion for summary judgment; the nonmoving party must identify with reasonable particularity the evidence upon which that the party relies. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The evidence relied upon must be competent evidence of a type otherwise admissible at trial. Id.

## ANALYSIS

I. <u>Sexual Harassment</u>

To establish a prima facie case of hostile environment sexual harassment, plaintiff must show that (1) she was subjected to unwelcome harassment in the form of sexual advances, requests for sexual favors or other conduct of a sexual nature; (2) the harassment was based on her sex; (3) the harassment created an intimidating, hostile or offensive working environment that unreasonably interfered with the plaintiff's work performance, and (4) there is a basis for employer liability. <u>Hall v. Bodine Elec. Co.</u>, 276 F.3d 345, 354-355 (7th Cir. 2002). Workplace harassment "must be sufficiently severe or pervasive" to be actionable, and to prevail, plaintiff must show that the work environment was both subjectively and objectively hostile. <u>Haugerud v. Amery Sch. Dist.</u>, 259 F.3d 678, 692-93 (7th Cir. 2001). In determining whether an employee's work environment was hostile within the meaning of Title VII, a court must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> at 693. The focus is on the totality of the circumstances; thus, no individual factor is dispositive. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). Title VII "do[es] not mandate admirable behavior from employers," and thus "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Haugerud</u>, 259 F.3d at 693 (citations omitted).

A. <u>Askew's Alleged Sexual Harassment</u>

This court cannot find as a matter of law that Askew's actions did not constitute sexual harassment under Title VII. Bray has presented sufficient evidence to show that Askew's acts were

7

both objectively and subjectively hostile. While it is true that Title VII is not a "general civility code designed to purge the workplace of all boorish or even all harassing conduct," Berry v. Delta Airlines, Inc., 260 F.3d 803, 808 (7th Cir. 2001), viewing the facts in the light most favorable to Bray, this court cannot find that Askew did not cross the line from boorishness to actionable sexual harassment.

Askew's conduct was clearly beyond the bounds of simple teasing, offhand comments, or general decency. Askew made numerous sexually offensive statements, on an almost daily basis, while serving as Bray's FTO. Moreover, Askew made inappropriate physical contact with Bray on several occasions. He grabbed her breasts three times, rubbed her ankle with his hand, and bear-hugged her around her waist and pushed his body against hers with such force that Bray could feel his erect penis. Askew's conduct, viewing the facts in Bray's favor, has no place in the workplace, and this court cannot find as a matter of law that such behavior was "relatively minor." Hostetler v. Quality Dining Inc., 218 F.3d 798, 806 (7th Cir. 2000). These incidents are "beyond the sort of casual contract which (if it were consensual) might be expected between friendly co-workers," but rather are significantly more intimate, intrusive forms of unwelcome contact. Id. at 808. Further, this court cannot find as a matter of law that Askew's behavior was not subjectively hostile to Bray. After these incidents of sexual harassment, she felt "humiliated," "degraded," and "embarrassed," and they affected her self-esteem and self-confidence and caused her great stress at work. In fact, she told Askew to stop.

B. Adams's Alleged Sexual Harassment

This court cannot find as a matter of law that Adams's actions do not rise to the level of sexual harassment under Title VII. Viewing the evidence in the light most favorable to Bray, this

8

court again is unable to find that Adams's conduct was not objectively hostile. On numerous occasions, Adams attempted to coerce Bray into soliciting sex in exchange for money. It does not appear from the record that Adams tried to get male officers to solicit sex for money. Thus, although Bray and Adams are both females, this court cannot find as a matter of law that Adams's conduct was not "because of sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81,118 S. Ct. 998, 1002 (1998) ("A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."). Further, this court cannot find as a matter of law that Adams's comments were simple workplace banter. Finally, although it is a closer question, this court is unable as a matter of law to find that Bray did not find Adams's conduct subjectively hostile. Whether Bray: (1) was embarrassed, (2) thought Adams's conduct was disgusting, and (3) argued with Adams about sleeping with men are disputed facts. Thus, because there are genuine issues of material fact in dispute, this court cannot grant summary judgment.

  C.  Basis for City's Liability

The Supreme Court, in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 U.S. 2275 (1998), set forth the test to be used to determine whether an employer is vicariously liable for an employee's conduct. The Seventh Circuit stated:

> "An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." Vicarious liability automatically applies when the harassing supervisor is either (1) "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy," or (2) "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Absent either of these

9

situations, however, an employer may avoid vicarious liability by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000) (citations omitted).

Upon review of the record, in this case, this court finds, as explained below, that neither Askew nor Adams was Bray's supervisor. However, there are material facts in dispute as to whether City was negligent in discovering or remedying the harassment. Alternatively, even if Askew and Adams were Bray's supervisors, the record does not show that either Askew or Adams took any tangible employment action against Bray, but there are facts in dispute as to whether City can establish its affirmative defense.

1. Neither Askew Nor Adams Was Bray's Supervisor[3]

As a preliminary matter, "[a]n employer's liability for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee." Hall, 276 at 355. The Seventh Circuit has held that:

> the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.

---

[3] Bray does not allege that Askew or Adams acted as City's "proxies." This court finds that even if such an argument had been advanced, neither Askew nor Adams was a proxy, as the Seventh Circuit has held the following to be treated as an employer's proxy: a president, owner, proprietor, partner, corporate officer, or supervisor "hold[ing] a sufficiently high position in the management hierarchy . . . ." Johnson, 218 F.3d at 730. Neither Askew nor Adams fits within these classifications.

Id. (quoting Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1034). Here, this court finds as a matter of law that neither Askew nor Adams was Bray's supervisor for Title VII purposes.

Plaintiff claims that because Askew and Adams were Bray's FTOs and had the ability to affect her employment through their evaluations of her job performance they are "supervisors." However, even viewing the facts in the light most favorable to Bray, this court cannot find that Askew or Adams had the power to hire, fire, demote, promote, transfer, or discipline Bray.

Although an FTO outranks a probationary officer, this alone is not sufficient to establish a supervisory relationship. Durkin v. City of Chicago, 199 F. Supp. 2d 836, 847 (N.D. Ill. 2002) (finding that Chicago police academy instructors are not supervisors for Title VII purposes even though they outrank probationary police officers in the chain of command). Askew and Adams, during their assignment as Bray's FTO, evaluated her performance. These evaluations were considered in whether Bray would be deemed "field qualified." At most, Askew and Adams could have made a recommendation to the Field Training Review Board ("Review Board") that Bray be terminated. It is undisputed, however, that neither Askew nor Adams themselves could have fired Bray. The Seventh Circuit has made clear that "[a]n individual is not a supervisor unless he possesses the authority to *directly* affect the terms and conditions of a victim's employment." Hall, 276 F.3d at 355 (emphasis in original). See also Parkins, 163 F.3d at 1035 (finding that foremen, who could recommend that employer fire another employee, but did not have the authority themselves to terminate another employee's employment, were not supervisors within the meaning of Title VII).

Further, the mere "fact that an employer authorizes one employee to oversee aspects of another employee's job performance does not establish a Title VII supervisory relationship." Hall,

11

276 F.3d at 355. Thus, although as FTOs Askew and Adams evaluated Bray's performance, they are not supervisors for Title VII purposes. In addition, there is some evidence that as FTOs Askew and Adams had the authority to discipline a probationary officer. However, this, in and of itself, does not rise, under Seventh Circuit law, to the level of a supervisory relationship. See id. (finding that this kind of "marginal discretion" is insufficient to impute vicarious liability to an employer).

In Hall, the Seventh Circuit held that an employee was not a supervisor for Title VII purposes even though the employee: (1) had the authority to direct the victim's work operations, (2) provided input into her performance evaluations, and (3) trained the victim and other employees. See id. Askew and Adams had exactly these influences over Bray's employment. Like Hall, "there is nothing in the record indicating that [City] entrusted [Askew and Adams] with the authority to 'hire, fire, demote, promote, transfer, or discipline' [Bray]." Id. The mere authority to instruct and oversee another employee's job performance is not enough to establish a supervisory relationship for purposes of Title VII.

Bray also claims that Askew's own statements evidence his supervisory status. Askew said such things as "getting twos in her second cycle would have gotten [her] terminated" (Pl.'s Rule 56.1(b) Response, Ex. 2 at 90), and "I have got your job in my hand. I can fire you just like that. It only takes . . . a pen." (Pl.'s Rule 56.1(b) Response, Ex. 4 at 26). However, the Seventh Circuit has held that an employee's perception of power over another employee does not make him or her a supervisor. Parkins, 163 F.3d at 1035 ("[E]ven if [the employee's] boast [about his ability to have employees fired] were accurate, this does not elevate him to supervisory status.").

Finally, Bray concedes that Askew and Adams were not her supervisors when her performance was recommended for review, and Bray also concedes that Askew was not her

12

supervisor when his unwelcome touchings of her occurred. The only sexually harassing behavior that occurred while Askew and Adams were Bray's FTOs was the verbal comments Askew and Adams individually made to Bray.

Thus, because Askew and Adams were not Bray's supervisors, to hold City liable, she must establish that City was negligent, which, as discussed below, this court finds is a material issue of fact for the jury to decide.

2. An Issue Exists As To City's Negligence

Employers are liable for co-employee's harassment only when they have been "'negligent either in discovering or remedying the harassment.'" Hall, 276 F.3d at 356 (quoting Parkins, 163 F.3d at 1032). In this case, there is a question of material fact as to whether City was negligent in discovering or remedying the sexual harassment that Bray allegedly suffered.

It is undisputed that CPD had a written sexual harassment policy in place during Bray's term as a PPO. (Def.'s Rule 56.1(a) Stmt., Ex. E at Ex. 6). The policy required the victim of sexual harassment to report such harassment to his or her immediate supervisor, or, if the supervisor was the alleged harasser, to a supervisor one rank above the accused.[4] (Id. at 3). It is undisputed that at no time prior to October 20, 2000, did Bray ever report the harassment she claims she suffered to a CPD supervisor.[5] On October 20, 2000, which was just four days before her termination, Bray tried

---

[4] The policy also required any alleged incident of sexual harassment to be reported within 180 days of the incident. (Def.'s Rule 56.1(a) Stmt., Ex. E at Ex. 6 at 3). It is undisputed that Bray complied with the policy's timing requirements.

[5] Viewing the evidence in the light most favorable to Bray, she complained, prior to October 20, 2000, to Askew, Adams, and a fellow officer, Gloria Jones; however, none of these officers was a supervisor under City's sexual harassment policy. Thus, the earliest City could have discovered the alleged harassment was October 20, 2000.

13

to tell Lieutenant Zapolsky ("Zapolsky"), Sergeant Judon ("Judon), and Lieutenant Deuwerth ("Deuwerth") that Askew had sexually harassed her and that Adams had been trying to get her to solicit sex. (Pl.'s Rule 56.1(b) Response, Ex. 1 at 393-94; Ex. 13 at 23-24). Sergeant Judon, however, cut her off with words to the effect: "It's too late for that." (Id.). Viewing the evidence in the light most favorable to Bray, it is possible to infer that this exchange put CPD on notice of the sexual harassment. At least two of the officers, Sergeant Judon and Lieutenant Deuwerth, however, deny Bray making any allegations of sexual harassment. (Pl.'s Rule 56.1(b) Response, Ex. 9 at 15-16, 28; Def.'s Response to Pl.'s Counter-Stmt., Ex. EE at ¶ 8). Thus, there is a dispute of fact. What makes this dispute of fact material is that under CPD's sexual harassment policy, these three officers had an obligation to:

   a.   contact the Office of Professional Standards and obtain a Complaint Register number.
   b.   submit a written report directly to the Internal Affairs Division containing as much information as possible concerning the allegation.
   c.   follow the provisions of the General Order entitled "Complaint and Disciplinary Procedures."

(Def.'s Rule 56.1(a) Stmt., Ex. E at Ex. 6 at 3). There is no evidence in the record that the officers complied with this policy. It is clear, however, that there are material facts in dispute for a jury to find that City was negligent by failing to follow its policy. Thus, this court cannot grant City's summary judgment motion.

   3.   Alternatively, Neither Askew Nor Adams Took Tangible Employment Action Against Bray

The law is clear that an employer can be vicariously liable for tangible employment actions taken by the harassing supervisor only. Johnson, 218 F.3d at 731. In other words, an employer is not vicariously liable for tangible employment actions taken by someone other than the

14

harassing supervisor. In this case, although Askew and Adams recommended review of Bray's performance, the Review Board independently assessed her performance, and Assistant Deputy Superintendent Gary W. Schenkel ("Schenkel"), after also independently reviewing all material, actually terminated her employment.[6]

This case is similar to Johnson, where the Seventh Circuit rejected an employer's vicarious liability on the basis that no tangible employment action was taken by the supervisor-harasser against the plaintiff even though the supervisor-harasser reported plaintiff's conduct to higher-ups, which resulted in her discharge, since the harasser's superiors investigated the complaint and resolved it through appropriate administrative channels. Like Johnson, here, although Askew's and Adams's recommendations to the Review Board for a review of Bray ultimately resulted in Bray being fired, neither Askew nor Adams was her supervisor at the time of the recommendation to the Review Board, their only role in the decision was their evaluations, and the decision to fire Bray was made after the Review Board and Schenkel conducted a full assessment of Bray's performance. See also Silk v. City of Chicago, 194 F.3d 788, 806 & n.17 (holding employer not vicariously liable for tangible employment action when supervisor submitted complaint regarding plaintiff-employee's violation of regulations and employment action was taken after full investigation and hearing on the issue).

4. City Cannot, As a Matter of Law, Establish Its Affirmative Defense

When a supervisor does not take tangible employment action against a plaintiff, the employer may raise the Ellerth/Faragher affirmative defense. Under the first prong of the

---

[6] It should be noted that the only tangible employment action Bray asserts is her termination. (Pl.'s Ans. Brief at 11).

15

Ellerth/Faragher affirmative defense, it is undisputed that CPD had in place and disseminated a detailed sexual harassment policy to all employees. As discussed above, at the earliest, Bray brought the harassment to the attention of City, via a supervisor, on October 20, 2000. This court cannot find as a matter of law that City exercised reasonable care to correct promptly Bray's allegations of sexual harassment. As stated above, there are material facts in dispute as to whether City acted negligently in investigating and addressing Bray's claim. These same issues of disputed material fact preclude summary judgment as to City's affirmative defense.

II. Retaliation

City claims that it discharged Bray for deficient performance. Bray, however, asserts that she was fired in retaliation for opposing a practice made unlawful by Title VII. This court finds that because there are material facts in dispute, summary judgment must be denied.

In order to make out a prima facie case of retaliation under the indirect method, plaintiff must establish the following four elements: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002). This court finds that there are material facts in dispute as to each of these elements. First, viewing the facts in the light most favorable to Bray, as previously stated, she complained about the sexual harassment on October 20, 2000. In addition, Bray claims that her threat to report Askew if he ever touched her again was sufficient opposition to his behavior. Bray's comments to Askew put him on notice that

Bray did not acquiesce in his behavior.[7] Bray was then terminated three weeks later. Second, it is undisputed that Bray failed two of her four field training cycles, the first one with Daniels, who Bray does not allege sexually harassed her, and the third one with Adams, who Bray admits did not sexually harass her during that cycle. There is adequate evidence in the record to support City's position that Bray was not performing up to CPD's expectations. However, Bray passed two field training cycles and was actually "field qualified." Summary judgment is not the proper place to determine, when material facts are in dispute, whether Bray was performing up to City's expectations. Third, after Askew recommended a review of Bray's performance, and after the Review Board met, Bray was discharged. Fourth, the parties dispute whether Benny Spurgeon and Cedric Taylor were similarly situated employees. Such disputes of material fact preclude this court from granting summary judgment.

Once an employee succeeds in proving her prima facie case, which for purposes of this summary judgment this court will assume, the employer must offer a legitimate, noninvidious reason for the adverse employment action. If the employer can do so, the burden of production shifts back to the employee to establish that the proffered reason was pretextual. See id.

The primary, dispositive issue in dispute on summary judgment is whether City's decision makers, the Review Board and Schenkel, had knowledge of Bray's alleged harassment. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment." Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir.

---

[7] City cites Arzate v. City of Topeka, 884 F. Supp. 1494, 1503 (D. Kan. 1995), for the proposition that informal opposition to sexual harassment must at least be a complaint to a supervisor. However, there is no Seventh Circuit law on this point, and this court finds that such requirement would undermine the purpose of Title VII.

2002). The Seventh Circuit recently has held that to succeed on a retaliation claim, a plaintiff must establish that "(a) [s]he complained about sex discrimination; (b) the persons who made the decisions . . . knew about those complaints; and (c) the adverse actions . . . occurred because of the complaints." Albrechtsen v. Bd. of Regents of the Univ. of Wis. Sys., Nos. 01-3577, 01-3791, 01-4197, slip op. at 4-5 (7th Cir. Oct. 23, 2002). As stated above, under CPD's sexual harassment policy, when Bray reported the sexual harassment, as she testified at her deposition (Pl.'s Rule 56.1(b) Response, Ex. 1 at 393-94), the three officers had an obligation to bring such allegations to the attention of the Office of Professional Standards and the Internal Affairs Division. There is no evidence in the record that this was done. Thus, this court cannot grant summary judgment on City's behalf.

## CONCLUSION

For the above stated reasons, City's motion for summary judgment is denied. Further, City's Motion to Strike is denied. In considering City's motion for summary judgment, this court has only relied upon admissible evidence.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

DATE: October 29, 2002